# EXHIBIT 7

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4    SANDRA KIRKMAN, CARLOS ALANIZ,        )
      individually and successor-in-       )
 5    interest to JOHN ALANIZ, deceased,    )
                                           )
 6                  Plaintiffs,             )
                                           )
 7              vs.                        )Case No.
                                           )2:23-CV-07532-DMG-SSC
 8    STATE OF CALIFORNIA, RAMON SILVA,     )
      and DOES 1-10, inclusive,            )
 9                                         )
                    Defendants.            )
10    _____ )

11

12

13

14            REMOTE VIDEOCONFERENCE DEPOSITION OF

15                      JOHN VAN DRAGT

16                  TUESDAY, APRIL 9, 2024

17

18

19

20

21

22

23    Reported Stenographically By:

24    Jinna Grace Kim, CSR No. 14151

25    Work Order:  56268
```

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 9

1    Q.    So what was the nature of the call for the case

2    we're here to talk about?)

3         A.    So I was working a Cal-Trans Unit.  I was positioned

4    on the eastbound 105 to the Studebaker off-ramp.  There's a

5    closure there for landscaping, and during this time I

6    monitored a call from East LA of a person down in lanes being

7    ran over multiple times.

8              So I checked my -- we call it F11, but it's like a

9    tracker for where everyone is.  I started listening to where

10   people were saying they were in route from, and I appeared to

11   be the closest unit even though I was on a my overtime

12   detail.

13             So due to the gravity and nature of the call, the

14   person being possibly ran over, I wanted to go and help and

15   assist.  So I responded from my -- to assist and see what I

16   could do to help out with the scene.

17        Q.    Great.  And do you have an estimate as to how long

18   it took you to get from where you coming from to the scene?

19        A.    To the where I first had contact with something

20   involving this incident, probably, two minutes, two to three

21   minutes.  That off-ramp that I was on ends, and then he just

22   turned right around and get right back on the eastbound

23   105.

24        Q.    Okay --

25        A.    -- 105.  Sorry.  I apologize.

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 11

```
 1     A.   Not that I recall, no, sir.

 2     Q.   Did you have any information that anybody other than

 3   the individual involved had been injured?

 4     A.   Not that I recall.

 5     Q.   Any information that anyone had been threatened in

 6   any way verbally?

 7     A.   No, sir.  Not that I recall.

 8     Q.   Any information that anybody had a weapon like a gun

 9   or knife?

10     A.   No, sir.

11     Q.   Did you have any specific information about the

12   nature of the accidents or the circumstances under which this

13   person was being struck or run over?

14     A.   So the original call came out and as kind of like

15   advisory to us in the San -- area because we're so close to

16   East LA.  The call came out East LA's radio.

17          So they -- they -- what I explained there is a

18   person down or a person being ran over by, you know, by

19   vehicles, that was my initial call, and then I responded.

20          And while I was responding I observed a helicopter

21   now as I'm going westbound, and then I asked that the

22   helicopter -- somehow helicopter's on the East LA's radio.

23          So that's when I switched to the East LA's radio.

24     Q.   And when you switched to the East LA radio, did you

25   get additional information?
```

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

1    A.    At some point while I was on my way there on a
2    traffic break it came out this party may be 1031 which is
3    possible suicide.

4    Q.    I was going to ask you about that because I think
5    you referenced that number in your statement.

6          Do you recall that?

7    A.    Yes.

8    Q.    So 1031, that's someone who is potentially
9    suicidal?

10   A.    Yes -- code.

11   Q.    And were you thinking that, you know, maybe this
12   person was possibly trying to get hit by the vehicles when
13   you heard the 1031?

14   A.    So I was super confused at the moment because this
15   has now gone from a party being ran over in lanes, and then
16   on my way to this location I came across westbound 105 at
17   Lakewood a semi truck stopped in lanes and a person was
18   running towards me which was appeared to me the driver of the
19   semi truck.

20         Somehow he was trying to tell me that he was
21   involved somehow in this incident, and that he was pointing
22   down westbound like the person was continued that way.

23         So I was super confused because this has come out
24   near East LA'S area.  So I would -- I didn't know if this was
25   the same incident or if this is something different that this

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 16

1    Q.    Now this person with the vest, is this the person

2    who you ended up tasing, or you tased another person?

3    A.    This was that -- that was just a witness that was

4    running.

5    Q.    So at first you were thinking maybe that's the

6    subject of the call?

7    A.    I did, sir, yes.  I believe that was the subject of

8    the call, and that's why I figured I was in a good tactical

9    position.  I parked there.  He would contact him and if that

10    pedestrian ran from -- from him, that I would we right there

11    to contact him or if he ran into lanes, we can go together

12    like we usually do.  And we would detain him and put him in

13    handcuffs --

14    Q.    Okay --

15    A.    -- and remove them from the freeway.

16         COURT REPORTER:  Okay.  I'm sorry to interrupt.

17         But could you slow down, please?

18         THE WITNESS:  Yes, ma'am.  I'm trying.

19         I apologize.

20    BY MR. GALIPO:

21    Q.    Okay.  I tell people, you know, I'm dating myself

22    now, but growing up we had the record players, you know, and

23    we had the 45, the 78, and the 33 speed, you know, the slower

24    speed --

25    A.    Yeah.

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 17

1      Q.    -- you know, yeah, you got to try to --

2      A.    I'll slow down, sir.

3      Q.    Just slow down.  And I understand what you're

4   saying, but I don't have to take every word down.

5      A.    No.  I understand.

6      Q.    And believe me, if I had to do it, we'd be here for

7   about three days.

8            So thank you for that.

9            At some point did you form the impression that the

10   person with the vest on was not actually the subject of the

11   call, someone else was?

12      A.    Yes, sir.  So I exited my patrol car and was going

13   to make -- watch the motor make contact with this pedestrian.

14   As I exited my patrol car I heard someone over the radio, and

15   I don't to this day who it was.  It could have been the air

16   ship, but someone said he's behind you.

17            And so then I realized, okay, this is not the person

18   that I was looking for.  And so I looked behind my patrol --

19   I walked behind my patrol car, and I noticed a male standing

20   on the -- is there a way to make your screen come back

21   because right now the court reporter is popped up.

22      Q.    Oh, what happened --

23      A.    There you go.  Okay.

24      Q.    Sorry.

25      A.    You're fine.  And so I exited my patrol vehicle, and

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 18

1    I looked behind my patrol car, and there was a male standing

2    on the right shoulder wearing shorts with his hands in his

3    pockets staring into lanes.

4        Q.   Okay.  Thank you for that.

5             Let me just stop you for a second.

6             I'm going to try to put an exhibit up.

7             I'm going to see if Shannon could help me with this.

8             I don't know if you could see this exhibit.

9             Do we have something similar we can put up?

10       A.   Yes, sir.  I see it.  That's my patrol vehicle.

11            MS. LEAP:  Yeah.  And I can share my screen.

12            MR. GALIPO:  Okay.  Hold on.  We're going to share

13   screen so that way, everyone could see it, and I was showing

14   you, but also showing Shannon so she'll know what I was

15   hoping to get.

16            MS. LEAP:  My computer is being a bit slow, but it's

17   opening up.

18            MR. GALIPO:  Okay.  I'll keep talking, but as soon

19   as you can put it up, you can go ahead and do it.

20            MS. LEAP:  Okay.

21   BY MR. GALIPO:

22       Q.   Do you recall how far the person was from you?

23            And I mean the second person that ended up being the

24   subject of the call when you first saw him?

25       A.   I would say three car lengths.  So I'm not the best

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 20

1      Q.   And there seems to be another car in this image or a

2   small pickup truck behind you on the shoulder facing west.

3           Do you see that?

4      A.   Yes.

5      Q.   Do you recall seeing that pickup truck at any time

6   before the tasing?

7      A.   No, sir.  I don't have any other -- other than the

8   pedestrian behind the car, I couldn't tell you what was

9   behind me.

10     Q.   Now, where were you positioned relative to your

11  patrol car when you first see this person?

12     A.   So I exited my patrol car on the driver side door

13  there.  I walked to the back, went there with a tail light,

14  and I noticed a male standing on the shoulder.

15     Q.   And do you know where that male was standing in

16  relation to this pickup truck we see?

17          I know the pickup truck wasn't there at the time.

18     A.   I couldn't tell you, sir.  He was back there on the

19  shoulder probably near there or like around my -- just past

20  the door.  Right around where the door is open right there.

21          I would say that's how far he was.

22     Q.   Okay.  And was --

23     A.   About 18 feet long.  So that's probably about

24  right.

25     Q.   Was this individual generally facing in your

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 21

1    direction?

2         A.   So at first he was facing in the lanes.

3              He was facing southbound standing on the right

4    shoulder staring in the lanes.

5         Q.   And what, if anything, did you say to him when you

6    saw him?

7         A.   So I came around the patrol vehicle and I observed

8    him with his hands in his pockets.  And due to him having his

9    hands in his pockets, I ordered him, let me see your hands.

10             He then began to comply.  His hands came out for a

11   second, and then his hands went back into his pockets.

12        Q.   Do you recall what he was wearing, generally?

13        A.   Some kind of sweatshirt.  I believe it was a black

14   sweatshirt and like camo shorts.

15        Q.   And when you say his hands were in his pockets,

16   you're talking about the pockets to his sweatshirt?

17        A.   Yes, sir.

18        Q.   Did it appear that both hands were in his hands,

19   initially?

20        A.   That's what I recall.  Yes, sir.

21        Q.   And you told him, let me see your hands, or words to

22   that effect?

23        A.   Yes, sir.  Trying to de-escalate the situation.

24             I attempted to advise him to let me see his hands so

25   we can place him into -- detain him and get him off the

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 22

1    freeway or figure out what is going on.

2        Q.    And he initially took his hands out of his

3    pockets?

4        A.    Yes.  His hands went up for a few seconds, and then

5    he shoved them back into his pockets.

6        Q.    Now, I know you were asked this, I believe, at the

7    time of your statement.

8             You wear either prescription glasses or contacts?

9        A.    Glasses.  Yes, sir.

10       Q.    Do you have prescription glasses on now?

11       A.    Yes.

12       Q.    Is that similar to the type of glasses you had on at

13   the time of the incident?

14       A.    They're either identical or they're the same type of

15   pair.  I have not switched glasses in the last four years.

16       Q.    And do they help you seeing far?

17       A.    Yes.

18       Q.    With them, do you feel comfortable you can see

19   well?

20       A.    Yes.  I hope so.

21       Q.    I hope so too.  So when you asked this gentleman to

22   take his hands out of his pockets, and he took his hands out,

23   could you see anything in his hands at that point?

24       A.    So he -- he complies, takes his hands out, he shoves

25   his hands back into his pockets, he spins on his heels very

SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL
John Van Dragt on 04/09/2024

Page 23

```
1    fast, and he begins to run towards my location.

2              While he's running at me, he retrieved something

3    from his right pocket and goes to a shooting platform towards

4    my location.

5       Q.   Okay --

6       A.   As he's -- as he's advancing on me.

7       Q.   So let me just make sure I'm understanding you.

8              Prior to him starting to run, so before he started

9    to run, did you see any object in his hands?

10      A.   No.

11      Q.   And how soon after him putting his hands back in his

12   pockets did he start to run in your direction?

13      A.   In my perspective it was a second or milliseconds.

14           It was very fast.

15      Q.   Okay.  Almost immediately?

16      A.   That's how I felt on-scene, yes.

17      Q.   Okay.  So when he started to run, were his hands

18   still in his pocket, or had he taken them back out again?

19      A.   So as he spun on his heels and he ran towards me,

20   like within the first step he was back out of his -- out of

21   that pocket with the -- out of the right pocket with whatever

22   object it was in a shooting platform pointed towards me.

23      Q.   So would you say you saw the object in his hands

24   right when he started running within the first few steps?

25      A.   One the first few steps.
```

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

1    Q.    And would you say he was in the shooting platform

2    also within the first few steps?

3        A.    From what I recall, yes, sir.

4        Q.    And were you still at the back of your vehicle, or

5    were you tactically repositioning at this point?

6        A.    So that -- he drew out in a shooting platform.

7            Based on -- on the -- being daylight and my

8    location, and I know firearms, what he was pointing at me

9    would have had to been a cannon from my perspective.

10            It was too round.  I described it as a Subway

11    sandwich like the width of like a sandwich.  So it's -- it --

12    to me the only reason that I didn't fire at that moment is

13    because it just looked like it was too big to be any kind

14    of -- it had to be a cannon.

15            And so I -- and I couldn't -- I couldn't determine

16    what it was.  It could have been a gun.  It could have been a

17    knife.  I don't know.

18            But due to the fact in that millisecond that I

19    determined that it was too big to be a gun, I tactically made

20    my way back around the patrol car.  I transitioned to my

21    Taser due to the fact that I felt I was being attacked.

22    Q.    So up to the point where this individual started

23    running, did you hear him saying anything to you?

24    A.    No, sir.

25    Q.    Did you hear him saying anything to anyone else?

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 26

1  I've seen people make homemade shotguns out of pipes, and

2  they can fire them from -- pocket.  So it could be

3  anything.

4  Q.  I realize that.  But would you at least agree that

5  generally firearms have certain characteristics?

6  A.  Yes, sir.  Like the one you would buy at a store,

7  yes, sir.

8  Q.  And it sounds like when you observed this object in

9  the individual's hand initially, you had your firearm out?

10  A.  Yes, sir.

11  Q.  And what type of firearm did you have?

12  A.  I carry a Smith&Wesson M&P, it's a 40-cal.

13      It's CHP-issued firearm.

14  Q.  Are you right-handed or left-handed?

15  A.  I'm right-handed, sir.

16  Q.  So do you ordinarily carry your holster for your

17  firearm on your right side?

18  A.  On my right hip.

19  Q.  And where would you normally carry the X2?

20  A.  It's on my left hip.  So it's retrieved with my left

21  hand, and I would -- I would move it to my right hand to

22  deploy it.

23  Q.  Okay.  And how far was this object or the individual

24  with the object from you when you first saw it?

25  A.  He's right back around on the shoulder a couple,

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 27

```
1    maybe a step or two towards my location from his original

2    location.

3         Q.   So just a little bit closer than the 30 to 50

4    feet?

5         A.   Yes, sir.

6         Q.   And if I'm understanding your testimony correctly,

7    from your perspective when you saw it, you did not think it

8    was a firearm; is that fair?

9         A.   I could not clearly identify as a firearm.

10             I was -- I was unsure, and that's why I did not

11   deploy my firearm because I was unsure that -- what it was.

12             It could have been a firearm in a -- in a -- in a

13   case, but because of that case being so round, I could not

14   clearly identify it as a firearm.  So I did not fire my

15   weapon.

16        Q.   But is it fair to say if you thought it was a

17   firearm, you would not have holstered your weapon at that

18   point; is that a fair statement?

19        A.   I would have fired my firearm.

20        Q.   If you thought it was a firearm?

21        A.   Yes.

22        Q.   Okay.  But you holstered your firearm because at the

23   time you did not think it was a firearm; is that fair?

24        A.   I holstered my firearm because I could not -- I

25   could not identify it clearly as a firearm.  I knew it was
```

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 28

1    something.  I didn't know what it was.  It could have been a

2    knife, it could have been a firearm.

3              But because of the round, the shape of it, I could

4    not deploy my -- I could not fire my -- my weapon at that

5    moment.

6        Q.   Do you recall in your statement that you, from your

7    perspective, you did not recognize the object in the person's

8    hands as a firearm?

9        A.   Yes.  That's why I -- that's what I'm saying.

10             I didn't recognize it as a firearm.  Like it was --

11   it would have to be a cannon.

12       Q.   Right.  And do you recall in trying to explain based

13   on the size and the shape of it, in your opinion, you did not

14   think it was a firearm?

15       A.   Similar to what I said today, yes, sir.

16             I described it as a Subway sandwich, yes, sir.

17       Q.   Do you recall what color the object was?

18       A.   I don't recall what it was as he ran at me, but it

19   was -- from the photos later on, it was a gray object.

20       Q.   Do you know what material it was made out of?

21       A.   I don't, sir.  It appeared to be a like a sunglass

22   case.

23       Q.   Like a gray sunglass case?

24       A.   Uh-huh.

25       Q.   Is that yes?

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 36

1       A.    Yes.

2       Q.    **Then you said -- was it fear, intent, and ability?**

3       A.    Yes.

4       Q.    **And the intent would be that the person had the**

5    **intent to cause you death or serious bodily injury?**

6       A.    To cause myself or others.

7       Q.    **And then the ability, what does that relate to?**

8       A.    Ability is -- is that all falls into play with the

9    whole circumstance in a whole.  So if -- if -- the -- the

10   ability would be let's say I'm in a fist fight and that

11   the -- I'm getting punched over and over and over again, the

12   ability to now I'm going to unconscious soon is there.

13          So his -- his fist is his ability.  At that point I

14   would deploy my firearm to save my life.

15      Q.    So in this case when you determined in your mind

16   that it was not a firearm, at that point you didn't think the

17   person had the ability to cause you to shoot you, at least

18   with a firearm; is that fair?

19      A.    I did not know.  I did not know if there was a

20   firearm, but I could not clearly identify it as a firearm or

21   a knife or if he was -- I knew I was being attacked, but I --

22   I couldn't justify firing my firearm at that moment.

23      Q.    How much time would you say passed from the person

24   running towards you in the shooting platform you described to

25   the time you deployed your Taser?

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 37

1    A.   A few seconds.

2    Q.   When you say a few, do you have a range in mind?

3    A.   I don't.  I don't recall, sir.

4    Q.   I take it you would have holstered your weapon and

5    then pulled out your Taser?

6    A.   Yes.  Unless it's an extreme emergency, I would -- I

7    would never keep my firearm out or my -- and my Taser out at

8    the same time due to the -- there cold be a accidental

9    discharge of my firearm.

10        So I would holster my firearm and deploy my -- and

11   retrieve my Taser.

12   Q.   Do you know how much time passed initially from you

13   asking the person to show you his hands and then him taking

14   his hands out of his pockets?

15   A.   In my -- in my recollection and in my mind, it was a

16   second.

17   Q.   Was the individual -- did the individual remain in

18   your field of view from the time he started running in your

19   direction to the time you deployed your Taser?

20   A.   Yes.  Yes, sir.  After I deployed my Taser I was now

21   in the front of my patrol vehicle, and that would be the time

22   that I lost visual of him for a -- for a few seconds.

23   Q.   Okay.

24        MR. GALIPO:  Can we put Exhibit 1 back up, please,

25   Shannon.

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 38

```
1    BY MR. GALIPO:

2        Q.    So I think you were explaining to me that you

3    started out with your firearm out towards the rear of your

4    patrol vehicle; is that correct?

5        A.    Yes, sir.

6        Q.    And then at some point you observed him moving in

7    your direction?

8        A.    Yes.

9        Q.    And is that when you tactically repositioned?

10       A.    Yeah.  I mean I tactically repositioned once I --

11   I -- I was unable to identify it as a firearm and with him

12   advancing on me very quickly with an unknown object in his

13   hands.  I came around the patrol car around my open door, and

14   as I got right there by that -- the beginning of that -- of

15   that wrap around bumper, I deployed my Taser as I continued

16   to move in front of the patrol vehicle.

17       Q.    And you believe your door would have been opened at

18   the time?

19       A.    Yes, I believe it was open.

20       Q.    And are you saying that you were towards the front

21   driver's bumper of your vehicle when you deployed your

22   Taser?

23       A.    Yes, sir.

24       Q.    And do you know approximately where the individual

25   was that you tased in relation to your vehicle?
```

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 39

1        A.    Advancing on me, I would say very close to the --

2    the front tire.

3        Q.    So you think you had made it past the open door at

4    the time of the Taser deployment?

5        A.    Yes.  Otherwise, I wouldn't -- I wouldn't have

6    been -- had it on my sight to -- to deploy my Taser.

7        Q.    How far was he approximately from you when you

8    deployed your Taser?

9        A.    Three, three to five feet.

10       Q.    Did you hear anyone say "drop it" before you

11   deployed your Taser?

12       A.    Not that I recall, no, sir.

13             I -- I was giving him commands to get on the ground

14   as he was attacking me.

15       Q.    Did you hear anyone give a verbal warning that

16   deadly force was going to be used before you deployed your

17   Taser?

18       A.    No, sir.

19       Q.    Did you say anything to him before you deployed your

20   Taser other than "let me see your hands and get on the

21   ground?"

22       A.    No, sir.

23       Q.    Did you hear any gunshots before you deployed your

24   Taser?

25       A.    No.

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 42

1    Q.   Does it generally look different than a firearm?

2    A.   Yes.

3    Q.   And do you have training on the sound that the X2

4    makes when you deploy it?

5    A.   I know the sound the X2 makes.

6    Q.   Is the sound different than the sound of a

7    firearm?

8    A.   It's a little lower, but it does make a popping

9    noise.

10   Q.   Are you --

11   A.   I would -- I would -- I apologize.

12   Q.   No.  Go ahead.

13   A.   I would say a similar sound to like a 22, like a

14   low -- like that low, you know, 22 sound, like a smaller

15   caliber.

16   Q.   I was just wondering whether you're able to

17   recognize the sound of a Taser when you hear it from your

18   experience.

19   A.   If I had my eyes closed and someone deployed a Taser

20   and they asked me if it was a Taser or a firearm, I wouldn't

21   be able to tell you which is which.  The only reason you can

22   tell a Taser it's in a quiet environment and you would hear

23   the -- the ark.

24   Q.   And did you say he went down in a prone position?

25   A.   Yes, sir.

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 44

1   subject goes to the ground.

2      Q.   How much time do you think passed from your Taser

3   deployment to hearing the shots start?

4      A.   Milliseconds.  It was all within that same time

5   frame.

6      Q.   Could you tell if your -- if the Taser darts struck

7   him from three to five feet away?

8      A.   No.  Because like I said, I was -- I was still on

9   the move, and I was -- I was making my way to the -- the

10  front of the patrol car creating more distance.

11         I -- I -- I deployed the Taser on the move.

12     Q.   Do you recall being asked in your interview about

13  how far you were from the suspect when you were able to

14  identify that the object in his hand was not a firearm, and

15  you said, "when he was on the shoulders" is when you could

16  see that.

17         Do you recall that part of your interview?

18     A.   I don't recall that.  When he -- so when he spun on

19  his heels, my recollection is -- is that he spun on his heels

20  and he's running at me, and that's -- he would still be on

21  the shoulder at that point.  So maybe that's what I was

22  meaning.

23     Q.   Okay.

24         MR. GALIPO:  Shannon, could we possibly put up Page

25  22 of his interview?

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 46

1      Q.   Okay.

2           MR. GALIPO:  Thank you, Shannon.

3           Oh, can you go back to that page real quick to Line

4    21.

5    BY MR. GALIPO:

6      Q.   And then you see where you say, "I would say like I

7    said, 30 feet."

8           And you continue on Line 23, "30 to 35 feet."

9      A.   Yes, sir, I see that.

10     Q.   Okay.

11          MR. GALIPO:  Thank you, Shannon.

12   BY MR. GALIPO:

13     Q.   That was the approximate distance you were from him

14   when you saw the object in his hands?

15     A.   Yeah.  The three car lengths, like I said.

16          That's when he spun on his heels and on that

17   shoulder is when came at -- he pulled it out of his right

18   pocket and began advancing on my location.

19     Q.   Okay.

20          MR. GALIPO:  Is this a good time to take a break for

21   ten minutes for everyone?

22          COURT REPORTER:  Yes.

23          THE WITNESS:  Yes, sir.

24          MS. REYES:  Yeah.

25          (Recess taken.)

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 52

1    Q.    And when you say a Subway sandwich, I go to Subway

2    once in a while, and I know you got the six inch and the

3    twelve inch.

4           What size are you referring to?

5    A.    I was just referring to like the width the sandwich,

6    that's I described like the roundness, not the length.

7    Q.    Okay.  I won't get into the types of Sandwiches they

8    have there.  We'll save that for another day.

9           Were you trained to give a warning when feasible

10   before using the Taser, also?

11   A.    When feasible, audible Taser would -- would be -- in

12   the perfect world, you would -- "Taser, Taser, Taser" would

13   be what you would try to yell or say.

14   Q.    So was the individual generally facing in your

15   direction when you deployed the Taser?

16   A.    Yes.  He was advancing on me continued his attack

17   when I deployed my Taser.

18   Q.    Did he ever punch you or kick you?

19   A.    No, sir.

20   Q.    Did he ever throw anything at you?

21   A.    No, sir.

22   Q.    Did he ever make physical contact with you before

23   you deployed the Taser?

24   A.    No, sir.

25   Q.    Were you looking in his direction when you heard the

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 54

```
 1      A.   Yes, sir.

 2      Q.   And did you ever approach the individual when he was

 3   on the ground after the shooting?

 4      A.   Yes.

 5      Q.   And was he still alive when you approached him, if

 6   you know?

 7      A.   I recall him breathing temporarily, and then that

 8   was it.

 9      Q.   So he was breathing for some time, and then at some

10   time stopped?

11           Yes.  We -- once he was placed -- he was placed into

12   custody, then we began medical aid.

13      Q.   Was he still alive when he was placed in

14   handcuffs?

15      A.   I couldn't tell you, sir.  I don't recall.

16      Q.   Did you note if there were any gunshot wounds to

17   him?

18      A.   Yes.  So upon placing the handcuffs, he was roll --

19   rolled over, and I noted a gunshot, I believe, in his right

20   leg, his right thigh.

21      Q.   And any other shots other than that that you

22   noted?

23      A.   I don't recall seeing anything other than that.

24           I know I advised an officer there to place the

25   tourniquet on that leg because of the wound that I saw.
```

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 55

1          And then at that point fire department showed up

2     very soon after that, and I stepped back.

3          Q.   Did you ever hear the individual that was shot say

4     anything either before the shooting or after?

5          A.   No, sir.

6          Q.   Did the shooting officer say anything to you or ask

7     you anything after the shooting?

8          A.   I believe he asked me, "Was that a gun?"

9          Q.   And did you respond to that?

10         A.   I can't remember what I said to him at this moment.

11              I would have to review the video.  I said something

12    to him, "No, it's right there."  Something of that nature.

13         Q.   Anything else you recall conversation-wise between

14    you and the shooting officer?

15         A.   I asked him if he was okay, and then I checked him,

16    I looked at him because he said he hadn't checked himself,

17    and then we went to -- beginning the transition to -- to

18    taking the subject into custody and beginning medical aid.

19         Q.   Okay.  We're going to try to play a portion of the

20    video footage of the shooting.  And just listen to the part

21    where the officer asks you, you know, what was a gun, or

22    words to that effect, and see if you can make out what your

23    response was.

24              Okay?

25         A.   Yes, sir.

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 58

```
 1  BY MR. GALIPO:

 2      Q.   Can you see your glasses?

 3      A.   Yes, sir.  Those are similar.

 4      Q.   At least similar glasses?

 5      A.   I kept the same frame.  So they could be the old

 6  pair, but they're the same ones.

 7      Q.   But the same or similar prescription as far as you

 8  know?

 9      A.   Yes, sir.

10      Q.   Okay.

11           MR. GALIPO:  We can keep playing.

12           (Video playing.)

13           MR. GALIPO:  Stop right there.

14           (Video paused.)

15           MR. GALIPO:  Thank you, Shannon.

16           So let's put up -- there is a few photos that show

17  the item on the ground somewhere from further away and some

18  are from closer up.

19           I don't think we need to mark unless counsel wants

20  it marked.

21           Do you want marked the -- well, I guess we'll just

22  make it Exhibit 2, the video footage.

23           (Exhibit 2 was marked for identification.)

24           MR. GALIPO:  And then the next one would be Exhibit

25  3.  You can put it up, Shannon.  I'm looking for something
```

SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL
John Van Dragt on 04/09/2024

Page 59

1    that has the item on the ground, and I know a couple of them

2    are from further away and a couple are closer up.

3              (Exhibit 3 was marked for identification.)

4    BY MR. GALIPO:

5        Q.    Are you able to see the photograph on your screen?

6        A.    Yes.

7        Q.    And we still see your vehicle in the photograph?

8        A.    Yes, sir.

9        Q.    And this gray item that you described as potentially

10   an eyeglass case, can you see it on the ground in this

11   image?

12       A.    Yes, sir.

13       Q.    And is it near the end of the shoulder of the road

14   if you could tell?

15       A.    No.  My patrol car is on the shoulder.

16             That's the lane.

17       Q.    Okay.  Do you think that might be a lane?

18       A.    I -- I believe so.

19       Q.    Okay --

20       A.    The -- the white line right there my left front tire

21   is almost on it --

22       Q.    Oh, yeah.  Thank you.

23             MR. GALIPO:  And then can we have Exhibit 4, please.

24             (Exhibit 4 was marked for identification.)

25   BY MR. GALIPO:

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 60

1    Q.    This also shows the show from a different

2    perspective?

3    A.    Uh-huh.

4    Q.    Is that yes?

5    A.    Yes, sir.

6    Q.    And is that the that you recall seeing?

7    A.    You mean like while he was running at me?

8    Q.    Yes.

9    A.    I don't recall the color, sir.

10    Q.    Is that the approximate shape you recall?

11    A.    Yes, sir.

12        MR. GALIPO:  And go to the next exhibit, I guess, is

13    5.

14        (Exhibit 5 was marked for identification.)

15    BY MR. GALIPO:

16    Q.    That the item is a little closer up.

17        Does that appear to be the item you recall seeing at

18    the scene?

19    A.    Yes, sir.

20        MR. GALIPO:  And Exhibit 6 if we have a little

21    closer up.

22        (Exhibit 6 was marked for identification.)

23    BY MR. GALIPO:

24    Q.    Again, you described it as a Subway sandwich.

25        When you look at it does it look like the size of a

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

**Page 61**

1      Subway sandwich here?

2          A.    Yes, sir.

3          Q.    Maybe more of a six inch than a twelve inch?

4          A.    There was no way that -- that I could see.

5                It was -- it was pointing at me.

6          Q.    Okay.  I got it.  All right.

7                But this is the item that you recall seeing at the

8      scene and you believe was in his hands?

9          A.    Yes.

10         Q.    Okay.

11               MR. GALIPO:  Thank you, Shannon.

12               So we can go back to full screen.

13     BY MR. GALIPO:

14         Q.    Are you trained that if you have information that

15     someone in a vehicle that you stopped may have a firearm, are

16     you trained to either draw your firearm and/or take cover

17     depending on the situation?

18         A.    Yeah.  If I -- if I made a traffic stop and I was

19     pointing a firearm, it would be felony stop situation.

20               So I would stay behind cover in a felony -- felony

21     stop procedures would go into place.

22         Q.    What if you had no prior information the person had

23     a firearm, and they suddenly -- you see a firearm on their

24     person or they pull it out of their pocket, then are you

25     trained to immediately draw your firearm?

**SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL**
**John Van Dragt on 04/09/2024**

Page 64

1                           CERTIFICATE

2                               OF

3              CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5              I, JINNA GRACE KIM, CSR No. 14151, a Certified

6     Stenographic Shorthand Reporter of the State of California,

7     do hereby certify:

8              That the foregoing proceedings were taken before me

9     at the time and place herein set forth;

10             That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12             That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15             Further, that the foregoing is an accurate

16    transcription thereof.

17             I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21             IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  April 9, 2024.

23

24             _____
               Jinna Grace Kim, CSR No. 14151

25



EXHIBIT
DragtJ 3
4/09/2024
Huseby.com

CONFIDENTIAL
SUBJECT TO STIPULATED PROTECTIVE ORDER

STATEOFCA000777



EXHIBIT
DragtJ 4
4/09/2024
Huseby.com

CONFIDENTIAL
SUBJECT TO STIPULATED PROTECTIVE ORDER

STATEOFCA000199



EXHIBIT
DragtJ 5
4/09/2024
Huseby.com

CONFIDENTIAL
SUBJECT TO STIPULATED PROTECTIVE ORDER

STATEOFCA001210