# EXHIBIT 8

SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL
Ramon Silva on 03/06/2024

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA KIRKMAN, CARLOS ALANIZ, individually and successor-in-interest to JOHN ALANIZ, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF CALIFORNIA, RAMON SILVA, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:23-CV-07532-DMG-SSC |

REMOTE VIDEOCONFERENCE DEPOSITION OF

RAMON SILVA

WEDNESDAY, MARCH 6, 2024

Reported Stenographically By:

Jinna Grace Kim, CSR No. 14151

Work Order: 51529

www.huseby.com Huseby Global Litigation 800-333-2082

voluntarily transferred back to East Los Angeles, and I've been here ever since.

**Q. And what was your assignment at the time of the shooting incident?**

A. Motorcycle patrol.

**Q. And can you give me an idea of what you had on your duty belt at the time in terms of weapons?**

**I know, obviously, you had a firearm?**

A. Can you be more specific, sir?

**Q. Sure. I'm trying to get an idea of what type of firearm you had on your person whether, for example, you had a Taser or pepper spray, things of that nature.**

A. So you're asking what kind of firearm I had, sir?

**Q. Yes. That's one of the questions I wanted to know.**

A. Okay. The firearm I have is a Smith&Wesson M&P 40-caliber.

**Q. And is that a semiautomatic weapon?**

A. Yes.

**Q. And do you have to press the trigger for each shots?**

A. Yes.

**Q. And do you know how many times you pressed the trigger in this incident?**

A. Yes.

**Q. How many times?**

A. Six times.

**Q. And did you have, for example, a Taser on you?**

A. I did, sir.

**Q. Do you know what type of Taser it was?**

A. Off the top of my head I don't know what brand or model it is, sir, but I do have a Taser.

**Q. Do you recall if you deployed it and used the cartridge, whether it had a second cartridge built in, or whether you had to reload an additional cartridge in?**

A. Are you asking if specifically if I deployed a Taser in this incident, sir, or are you just asking specifically about the model?

**Q. Yes. Because I realize you did not deploy a Taser during the incident because I have read your statements, but I was just trying to get an idea.**

**I know the X26 was an older model where if you deployed the cartridge and you wanted to deploy another cartridge, you would have to, you know, load the new cartridge.**

**Whereas the X2 which is a little bit more of a current model has two cartridges in it from the beginning.**

**And I was just wondering if you knew whether you had either one of those types.**

A. Yes. I definitely did not have the X26, but the latter one you described sounds consistent with what I

Would you work certain days of the week, or did you work some days on and then have a break?
How did it work generally?
A. Are you asking what are my regular days off, sir?
Q. Basically, yes.
A. My regular days off at the time would have been Saturday, Sunday.
Q. So at that time you normally worked Monday through Friday from about 6:00 a.m. to 2:30 p.m?
A. Yes, sir.
Q. And, obviously, you were on your police motorcycle when you heard some information regarding this call?
A. Yes.
Q. And it's my understanding from reading your statement that you were not specifically assigned to the call from the beginning, but after hearing it you decided to assist?
A. That's correct.
Q. And what general information did you hear or do you recall hearing about the call?
A. Specifically or explicitly what I remember, I don't remember exactly what was said. The general nature of the call relayed over the radio was I believe at first it was a traffic collision with an accident responding, but then it came out as somebody, a person jumping in front of cars

trying to, you know, cause accidents or trying to get hit intentionally.

**Q. And was that at least from your perspective an unusual call to get, or do you get calls like that from time to time?**

A. Unfortunately, more often than you would like to believe. We get those calls more often than you think.

**Q. Now, it sounds like you get calls regarding pedestrians on the freeway fairly commonly; is that correct?**

A. Yes.

**Q. And in this call it sounds like you had some information that the person may actually be trying to get hit.**

**Was that some of the information that you had?**

A. Yes, sir.

**Q. And did you receive that information generally over the police radio?**

A. Yes.

**Q. And did you have any information one way or the other, whether the person had actually been struck at some point?**

A. Not that I recall. I would imagine yes simply because it came out as a traffic collision. So -- but any explicit knowledge in terms of, you know, pedestrian versus

vehicle contact, no, I don't recall.

**Q. And did you consider after hearing that information that the person could be potentially suicidal if they were trying to get hit by a vehicle?**

A. Yes.

**Q. And did you consider that the person may be experiencing some type of mental health crisis?**

A. Potentially, yes.

**Q. What freeway was it on that this occurred?**

A. The 105.

**Q. And do you know what off-ramp or between what off-ramps the incident occurred?**

A. I do.

**Q. And between what off-ramps?**

A. It was in the general area of the Paramount or the Paramount overcrossing in the Garfield Avenue on-and off-ramps.

**Q. Does the 105 generally run east and west?**

A. Yes.

**Q. And it appears from watching your body-worn camera footage that at some point you were on the shoulder as you were approaching the scene going in the opposite direction of traffic; is that correct?**

A. That's correct.

**Q. And which direction were you going as you were**

**Q. Did you have any specific information that the person had a weapon?**

A. Not that I recall.

**Q. Any specific information that the person had verbally threatened to harm anyone?**

A. Not that I'm aware of.

**Q. Any specific information that the individual had actually injured another person?**

A. Not that I'm aware of.

**Q. But you did have some understanding that the person themselves might be injured?**

A. No. No -- I didn't have any specific information that this person was injured, no, sir. Not that I recall.

**Q. Just some general information that they may have been struck by a vehicle in an accident?**

A. Yes, sir.

**Q. Do you know if paramedics were called to stage in the area prior to the shooting?**

A. So as I previously stated, I believe the initial call came out as a traffic collision with an ambulance responding. So I would imagine, you know, I would assume that fire was already -- or the ambulance and the fire department were already responding to the scene.

**Q. So I wanted go up to the point in time now where you're on your motorcycle and you're on the shoulder going**

you're asking specifically who they were, I do not know.

**Q. And what, if anything, did you observe the people on the shoulder doing while you were still on your motorcycle?**

A. I don't recall from my line of sight.

I just remember people standing around.

**Q. Okay. And did you think to yourself that one of them could possibly be the suspect?**

A. I did.

**Q. Did you identify any one of those three as the suspect before you got off your motorcycle?**

A. Not that I recall.

**Q. Any other observations regarding the individuals or Officer Van Dragt or his vehicle that you recall before you got off your motorcycle?**

A. Not that I recall that I have not already relayed.

**Q. And where approximately did you position your motorcycle when you came to a stop?**

A. It would have been in the northern most lanes of 105 freeway. So possibly on the shoulder, maybe on the far right lane, somewhere in that general area.

**Q. And at the time you stopped your motorcycle, do you know if Officer Van Dragt's patrol vehicle had come to a stop?**

A. Yes.

**Q. And had it?**

A. Yes.
Q. We're going to try to put up an exhibit.
We'll see how this goes. We're going to try to share the screen. We're going to put up Exhibit 1.
Tell me if you can see it on your screen first, and then I'll ask you a couple questions about it.
A. Sure.
(Exhibit 1 was marked for identification.)
BY MR. GALIPO:
Q. Are you able to see it on your screen?
A. Yes, sir.
Q. Does that look to be Officer Van Dragt's patrol vehicle?
A. It would be safe to assume that, yes.
Q. Is that the approximate position you recall it in when you got off your motorcycle?
A. From this point of view it's hard to tell simply because I was -- I was further. I mean if you're facing the -- you know, if we're at the orientation of this picture, I was further out.
So I -- it's kind of tell from this angle.
I don't remember it as such.
Q. Okay. I think we have a couple other diagrams.
Maybe we can look at Exhibit 6 and see if that helps.

behind Officer Van Dragt.
Do you remember seeing that at any time?
A. I don't.
**Q. Now, when you got off your motorcycle, did you take your helmet off at some point, or did you still have it on at the time of the shooting?**
A. I did not take it off.
**Q. So you would have had your helmet on and your sunglasses.**
**Did you have anything over your sunglasses in terms of protective -- was there anything over your sunglasses, it was just your sunglasses and then the open air?**
A. That's accurate.
**Q. When you got off your motorcycle, do you have a sense or did you have a sense as to where Officer Van Dragt was?**
A. Yes.
**Q. And where was he, approximately?**
A. Him, personally, sir? Or his patrol vehicle?
**Q. Let's start with the patrol vehicle.**
**Where was the patrol vehicle approximately when you got off your motorcycle?**
**So as you or as we previously showed the photos, it was at an angle, you know, close to the northernmost lanes of that freeway. I would -- it would have been in a**

northwesterly angle.
Q. Okay.
A. Directly ahead of me.
Q. And how about Officer Van Dragt, where was he initially when you got off your motorcycle?
A. Exiting that patrol vehicle I just described.
Q. And do you have an estimate as to how far your motorcycle was stopped from the front of Officer Van Dragt's patrol vehicle?
A. Maybe ten to fifteen feet.
Q. And is that an estimate?
A. That's an estimate, sir.
Q. And could you tell when you saw Officer Van Dragt getting out of the vehicle after you got off your motorcycle, whether he had anything in his hands?
A. Yes.
Q. And what, if anything, did you observe in his hands?
A. So when Officer Van Dragt -- sorry -- when he, like I said, when he exited the patrol car and he was walking towards what would be the left rear of the patrol car, I observed him with his firearm.
Q. And did it appear to be a semiautomatic firearm?
A. At the time I was under the assumption we had the same gun. So yes.

Q. How could you tell it was his firearm as opposed to something else?

A. Because I remember the black -- seeing the black handgun similar to the one I carry.

Q. I'm assuming your handgun has various parts to it; trigger, trigger guard, barrel, grip, things of that nature?

A. Yes.

Q. And did you see where Officer Van Dragt went after he initially got out of your vehicle?

A. Yes.

Q. And where did he go?

A. He walked towards the back of his patrol vehicle.

Q. Did you see where these individuals were at that time on the shoulder, the two or three that you described, after getting off your motorcycle?

A. I'm sorry. Can you repeat the question?

Q. Sure. I think we talked about earlier, as you were approaching while you were on your motorcycle, you saw two or three individuals on the shoulder of the road.

Do you recall us generally talking about that?

A. Yes, sir.

Q. I'm wondering after you stopped your motorcycle and got off, whether you observed any of those individuals.

A. Yes. I still observed them.

Ms. Reyes and I first talked.

**Q. And then after the one individual was walking towards you, did you make any observations about any of the other individuals on the shoulder?**

A. Yes.

**Q. And what observations did you make of them?**

A. I immediately noticed somebody on the shoulder matching the description provided to us by dispatch, and I immediately observed this person place his hands in his pocket.

**Q. And the person that matched the description, do you have an estimate as to how far he was from you when you first saw him?**

A. Anywhere between 25 to 50 feet.

**Q. And do you recall what he was wearing, generally?**

A. Not specifically. But I do recall he was not wearing shoes.

**Q. And are you saying that you initially saw his hands out of his pockets before he put them in his pockets?**

A. It's safe to assume that, but my first, you know, my first recollection of him was him putting his hands in his pocket.

**Q. Before he put his hands in his pockets, did you see any object in his hands?**

A. I don't recall if I ever saw his hands out of his

pockets, specifically.

**Q. But you do recall at some point seeing his hands in his pockets?**

A. Yes, sir.

**Q. I guess what I'm getting at, and it's probably -- it may not matter at the end, but I'm just wondering whether your recollection is when you first saw him, his hands were already in his pockets?**

**Or you have a specific recollection of his hands being out of his pockets and then putting them in his pockets?**

A. Specifically, no, sir. I just remember was his hands going in his pockets.

**Q. And do you recall whether they were his like pants pockets or sweatshirt pockets, or what they were?**

A. From what I recall, they were -- it would have been sweatshirt pockets above -- right around the waistband area.

**Q. And when you observed that, do you have a -- did you have a sense of where Officer Van Dragt was?**

A. Yes.

**Q. Where was he at that time when you first observed the person with their hands in their pockets?**

A. Officer Van Dragt would have been somewhere closer to the right rear of his patrol vehicle.

**Q. And did you say anything to the individual when you saw his hands in his pockets?**
A. Yes.
**Q. And what did you say?**
A. To show me his hands, something to that effect. I don't recall specifically.
**Q. And why did you say that?**
A. Because we were trained that most people carry, you know, weapons, blunt force objects, anything that can cause bodily harm in their pockets, waistband, that general area.
**Q. So you wanted to see his hands to see if he had any weapons in his hands, essentially?**
A. Yes, sir.
**Q. And did he ever take his hands out of his pockets after you said, "Show me your hands?"**
A. Yes.
**Q. And do you know if you said, "Show me your hands" once or more than once?**
A. From what I recall, it was just once.
**Q. And how long altogether did you see him with his hands in his pockets before he took them out?**
A. I don't recall, sir.
**Q. Do you recall how much time passed from you telling him to show his hands to his hands coming out of his pockets?**

A. It's hard to quantify simply because the entirety of the, you know, incident happened relatively quick.
So it could have been seconds.
**Q. But you do recall him taking his hands out of his pockets at some point?**
A. Yes, sir.
**Q. And it's my understanding he ran in your direction or your partner's direction, at least, at some point?**
A. He ran in my partner's direction, Officer Van Dragt's direction.
**Q. And then at some point he went out of your view momentarily?**
A. Correct.
**Q. And were you observing him from the time he took his hands out of his pockets to the time he went out of your view momentarily?**
A. I don't understand your question, sir.
**Q. Okay. You saw him at some point with his hands in his pockets; correct?**
A. Yes, sir.
**Q. I'm assuming you're looking at him at that point?**
A. Yes, sir.
**Q. And then you told him to show his hands, or words to that effect?**
A. Yes, sir.

Q. And at some point you see him take his hands out of his pockets?
A. Yes, sir.
Q. And at some point he started running in the direction of your partner?
A. Yes, sir.
Q. Do you recall if he took his hands out of his pockets before or after he started running in your partner's direction?
A. I would say simultaneous.
Happened at the same time.
Q. And then as he's running towards your partner, are you watching him continuously?
A. Well, no. He was obscured from my vision as he ran behind the patrol vehicle.
Q. So that's what I'm trying to find out.
How long could you see him while he was running before he was obscured from your vision?
A. Are you asking the amount of time I observed him before he became obscured?
Q. Yes. Basically, yes, but I'm trying to take it from the time he took his hands out of is pockets to the time he became obscured.
A. It would have been seconds.
Q. Do you have any estimate or any range?

**Are we talking one to three? Two to five? Anything you're comfortable with?**

A. Not that I'm comfortable with, but it would have been maybe one to two seconds.

**Q. Did you say anything else to him prior to him going out of your view?**

A. Not that I recall.

**Q. Did you see your partner moving at all as he was running in your partner's direction?**

A. Yes.

**Q. And how did you see your partner moving?**

A. I believe he was retreating in my general direction.

**Q. And what was the closest you think the individual got to you before he went out of your view?**

A. Maybe ten to fifteen feet.

**Q. Okay.**

MR. GALIPO: I think we've been going about an hour, and I think this is a good time to take a break. After we come back, I'll go and ask you about what happened after he came back in your view.

So if it's goof for everyone, we'll take a ten-minute break.

MS. REYES: Yes. Thank you.

(Recess taken.)

**Q. Okay. Do you have any estimate now as to whether you were on the shoulder, for example, or in the far right lane when you fired the shots?**

A. Not that I feel comfortable, you know, telling you right now because that would be assuming or speculating.

**Q. You're not sure; is that fair?**

A. That's fair.

**Q. Do you recall if the driver side door of Officer Van Dragt's vehicle was open when you fired the shots?**

A. I don't recall.

**Q. Other than "show me your hands," do you recall ever giving any other commands to the individual you shot?**

A. No.

**Q. Did you ever give a verbal warning that you were going to shoot?**

A. No.

**Q. With respect to the Taser, you've had obviously training on the Taser; correct?**

A. Correct.

**Q. And you were at least familiar with the sound of the Taser when it's deployed in the dart or probe mode?**

A. Yes. In a sterile environment.

**Q. Did you ever see your partner or Officer Van Dragt transition from his handgun to a Taser?**

A. No, sir.

**Q. Did you hear any pop before you fired your shots?**

A. I heard a gunshot.

**Q. Have you ever described it as a pop?**

A. Potentially, yes. I would have to relook at my statements, but it was consistent with a gunshot.

**Q. Was it also consistent with a Taser being deployed?**

A. It's hard to say. Just like I said, it's -- in the static environment, it's -- it probably sounds the same.

**Q. When you say probably sounds the same, are you saying on your -- strike that.**

**Your body-worn camera has an audio, I take it?**

A. Yes, sir.

**Q. And can you hear the initial -- you know now it's a Taser deployment; correct?**

A. In hindsight.

**Q. Can you hear the Taser deployment on your body-worn camera footage now?**

A. Obviously, with the benefit of hindsight, yes, I can see that. But at the time my frame of mind was it was a gunshot.

**Q. I'm just wondering on your body-worn camera footage now, does the Taser deployment to you sound the same as the gunshots or different now?**

A. Now, it's the same.

Q. So when you hear your body-worn camera footage, it sounds like a gunshot to you, still?
A. Yes, sir.
Q. Could you tell where the pop or shot or whatever you want to call it, the initial one, came from?
A. Yes.
Q. And where did it sound like it was coming from?
A. From the general direction of the person running towards me and Officer Van Dragt.
Q. Did you know who fired that round at the time?
A. No.
Q. And when did you hear that in relation to your shots?
A. Right before.
Q. And when you heard that, was it during the time frame the individual was out of your view, or had he come back in your view?
A. It's kind of hard to tell because like I said, it all happened so fast. I would say it happened simultaneously.
Q. Simultaneously with what?
Him coming back in your view?
A. Yes, sir.
Q. Have you had any --
MR. GALIPO: Okay. That's fine.

tractor-trailer?
A. I do not.
Q. Was there any discussion after the shooting about checking to see if the operator of the tractor-trailer had been struck?
A. Yes.
Q. What do you recall about that?
A. Specifically I don't remember.
Q. The object in the individual's hands that you shot, do you know now what that object is?
A. No.
Q. Have you ever seen -- did you look at the object after the shooting while you were at the scene?
A. Not that I recall.
Q. Had you ever been shown photos of the object?
A. No.
Q. When looking at the object in his hands, did you see any identifiable parts of a gun like a grip or a magazine or a hammer or a trigger or a trigger guard, for example?
A. I saw the barrel of a gun, a long barrel.
Q. Anything else?
A. That I can recall, no.
Q. Let's see if we can put up Exhibit 2, please.
(Exhibit 2 was marked for identification.)
BY MR. GALIPO:

gray in color, but some object on the ground?

A. I see an object, yes.

Q. Is that the object that you believe he had in his hands when you shot him?

A. Specifically, I don't recall.

It's hard to tell. You can't see the entire scene from this photo.

Q. Well, the object that you saw in his hand, did it look like that object that we see on the bottom of Exhibit 2?

A. The object I saw in his hand I would describe it as a firearm. So like I said, I don't -- it's kind of hard to tell from the photo if I can't see the entire scene.

Q. Let me just try a few that might be closer up.

MR. GALIPO: Can we put up Exhibit 3 -- no, Exhibit 5. I'm sorry.

(Exhibit 5 was marked for identification.)

BY MR. GALIPO:

Q. Do you see that on your screen?

A. Yes, sir.

Q. Did you see that object after the shooting on the ground near the person you shot?

A. Not that I recall.

Q. Do you think that object that we're seeing in Exhibit 5 looks like a gun?

you've already described, you saw him with his hands in his pockets, you said, "Show me your hands" or words to that effect, he took his hands out of his pockets, and then started running in the direction of your partner; is that right so far?

A. Yes, sir.

Q. And at some point you saw him for a second or two, but then he went out of your view in part because the vehicle was blocking you from a full view of him?

A. Yes.

Q. Now, at some the point did you pull out your gun?

A. Yes.

Q. When did you pull out your gun in the sequence?

A. When he -- initially when I observed him put his hands in his pockets.

Q. And so when you said, "Show me your hands," you would have already had your gun out?

A. Yes.

Q. So now what I'm asking you is, I understand he went out of your view for some period of time and then came back into your view just before the shooting; is that correct?

A. Correct.

Q. I'm wondering how much or how long was he back in your view before the shooting?

Was it a second? Was it a split second?

What estimate would you give?
A. A split second, a second.
Q. And were you in a shooting stance when you fired?
A. I don't recall what stance.
Q. Do you recall if you were firing with one hand or two?
A. I was firing with two.
Q. Are you right-handed or left-handed?
A. I'm ambidextrous, but with a firearm I shoot it right-handed.
Q. That probably helped you in your baseball days.
In any event, I like sports. So being ambidextrous is a good thing in most sports.
But in any event, were you aiming center mass when you were firing your shots?
A. Yes.
Q. What part of his body were you aiming at?
A. Center mass.
Q. And how far would you estimate he was from you when you fired your first shot?
A. Maybe anywhere between five to ten feet is my best estimate.
Q. And how about the other shots two, three, four, five, six, what would you estimate the distance during the shooting sequence?

A. More or less the same.
Q. Were you using your sights when you were firing?
A. No.
Q. And then it was soon after the last shots and you looking at the ground and not seeing a gun that you asked Officer Van Dragt, "What did he have in his hands? Was that a gun?"
In other words, that was just like a few seconds after the shooting that you asked Officer Van Dragt what he had in his hands?
A. Yes.
Q. Didn't you ask Officer Van Dragt what he had in his hands because you were not sure at that point?
A. No.
Q. And when Officer Van Dragt said when you referenced as to whether it was a gun, he said, "No, it's nothing," what was your thought process at that point when Officer Van Dragt said he didn't have a gun, it was nothing?
A. Confusion. Because I was certain it was a gun.
Q. After the shooting did you ever approach the person you shot, get any closer to him?
A. Yes.
Q. And when you got closer to him, what observations, if any, did you make about his medical status?
A. I don't recall.

MR. GALIPO: Stop.
(Video paused.)
BY MR. GALIPO:
**Q. So is this Officer Van Dragt that we see in this portion of the video?**
A. Yes.
**Q. Okay. And were you telling the decedent to get down after the shooting when he was on the ground?**
A. Yes.
**Q. Is there a reason why you were telling him to get down if he was already on the ground?**
A. I don't recall.
**Q. And then did Officer Van Dragt call in that shots were fired?**
A. Yes.
**Q. Okay.**
MR. GALIPO: Let's back it up a little bit, Shannon, to right before the shooting, and then I'll let you play it and tell you when to stop.
(Video playing.)
MR. GALIPO: Okay. Thank you, Shannon.
(Video paused.)
BY MR. GALIPO:
**Q. Does that look to be at last a portion of your body-worn camera footage?**

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date: March 6, 2024.

Jinna Grace Kim, CSR No. 14151