# EXHIBIT 9

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

Case 2:23-cv-07532-DMC-SSC Sandra Kirkman Carlos Alaniz v. State of California, et al. 2:23-cv-07532-DMC-SSC Document 68-12 Filed 01/24/25 Page 2 of 69 Page ID #:902



1

2

3

4

5

6

7

8

9

10

11

12

13    California Department of Justice

14          Silva, Ramon

15   ROI 18 - BI-LA2022-00016 Interview of CHP Officer

16          Enrique RAMOS

17

18

19

20

21

22

23

24

25

Page 1

DOJ00001

```
 1              SPECIAL AGENT DANIEL IBARRA:  Today is
 2    May 9th, 2022.  The time is approximately 1232
 3    hours.  Special Agent Daniel Ibarra, Serial No.
 4    15-0050 with the California Department of Justice
 5    Police Shooting Investigation Team.  We're here
 6    at the East LA CHP station conducting an
 7    interview with Officer Ramon Silva regarding the
 8    OIS that occurred on the 105 Freeway at Garfield
 9    Avenue on the westbound lanes on Wednesday, May
10    4th of this year at approximately 1119 hours.
11              SPECIAL AGENT TONY BACA:  Also present
12    is Tony Baca, Special Agent with the California
13    Department of Justice, California Police Shooting
14    Investigative Team.  Last name  B A C A.  Serial
15    No. 20-0001.
16              JAKE JOHNSON:  Jake Johnson from the
17    California Association of Highway Patrolman on
18    behalf of Officer Silva.
19              OFFICER RAMON SILVA:  My name is Ramon
20    Silva.  I'm a motor officer assigned to the East
21    Los Angeles Office, California Highway Patrol.
22              JOSE CHI:  May name is Jose Chi.  I'm a
23    representative of California Association of
24    Highway Patrolman, representative for Officer
25    Silva.
```

Page 2

DOJ00002

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER
Sandra Kirkman v. Carlos Alaniz, et al., State of California

```
 1            SPECIAL AGENT DANIEL IBARRA:  Thank
 2    you, sirs.  Just double check some stuff here,
 3    Mr. Silva.  This is a criminal investigation and
 4    it will be submitted to the Deputy Attorney
 5    General's Office for review.
 6            JAKE JOHNSON:  Can you get them to
 7    identify -- did you forget that?
 8            SPECIAL AGENT DANIEL IBARRA:  My
 9    apologies.  We also have two gentlemen here in
10    the room.  Please identify yourselves.
11            SERGEANT ADAM TAYLOR:  Sergeant Adam
12    Taylor, T A Y L O R, ID 15632, Southern Division
13    Critical Incident Investigation Team.
14            SERGEANT SEAN POMERLEAU:  Sergeant Sean
15    Pomerleau, P O M E R L E A U, ID 1612 with the
16    Southern Division Critical Incident Investigation
17    Team.
18            SPECIAL AGENT DANIEL IBARRA:  We also
19    have in the adjacent room listening in through
20    the phone, we have our Special Agent Supervisor
21    Samuel Richardson and Special Agent Elvin
22    Hernandez along with Detective Rob Hinds with
23    CHP.  My apologies, again, sir.
24            Mr. Silva, this is a criminal
25    investigation.  Once completed, it will be
```

Veritext Legal Solutions
866 299-5127

DOJ00003

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

```
 1   submitted to the Attorney General's Office for

 2   review.  Do you want to speak with me today?

 3          OFFICE RAMON SILVA:  I'll give you a

 4   voluntary statement.

 5          SPECIAL AGENT DANIEL IBARRA:  Thank you

 6   sir.  Have you been ordered to provide a

 7   statement?

 8          OFFICER RAMON SILVA:  No.

 9          SPECIAL AGENT DANIEL IBARRA:  Thank you

10   sir.  We're going to start off with just a little

11   bit of your background, your years of service

12   when you started, things like that.  So how long

13   you've been a CHP officer?

14          OFFICER RAMON SILVA:  Almost 14 years.

15          SPECIAL AGENT DANIEL IBARRA:  Any prior

16   law enforcement experience, prior to that?

17          OFFICER RAMON SILVA:  No.

18          SPECIAL AGENT DANIEL IBARRA:  Any

19   military experience?

20          OFFICER RAMON SILVA:  No.

21          SPECIAL AGENT DANIEL IBARRA:  What year

22   did you get hired on?

23          OFFICER RAMON SILVA:  July or January

24   2008.

25          SPECIAL AGENT DANIEL IBARRA:  I don't
```

Page 4

DOJ00004

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

Case 2:23-cv-07532-DMG-SSC  Sandra Kirkman v. State of California, et al. 2:23-cv-07532-DMG-SSC  Document 68  Filed 01/22/25  Page 6 of 69  Page ID #:906

1    want to assume, but you attended the academy and

2    completed the academy, right?

3           OFFICER RAMON SILVA:  You're safe to

4    assume that, sir, yes.

5           SPECIAL AGENT DANIEL IBARRA: Can you

6    provide me a rundown of your assignments

7    throughout the last 14 years?  Just in general

8    terms.

9           OFFICER RAMON SILVA:  Geographically

10   or?

11          SPECIAL AGENT DANIEL IBARRA:  Any

12   specific assignments like traffic, investigative,

13   K-9, anything like that.

14          OFFICER RAMON SILVA:  I've been working

15   patrol most of my career.  I jumped on motors in

16   2012 and I've been on motor since.

17          SPECIAL AGENT DANIEL IBARRA:  Thank

18   you.  Your training in addition to the academy,

19   any additional training?

20          OFFICER RAMON SILVA:  Can you be a

21   little bit more specific?

22          SPECIAL AGENT DANIEL IBARRA:  Have you

23   done any type of in regards to like entry

24   training, SWAT training, taser training, anything

25   in addition to the normal academy?

Page 5

DOJ00005

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

Case 2:23-cv-07532-DMG-SSC   Sandra Kirkman v. Carlos Alaniz, et al., State of California, Filed 02/24/25   Document 66   Page 7 of 69   Page ID #:907

```
 1                JAKE JOHNSON:  He won't answer anything

 2     other than he'll answer -- the question you

 3     asked, he'll only answer the question about

 4     tasers.

 5                OFFICER RAMON SILVA:  Can you reask it,

 6     sir?

 7                SPECIAL AGENT DANIEL IBARRA:  Did you

 8     receive training in tasers?

 9                OFFICER RAMON SILVA:  Yes, sir.

10                SPECIAL AGENT DANIEL IBARRA:  What was

11     your call sign recent, today, or on the date of

12     the incident?

13                OFFICER RAMON SILVA:  I was Mary 2.

14                SPECIAL AGENT DANIEL IBARRA:  Your unit

15     identification number?  Does you motor have unit

16     numbers?

17                OFFICER RAMON SILVA:  Yes.

18                SPECIAL AGENT DANIEL IBARRA:  What's

19     that?

20                OFFICER RAMON SILVA:  It's Mary 10148.

21                SPECIAL AGENT DANIEL IBARRA:  Let me

22     backtrack a little bit.  In regards to your

23     uniform, you're out of uniform today, but on the

24     date of the incident where you in uniform?

25                OFFICER RAMON SILVA:  Yes, sir.
```

Page 6

DOJ00006

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

```
 1              SPECIAL AGENT DANIEL IBARRA:  What's
 2   your typical uniform?
 3              OFFICER RAMON SILVA:  It's a very
 4   comfortable tan wool uniforms, some black riding
 5   boots.  Specifically, they're horse-riding boots,
 6   but we use them as motorcycle riding boots.  A
 7   black, blue and gold helmet, eye protection,
 8   gloves, badge, patch, two patches, duty belt.
 9   What you'd normally, typically see a CHP officer
10   wearing.
11              SPECIAL AGENT DANIEL IBARRA:  And I
12   don't want to assume, but the patches identify
13   you as a California Highway patrolman?
14              OFFICER RAMON SILVA:  Safe to assume
15   that, yes, sir.
16              SPECIAL AGENT DANIEL IBARRA:  What's
17   your normal shift?
18              OFFICER RAMON SILVA:  Are you talking
19   about time, sir?
20              SPECIAL AGENT DANIEL IBARRA:  Time-wise
21   and dates.
22              OFFICER RAMON SILVA:  I work Monday
23   through Friday, usually, 0600 hours to
24   approximately 1430 hours.
25              SPECIAL AGENT DANIEL IBARRA:  On the
```

Page 7

DOJ00007

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

1    date of the incident, what was your shift that

2    day?

3             OFFICER RAMON SILVA:  The shift that I

4    just told you.

5             SPECIAL AGENT DANIEL IBARRA:  Same

6    thing?

7             OFFICER RAMON SILVA:  Yes, sir.

8             SPECIAL AGENT DANIEL IBARRA:  And I

9    believe they don't, but I want to make sure I

10   ask.  Does your motor vehicle have any cameras?

11            OFFICER RAMON SILVA:  My motorcycle --

12            SPECIAL AGENT DANIEL IBARRA:  Your

13   motorcycle.

14            OFFICER RAMON SILVA:  -- like attached

15   to it?

16            SPECIAL AGENT DANIEL IBARRA:  Attached

17   to.  Like the patrol cars, the normal patrol cars

18   have the in dash?

19            OFFICER RAMON SILVA:  No, there is no

20   video recording on my motorcycle.

21            SPECIAL AGENT DANIEL IBARRA:  and

22   before I go any further, have you had a chance to

23   review the video?

24            OFFICER RAMON SILVA:  Yes.

25            SPECIAL AGENT DANIEL IBARRA:  Okay.

                                        Page 8

DOJ00008

1   What videos did you review?

2              OFFICER RAMON SILVA:  Just my body

3   camera.

4              SPECIAL AGENT DANIEL IBARRA:  Any other

5   equipment on your motorcycle besides just what's

6   on your person?

7              OFFICER RAMON SILVA:  It's kind of a

8   vague question.  What do you mean, sir?

9              SPECIAL AGENT DANIEL IBARRA:  Like any

10  extra long guns, shotguns, anything like that on

11  the motor vehicle?

12             OFFICER RAMON SILVA:  You're

13  specifically asking about rifles.  There's no

14  rifles attached to my motorcycle.

15             SPECIAL AGENT DANIEL IBARRA:  All

16  right.  I'm going to have you go walk me through

17  the date of the incident as to how you got

18  summoned there.  How you got called to the scene

19  there.  I'll start from there and just give me a

20  rundown.  Instead of me bombard you with

21  questions, as it gets closer to the actual OIS,

22  slow it down for me, instead of me trying.

23             OFFICER RAMON SILVA:  Just to be clear.

24  You want me to give you a chronological timeline

25  of how I arrived to the shooting?

                                            Page 9

DOJ00009

1            SPECIAL AGENT DANIEL IBARRA:  Yes, sir,

2    when you got summoned or dispatched.

3            OFFICER RAMON SILVA:  Okay.  Are you

4    ready?

5            SPECIAL AGENT DANIEL IBARRA:  Go ahead.

6            OFFICER RAMON SILVA:  So I was, I

7    wasn't assigned to the call.  It was just

8    broadcast to the unit that was assigned to that

9    beat, which would have been the Beat 74.  When I

10   heard the call, I was northbound Ford Boulevard,

11   just south of Floral, right here.  A couple

12   football fields away from here.

13            I was assigned to a, assigned to a

14   different call.  I was assigned to a traffic

15   collision with a, with a civil disturbance

16   attached to it, which is the majority of these

17   calls.  It was in the unincorporated area, what

18   we consider RB-1.  So just -- I think the call

19   was on Ford and Record.  I'm sorry, Floral and

20   Record, that's where I was initially responding

21   to.

22            I heard the call and it just came out

23   as a traffic collision with an ambulance

24   responding involving a tractor trailer and a

25   pedestrian.  That's unfortunately not too out of

DOJ00010

1    ordinary for me.  So I had no intention of

2    responding.  And then we started to receive more

3    calls as I was still continuing to the other call

4    that I was initially assigned to about the person

5    that was initially hit by the tractor trailer was

6    now attempting to get hit by the cars.

7                At that point, I -- there was only one

8    unit from our area responding.  So I thought it'd

9    be a good idea to go help him out.  So I

10   discontinued, discontinued my response to the

11   initial traffic collision I was responding to and

12   I made my way south on the 710.

13               As I'm heading down there, we're

14   receiving more and more information via dispatch

15   about this person continuously jumping in and out

16   of traffic.  Right before I made the decision to

17   respond there, I asked our dispatcher to -- if

18   she could start air support and by the time as

19   I'm heading south, maybe in the area of Florence,

20   I hear the sheriff's helicopter arrive on scene.

21   By on scene, I mean it was overhead.  At that

22   point, the air unit is continuously providing

23   information about the person jumping in and out

24   of cars -- or in front of cars and essentially

25   causing a disturbance on the freeway.

Page 11

DOJ00011

```
 1              I continued south.  I exited Garfield,
 2      I got back on the 105 westbound at Garfield.  And
 3      then I went the wrong way and that's when I
 4      arrived on scene.
 5              SPECIAL AGENT DANIEL IBARRA:  You
 6      arrived on scene on the 105.  And what happened
 7      from there?
 8              OFFICER RAMON SILVA:  So I remember
 9      seeing a commotion, what I would describe as a
10      commotion and chaos essentially.  There's a lot
11      of people stopped.  There was cars stopped and
12      there was a few individuals -- I don't recall how
13      many -- standing around in the shoulder area in
14      the direction I was looking at.  So I wasn't
15      quite certain what I -- essentially what I was
16      arriving on scene to.  The situation seemed
17      definitely tense and uncertain as I'm viewing it
18      as I'm getting there.
19              At that point, I just remember waving
20      people away because as I'm, you know, as I'm
21      responding, I'm receiving information about this,
22      the description of the person and they described
23      this person as a transient.  Somebody I would
24      imagine as homeless.  So as I'm arriving on
25      scene, I identify somebody who would match the
```

                                                Page 12

DOJ00012

```
 1    description provided by what dispatch was giving
 2    me and what the air support unit was giving me.
 3    And I, initially I was trying to wave people away
 4    or, you know, isolate the source of the call.  So
 5    I was waving cars through, the cars that were
 6    stopped.  I can only assume what they were doing,
 7    but there were cars stopped.  I was waving those
 8    cars through and obviously you could imagine it
 9    was causing traffic to back up.  So I was waving
10    cars through as I remember hearing sirens.  And
11    so I interpreted that as other CHP units were
12    arriving on scene.
13             Like I said, I arrived on scene and I
14    was trying to isolate the source of the calls or
15    the person who was, you know, the source of all
16    these calls.  Once I identified that, I let my
17    dispatcher know what I saw and I saw the person
18    with his hands in his pocket.  And then I let my
19    dispatcher know that I was just going to wait for
20    somebody else to get there to -- prior to making
21    contact.  And at that time, like I said, I saw, I
22    don't explicitly remember, but there was a CHP
23    unit that I remember seeing bringing in a traffic
24    break.  So at that point I thought we had, you
25    know, the tactical advantage of traffic being
```

Page 13

DOJ00013

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

```
 1    stopped.  And isolating this person to this one
 2    area so we can just put handcuffs on him and get
 3    him out of there.
 4             So the traffic break that I envisioned
 5    or that I was hoping it was going to get there
 6    was, I don't know, you can only, I can only
 7    speculate, but the officer that I initially
 8    observed or the patrol unit that I observed
 9    bringing in a traffic break kind of started
10    driving towards me and like completely past the
11    person that I identified as the source of the
12    calls, which confused me because, like I said, I
13    thought we had a, we have a tactical advantage.
14    I was content with just, you know, waiting there
15    for more help.
16             Like I said, help arrived, but it was,
17    like I said, I couldn't speculate what the
18    officer was thinking.  And he kind of put his
19    patrol car in between me and the person that was
20    the source of these calls.
21             Do you want me to continue?
22             SPECIAL AGENT DANIEL IBARRA:  Go ahead,
23    sir.
24             OFFICER RAMON SILVA:  Like I said, I
25    observed this person, the source of the calls,
```

Page 14

DOJ00014

```
 1    matched the description.  He had his hands in his
 2    pocket which, I mean for lack of a better term,
 3    scared the shit out of me.  So that's why I was
 4    just going to wait.  Like I said, the officer
 5    then positioned his patrol vehicle in between me
 6    and the person.  I observed the officer made a
 7    brief glance at him.  It was identified as a male
 8    officer.  He jumped out of his patrol car and
 9    drew his firearm at that point, as did I.
10           Within seconds it seemed like, it's
11    hard to quantify in terms of time how quickly it
12    happened, but as, you know, we're on, I observed
13    my partner, you know, the other officer firearm
14    drawn, My firearm is drawn, I'm telling this
15    person to let me see his hands.  It happened
16    almost simultaneous.  He made, he started
17    charging the officer, the partner officer, who's
18    patrol car was directly in front of me and he was
19    standing out of my line, direct line of sight to
20    the right.
21           The person charges at the officer and
22    pulls out, I see him pull out of his -- I see him
23    remove his hands from his pocket.  And there's a
24    long, almost like a cylindrical silver thing in
25    his hand, which at the time I identified it as a
```

Page 15

1    firearm.  But as he's running, he obscures it, he

2    obscures himself for me because he's behind the

3    patrol car now.  And I just remember it's, you

4    know, it's like I said, it's hard to quantify,

5    but I was just thinking fuck because now there's,

6    now there's a crossfire situation where I'm in no

7    position to return fire or, you know, help my

8    partner out who's being charged at by somebody

9    with a firearm.

10           So there was this, this brief second of

11   just helplessness.  And, mind you, this is

12   happening within seconds and so I . e to make a

13   conscious decision.  You know, I say it like it's

14   a conscious decision, but it was like I can't

15   explain to you exactly, like I said, it's hard to

16   quantify or how to put into words, but I have to

17   make a decision whether I'm going to remain in

18   this helpless situation, essentially a crossfire

19   situation where I'm not going to be able help my

20   partner if he takes rounds or he falls, whether,

21   you know, I have to make a decision whether to go

22   to cover behind the patrol car, essentially out

23   of, out of play, or -- sorry.

24           SPECIAL AGENT DANIEL IBARRA:  Take your

25   time.

Page 16

DOJ00016

1        SPECIAL AGENT DANIEL IBARRA:  -- or the

2    alternate, or the alternative would be to step

3    out with no cover and essentially, mentally I was

4    prepared to get shot because at that point I had

5    no cover.  I was, I mean it's like I said, I'm

6    sitting here and I'm trying to explain it to you,

7    but unless you're there, you'll never know, but -

8    -

9        JAKE JOHNSON:  Do you want to take a

10   break?

11       OFFICER RAMON SILVA:  No, I'm good.

12       JAKE JOHNSON:  You good.

13       OFFICER RAMON SILVA:  Essentially I had

14   to make a decision whether to help my partner or

15   get shot.  So I've, I waited until the last

16   fuckin' minute.  I took a step out; I hear the

17   pop.  I said, oh fuck, you know, somebody,

18   somebody fired a round off.  And I still see, I

19   see my partner, the other CHP officer kind of

20   doing this weird side-step thing were I wasn't

21   certain if he was it and in that same, you know,

22   that same moment, there's a person still charging

23   at me in a shooting stance.  And the rest, it was

24   just automatic what I was trained to do.  I

25   observed a lethal threat in front of me and I

Page 17

DOJ00017

Case 2:23-cv-07532-DMG-SSC   Sandra Kirkman, et al. vs. State of California, et al., 2:23-cv-07532-DMG-SSC

```
 1    responded with equal amounts of force.
 2              The person, the lethal threat,
 3    immediately fell to the ground.  Then I advised
 4    my partner to take cover and we took cover until
 5    other CHP units arrived on scene.
 6              SPECIAL AGENT DANIEL IBARRA:  what
 7    happened after the other units arrived?
 8              OFFICER RAMON SILVA:  So I remember we
 9    retreated to cover and I believe it was Officer
10    Ramos arrived on scene and at that point, we --
11    myself and the initial officer who made contact -
12    - we prior, I'm sorry, prior to -- I don't recall
13    in which order it happened -- but we made a
14    decision to arrest or place handcuffs on the
15    subject who is now lying on the ground in front
16    of you.
17              I believe, I don't know, I don't recall
18    exactly who was on scene but an officer placed
19    his handcuffs or I think it was my handcuffs, I
20    don't recall.  We placed handcuffs on the subject
21    and began to render medical aid.
22              SPECIAL AGENT DANIEL IBARRA:  Thank
23    you, sir.  We'll take a break from there.
24              JAKE JOHNSON:  We'll take ten minutes.
25              SPECIAL AGENT DANIEL IBARRA:  Sure.
```

                                                    Page 18

DOJ00018

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

```
 1    We'll take a 10-minute break.

 2              (Off the record)

 3              SPECIAL AGENT DANIEL IBARRA:  We're

 4    here to continue with the interview of Officer

 5    Silva.  The time is 1311 hours.

 6              Officer Silva, we're going to back and

 7    do some follow ups.  Going back to when you were

 8    traveling southbound on the 710 and you had

 9    mentioned that you were receiving additional

10    dispatch communication.  Can you tell me a little

11    bit, some of the communication that you were

12    receiving?

13              OFFICER RAMON SILVA:  Specifically what

14    was being said, I don't recall, but the nature of

15    what was being relayed to me was essentially that

16    there was a person jumping in front of cars,

17    causing cars to swerve, causing cars to, you

18    know, potentially collide into other cars.  At

19    some point there was, you know, I received a call

20    that there was, you know, bystanders attempting

21    to restrain the person to no avail.  It was

22    essentially being related to me that there was

23    mass chaos on the freeway for lack of a better

24    word.

25              SPECIAL AGENT DANIEL IBARRA:  You
```

Page 19

DOJ00019

1   mentioned that there were bystanders restraining

2   the suspect and that he was jumping in front of

3   cars.  Is that -- I know that's not normal, but

4   is that something normal that you've seen?

5              OFFICER RAMON SILVA:  No, it was

6   absolutely abnormal.

7              SPECIAL AGENT DANIEL IBARRA:  Okay.

8   What kind of red flags does that throw in your

9   mind as you're going towards the scene?

10             OFFICER RAMON SILVA:  Somebody who has

11  the capability of violence.  Somebody, like

12  somebody that just will stop at nothing to cause

13  mayhem or injury to other people, to people's

14  property.  It just completely put me on high

15  alert as to the type of person that was out

16  there.  Somebody who is readily capable of

17  inflecting harm on others.

18             SPECIAL AGENT DANIEL IBARRA:  You

19  stated that you requested for air support.  In

20  your mind, what caused you to request air

21  support?

22             OFFICER RAMON SILVA:  You know as a

23  patrol officer, a lot of the times, you know,

24  just my experience, a lot of the -- my training,

25  you know, the experience that I have here in

Page 20

DOJ00020

```
1    working patrol is area support is, most often
2    than not, it's invaluable.  It's great to have,
3    you know, somebody up top essentially, you know,
4    quarterbacking something or just give you a
5    obviously a bird's eye view of what you're
6    arriving on scene to because, you know, as patrol
7    officers, we, you know, we usually arrive
8    somewhere on the freeway or wherever it is, we
9    can only see in one direction.  You know and
10   there's so many other variables when it comes to,
11   you know, situations such as this, but just in
12   general, situations that are, you know, dynamic,
13   rapidly evolving and it helps to have as many
14   eyes on whatever it is that you're arriving on
15   scene to.  That's what air support provides and
16   that's why I requested it.
17            SPECIAL AGENT TONY BACA:  So my
18   understanding is that you called it in an attempt
19   to try to get as much and gather as much info to
20   assist you in making that, a better decision on
21   the ground.
22            OFFICER RAMON SILVA:  Correct, sir.
23   That's a correct interpretation of what I just
24   said.  And you had mentioned that air support
25   provided your information.  What type of info did
```

Page 21

1   it provide you?  That you can recall.

2           OFFICER RAMON SILVA:  Explicitly, I

3   can't remember what was said, but essentially

4   confirmed what the initial calls we were

5   receiving, you know, on the onset of this call,

6   that there was a person jumping in front of cars,

7   run across the freeway, causing vehicles to

8   nearly collide with each other, nearly collide

9   with the pedestrians, you know, the person, the

10  source of the calls.  It essentially reinforced

11  everything that dispatch had initially related to

12  us.

13          SPECIAL AGENT DANIEL IBARRA:  And you

14  had mentioned that as you were approaching, you

15  were seeing a lot of chaos.  You saw a lot of

16  people.  You weren't sure as to how many, the

17  number of folks that were there in that area.

18  Can you tell me roughly where you're at, as you

19  were seeing, as you're approaching that scene?

20          OFFICER RAMON SILVA:  Can you be more

21  specific?

22          SPECIAL AGENT DANIEL IBARRA:  Were you

23  in the lanes?  Were you on the shoulder?

24          OFFICER RAMON SILVA:  So as I

25  previously stated, I accessed the scene wrong

Page 22

DOJ00022

```
 1   way.  So I was, if I'm facing the scene, I was

 2   traveling with -- my motorcycle was on the

 3   northernmost portion of the scene along what

 4   would be the westbound right shoulder.  I was

 5   facing east.

 6            SPECIAL AGENT DANIEL IBARRA:  And

 7   that's when you saw the number of folks out

 8   there?

 9            OFFICER RAMON SILVA:  Correct.

10            SPECIAL AGENT DANIEL IBARRA:  And at

11   this point, had you determined who the

12   individual, the suspect was?

13            OFFICER RAMON SILVA:  Not immediately,

14   sir.

15            SPECIAL AGENT DANIEL IBARRA:  And you

16   had mentioned something about, and I might have

17   understood it wrong, but my understanding was

18   that dispatch said something along the lines that

19   they described them as a transient homeless.

20   Does that sound right?

21            OFFICER RAMON SILVA:  No, you do not

22   understand that wrong.  That was correct.

23            SPECIAL AGENT DANIEL IBARRA:  Okay.

24            OFFICER RAMON SILVA:  From what I

25   recall, dispatch relayed to us, people were
```

Page 23

DOJ00023

```
 1    described, or the calls that were coming in were

 2    describing this person as a transient, homeless,

 3    you know, disheveled, stuff of that nature.  I

 4    can only speculate as to what the calls were, but

 5    what was relayed to me, what I heard was that it

 6    was a transient/homeless.  I don't recall exactly

 7    what.

 8              SPECIAL AGENT DANIEL IBARRA:  Okay.

 9    Did they -- and you may recall or not -- but do

10    you remember what they described him clothing

11    wise?

12              OFFICER RAMON SILVA:  I don't recall

13    that, sir.

14              SPECIAL AGENT DANIEL IBARRA:  And going

15    back to the part where you're waving folks

16    through, what's your concern there?  Why are you

17    waving those folks through or moving them out of

18    the way?

19              OFFICER RAMON SILVA:  Yeah, man --

20              SPECIAL AGENT DANIEL IBARRA:  I can

21    only assume, but I want to make sure I hear.

22              OFFICER RAMON SILVA:  So many things.

23    So obviously we have potentially or a violent,

24    unstable -- or a tense situation occurring, you

25    know, right in front of me.  So my concern is to
```

Page 24

DOJ00024

1   essentially get everybody out of harm's way

2   because what, you know, all the information we

3   had up on that point, this was nothing short of

4   an unpredictable person.  And I was trying to

5   isolate this person so that nobody else gets

6   hurt.

7         SPECIAL AGENT DANIEL IBARRA:  Okay,

8   fair enough.  And then you had mentioned that you

9   saw the person, the suspect, with his hands in

10   his pocket.  When you, when you saw that moment

11   in time, where was the individual at and where

12   were you at?

13         OFFICER RAMON SILVA:  I was still more

14   or less in the area of the shoulder in the

15   northernmost lane of the freeway.  I don't recall

16   specifically.  But in that general area.

17         SPECIAL AGENT DANIEL IBARRA:  And where

18   was the suspect/decedent at?

19         OFFICER RAMON SILVA:  Still about, you

20   know, 50 to 100 feet away from me, still also on

21   the right shoulder.

22         SPECIAL AGENT TONY BACA:  Were both

23   hands in the pocket?

24         OFFICER RAMON SILVA:  Yes.

25         SPECIAL AGENT DANIEL IBARRA:  And

Page 25

DOJ00025

1   that's when you stated that you have seen him

2   reach into his pocket.  Do you remember which,

3   which pocket?

4           OFFICER RAMON SILVA:  He had both of

5   his hands in his pockets.

6           SPECIAL AGENT DANIEL IBARRA:  Both

7   hands.  From that position, did you, did you ever

8   see him extend his arms out?  Did he pull

9   something out of the pockets or did he keep them

10  in his pockets?

11          OFFICER RAMON SILVA:  When he made the

12  bee line or when he started charging the officer,

13  he removed his hands from his pockets.

14          SPECIAL AGENT DANIEL IBARRA:  So when

15  he ran towards the other officer, that was from a

16  different area, correct?  Not necessarily you.

17          OFFICER RAMON SILVA:  Yes.

18          SPECIAL AGENT DANIEL IBARRA:  And you

19  saw him take his hands out of his pockets?

20          OFFICER RAMON SILVA:  Yes, sir.

21          SPECIAL AGENT DANIEL IBARRA:  What was

22  your concern at that moment?

23          OFFICER RAMON SILVA:  Weapons.

24          SPECIAL AGENT DANIEL IBARRA:  And why

25  is that a concern if he's moving towards your

Page 26

DOJ00026

```
 1    partner?

 2              OFFICER RAMON SILVA:  Why is that a

 3    concern?  Is that a rhetorical question?

 4              SPECIAL AGENT DANIEL IBARRA:  I just

 5    want to make sure it's stated out.

 6              OFFICER RAMON SILVA:  I was in fear for

 7    my partner's life.  Sorry, I don't need to make a

 8    joke out of it.

 9              SPECIAL AGENT DANIEL IBARRA:  No, as an

10    officer, I get you, but I got to get it on record

11    here.

12              OFFICER RAMON SILVA:  I'm okay with it.

13              SPECIAL AGENT DANIEL IBARRA:  And how

14    close at that moment in time, how close was he to

15    your partner?

16              OFFICER RAMON SILVA:  At what point,

17    sir?

18              SPECIAL AGENT DANIEL IBARRA:  When you

19    felt that, you were in fear for your partner's

20    life?

21              OFFICER RAMON SILVA:  Oh, man.  A

22    lane's width, maybe 10 to 12 feet.

23              SPECIAL AGENT TONY BACA:  Any commands

24    given?

25              OFFICER RAMON SILVA:  That I can hear
```

Page 27

DOJ00027

```
 1   from --
 2            SPECIAL AGENT TONY BACA:  from yourself
 3   or your partner?
 4            OFFICER RAMON SILVA:  Yes, there were
 5   commands.
 6            SPECIAL AGENT TONY BACA:  From who?
 7            OFFICER RAMON SILVA:  From me.
 8            SPECIAL AGENT TONY BACA:  What command
 9   did you give?
10            OFFICER RAMON SILVA:  I told him to
11   show me his hands.
12            SPECIAL AGENT DANIEL IBARRA:  And you
13   said he was charging at you.  Where were his
14   hands at?
15            OFFICER RAMON SILVA:  I never said he
16   was trying to me, sir.
17            SPECIAL AGENT DANIEL IBARRA:  Moving
18   towards you.
19            OFFICER RAMON SILVA:  He was never
20   moving towards me, sir.
21            SPECIAL AGENT DANIEL IBARRA:  Your
22   partner, sir, when he was moving towards your
23   partner at any point, where were his hands?
24            OFFICER RAMON SILVA:  He removed them
25   from his pockets.
```

Page 28

DOJ00028

1          SPECIAL AGENT DANIEL IBARRA:  As he's

2     going towards your partner?

3          OFFICER RAMON SILVA:  Yes, sir.

4          SPECIAL AGENT DANIEL IBARRA:  At that

5     moment, did you see anything in his hands?

6          OFFICER RAMON SILVA:  I did.

7          SPECIAL AGENT DANIEL IBARRA:  What did

8     you see from your perspective?  What did you see

9     in his hands?

10         OFFICER RAMON SILVA:  Something I

11    identified as a firearm.  It was a long

12    cylindrical metal or metal and color, a silver-

13    colored cylindrical firearm.

14         SPECIAL AGENT DANIEL IBARRA:  Now in

15    your 14 years of experience, is that normal for

16    somebody to advance towards an officer in uniform

17    like that?

18         OFFICER RAMON SILVA:  No, it's

19    abnormal.

20         SPECIAL AGENT DANIEL IBARRA:  Did that

21    cause -- I'm trying to find the right word here -

22    - but did that cause more concern for you now?

23         OFFICER RAMON SILVA:  Absolutely.

24         SPECIAL AGENT DANIEL IBARRA:  Not a few

25    seconds, you had mentioned around that time in

Page 29

DOJ00029

1   the moment there, you had mentioned that you were

2   a bit confused because you suspected that your

3   partner was going to be doing a break in traffic

4   and he didn't.

5            OFFICER RAMON SILVA:  I'm sorry, was

6   that a question, sir?

7            SPECIAL AGENT DANIEL IBARRA:  Just a

8   little bit, just a few minutes before that

9   incident, I'm backtracking a little bit and I

10  apologize for that.  But just before that moment

11  in time, you had mentioned earlier on that you

12  were a little bit confused because you suspected

13  that your partner is going to do a break and he

14  didn't.

15           OFFICER RAMON SILVA:  Correct.

16           SPECIAL AGENT DANIEL IBARRA:  Was there

17  communication that he was going to do that or did

18  you guys communicate at all about that or?

19           OFFICER RAMON SILVA:  So the

20  unfortunate, you know, however you want to call

21  it, set of circumstances that, you know, appeared

22  ahead of me was that this area that where this

23  incident occurred, is what I would consider like

24  CHP purgatory because it's the short area of

25  freeway where there's three areas that

                                        Page 30

DOJ00030

```
 1   essentially converge in the area of jurisdiction.
 2   So I had no communication with the other unit
 3   responding because he was from a different area.
 4   So within, you know, a couple of couple hundred
 5   thousand feet, there's three areas that have
 6   responsibility within, you know, eye shot.
 7            SPECIAL AGENT DANIEL IBARRA:  So there
 8   was no way, even if you wanted to, there's no way
 9   for you to communicate to him in that, in that
10   moment in time.
11            OFFICER RAMON SILVA:  Correct.  Not in
12   a situation that was so rapidly evolving.
13            SPECIAL AGENT DANIEL IBARRA:  Okay.  So
14   going back to where we're at where you see the
15   suspect, you see him reaching into his hands, you
16   see him moving towards your officer, your
17   partner.  Your fear for your partner's life.  You
18   had mentioned that in between that moment, he
19   went -- and I'm just making sure I heard it
20   correctly -- he went behind the SUV, the patrol
21   car?
22            OFFICER RAMON SILVA:  Correct, you
23   heard correctly, sir.  He was momentarily
24   obscured from my vision because he ran directly,
25   in my line of sight, he ran behind towards my
```

Page 31

DOJ00031

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

Case 2:23-cv-07532-DMG-SSC   Sandra Kirkman v. Carlos Alanton, State of California, et al.   Document 60-19   Filed 04/24/25   Page 33 of 69   Page ID #:933

```
 1    partner behind the patrol vehicle.

 2              SPECIAL AGENT DANIEL IBARRA:  So it's

 3    safe to say you lost sight of him briefly.

 4              OFFICER RAMON SILVA:  That is safe to

 5    say, sir.

 6              SPECIAL AGENT DANIEL IBARRA:  And prior

 7    to losing sight of him, you had seen him with

 8    that object in his hand.

 9              OFFICER RAMON SILVA:  Correct.

10              SPECIAL AGENT DANIEL IBARRA:  And is

11    that the moment in time where you observed your

12    partner unholster his weapon?

13              OFFICER RAMON SILVA:  I observed him

14    unholster the weapon, it was prior to that

15    moment.

16              SPECIAL AGENT DANIEL IBARRA:  Prior to

17    that.

18              OFFICER RAMON SILVA:  So as I was

19    arriving on scene and as I described that moment

20    of confusion where he kind of cut in front of me,

21    or cutting between myself, and as he's getting

22    now, you know, as he's jumping out of his patrol

23    car in my line of sight, I see him draw out his

24    firearm.

25              SPECIAL AGENT DANIEL IBARRA:  Okay.
```

Page 32

DOJ00032

```
 1   And going back to the point where the suspect or

 2   suspect at the scene is running behind the SUV,

 3   did you see your partner, what was he doing at

 4   that moment?

 5           OFFICER RAMON SILVA:  I can't recall

 6   specifically what he was doing.  My focus was on

 7   the person that was momentarily obscured behind

 8   their vision and was going to going to pop out

 9   directly in front of me at some point.

10           SPECIAL AGENT DANIEL IBARRA:  How fast

11   was that in your mind?  How fast was that moment

12   that he took off behind the SUV to when you saw

13   him again?

14           OFFICER RAMON SILVA:  Like I said, I

15   can give you a number and I can say seconds but

16   it's something that's just it's so difficult to

17   quantify in terms of numbers, but it was --

18           SPECIAL AGENT DANIEL IBARRA:  Like a

19   snap of a finger.

20           OFFICER RAMON SILVA:  Yeah, I mean

21   something that you have to experience, and like I

22   said, just happened like that.

23           SPECIAL AGENT DANIEL IBARRA:  From your

24   perspective, very quick.

25           OFFICER RAMON SILVA:  Absolutely.  Did
```

Page  33

DOJ00033

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

```
 1    you have any other alternative considering what

 2    you had seen him do on the shoulders with his

 3    hands in his pocket, considering that you had

 4    seen him have remove an object out of his person

 5    or his pockets, considering that he ran around

 6    the corner there at that very quick moment in

 7    mind, did you have any other options?

 8              OFFICER RAMON SILVA:  I had no options,

 9    sir.

10              SPECIAL AGENT DANIEL IBARRA:  What

11    would have happened if let's say you tried to,

12    just to rule it out, you would have tried to do a

13    taser?  Could he have advanced on you prior to

14    you being able to switch weapons?

15              OFFICER RAMON SILVA:  I don't

16    understand that question.  Are we like what

17    iffing it?

18              SPECIAL AGENT DANIEL IBARRA:  I'm just

19    trying to get an idea of how much time here based

20    off on your training.

21              OFFICER RAMON SILVA:  Oh, would I have

22    time to deploy?

23              SPECIAL AGENT DANIEL IBARRA:  If you

24    had switched, if you have switched gears,

25    switched weapons, would you have had the time to
```

Page 34

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

Case 2:23-cv-07532-DMG-SSC   Sandra Kirkman v. Carlos Alaniz, et al., State of California, Filed 04/24/25   Page 36 of 69   Page ID #:936

```
 1    be able to switch to your less lethal?

 2              OFFICER RAMON SILVA:  No, it would have

 3    been futile.

 4              SPECIAL AGENT DANIEL IBARRA:  Would

 5    that have placed you in danger?

 6              OFFICER RAMON SILVA:  Absolutely.

 7              SPECIAL AGENT DANIEL IBARRA:  And you

 8    had mentioned that when he came around that SUV

 9    and I guess my question is where exactly where

10    his hands?  You mentioned something about a

11    position that that you saw from him.

12              OFFICER RAMON SILVA:  So when he

13    reappeared, his hands were for the recording I'm

14    going to obviously make a shooting stance, you

15    know, they were in this direction.

16              SPECIAL AGENT TONY BACA:  So you're

17    showing me your hands fully stretched out in

18    front of you as if you were shooting a firearm?

19              OFFICER RAMON SILVA:  Correct.

20              SPECIAL AGENT TONY BACA:  Is that what

21    his hands were?

22              OFFICER RAMON SILVA:  That's what I

23    observed.

24              SPECIAL AGENT TONY BACA:  And I just

25    want to make sure I'm correct here.  He's doing
```

Page 35

DOJ00035

1   this simultaneously as he's --

2            OFFICER RAMON SILVA:  Still charging at

3   me, yeah.

4            SPECIAL AGENT TONY BACA:  By this,

5   you're putting both of your hands in front of

6   you?

7            OFFICER RAMON SILVA:  Yes.

8            SPECIAL AGENT DANIEL IBARRA:  Now you

9   had mentioned earlier about you had a bit of

10  concern with crossfire.  How close was your

11  partner at that moment to you and -- relative to

12  you and the suspect?

13           OFFICER RAMON SILVA:  Can you repeat

14  that question?  Sorry.

15           SPECIAL AGENT DANIEL IBARRA:  So at

16  that point there's a bit of a like a triangle

17  separation, right?

18           OFFICER RAMON SILVA:  Yeah.

19           SPECIAL AGENT DANIEL IBARRA:  Sort of.

20  About how close is your partner to the decedent

21  and you?  It's two questions I guess.

22           OFFICER RAMON SILVA:  Okay, so what's

23  your first question?

24           SPECIAL AGENT DANIEL IBARRA:  How close

25  was the officer to you?

                                    Page 36

```
 1              OFFICER RAMON SILVA:  To me?  I would
 2   say the distance from me to that wall.
 3              SPECIAL AGENT DANIEL IBARRA:  Okay.  So
 4   about 15 feet, 30 feet maybe.  Up?
 5              OFFICER RAMON SILVA:  Ten feet.
 6              SPECIAL AGENT DANIEL IBARRA:  Ten feet.
 7   And how close was your partner to the suspect, to
 8   the decedent?
 9              OFFICER RAMON SILVA:  From my point of
10   view, he was on top of him, so within arm's
11   reach.
12              SPECIAL AGENT DANIEL IBARRA:  And you
13   had mentioned that around that time, you said
14   that for a brief second, a moment of
15   helplessness.
16              OFFICER RAMON SILVA:  Yes, I said that.
17              SPECIAL AGENT DANIEL IBARRA:  How did
18   you feel at that moment?
19              OFFICER RAMON SILVA:  Helpless.
20              SPECIAL AGENT DANIEL IBARRA:  Nothing
21   else I can do, right?
22              OFFICER RAMON SILVA:  Yeah.  It felt
23   like I was in no position to help because here we
24   have, you know, somebody with a gun charging my
25   partner and here I am standing right behind him,
```

Page 37

DOJ00037

```
 1   you know helplessness.
 2           SPECIAL AGENT DANIEL IBARRA:  And you
 3   had mentioned something about being concerned for
 4   -- you had to make a conscious decision to take
 5   cover or step up with no cover.  And I know
 6   you're a motorcycle officer, motorcycle officers,
 7   how much cover do you have with the unit compared
 8   to somebody with an SUV?
 9           OFFICER RAMON SILVA:  You got a wallet?
10   Are you asking how much cover does a motorcycle
11   provide?
12           SPECIAL AGENT DANIEL IBARRA:  Right.
13           OFFICER RAMON SILVA:  Probably nothing.
14   And I'd have to be crouching or on all fours to
15   receive any sort of viable cover.
16           SPECIAL AGENT DANIEL IBARRA:  So just
17   kind of bear with me here a little bit.  So you
18   already know the feeling, I'm assuming, I don't
19   want to assume, about being in a position of no
20   cover?
21           OFFICER RAMON SILVA:  Correct.
22           SPECIAL AGENT DANIEL IBARRA:  So you
23   clearly knew you were in a position of no cover.
24           OFFICER RAMON SILVA:  No man's land,
25   yes, sir.
```

Page 38

DOJ00038

Case 2:23-cv-07532-DMG-SSC Sandra Kirkman, et al. v. State of California, et al., 2:23-cv-07532-DMG-SSC

1        SPECIAL AGENT DANIEL IBARRA:  Right

2  around that moment, you said that you heard a

3  pop.  Can you describe a little bit more of that

4  sound?  What did it sound to you?

5        OFFICER RAMON SILVA:  Like a gunshot.

6        SPECIAL AGENT DANIEL IBARRA:  And that

7  was not you shooting.  You suspected somebody

8  else.

9        OFFICER RAMON SILVA:  It was not me.

10  Correct.

11        SPECIAL AGENT DANIEL IBARRA:  And then

12  you notice the individual do what?

13        OFFICER RAMON SILVA:  I still see the

14  individual charging at me and my partner with his

15  hands in the shooting stance.

16        SPECIAL AGENT DANIEL IBARRA:  So the

17  threat was still continuing.

18        OFFICER RAMON SILVA:  Yes.

19        SPECIAL AGENT TONY BACA:  At this time,

20  your firearm was unholstered?

21        OFFICER RAMON SILVA:  Yes.

22        SPECIAL AGENT TONY BACA:  And where

23  were you aiming?

24        OFFICER RAMON SILVA:  At the threat.

25        SPECIAL AGENT TONY BACA:  Was that

Veritext Legal Solutions
866 299-5127

DOJ00039

```
 1   sight picture?

 2              OFFICER RAMON SILVA:  I don't know what

 3   that means, sir.

 4              SPECIAL AGENT TONY BACA:  Did you have

 5   your sites aligned?

 6              OFFICER RAMON SILVA:  It was just

 7   reactive, sir.

 8              SPECIAL AGENT TONY BACA:  Reactive.

 9   Your shooting platform, one hand, two hands?

10              OFFICER RAMON SILVA:  Two hands.

11              SPECIAL AGENT TONY BACA: Visual

12   obstructions?

13              OFFICER RAMON SILVA:  Yes.

14              SPECIAL AGENT TONY BACA:  Which were?

15              OFFICER RAMON SILVA:  The patrol car.

16              SPECIAL AGENT TONY BACA:  And what was

17   behind the decedent or or suspect when you fired?

18              OFFICER RAMON SILVA:  There was a

19   tractor trailer.

20              SPECIAL AGENT DANIEL IBARRA:  Then you

21   mentioned that the person immediately fell to the

22   ground.  Did you continue to give commands?

23              OFFICER RAMON SILVA:  Yes.

24              SPECIAL AGENT DANIEL IBARRA:  Was the

25   individual complying with those commands?
```

Page 40

DOJ00040

```
 1              OFFICER RAMON SILVA:  No.

 2              SPECIAL AGENT DANIEL IBARRA:  And you

 3    mentioned you retreated to get cover and

 4    additional officers arrived on scene.

 5              OFFICER RAMON SILVA:  Correct.

 6              SPECIAL AGENT DANIEL IBARRA:  You made

 7    a decision to cuff the suspect from there?

 8              OFFICER RAMON SILVA:  I did not

 9    physically cuff him.  I believe my partner did.

10              SPECIAL AGENT DANIEL IBARRA:  Did you

11    search at all this individual?

12              OFFICER RAMON SILVA:  I did not.

13              SPECIAL AGENT DANIEL IBARRA:  Did you

14    see any weapon in the area of the individual's

15    person?

16              OFFICER RAMON SILVA:

17              SPECIAL AGENT DANIEL IBARRA:  What did

18    you see?  Did you see any objects around his

19    person?

20              OFFICER RAMON SILVA:  I saw the long

21    cylindrical metal, or I perceived it to be a

22    metal object the firearm that he was holding,

23    what I perceived as a firearm laying on the

24    ground next to him.

25              SPECIAL AGENT DANIEL IBARRA:  Can you
```

Page 41

Veritext Legal Solutions
866 299-5127

DOJ00041

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

```
 1   describe that a little bit more?

 2            OFFICER RAMON SILVA:  That's about the

 3   best of my description, sir.

 4            SPECIAL AGENT DANIEL IBARRA:  You had

 5   handcuffs on him.  The other officers arrive.

 6   Who provided medical care?

 7            OFFICER RAMON SILVA:  I think it was

 8   the initial officer, my partner, who arrived on

 9   scene and then I believe Officer Ramos arrived on

10   scene and him and my, you know, the officer who

11   initially arrived, who I described as my partner

12   up until this point, him and Officer Ramos and I

13   think there was another CHP officer as well.  I

14   don't recall who.

15            SPECIAL AGENT DANIEL IBARRA:  And what

16   type of, if you know, what type of first aid did

17   they render?

18            OFFICER RAMON SILVA:  I don't know,

19   sir.

20            SPECIAL AGENT DANIEL IBARRA:  And just

21   a follow up on your firearm, what type of firearm

22   do you have?

23            OFFICER RAMON SILVA:  A Smith and

24   Wesson MMP, 40 caliber.

25            SPECIAL AGENT DANIEL IBARRA:  40?
```

Page 42

DOJ00042

```
 1              OFFICER RAMON SILVA:  Yes, sir.

 2              SPECIAL AGENT DANIEL IBARRA:  And how

 3   many mags do you carry?

 4              OFFICER RAMON SILVA:  I carry a total

 5   of five magazines.

 6              SPECIAL AGENT DANIEL IBARRA:  Topped

 7   off to what?  To what number?

 8              OFFICER RAMON SILVA:  I'm sorry?

 9              SPECIAL AGENT DANIEL IBARRA:  How much

10   do you care in each mag?

11              OFFICER RAMON SILVA:  15 rounds.

12              SPECIAL AGENT DANIEL IBARRA:  And one

13   in the chamber?

14              OFFICER RAMON SILVA:  Yes, sir.

15              SPECIAL AGENT DANIEL IBARRA:  How many

16   rounds do you believe you shot?

17              OFFICER RAMON SILVA:  Well, they did

18   the round count in front of me so I know I shot

19   six rounds.

20              SPECIAL AGENT DANIEL IBARRA:  Six

21   rounds?

22              OFFICER RAMON SILVA:  Yes, sir.

23              SPECIAL AGENT TONY BACA:  Were you

24   injured?

25              OFFICER RAMON SILVA:  Not that you can
```

                                        Page 43

DOJ00043

```
 1   see.
 2            SPECIAL AGENT DANIEL IBARRA:  There's a
 3   moment in the video, it's kind of hard to explain
 4   --
 5            OFFICER RAMON SILVA:  Do your best,
 6   sir.
 7            SPECIAL AGENT DANIEL IBARRA:  You can
 8   see your body and then once the cuffs go on, can
 9   you explain that a little bit more?
10            OFFICER RAMON SILVA:  Well, it was a
11   lethal threat neutralized and that's, you know,
12   the physical embodiment of it.
13            SPECIAL AGENT DANIEL IBARRA:  Did you -
14   - I'm not trying to put words in your, but I just
15   want to get kind of explain.  Is there a moment
16   of relief that the threat was over?
17            OFFICER RAMON SILVA:  Absolutely.
18            SPECIAL AGENT DANIEL IBARRA:  What was
19   going through your mind in those few seconds that
20   that made you feel that and then that release?
21            OFFICER RAMON SILVA:  At one moment,
22   sir?
23            SPECIAL AGENT DANIEL IBARRA:  During
24   that event, during those few seconds there.
25            OFFICER RAMON SILVA:  What was going
```

                                        Page 44

DOJ00044

1   through my mind?  Fear.  It's hard to quantify

2   let alone put into words.  I just thought I

3   wouldn't see my son grow up.

4           SPECIAL AGENT TONY BACA:  What do you

5   think would have happened if you hadn't fired the

6   firearm?

7           OFFICER RAMON SILVA:  At the time, I

8   was thinking that I was going to get shot.

9           SPECIAL AGENT TONY BACA:  What was your

10  intent when you fired your firearm?

11          OFFICER RAMON SILVA:  To neutralize a

12  lethal threat.

13          SPECIAL AGENT DANIEL IBARRA:  After the

14  EMT Services, did you see any, did you see the

15  scene?  Were you able to see what else was there?

16          OFFICER RAMON SILVA:  Not that I can

17  recall, sir.

18          SPECIAL AGENT DANIEL IBARRA:  Did any

19  witnesses come up to you and provide any

20  additional information that you can recall?

21          OFFICER RAMON SILVA:  That I can

22  recall, no, sir.

23          SPECIAL AGENT TONY BACA:  Have you ever

24  had any contact with the decedent suspect before?

25          OFFICER RAMON SILVA:  Not that I -- I

Page 45

DOJ00045

```
 1    don't know who he is.  So I can't even answer
 2    that.
 3              SPECIAL AGENT TONY BACA:  When you're
 4    responding to the situation, what type of person
 5    do you think you're going to be dealing with?
 6              OFFICER RAMON SILVA:  A violent person.
 7              SPECIAL AGENT TONY BACA:  And did you
 8    receive dispatch updates?
 9              OFFICER RAMON SILVA:  Yes.
10              SPECIAL AGENT TONY BACA:  In regards to
11    his behavior.
12              OFFICER RAMON SILVA:  Correct.
13              SPECIAL AGENT TONY BACA:  Can you
14    describe the communication with dispatch?
15              OFFICER RAMON SILVA:  Between me and
16    dispatcher?  It was it was one-way communication.
17    It was, you know, dispatch letting us know that,
18    you know, another car almost collided with him
19    causing other collisions or near collisions.
20    People trying to hold him down, just like I said,
21    it was one-way communication constantly.
22              SPECIAL AGENT TONY BACA:  Did they ever
23    put out how many people were trying to put him
24    down?
25              OFFICER RAMON SILVA:  Not that I can
```

Page 46

DOJ00046

```
 1    recall, sir.

 2            SPECIAL AGENT TONY BACA:  Are you

 3    familiar with that area?

 4            OFFICER RAMON SILVA:  Yes.

 5            SPECIAL AGENT DANIEL IBARRA:  I got a

 6    follow up.  I know the event was captured on a

 7    body-worn video camera.

 8            OFFICER RAMON SILVA:  Yes, sir.

 9            SPECIAL AGENT DANIEL IBARRA:  Is that

10    your body-worn camera?

11            OFFICER RAMON SILVA:  Correct.

12            SPECIAL AGENT DANIEL IBARRA:  And it's

13    personally owned or department owned?

14            OFFICER RAMON SILVA:  Correct, it's

15    mine.

16            SPECIAL AGENT TONY BACA:  What kind of

17    camera is it?

18            OFFICER RAMON SILVA:  It's the Axon

19    Body II.

20            SPECIAL AGENT TONY BACA:  And where do

21    you carry it at?

22            OFFICER RAMON SILVA:  On patrol?

23            SPECIAL AGENT TONY BACA:  Yes.

24            OFFICER RAMON SILVA:  On my chest.

25    Right about here.
```

Page 47

DOJ00047

```
 1              SPECIAL AGENT TONY BACA:  And you're
 2   pointing at?
 3              OFFICER RAMON SILVA:  My chest.
 4              SPECIAL AGENT TONY BACA:  What part of
 5   your chest?
 6              OFFICER RAMON SILVA:  My upper chest.
 7              SPECIAL AGENT DANIEL IBARRA:  And I
 8   don't know the policy obviously because I'm not a
 9   member of your department, what is the policy on
10   carrying your personal, if you if you can recall
11   it?
12              OFFICER RAMON SILVA:  I can't spout it.
13              SPECIAL AGENT TONY BACA:  What was the
14   lighting like in that day?
15              OFFICER RAMON SILVA:  It was daylight.
16              SPECIAL AGENT TONY BACA:  Any
17   obstructions?  Any shadows or anything like that?
18              OFFICER RAMON SILVA:  Not that I can
19   recall.
20              SPECIAL AGENT TONY BACA:  I got to ask
21   this question.  Did you consider other use of
22   force options?
23              OFFICER RAMON SILVA:  There was nothing
24   else.  There was no other force options that
25   were, that seemed appropriate at the time.
```

Page 48

DOJ00048

1              SPECIAL AGENT TONY BACA:  Why?

2              OFFICER RAMON SILVA:  Because I was

3      confronted with a lethal threat.

4              SPECIAL AGENT TONY BACA:  I have to ask

5      this.  Was it feasible to attempt any form of de-

6      escalation?

7              OFFICER RAMON SILVA:  No.

8              SPECIAL AGENT TONY BACA:  Why?

9              OFFICER RAMON SILVA:  Because this

10     person created the exigency.  He charged at us.

11     I was more than content with sitting there

12     waiting for, you know, back up or whatever.

13     However, this was -- however we could have

14     attempted to defuse it.  However, this person

15     created this situation to escalate.

16             SPECIAL AGENT TONY BACA:  Another

17     question.  Why did you choose the weapon you

18     used?

19             OFFICER RAMON SILVA:  Because that was

20     the only lethal threat, or lethal force option I

21     had on my person.

22             SPECIAL AGENT TONY BACA:  What did you

23     use for cover and/or concealment?

24             OFFICER RAMON SILVA:  The patrol car.

25             SPECIAL AGENT TONY BACA:  Why?

                                        Page 49

DOJ00049

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER
Sandra Kirkman v. Carlos Alaniz, State of California, et al., 2:23-cv-07532-DMG-SSC

```
 1              OFFICER RAMON SILVA:  Because as your
 2    partner said, or we both said, my motorcycle does
 3    not provide much cover.
 4              SPECIAL AGENT DANIEL IBARRA:  Is there
 5    anything else that you would want to add that
 6    neither one of us have asked you that you think
 7    is pertinent to the incident?
 8              SPECIAL AGENT TONY BACA:  I got
 9    something I want to revisit with him.
10              SPECIAL AGENT DANIEL IBARRA:  Sure.
11              SPECIAL AGENT TONY BACA:  So going back
12    to anything that you said to the suspect, do you
13    remember what you said to him and when?
14              OFFICER RAMON SILVA:  Explicitly, I
15    remember when I initially arrived on scene and
16    the partner officer, you know, positioned his
17    patrol car between us.  At that point, you know,
18    I started moving way slowly there.  I remember
19    ordering to show me his hands.
20              SPECIAL AGENT TONY BACA:  And do you
21    know how many times you said that?
22              OFFICER RAMON SILVA:  I don't recall
23    how many times.
24              SPECIAL AGENT TONY BACA:  Do you know
25    if you said anything else to him prior to
```

                                              Page 50

```
 1    shooting?

 2            OFFICER RAMON SILVA:  I don't recall.

 3            SPECIAL AGENT TONY BACA:  Have have you

 4    been trained by the Highway Patrol that verbally

 5    giving orders as a form of de-escalation?

 6            OFFICER RAMON SILVA:  Yes, I have, sir.

 7            SPECIAL AGENT TONY BACA:  That's all we

 8    have on that.

 9            SPECIAL AGENT DANIEL IBARRA:  Thank

10    you, sir.  Anything else?  Mr. Silva, I

11    appreciate your time, sir.  Thank you so much.

12    This concludes the interview at approximately

13    1:46 in the afternoon.

14            (Interview concluded)

15

16

17

18

19

20

21

22

23

24

25
```

Page 51

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER
Sandra Kirkman - Carlos Alantar - State of California, et al.  2:23-cv-07532-DMG-SSC

```
 1              C E R T I F I C A T I O N

 2

 3    I, Sonya Ledanski Hyde, certify that the

 4    foregoing transcript is a true and accurate

 5    record of the proceedings.

 6

 7

 8

 9

10

11    Veritext Legal Solutions

12    330 Old Country Road

13    Suite 300

14    Mineola, NY 11501

15

16    Date:  May 27, 2022

17

18

19

20

21

22

23

24

25
```

Page 52

DOJ00052

**[0600 - asking]**

| 0 | |
|---|---|
| **0600** 7:23 | |

| 1 | |
|---|---|
| **1** 10:18 | |
| **10** 19:1 27:22 | |
| **100** 25:20 | |
| **10148** 6:20 | |
| **105** 2:8 12:2,6 | |
| **1119** 2:10 | |
| **11501** 52:14 | |
| **12** 27:22 | |
| **1232** 2:2 | |
| **1311** 19:5 | |
| **14** 4:14 5:7 29:15 | |
| **1430** 7:24 | |
| **15** 37:4 43:11 | |
| **15-0050** 2:4 | |
| **15632** 3:12 | |
| **1612** 3:15 | |
| **18** 1:15 | |
| **1:46** 51:13 | |

| 2 | |
|---|---|
| **2** 6:13 | |
| **20-0001** 2:15 | |
| **2008** 4:24 | |
| **2012** 5:16 | |
| **2022** 2:2 52:16 | |
| **27** 52:16 | |

| 3 | |
|---|---|
| **30** 37:4 | |
| **300** 52:13 | |
| **330** 52:12 | |

| 4 | |
|---|---|
| **40** 42:24,25 | |
| **4th** 2:10 | |

| 5 | |
|---|---|
| **50** 25:20 | |

| 7 | |
|---|---|
| **710** 11:12 19:8 | |
| **74** 10:9 | |

| 9 | |
|---|---|
| **9** 5:13 | |
| **9th** 2:2 | |

| a | |
|---|---|
| **able** 16:19 34:14 | |
| 35:1 45:15 | |
| **abnormal** 20:6 | |
| 29:19 | |
| **absolutely** 20:6 | |
| 29:23 33:25 35:6 | |
| 44:17 | |
| **academy** 5:1,2,18 | |
| 5:25 | |
| **accessed** 22:25 | |
| **accurate** 52:4 | |
| **actual** 9:21 | |
| **adam** 3:11,11 | |
| **add** 50:5 | |
| **addition** 5:18,25 | |
| **additional** 5:19 | |
| 19:9 41:4 45:20 | |
| **adjacent** 3:19 | |
| **advance** 29:16 | |
| **advanced** 34:13 | |
| **advantage** 13:25 | |
| 14:13 | |
| **advised** 18:3 | |
| **afternoon** 51:13 | |
| **agent** 2:1,3,11,12 | |
| 3:1,8,18,20,21 4:5 | |
| 4:9,15,18,21,25 | |
| 5:5,11,17,22 6:7 | |
| 6:10,14,18,21 7:1 | |
| 7:11,16,20,25 8:5 | |
| 8:8,12,16,21,25 | |
| 9:4,9,15 10:1,5 | |
| 12:5 14:22 16:24 | |

17:1 18:6,22,25
19:3,25 20:7,18
21:17 22:13,22
23:6,10,15,23
24:8,14,20 25:7
25:17,22,25 26:6
26:14,18,21,24
27:4,9,13,18,23
28:2,6,8,12,17,21
29:1,4,7,14,20,24
30:7,16 31:7,13
32:2,6,10,16,25
33:10,18,23 34:10
34:18,23 35:4,7
35:16,20,24 36:4
36:8,15,19,24
37:3,6,12,17,20
38:2,12,16,22
39:1,6,11,16,19
39:22,25 40:4,8
40:11,14,16,20,24
41:2,6,10,13,17
41:25 42:4,15,20
42:25 43:2,6,9,12
43:15,20,23 44:2
44:7,13,18,23
45:4,9,13,18,23
46:3,7,10,13,22
47:2,5,9,12,16,20
47:23 48:1,4,7,13
48:16,20 49:1,4,8
49:16,22,25 50:4
50:8,10,11,20,24
51:3,7,9

**ahead** 10:5 14:22
30:22
**aid** 18:21 42:16
**aiming** 39:23
**air** 11:18,22 13:2
20:19,20 21:15,24

**alert** 20:15
**aligned** 40:5
**alternate** 17:2
**alternative** 17:2
34:1
**ambulance** 10:23
**amounts** 18:1
**angeles** 2:21
**answer** 6:1,2,3
46:1
**apologies** 3:9,23
**apologize** 30:10
**appeared** 30:21
**appreciate** 51:11
**approaching**
22:14,19
**appropriate** 48:25
**approximately** 2:2
2:10 7:24 51:12
**area** 10:17 11:8,19
12:13 14:2 21:1
22:17 25:14,16
26:16 30:22,24
31:1,3 41:14 47:3
**areas** 30:25 31:5
**arm's** 37:10
**arms** 26:8
**arrest** 18:14
**arrive** 11:20 21:7
42:5
**arrived** 9:25 12:4
12:6 13:13 14:16
18:5,7,10 41:4
42:8,9,11 50:15
**arriving** 12:16,24
13:12 21:6,14
32:19
**asked** 6:3 11:17
50:6
**asking** 9:13 38:10

DOJ00053

**[assigned - collided]**

**assigned** 2:20 10:7
10:8,13,13,14
11:4
**assignments** 5:6
5:12
**assist** 21:20
**association** 2:17
2:23
**assume** 5:1,4 7:12
7:14 13:6 24:21
38:19
**assuming** 38:18
**attached** 8:14,16
9:14 10:16
**attempt** 21:18
49:5
**attempted** 49:14
**attempting** 11:6
19:20
**attended** 5:1
**attorney** 3:4 4:1
**automatic** 17:24
**avail** 19:21
**avenue** 2:9
**axon** 47:18

**b**

**b** 2:14
**baca** 2:11,12
21:17 25:22 27:23
28:2,6,8 35:16,20
35:24 36:4 39:19
39:22,25 40:4,8
40:11,14,16 43:23
45:4,9,23 46:3,7
46:10,13,22 47:2
47:16,20,23 48:1
48:4,13,16,20
49:1,4,8,16,22,25
50:8,11,20,24
51:3,7

**back** 12:2 13:9
19:6,7 24:15
31:14 33:1 49:12
50:11
**background** 4:11
**backtrack** 6:22
**backtracking** 30:9
**badge** 7:8
**based** 34:19
**bear** 38:17
**beat** 10:9,9
**bee** 26:12
**began** 18:21
**behalf** 2:18
**behavior** 46:11
**believe** 8:9 18:9,17
41:9 42:9 43:16
**belt** 7:8
**best** 42:3 44:5
**better** 15:2 19:23
21:20
**bi** 1:15
**bird's** 21:5
**bit** 4:11 5:21 6:22
19:11 30:2,8,9,12
36:9,16 38:17
39:3 42:1 44:9
**black** 7:4,7
**blue** 7:7
**body** 9:2 44:8 47:7
47:10,19
**bombard** 9:20
**boots** 7:5,5,6
**boulevard** 10:10
**break** 13:24 14:4
14:9 17:10 18:23
19:1 30:3,13
**brief** 15:7 16:10
37:14
**briefly** 32:3

**bringing** 13:23
14:9
**broadcast** 10:8
**bystanders** 19:20
20:1

**c**

**c** 2:14 52:1,1
**caliber** 42:24
**california** 1:13 2:4
2:12,13,17,21,23
7:13
**call** 6:11 10:7,10
10:14,18,22 11:3
13:4 19:19 22:5
30:20
**called** 9:18 21:18
**calls** 10:17 11:3
13:14,16 14:12,20
14:25 22:4,10
24:1,4
**camera** 9:3 47:7
47:10,17
**cameras** 8:10
**capability** 20:11
**capable** 20:16
**captured** 47:6
**car** 14:19 15:8,18
16:3,22 31:21
32:23 40:15 46:18
49:24 50:17
**care** 42:6 43:10
**career** 5:15
**carry** 43:3,4 47:21
**carrying** 48:10
**cars** 8:17,17 11:6
11:24,24 12:11
13:5,5,7,8,10
19:16,17,17,18
20:3 22:6
**cause** 20:12 29:21
29:22

**caused** 20:20
**causing** 11:25
13:9 19:17,17
22:7 46:19
**certain** 12:15
17:21
**certify** 52:3
**chamber** 43:13
**chance** 8:22
**chaos** 12:10 19:23
22:15
**charged** 16:8
49:10
**charges** 15:21
**charging** 15:17
17:22 26:12 28:13
36:2 37:24 39:14
**check** 3:2
**chest** 47:24 48:3,5
48:6
**chi** 2:22,22
**choose** 49:17
**chp** 1:15 2:6 3:23
4:13 7:9 13:11,22
17:19 18:5 30:24
42:13
**chronological**
9:24
**circumstances**
30:21
**civil** 10:15
**clear** 9:23
**clearly** 38:23
**close** 27:14,14
36:10,20,24 37:7
**closer** 9:21
**clothing** 24:10
**collide** 19:18 22:8
22:8
**collided** 46:18

**[collision - discontinued]**

| | | | |
|---|---|---|---|
| **collision** 10:15,23 11:11 | **consider** 10:18 30:23 48:21 | **cuffs** 44:8 | **dash** 8:18 |
| **collisions** 46:19,19 | **considering** 34:1,3 34:5 | **cut** 32:20 | **date** 6:11,24 8:1 9:17 52:16 |
| **color** 29:12 | **constantly** 46:21 | **cutting** 32:21 | **dates** 7:21 |
| **colored** 29:13 | **contact** 13:21 18:11 45:24 | **cylindrical** 15:24 29:12,13 41:21 | **day** 8:2 48:14 |
| **come** 45:19 | **content** 14:14 49:11 | **d** | **daylight** 48:15 |
| **comes** 21:10 | **continue** 14:21 19:4 40:22 | **danger** 35:5 | **de** 49:5 51:5 |
| **comfortable** 7:4 | **continued** 12:1 | **daniel** 2:1,3 3:1,8 3:18 4:5,9,15,18 4:21,25 5:5,11,17 5:22 6:7,10,14,18 6:21 7:1,11,16,20 7:25 8:5,8,12,16 8:21,25 9:4,9,15 10:1,5 12:5 14:22 16:24 17:1 18:6 18:22,25 19:3,25 20:7,18 22:13,22 23:6,10,15,23 24:8,14,20 25:7 25:17,25 26:6,14 26:18,21,24 27:4 27:9,13,18 28:12 28:17,21 29:1,4,7 29:14,20,24 30:7 30:16 31:7,13 32:2,6,10,16,25 33:10,18,23 34:10 34:18,23 35:4,7 36:8,15,19,24 37:3,6,12,17,20 38:2,12,16,22 39:1,6,11,16 40:20,24 41:2,6 41:10,13,17,25 42:4,15,20,25 43:2,6,9,12,15,20 44:2,7,13,18,23 45:13,18 47:5,9 47:12 48:7 50:4 50:10 51:9 | **dealing** 46:5 |
| **coming** 24:1 | **continuing** 11:3 39:17 | | **decedent** 25:18 36:20 37:8 40:17 45:24 |
| **command** 28:8 | **continuously** 11:15,22 | | **decision** 11:16 16:13,14,17,21 17:14 18:14 21:20 38:4 41:7 |
| **commands** 27:23 28:5 40:22,25 | **converge** 31:1 | | **definitely** 12:17 |
| **commotion** 12:9 12:10 | **corner** 34:6 | | **defuse** 49:14 |
| **communicate** 30:18 31:9 | **correct** 21:22,23 23:9,22 26:16 30:15 31:11,22 32:9 35:19,25 38:21 39:10 41:5 46:12 47:11,14 | | **department** 1:13 2:4,13 47:13 48:9 |
| **communication** 19:10,11 30:17 31:2 46:14,16,21 | **correctly** 31:20,23 | | **deploy** 34:22 |
| **compared** 38:7 | **count** 43:18 | | **deputy** 3:4 |
| **completed** 3:25 5:2 | **country** 52:12 | | **describe** 12:9 39:3 42:1 46:14 |
| **completely** 14:10 20:14 | **couple** 10:11 31:4 31:4 | | **described** 12:22 23:19 24:1,10 32:19 42:11 |
| **complying** 40:25 | **cover** 16:22 17:3,5 18:4,4,9 38:5,5,7 38:10,15,20,23 41:3 49:23 50:3 | | **describing** 24:2 |
| **concealment** 49:23 | **created** 49:10,15 | | **description** 12:22 13:1 15:1 42:3 |
| **concern** 24:16,25 26:22,25 27:3 29:22 36:10 | **criminal** 3:3,24 | | **detective** 3:22 |
| **concerned** 38:3 | **critical** 3:13,16 | | **determined** 23:11 |
| **concluded** 51:14 | **crossfire** 16:6,18 36:10 | | **different** 10:14 26:16 31:3 |
| **concludes** 51:12 | **crouching** 38:14 | | **difficult** 33:16 |
| **conducting** 2:6 | **cuff** 41:7,9 | | **direct** 15:19 |
| **confirmed** 22:4 | | | **direction** 12:14 21:9 35:15 |
| **confronted** 49:3 | | | **directly** 15:18 31:24 33:9 |
| **confused** 14:12 30:2,12 | | | **discontinued** 11:10,10 |
| **confusion** 32:20 | | | |
| **conscious** 16:13 16:14 38:4 | | | |

Veritext Legal Solutions
866 299-5127

DOJ00055

**[disheveled – guess]**

**disheveled** 24:3
**dispatch** 11:14
  13:1 19:10 22:11
  23:18,25 46:8,14
  46:17
**dispatched** 10:2
**dispatcher** 11:17
  13:17,19 46:16
**distance** 37:2
**disturbance** 10:15
  11:25
**division** 3:12,16
**doing** 13:6 17:20
  30:3 33:3,6 35:25
**double** 3:2
**draw** 32:23
**drawn** 15:14,14
**drew** 15:9
**driving** 14:10
**duty** 7:8
**dynamic** 21:12

**e**

**e** 3:15,15 16:12
  52:1
**earlier** 30:11 36:9
**east** 2:6,20 23:5
**elvin** 3:21
**embodiment**
  44:12
**emt** 45:14
**enforcement** 4:16
**enrique** 1:16
**entry** 5:23
**envisioned** 14:4
**equal** 18:1
**equipment** 9:5
**escalate** 49:15
**escalation** 49:6
  51:5
**essentially** 11:24
  12:10,15 16:18,22

17:3,13 19:15,22
  21:3 22:3,10 25:1
  31:1
**event** 44:24 47:6
**everybody** 25:1
**evolving** 21:13
  31:12
**exactly** 16:15
  18:18 24:6 35:9
**exigency** 49:10
**exited** 12:1
**experience** 4:16
  4:19 20:24,25
  29:15 33:21
**explain** 16:15 17:6
  44:3,9,15
**explicitly** 13:22
  22:2 50:14
**extend** 26:8
**extra** 9:10
**eye** 7:7 21:5 31:6
**eyes** 21:14

**f**

**f** 52:1
**facing** 23:1,5
**fair** 25:8
**falls** 16:20
**familiar** 47:3
**fast** 33:10,11
**fear** 27:6,19 31:17
  45:1
**feasible** 49:5
**feel** 37:18 44:20
**feeling** 38:18
**feet** 25:20 27:22
  31:5 37:4,4,5,6
**fell** 18:3 40:21
**felt** 27:19 37:22
**fields** 10:12
**find** 29:21

**finger** 33:19
**fire** 16:7
**firearm** 15:9,13
  15:14 16:1,9
  29:11,13 32:24
  35:18 39:20 41:22
  41:23 42:21,21
  45:6,10
**fired** 17:18 40:17
  45:5,10
**first** 36:23 42:16
**five** 43:5
**flags** 20:8
**floral** 10:11,19
**florence** 11:19
**focus** 33:6
**folks** 22:17 23:7
  24:15,17
**follow** 19:7 42:21
  47:6
**football** 10:12
**force** 18:1 48:22
  48:24 49:20
**ford** 10:10,19
**foregoing** 52:4
**forget** 3:7
**form** 49:5 51:5
**fours** 38:14
**freeway** 2:8 11:25
  19:23 21:8 22:7
  25:15 30:25
**friday** 7:23
**front** 11:24 15:18
  17:25 18:15 19:16
  20:2 22:6 24:25
  32:20 33:9 35:18
  36:5 43:18
**fuck** 16:5 17:17
**fuckin** 17:16
**fully** 35:17

**further** 8:22
**futile** 35:3

**g**

**garfield** 2:8 12:1,2
**gather** 21:19
**gears** 34:24
**general** 5:7 21:12
  25:16
**general's** 3:5 4:1
**gentlemen** 3:9
**geographically**
  5:9
**getting** 12:18
  32:21
**give** 4:3 9:19,24
  21:4 28:9 33:15
  40:22
**given** 27:24
**giving** 13:1,2 51:5
**glance** 15:7
**gloves** 7:8
**go** 8:22 9:16 10:5
  11:9 14:22 16:21
  44:8
**going** 4:10 9:16
  13:19 14:5 15:4
  16:17,19 19:6,7
  20:9 24:14 29:2
  30:3,13,17 31:14
  33:1,8,8 35:14
  44:19,25 45:8
  46:5 50:11
**gold** 7:7
**good** 11:9 17:11
  17:12
**great** 21:2
**ground** 18:3,15
  21:21 40:22 41:24
**grow** 45:3
**guess** 35:9 36:21

**[gun - justice]**

| | | | |
|---|---|---|---|
| **gun** 37:24 | **helplessness** 16:11 | 32:2,6,10,16,25 | **initial** 11:11 18:11 |
| **guns** 9:10 | 37:15 38:1 | 33:10,18,23 34:10 | 22:4 42:8 |
| **gunshot** 39:5 | **helps** 21:13 | 34:18,23 35:4,7 | **initially** 10:20 |
| **guys** 30:18 | **hernandez** 3:22 | 36:8,15,19,24 | 11:4,5 13:3 14:7 |
| **h** | **high** 20:14 | 37:3,6,12,17,20 | 22:11 42:11 50:15 |
| **hand** 15:25 32:8 | **highway** 2:17,21 | 38:2,12,16,22 | **injured** 43:24 |
| 40:9 | 2:24 7:13 51:4 | 39:1,6,11,16 | **injury** 20:13 |
| **handcuffs** 14:2 | **hinds** 3:22 | 40:20,24 41:2,6 | **intent** 45:10 |
| 18:14,19,20 | **hired** 4:22 | 41:10,13,17,25 | **intention** 11:1 |
| 42:5 | **hit** 11:5,6 | 42:4,15,20,25 | **interpretation** |
| **hands** 13:18 15:1 | **hold** 46:20 | 43:2,6,9,12,15,20 | 21:23 |
| 15:15,23 25:9,23 | **holding** 41:22 | 44:2,7,13,18,23 | **interpreted** 13:11 |
| 26:5,7,13,19 | **homeless** 12:24 | 45:13,18 47:5,9 | **interview** 1:15 2:7 |
| 28:11,14,23 29:5 | 23:19 24:2,6 | 47:12 48:7 50:4 | 19:4 51:12,14 |
| 29:9 31:15 34:3 | **hoping** 14:5 | 50:10 51:9 | **invaluable** 21:2 |
| 35:10,13,17,21 | **horse** 7:5 | **idea** 11:9 34:19 | **investigation** 2:5 |
| 36:5 39:15 40:9 | **hours** 2:3,10 7:23 | **identification** 6:15 | 3:3,13,16,25 |
| 40:10 50:19 | 7:24 19:5 | **identified** 13:16 | **investigative** 2:14 |
| **happened** 12:6 | **hundred** 31:4 | 14:11 15:7,25 | 5:12 |
| 15:12,15 18:7,13 | **hurt** 25:6 | 29:11 | **involving** 10:24 |
| 33:22 34:11 45:5 | **hyde** 52:3 | **identify** 3:7,10 | **isolate** 13:4,14 |
| **happening** 16:12 | **i** | 7:12 12:25 | 25:5 |
| **hard** 15:11 16:4 | **ibarra** 2:1,3 3:1,8 | **iffing** 34:17 | **isolating** 14:1 |
| 16:15 44:3 45:1 | 3:18 4:5,9,15,18 | **ii** 47:19 | **it'd** 11:8 |
| **harm** 20:17 | 4:21,25 5:5,11,17 | **imagine** 12:24 | **j** |
| **harm's** 25:1 | 5:22 6:7,10,14,18 | 13:8 | **jake** 2:16,16 3:6 |
| **he'll** 6:2,3 | 6:21 7:1,11,16,20 | **immediately** 18:3 | 6:1 17:9,12 18:24 |
| **heading** 11:13,19 | 7:25 8:5,8,12,16 | 23:13 40:21 | **january** 4:23 |
| **hear** 11:20 17:16 | 8:21,25 9:4,9,15 | **incident** 3:13,16 | **johnson** 2:16,16 |
| 24:21 27:25 | 10:1,5 12:5 14:22 | 6:12,24 8:1 9:17 | 3:6 6:1 17:9,12 |
| **heard** 10:10,22 | 16:24 17:1 18:6 | 30:9,23 50:7 | 18:24 |
| 24:5 31:19,23 | 18:22,25 19:3,25 | **individual** 23:12 | **joke** 27:8 |
| 39:2 | 20:7,18 22:13,22 | 25:11 39:12,14 | **jose** 2:22,22 |
| **hearing** 13:10 | 23:6,10,15,23 | 40:25 41:11 | **july** 4:23 |
| **helicopter** 11:20 | 24:8,14,20 25:7 | **individual's** 41:14 | **jumped** 5:15 15:8 |
| **helmet** 7:7 | 25:17,25 26:6,14 | **individuals** 12:12 | **jumping** 11:15,23 |
| **help** 11:9 14:15,16 | 26:18,21,24 27:4 | **inflecting** 20:17 | 19:16 20:2 22:6 |
| 16:7,19 17:14 | 27:9,13,18 28:12 | **info** 21:19,25 | 32:22 |
| 37:23 | 28:17,21 29:1,4,7 | **information** 11:14 | **jurisdiction** 31:1 |
| **helpless** 16:18 | 29:14,20,24 30:7 | 11:23 12:21 21:25 | **justice** 1:13 2:4,13 |
| 37:19 | 30:16 31:7,13 | 25:2 45:20 | |

Veritext Legal Solutions
866 299-5127

DOJ00057

[k - observed]

| k | | | |
|---|---|---|---|
| **k** 5:13 | **lethal** 17:25 18:2 | **means** 40:3 | **motors** 5:15 |
| **keep** 26:9 | 35:1 44:11 45:12 | **medical** 18:21 | **moving** 24:17 |
| **kind** 9:7 14:9,18 | 49:3,20,20 | 42:6 | 26:25 28:17,20,22 |
| 17:19 20:8 32:20 | **letting** 46:17 | **member** 48:9 | 31:16 50:18 |
| 38:17 44:3,15 | **life** 27:7,20 31:17 | **mentally** 17:3 | |
| 47:16 | **lighting** 48:14 | **mentioned** 19:9 | **n** |
| **knew** 38:23 | **line** 15:19,19 | 20:1 21:24 22:14 | **n** 52:1 |
| **know** 12:20 13:4 | 26:12 31:25 32:23 | 23:16 25:8 29:25 | **name** 2:14,19,22 |
| 13:15,17,19,25 | **lines** 23:18 | 30:1,11 31:18 | **nature** 19:14 24:3 |
| 14:6,14 15:12,13 | **listening** 3:19 | 35:8,10 36:9 | **near** 46:19 |
| 16:4,7,13,21 17:7 | **little** 4:10 5:21 | 37:13 38:3 40:21 | **nearly** 22:8,8 |
| 17:17,21 18:17 | 6:22 19:10 30:8,9 | 41:3 | **necessarily** 26:16 |
| 19:18,19,20 20:3 | 30:12 38:17 39:3 | **metal** 29:12,12 | **need** 27:7 |
| 20:22,23,25 21:3 | 42:1 44:9 | 41:21,22 | **neither** 50:6 |
| 21:3,6,7,9,11,12 | **long** 4:12 9:10 | **military** 4:19 | **neutralize** 45:11 |
| 22:5,9 24:3,25 | 15:24 29:11 41:20 | **mind** 16:11 20:9 | **neutralized** 44:11 |
| 25:2,20 30:20,21 | **looking** 12:14 | 20:20 33:11 34:7 | **never** 17:7 28:15 |
| 31:4,6 32:22 | **los** 2:21 | 44:19 45:1 | 28:19 |
| 35:15 37:24 38:1 | **losing** 32:7 | **mine** 47:15 | **normal** 5:25 7:17 |
| 38:5,18 40:2 | **lost** 32:3 | **mineola** 52:14 | 8:17 20:3,4 29:15 |
| 42:10,16,18 43:18 | **lot** 12:10 20:23,24 | **minute** 17:16 19:1 | **normally** 7:9 |
| 44:11 46:1,17,17 | 22:15,15 | **minutes** 18:24 | **northbound** 10:10 |
| 46:18 47:6 48:8 | **lying** 18:15 | 30:8 | **northernmost** |
| 49:12 50:16,17,21 | | **mmp** 42:24 | 23:3 25:15 |
| 50:24 | **m** | **moment** 17:22 | **notice** 39:12 |
| | **m** 3:15 | 25:10 26:22 27:14 | **number** 6:15 |
| **l** | **mag** 43:10 | 29:5 30:1,10 | 22:17 23:7 33:15 |
| **l** 3:12,15 | **magazines** 43:5 | 31:10,18 32:11,15 | 43:7 |
| **la** 2:6 | **mags** 43:3 | 32:19 33:4,11 | **numbers** 6:16 |
| **la2022-00016** 1:15 | **majority** 10:16 | 34:6 36:11 37:14 | 33:17 |
| **lack** 15:2 19:23 | **making** 13:20 | 37:18 39:2 44:3 | **ny** 52:14 |
| **land** 38:24 | 21:20 31:19 | 44:15,21 | |
| **lane** 25:15 | **male** 15:7 | **momentarily** | **o** |
| **lane's** 27:22 | **man** 24:19 27:21 | 31:23 33:7 | **o** 3:12,15 52:1 |
| **lanes** 2:9 22:23 | **man's** 38:24 | **monday** 7:22 | **object** 32:8 34:4 |
| **law** 4:16 | **mary** 6:13,20 | **motor** 2:20 5:16 | 41:22 |
| **laying** 41:23 | **mass** 19:23 | 6:15 8:10 9:11 | **objects** 41:18 |
| **ledanski** 52:3 | **match** 12:25 | **motorcycle** 7:6 | **obscured** 31:24 |
| **legal** 52:11 | **matched** 15:1 | 8:11,13,20 9:5,14 | 33:7 |
| | **mayhem** 20:13 | 23:2 38:6,6,10 | **obscures** 16:1,2 |
| | **mean** 9:8 11:21 | 50:2 | **observed** 14:8,8 |
| | 15:2 17:5 33:20 | | 14:25 15:6,12 |

Veritext Legal Solutions
866 299-5127

DOJ00058

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

[observed - pop]

17:25 32:11,13
35:23
**obstructions**
40:12 48:17
**obviously**  13:8
21:5 24:23 35:14
48:8
**occurred**  2:8
30:23
**occurring**  24:24
**office**  2:21 3:5 4:1
4:3
**officer**  1:15 2:7,18
2:19,20,24 4:8,13
4:14,17,20,23 5:3
5:9,14,20 6:5,9,13
6:17,20,25 7:3,9
7:14,18,22 8:3,7
8:11,14,19,24 9:2
9:7,12,23 10:3,6
12:8 14:7,18,24
15:4,6,8,13,17,17
15:21 17:11,13,19
18:8,9,11,18 19:4
19:6,13 20:5,10
20:22,23 21:22
22:2,20,24 23:9
23:13,21,24 24:12
24:19,22 25:13,19
25:24 26:4,11,12
26:15,17,20,23
27:2,6,10,12,16
27:21,25 28:4,7
28:10,15,19,24
29:3,6,10,16,18
29:23 30:5,15,19
31:11,16,22 32:4
32:9,13,18 33:5
33:14,20,25 34:8
34:15,21 35:2,6
35:12,19,22 36:2

36:7,13,18,22,25
37:1,5,9,16,19,22
38:6,9,13,21,24
39:5,9,13,18,21
39:24 40:2,6,10
40:13,15,18,23
41:1,5,8,12,16,20
42:2,7,8,9,10,12
42:13,18,23 43:1
43:4,8,11,14,17
43:22,25 44:5,10
44:17,21,25 45:7
45:11,16,21,25
46:6,9,12,15,25
47:4,8,11,14,18
47:22,24 48:3,6
48:12,15,18,23
49:2,7,9,19,24
50:1,14,16,22
51:2,6
**officers**  21:7 38:6
41:4 42:5
**oh**  17:17 27:21
34:21
**ois**  2:8 9:21
**okay**  8:25 10:3
20:7 23:23 24:8
25:7 27:12 31:13
32:25 36:22 37:3
**old**  52:12
**once**  3:25 13:16
44:8
**onset**  22:5
**option**  49:20
**options**  34:7,8
48:22,24
**order**  18:13
**ordered**  4:6
**ordering**  50:19
**orders**  51:5

**ordinary**  11:1
**overhead**  11:21
**owned**  47:13,13

**p**

**p**  3:15
**part**  24:15 48:4
**partner**  15:13,17
16:8,20 17:14,19
18:4 27:1,15 28:3
28:22,23 29:2
30:3,13 31:17
32:1,12 33:3
36:11,20 37:7,25
39:14 41:9 42:8
42:11 50:2,16
**partner's**  27:7,19
31:17
**patch**  7:8
**patches**  7:8,12
**patrol**  2:21 5:15
8:17,17 14:8,19
15:5,8,18 16:3,22
20:23 21:1,6
31:20 32:1,22
40:15 47:22 49:24
50:17 51:4
**patrolman**  2:17
2:24 7:13
**pedestrian**  10:25
**pedestrians**  22:9
**people**  12:11,20
13:3 20:13 22:16
23:25 46:20,23
**people's**  20:13
**perceived**  41:21
41:23
**person**  9:6 11:4,15
11:23 12:22,23
13:15,17 14:1,11
14:19,25 15:6,15
15:21 17:22 18:2

19:16,21 20:15
22:6,9 24:2 25:4,5
25:9 33:7 34:4
40:21 41:15,19
46:4,6 49:10,14
49:21
**personal**  48:10
**personally**  47:13
**perspective**  29:8
33:24
**pertinent**  50:7
**phone**  3:20
**physical**  44:12
**physically**  41:9
**picture**  40:1
**place**  18:14
**placed**  18:18,20
35:5
**platform**  40:9
**play**  16:23
**please**  3:10
**pocket**  13:18 15:2
15:23 25:10,23
26:2,3 34:3
**pockets**  26:5,9,10
26:13,19 28:25
34:5
**point**  11:7,22
12:19 13:24 15:9
17:4 18:10 19:19
23:11 25:3 27:16
28:23 33:1,9
36:16 37:9 42:12
50:17
**pointing**  48:2
**police**  2:5,13
**policy**  48:8,9
**pomerleau**  3:14
3:15
**pop**  17:17 33:8
39:3

Page 7

DOJ00059

**[portion - restrain]**

| | | | |
|---|---|---|---|
| **portion** 23:3 | 35:9 36:14,23 | 42:2,7,18,23 43:1 | **recording** 8:20 |
| **position** 16:7 26:7 | 48:21 49:17 | 43:4,8,11,14,17 | 35:13 |
| 35:11 37:23 38:19 | **questions** 9:21 | 43:22,25 44:5,10 | **red** 20:8 |
| 38:23 | 36:21 | 44:17,21,25 45:7 | **regarding** 2:7 |
| **positioned** 15:5 | **quick** 33:24 34:6 | 45:11,16,21,25 | **regards** 5:23 6:22 |
| 50:16 | **quickly** 15:11 | 46:6,9,12,15,25 | 46:10 |
| **potentially** 19:18 | **quite** 12:15 | 47:4,8,11,14,18 | **reinforced** 22:10 |
| 24:23 | | 47:22,24 48:3,6 | **related** 19:22 |
| **prepared** 17:4 | **r** | 48:12,15,18,23 | 22:11 |
| **present** 2:11 | **r** 3:12,15 52:1 | 49:2,7,9,19,24 | **relative** 36:11 |
| **previously** 22:25 | **ramon** 1:14 2:7,19 | 50:1,14,22 51:2,6 | **relayed** 19:15 |
| **prior** 4:15,16 | 2:19 4:3,8,14,17 | **ramos** 1:16 18:10 | 23:25 24:5 |
| 13:20 18:12,12 | 4:20,23 5:3,9,14 | 42:9,12 | **release** 44:20 |
| 32:6,14,16 34:13 | 5:20 6:5,9,13,17 | **ran** 26:15 31:24 | **relief** 44:16 |
| 50:25 | 6:20,25 7:3,14,18 | 31:25 34:5 | **remain** 16:17 |
| **probably** 38:13 | 7:22 8:3,7,11,14 | **rapidly** 21:13 | **remember** 12:8,19 |
| **proceedings** 52:5 | 8:19,24 9:2,7,12 | 31:12 | 13:10,22,23 16:3 |
| **property** 20:14 | 9:23 10:3,6 12:8 | **rb** 10:18 | 18:8 22:3 24:10 |
| **protection** 7:7 | 14:24 17:11,13 | **reach** 26:2 37:11 | 26:2 50:13,15,18 |
| **provide** 4:6 5:6 | 18:8 19:13 20:5 | **reaching** 31:15 | **remove** 15:23 34:4 |
| 22:1 38:11 45:19 | 20:10,22 21:22 | **reactive** 40:7,8 | **removed** 26:13 |
| 50:3 | 22:2,20,24 23:9 | **readily** 20:16 | 28:24 |
| **provided** 13:1 | 23:13,21,24 24:12 | **ready** 10:4 | **render** 18:21 |
| 21:25 42:6 | 24:19,22 25:13,19 | **reappeared** 35:13 | 42:17 |
| **provides** 21:15 | 25:24 26:4,11,17 | **reask** 6:5 | **repeat** 36:13 |
| **providing** 11:22 | 26:20,23 27:2,6 | **recall** 12:12 18:12 | **representative** |
| **pull** 15:22 26:8 | 27:12,16,21,25 | 18:17,20 19:14 | 2:23,24 |
| **pulls** 15:22 | 28:4,7,10,15,19 | 22:1 23:25 24:6,9 | **request** 20:20 |
| **purgatory** 30:24 | 28:24 29:3,6,10 | 24:12 25:15 33:5 | **requested** 20:19 |
| **put** 14:2,18 16:16 | 29:18,23 30:5,15 | 42:14 45:17,20,22 | 21:16 |
| 20:14 44:14 45:2 | 30:19 31:11,22 | 47:1 48:10,19 | **respond** 11:17 |
| 46:23,23 | 32:4,9,13,18 33:5 | 50:22 51:2 | **responded** 18:1 |
| **putting** 36:5 | 33:14,20,25 34:8 | **receive** 6:8 11:2 | **responding** 10:20 |
| | 34:15,21 35:2,6 | 38:15 46:8 | 10:24 11:2,8,11 |
| **q** | 35:12,19,22 36:2 | **received** 19:19 | 12:21 31:3 46:4 |
| **quantify** 15:11 | 36:7,13,18,22 | **receiving** 11:14 | **response** 11:10 |
| 16:4,16 33:17 | 37:1,5,9,16,19,22 | 12:21 19:9,12 | **responsibility** |
| 45:1 | 38:9,13,21,24 | 22:5 | 31:6 |
| **quarterbacking** | 39:5,9,13,18,21 | **record** 10:19,20 | **rest** 17:23 |
| 21:4 | 39:24 40:2,6,10 | 19:2 27:10 52:5 | **restrain** 19:21 |
| **question** 6:2,3 9:8 | 40:13,15,18,23 | | |
| 27:3 30:6 34:16 | 41:1,5,8,12,16,20 | | |

Veritext Legal Solutions
866 299-5127

**[restraining - situations]**

| | | | |
|---|---|---|---|
| **restraining** 20:1 | 18:5,10,18 20:9 | **shotguns** 9:10 | 40:13,15,18,23 |
| **retreated** 18:9 | 21:6,15 22:19,25 | **shoulder** 12:13 | 41:1,5,8,12,16,20 |
| 41:3 | 23:1,3 32:19 33:2 | 22:23 23:4 25:14 | 42:2,7,18,23 43:1 |
| **return** 16:7 | 41:4 42:9,10 | 25:21 | 43:4,8,11,14,17 |
| **review** 3:5 4:2 | 45:15 50:15 | **shoulders** 34:2 | 43:22,25 44:5,10 |
| 8:23 9:1 | **sean** 3:14,14 | **show** 28:11 50:19 | 44:17,21,25 45:7 |
| **revisit** 50:9 | **search** 41:11 | **showing** 35:17 | 45:11,16,21,25 |
| **rhetorical** 27:3 | **second** 16:10 | **side** 17:20 | 46:6,9,12,15,25 |
| **richardson** 3:21 | 37:14 | **sight** 15:19 31:25 | 47:4,8,11,14,18 |
| **riding** 7:4,5,6 | **seconds** 15:10 | 32:3,7,23 40:1 | 47:22,24 48:3,6 |
| **rifles** 9:13,14 | 16:12 29:25 33:15 | **sign** 6:11 | 48:12,15,18,23 |
| **right** 5:2 9:16 | 44:19,24 | **silva** 1:14 2:7,18 | 49:2,7,9,19,24 |
| 10:11 11:16 15:20 | **see** 7:9 15:15,22 | 2:19,20,25 3:3,24 | 50:1,14,22 51:2,6 |
| 23:4,20 24:25 | 15:22 17:18,19 | 4:3,8,14,17,20,23 | 51:10 |
| 25:21 29:21 36:17 | 21:9 26:8 29:5,8,8 | 5:3,9,14,20 6:5,9 | **silver** 15:24 29:12 |
| 37:21,25 38:12 | 31:14,15,16 32:23 | 6:13,17,20,25 7:3 | **simultaneous** |
| 39:1 47:25 | 33:3 39:13 41:14 | 7:14,18,22 8:3,7 | 15:16 |
| **road** 52:12 | 41:18,18 44:1,8 | 8:11,14,19,24 9:2 | **simultaneously** |
| **rob** 3:22 | 45:3,14,14,15 | 9:7,12,23 10:3,6 | 36:1 |
| **roi** 1:15 | **seeing** 12:9 13:23 | 12:8 14:24 17:11 | **sir** 3:23 4:6,10 5:4 |
| **room** 3:10,19 | 22:15,19 | 17:13 18:8 19:5,6 | 6:6,9,25 7:15,19 |
| **roughly** 22:18 | **seen** 20:4 26:1 | 19:13 20:5,10,22 | 8:7 9:8 10:1 14:23 |
| **round** 17:18 43:18 | 32:7 34:2,4 | 21:22 22:2,20,24 | 18:23 21:22 23:14 |
| **rounds** 16:20 | **separation** 36:17 | 23:9,13,21,24 | 24:13 26:20 27:17 |
| 43:11,16,19,21 | **sergeant** 3:11,11 | 24:12,19,22 25:13 | 28:16,20,22 29:3 |
| **rule** 34:12 | 3:14,14 | 25:19,24 26:4,11 | 30:6 31:23 32:5 |
| **run** 22:7 | **serial** 2:3,14 | 26:17,20,23 27:2 | 34:9 38:25 40:3,7 |
| **rundown** 5:6 9:20 | **service** 4:11 | 27:6,12,16,21,25 | 42:3,19 43:1,14 |
| **running** 16:1 33:2 | **services** 45:14 | 28:4,7,10,15,19 | 43:22 44:6,22 |
| **s** | **set** 30:21 | 28:24 29:3,6,10 | 45:17,22 47:1,8 |
| **safe** 5:3 7:14 32:3 | **shadows** 48:17 | 29:18,23 30:5,15 | 51:6,10,11 |
| 32:4 | **sheriff's** 11:20 | 30:19 31:11,22 | **sirens** 13:10 |
| **samuel** 3:21 | **shift** 7:17 8:1,3 | 32:4,9,13,18 33:5 | **sirs** 3:2 |
| **saw** 13:17,17,21 | **shit** 15:3 | 33:14,20,25 34:8 | **sites** 40:5 |
| 22:15 23:7 25:9 | **shooting** 2:5,13 | 34:15,21 35:2,6 | **sitting** 17:6 49:11 |
| 25:10 26:19 33:12 | 9:25 17:23 35:14 | 35:12,19,22 36:2 | **situation** 12:16 |
| 35:11 41:20 | 35:18 39:7,15 | 36:7,13,18,22 | 16:6,18,19 24:24 |
| **scared** 15:3 | 40:9 51:1 | 37:1,5,9,16,19,22 | 31:12 46:4 49:15 |
| **scene** 9:18 11:20 | **short** 25:3 30:24 | 38:9,13,21,24 | **situations** 21:11 |
| 11:21 12:4,6,16 | **shot** 17:4,15 31:6 | 39:5,9,13,18,21 | 21:12 |
| 12:25 13:12,13 | 43:16,18 45:8 | 39:24 40:2,6,10 | |

Veritext Legal Solutions
866 299-5127

DOJ00061

**[six - threat]**

| | | | |
|---|---|---|---|
| **six**  43:19,20 | 25:17,22,25  26:6 | **start**  4:10  9:19 | **switched**  34:24,24 |
| **slow**  9:22 | 26:14,18,21,24 | 11:18 | 34:25 |
| **slowly**  50:18 | 27:4,9,13,18,23 | **started**  4:12  11:2 | **t** |
| **smith**  42:23 | 28:2,6,8,12,17,21 | 14:9  15:16  26:12 | **t**  3:12  52:1,1 |
| **snap**  33:19 | 29:1,4,7,14,20,24 | 50:18 | **tactical**  13:25 |
| **solutions**  52:11 | 30:7,16  31:7,13 | **stated**  20:19  22:25 | 14:13 |
| **somebody**  12:23 | 32:2,6,10,16,25 | 26:1  27:5 | **take**  16:24  17:9 |
| 12:25  13:20  16:8 | 33:10,18,23  34:10 | **statement**  4:4,7 | 18:4,23,24  19:1 |
| 17:17,18  20:10,11 | 34:18,23  35:4,7 | **station**  2:6 | 26:19  38:4 |
| 20:12,16  21:3 | 35:16,20,24  36:4 | **step**  17:2,16,20 | **takes**  16:20 |
| 29:16  37:24  38:8 | 36:8,15,19,24 | 38:5 | **talking**  7:18 |
| 39:7 | 37:3,6,12,17,20 | **stop**  20:12 | **tan**  7:4 |
| **son**  45:3 | 38:2,12,16,22 | **stopped**  12:11,11 | **taser**  5:24  34:13 |
| **sonya**  52:3 | 39:1,6,11,16,19 | 13:6,7  14:1 | **tasers**  6:4,8 |
| **sorry**  10:19  16:23 | 39:22,25  40:4,8 | **stretched**  35:17 | **taylor**  3:11,12 |
| 18:12  27:7  30:5 | 40:11,14,16,20,24 | **stuff**  3:2  24:3 | **team**  2:5,14  3:13 |
| 36:14  43:8 | 41:2,6,10,13,17 | **subject**  18:15,20 | 3:17 |
| **sort**  36:19  38:15 | 41:25  42:4,15,20 | **submitted**  3:4  4:1 | **tell**  19:10  22:18 |
| **sound**  23:20  39:4 | 42:25  43:2,6,9,12 | **suite**  52:13 | **telling**  15:14 |
| 39:4 | 43:15,20,23  44:2 | **summoned**  9:18 | **ten**  18:24  37:5,6 |
| **source**  13:4,14,15 | 44:7,13,18,23 | 10:2 | **tense**  12:17  24:24 |
| 14:11,20,25  22:10 | 45:4,9,13,18,23 | **supervisor**  3:20 | **term**  15:2 |
| **south**  10:11  11:12 | 46:3,7,10,13,22 | **support**  11:18 | **terms**  5:8  15:11 |
| 11:19  12:1 | 47:2,5,9,12,16,20 | 13:2  20:19,21 | 33:17 |
| **southbound**  19:8 | 47:23  48:1,4,7,13 | 21:1,15,24 | **thank**  3:1  4:5,9 |
| **southern**  3:12,16 | 48:16,20  49:1,4,8 | **sure**  8:9  18:25 | 5:17  18:22  51:9 |
| **speak**  4:2 | 49:16,22,25  50:4 | 22:16  24:21  27:5 | 51:11 |
| **special**  2:1,3,11,12 | 50:8,10,11,20,24 | 31:19  35:25  50:10 | **thing**  8:6  15:24 |
| 3:1,8,18,20,21  4:5 | 51:3,7,9 | **suspect**  20:2  23:12 | 17:20 |
| 4:9,15,18,21,25 | **specific**  5:12,21 | 25:9,18  31:15 | **things**  4:12  24:22 |
| 5:5,11,17,22  6:7 | 22:21 | 33:1,2  36:12  37:7 | **think**  10:18  18:19 |
| 6:10,14,18,21  7:1 | **specifically**  7:5 | 40:17  41:7  45:24 | 42:7,13  45:5  46:5 |
| 7:11,16,20,25  8:5 | 9:13  19:13  25:16 | 50:12 | 50:6 |
| 8:8,12,16,21,25 | 33:6 | **suspected**  30:2,12 | **thinking**  14:18 |
| 9:4,9,15  10:1,5 | **speculate**  14:7,17 | 39:7 | 16:5  45:8 |
| 12:5  14:22  16:24 | 24:4 | **suv**  31:20  33:2,12 | **thought**  11:8 |
| 17:1  18:6,22,25 | **spout**  48:12 | 35:8  38:8 | 13:24  14:13  45:2 |
| 19:3,25  20:7,18 | **stance**  17:23  35:14 | **swat**  5:24 | **thousand**  31:5 |
| 21:17  22:13,22 | 39:15 | **swerve**  19:17 | **threat**  17:25  18:2 |
| 23:6,10,15,23 | **standing**  12:13 | **switch**  34:14  35:1 | 39:17,24  44:11,16 |
| 24:8,14,20  25:7 | 15:19  37:25 | | 45:12  49:3,20 |

Veritext Legal Solutions
866 299-5127

DOJ00062

**[three - wrong]**

| | | | |
|---|---|---|---|
| **three** 30:25 31:5 | **trained** 17:24 51:4 | **uniforms** 7:4 | **walk** 9:16 |
| **throw** 20:8 | **training** 5:18,19 | **unincorporated** | **wall** 37:2 |
| **time** 2:2 7:19,20 | 5:24,24,24 6:8 | 10:17 | **wallet** 38:9 |
| 11:18 13:21 15:11 | 20:24 34:20 | **unit** 6:14,15 10:8 | **want** 4:2 5:1 7:12 |
| 15:25 16:25 19:5 | **transcript** 52:4 | 11:8,22 13:2,23 | 8:9 9:24 14:21 |
| 25:11 27:14 29:25 | **transient** 12:23 | 14:8 31:2 38:7 | 17:9 24:21 27:5 |
| 30:11 31:10 32:11 | 23:19 24:2,6 | **units** 13:11 18:5,7 | 30:20 35:25 38:19 |
| 34:19,22,25 37:13 | **traveling** 19:8 | **unpredictable** | 44:15 50:5,9 |
| 39:19 45:7 48:25 | 23:2 | 25:4 | **wanted** 31:8 |
| 51:11 | **triangle** 36:16 | **unstable** 24:24 | **wave** 13:3 |
| **timeline** 9:24 | **tried** 34:11,12 | **updates** 46:8 | **waving** 12:19 13:5 |
| **times** 20:23 50:21 | **true** 52:4 | **upper** 48:6 | 13:7,9 24:15,17 |
| 50:23 | **try** 21:19 | **ups** 19:7 | **way** 11:12 12:3 |
| **today** 2:1 4:2 6:11 | **trying** 9:22 13:3 | **use** 7:6 48:21 | 23:1 24:18 25:1 |
| 6:23 | 13:14 17:6 25:4 | 49:23 | 31:8,8 46:16,21 |
| **told** 8:4 28:10 | 28:16 29:21 34:19 | **usually** 7:23 21:7 | 50:18 |
| **tony** 2:11,12 21:17 | 44:14 46:20,23 | | **weapon** 32:12,14 |
| 25:22 27:23 28:2 | **two** 3:9 7:8 36:21 | **v** | 41:14 49:17 |
| 28:6,8 35:16,20 | 40:9,10 | | **weapons** 26:23 |
| 35:24 36:4 39:19 | **type** 5:23 20:15 | **vague** 9:8 | 34:14,25 |
| 39:22,25 40:4,8 | 21:25 42:16,16,21 | **variables** 21:10 | **wearing** 7:10 |
| 40:11,14,16 43:23 | 46:4 | **vehicle** 8:10 9:11 | **wednesday** 2:9 |
| 45:4,9,23 46:3,7 | **typical** 7:2 | 15:5 32:1 | **weird** 17:20 |
| 46:10,13,22 47:2 | **typically** 7:9 | **vehicles** 22:7 | **went** 12:3 31:19 |
| 47:16,20,23 48:1 | | **verbally** 51:4 | 31:20 |
| 48:4,13,16,20 | **u** | **veritext** 52:11 | **wesson** 42:24 |
| 49:1,4,8,16,22,25 | | **viable** 38:15 | **westbound** 2:9 |
| 50:8,11,20,24 | **u** 3:15 | **video** 8:20,23 44:3 | 12:2 23:4 |
| 51:3,7 | **uncertain** 12:17 | 47:7 | **width** 27:22 |
| **top** 21:3 37:10 | **understand** 23:22 | **videos** 9:1 | **wise** 7:20 24:11 |
| **topped** 43:6 | 34:16 | **view** 21:5 37:10 | **witnesses** 45:19 |
| **total** 43:4 | **understanding** | **viewing** 12:17 | **wool** 7:4 |
| **tractor** 10:24 11:5 | 21:18 23:13 | **violence** 20:11 | **word** 19:24 29:21 |
| 40:19 | **understood** 23:17 | **violent** 24:23 46:6 | **words** 16:16 44:14 |
| **traffic** 5:12 10:14 | **unfortunate** 30:20 | **vision** 31:24 33:8 | 45:2 |
| 10:23 11:11,16 | **unfortunately** | **visual** 40:11 | **work** 7:22 |
| 13:9,23,25 14:4,9 | 10:25 | **voluntary** 4:4 | **working** 5:14 21:1 |
| 30:3 | **unholster** 32:12 | | **worn** 47:7,10 |
| **trailer** 10:24 11:5 | 32:14 | **w** | **wrong** 12:3 22:25 |
| 40:19 | **unholstered** 39:20 | | 23:17,22 |
| | **uniform** 6:23,23 | **wait** 13:19 15:4 | |
| | 6:24 7:2 29:16 | **waited** 17:15 | |
| | | **waiting** 14:14 | |
| | | 49:12 | |

Page 11

DOJ00063

**[y - years]**

| y |
|---|
| **y**   3:12 |
| **yeah**   24:19 33:20 |
|    36:3,18 37:22 |
| **year**   2:10 4:21 |
| **years**   4:11,14 5:7 |
|    29:15 |

Page 12

DOJ00064

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

 

   (a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

   (b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

DOJ00066

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

DOJ00067

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.