**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE

# CENTRAL DISTRICT OF CALIFORNIA

SANDRA KIRKMAN, CARLOS
ALANIZ, individually and successors-in-
interest to JOHN ALANIZ, deceased,

Plaintiff,

vs.

STATE OF CALIFORNIA, RAMON
SILVA, and DOES 1-10, inclusive,

Defendants.

Case No. 2:23-cv-07532-DMG-SSC

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Judge:            Dolly M. Gee
Hearing Date:     February 28, 2025
Hearing Time:     9:30 a.m.
Courtroom:        8C

## **TABLE OF CONTENTS**

*I.    INTRODUCTION: SHOOT FIRST, ASK QUESTIONS LATER* ................................. *1*

*II.    STATEMENT OF RELEVANT FACTS* ........................................................ *1*

   A.   Initial Incident and Citizen Response ............................................. 1

   B.   Law Enforcement Response .......................................................... 2

   C.   Alaniz Was Unarmed .................................................................. 3

   D.   Van Dragt Tased Alaniz and Alaniz Seized up and Turned Away From the Officers Before Silva Shot Him ......................................................... 5

   E.   Contemporaneous Witness Reactions ............................................. 5

*III.   LEGAL STANDARD* .......................................................................... *5*

   A.   Summary Judgment Standards ...................................................... 5

   B.   Mistakes of Fact in Excessive Force Cases ...................................... 6

   C.   Qualified Immunity .................................................................... 7

*IV.    ARGUMENT* .................................................................................. *7*

   A.   Fourth Amendment Claim ........................................................... 8

     i.    The Shooting Violated the Fourth Amendment .............................. 9

     ii.   Silva is Not Entitled to Qualified Immunity .............................. 16

   B.   Fourteenth Amendment ............................................................. 19

   C.   State Law Claims .................................................................... 19

*V.    CONCLUSION* ............................................................................... *20*

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*A. K. H by & through Landeros v. City of Tustin,*
   837 F.3d 1005 (9th Cir. 2016) ........................................................................ 17

*Abuka v. City of El Cajon,*
   No. 17-CV-347-BAS-NLS, 2019 WL 1077495 (S.D. Cal. Mar. 7, 2019) .................... 14

*Adickes v. S.H. Kress & Co.,*
   398 U.S. 144, (1970) ...................................................................................... 6

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................ 6

*Arian v. City of Los Angeles,*
   No. CV1205261RGKPLAX, 2013 WL 12081081 (C.D. Cal. Apr. 30, 2013) .............. 15

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011) ........................................................................................ 7

*Bahrampour v. Lampert,*
   356 F.3d 969 (9th Cir. 2004) ............................................................................ 7

*Barnes v. City of Pasadena,*
   508 F. App'x 663 (9th Cir. 2013) ...................................................................... 15

*Brosseau v. Haugen,*
   543 U.S. 194 (2004) ........................................................................................ 7

*Bryan v. McPherson,*
   630 F.3d 805 (9th Cir. 2010) ............................................................................ 8

*C.V. by and through Villegas v. City of Anaheim,*
   823 F.3d 1252 (9th Cir. 2016) ......................................................................... 10

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...................................................... 6

*Collender v. City of Brea,*
   605 F. App'x 624 (9th Cir. 2015) ...................................................................... 18

*Cornell v. City and County of San Francisco,*
   17 Cal. App. 5th 766 (2017) ............................................................................ 19

*Corrales v. Impastato,*
   650 F. App'x 540 (9th Cir. 2016) ...................................................................... 15

*Cruz v. City of Anaheim,*
   765 F.3d 1076 (9th Cir. 2014), ......................................................................... 10

*Deorle v. Rutherford,*
   272 F.3d 1272 (9th Cir. 2001) .................................................................... 13, 17

*Diaz v. Cnty. of Ventura,*
   512 F. Supp. 3d 1030 (C.D. Cal. 2021) ............................................................... 7

*Espinosa v. City & Cnty. of San Francisco,*
   598 F.3d 528 (9th Cir. 2010) ........................................................................ 8, 18

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*Est. of Elkins v. Pelayo,*
   737 F. App'x 830 (9th Cir. 2018) ................................................................. 11

*Est. of Strickland v. Nevada Cnty.,*
   69 F.4th 614 (9th Cir. 2023) ....................................................................... 12

*Estate of Kosakoff v. City of San Diego,*
   460 F.Appx. 652 (9th Cir. 2011) ................................................................. 17

*Ford v. City of Yakima,*
   706 F.3d 1188 (9th Cir. 2013) ...................................................................... 7

*Glenn v. Washington Cnty.,*
   673 F.3d 864 (9th Cir. 2011) .................................................................... 7, 8

*Gonzalez v. City of Anaheim,*
   747 F.3d 789 (9th Cir. 2014) ....................................................................... 6

*Graham v. Connor,*
   490 U.S. 386 (1989) ........................................................................... 8,9,17

*Harris v. Roderick,*
   126 F.3d 1189 (9th Cir. 1997) ..................................................................... 8

*Hopkins v. Andaya,*
   958 F.2d 881 (9th Cir. 1992) ....................................................................... 6

*Hyer v. City & Cty. of Honolulu,*
   118 F.4th 1044 (9th Cir. 2024) ................................................................... 14

*Johnson v. Jones,*
   515 U.S. 304 (1995) .................................................................................. 16

*Longoria v. Pinal Cnty.,*
   873 F.3d 699 (9th Cir. 2017) ................................................... 10, 14, 17, 18

*Munoz v. City of Union City,*
   120 Cal. App. 4th 1077 (2004) ................................................................... 19

*Napouk v. Las Vegas Metro. Police Dep't,*
   123 F.4th 906 (9th Cir. 2024) .................................................................... 12

*Nehad v. Browder,*
   929 F.3d 1125 (9th Cir. 2019) ..................................................................... 6

*Nelson v. City of Davis,*
   685 F.3d 867 (9th Cir. 2012) ....................................................................... 8

*Newmaker v. City of Fortuna,*
   842 F.3d 1108 (9th Cir. 2016) ................................................................... 16

*Plumhoff v. Rickard,*
   572 U.S. 765 (2014) .................................................................................. 11

*Reese v. County of Sacramento,*
   888 F.3d 1030 (9th Cir. 2018) ................................................................... 19

*Rodriguez v. Swartz,*
   899 F.3d 719 (9th Cir. 2018) ..................................................................... 14

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*Scott v. Harris*,
    550 U.S. 372 (2007) ............................................................................ 6
*Tennessee v. Garner*,
    471 U.S. 1 (1985) ............................................................................... 8
*Torres v. City of Madera*,
    648 F.3d 1119 (9th Cir. 2011) ........................................................... 6
*Vos v. City of Newport Beach*,
    892 F.3d 1024  (9th Cir. 2018) ....................................................... 17
Wilkins v. City of Oakland,
    350 F.3d 949 (9th Cir. 2003) .......................................................... 16

**Statutes**
42 U.S.C. §1983 ................................................................................. 12
Fed. R. Civ. P. 56 .............................................................................. 11


**Other Authorities**
Ninth Circuit Model Civil Jury Instructions § 9.25 (2024) .................. 12

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION: SHOOT FIRST, ASK QUESTIONS LATER

On May 4, 2022, Officer Ramon Silva shot and killed John Alaniz, an unarmed Air Force veteran in the midst of a mental health crisis, just minutes after Alaniz had thrown himself in front of a semi-truck traveling at 55 miles per hour. Silva now claims he fired because he believed Alaniz was pointing a gun at his partner, Officer Van Dragt. But this justification is a post hoc fabrication, designed to shield Silva from accountability. At the time of the shooting, Silva did not announce that he had seen a gun. In fact, moments after firing, the first thing said was, "What did he have in his hand?"

Even if Silva's mistaken perception were genuine, it was not reasonable to mistake the object in Alaniz's hands for a gun. Two witnesses to the shooting, including Van Dragt, stated that Alaniz did not appear to have a firearm. Van Dragt testified that the object Alaniz was holding looked like a "subway sandwich," and stated that it did not look anything like a gun. The object was likely a grey felt sunglass case, which even Silva admits looks nothing like a gun.

Defendants' motion must be denied because this case turns on a fundamental dispute of material facts. Given the witness testimony contradicting Silva's account, it is the role of a jury to determine whether Silva's story is credible and whether a reasonable officer would have mistakenly perceived a gun under the circumstances, especially when it is undisputed that the actual object in Alaniz's hands looks nothing like a gun.

Any appeal to the Ninth Circuit should promptly be deemed frivolous, as it would merely seek to avoid the jury's rightful role in resolving the factual disputes in this case.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Initial Incident and Citizen Response

On the morning of May 4, 2022, John Alaniz was experiencing a mental health crisis while he was walking alongside the shoulder of the westbound 105 freeway in Paramount, California. (PAMF 1.) At some point, Alaniz ran in front of a semi-truck that

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

was travelling westbound at approximately 55 miles per hour. (PAMF 2.) He was struck

and launched westward by the force of the impact, hitting his head against the pavement.

(PAMF 3.) The semi-truck and a white pick-up truck in the next lane both stopped to

avoid running him over. (PAMF 4.) Alaniz remained on the ground for nearly three

minutes while witnesses got out of their cars to check on him and to call for help. (PAMF

5.)

Alaniz was severely injured after being struck by multiple vehicles, bleeding

heavily from his head as he stumbled along the freeway shoulder. (PAMF 6, 11, 16.)

Witness Acosta, concerned for his safety, followed him for about 12 minutes, trying to

help and calling 911. (PAMF 11.) During that time, Alaniz never harmed or threatened

anyone—his actions were solely self-destructive. (PAMF 12–15.)

## B.    Law Enforcement Response

At approximately 11:31 a.m., Officer Ramon Silva arrived on scene, approaching

from the opposite direction of traffic. (PAMF 17.) Silva had learned from dispatch that

Alaniz was suicidal and had been trying to jump in front of vehicles. (PAMF 18.) Silva

knew Alaniz was potentially suffering from a mental health crisis. (PAMF 19.) Silva had

no information that Alaniz was armed or that he had harmed or threatened anyone other

than himself. (PAMF 20–21.)

Unlike Acosta and the other Good Samaritans, who had been managing this

situation admirably for more than 12 minutes, when Silva arrived, he was agitated and

erratic, shouting commands while inexplicably waving traffic to continue driving. (PAMF

22.) Silva saw Acosta, Alaniz, and another individual "standing around," near the

shoulder of the highway. (PAMF 23.) Acosta, who has been helping Alaniz for nearly

twenty minutes, approached Silva and tried to convey some information to him, but Silva

ignored him and screamed, "Move! Move! Move!" (PAMF 24.) Silva does not even

attempt to gather information from Acosta to learn critical facts like whether anyone is

injured, whether Alaniz is attacking or threatening anyone, or whether Alaniz has a

weapon. (PAMF 25.)

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Van Dragt arrived in his patrol car around 10 seconds after Silva and positioned his vehicle at an angle to the shoulder between Alaniz and Silva, about 60 feet in front of Silva. (PAMF 26.) Van Dragt exited his car, saw Alaniz standing on the shoulder with his hands in his pockets, and moved toward the back of his vehicle while unholstering his gun. (SUF 23, 25.)

At the same time, Silva approached, unholstering his weapon and ordering Alaniz to show his hands. (PAMF 27.) With his hands visible, Alaniz started walking toward Van Dragt before breaking into a slow run. (PAMF 29.) Van Dragt saw that Alaniz did not have a gun or a knife, so he holstered his firearm and drew his Taser while repositioning toward the front of his car. (PAMF 30.)

As Alaniz rounded the rear of Van Dragt's patrol unit. Van Dragt deployed his taser, striking Alaniz and causing him to seize up. (PAMF 31.) The autopsy report indicates that the taser barbs penetrated Alaniz, which would likely mean the Taser was effective. (PAMF 32.) While Alaniz was seizing up from the effects of the Taser, Silva shot five rounds at Alaniz without warning, striking his left leg, his right leg, and his chest. (PAMF 33.) Alaniz died from his injuries. (PAMF 34.)

More than two minutes after killing Alaniz, Silva and two other officers put his limp body in handcuffs. (PAMF 35.) A witness can be heard exclaiming, "You guys are going to handcuff a dead guy? He's dead! He's dead! You're handcuffing a dead guy!" (PAMF 36.)

### C.    Alaniz Was Unarmed

It is undisputed that Alaniz was not armed with any type of weapon when he was fatally shot by Silva.

Acosta saw the entire incident and testified that he did not perceive a gun in Alaniz's hand. (PAMF 37.) Van Dragt did not see anything that even "looked like a firearm in any way." (PAMF 38.)

Acosta was positioned several feet west of Silva's motorcycle and saw the entire incident. (PAMF 39.) As Alaniz moved toward the officers, Acosta saw him put his hand

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

into his pocket. (PAMF 40.) But Acosta did not see the individual pull any object out of his pocket prior to the shots. (PAMF 41.) Certainly, he did not see anything that looked like a gun. (PAMF 41.)

Van Dragt agrees that Alaniz did not appear to be armed with a gun. (PAMF 42.) He claims he saw Alaniz pull out an objection from his jacket pocket before he started running in his direction, but he describes the object as looking like "a subway sandwich." (PAMF 42.) Van Dragt subsequently testified that what he saw in Alaniz's hand was probably the gray sunglass case that was found at the scene. (PAMF 43.) He is certain that he did not see a gun, otherwise he would not have holstered his firearm. (PAMF 44.)

Finally, despite what Silva and his attorney say now, the evidence shows that *at the time of the shooting*, Silva did not perceive a gun in Alaniz's hand. Seconds after the shooting, Silva and Van Dragt have this important exchange:

> **Silva:** What did he have in his hand? Was that a gun?
> **Van Dragt:** No, it was nothing.

(PAMF 45.) When shown a picture of the gray sunglass case that was most likely the object in Alaniz's hands, Silva admitted that it "doesn't look like a gun, obviously" (PAMF 46.)

Silva was trained to yell "gun" and order armed suspects to drop their weapon if he saw a suspect draw a gun, but he did neither in this case. (PAMF 47–50.) Such announcements were feasible because about 5 seconds passed between when he says he saw the gun and when he shot. (PAMF 51.)

Even if we assume Silva honestly believed he saw a gun, his mistake would still be entirely unreasonable. A felt sunglass case does not have the identifying features of a firearm such as a barrel, trigger, trigger guard, grip, or magazine.  (PAMF 52.) Further, the fact that two other witnesses said they did not perceive anything that looked like a gun casts doubt on the reasonableness of Silva's mistake. (PAMF 53, 54.)

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**D.    Van Dragt Tased Alaniz and Alaniz Seized up and Turned Away From the Officers Before Silva Shot Him**

Silva admits that he heard the Taser deploy before he opened fire, though he claims he mistook the sound for gunfire. (PAMF 55.) Video footage from Silva's perspective clearly shows Van Dragt unholstering his Taser, aiming it, and successfully striking Alaniz. (PAMF 56.) Alaniz's autopsy confirms that he was struck in two places, completing a full circuit, which explains why he seized up in reaction to the Taser. (PAMF 57.) The video further shows Alaniz turning away from the officers after being struck. (PAMF 58.)

Silva—who heard and saw the Taser deploy, witnessed Alaniz seize up and turn away—chose to shoot even though non-lethal force had already been deployed and was actively neutralizing any perceived threat. (PAMF 59.) Moreover, at the moment Silva opened fire, Alaniz was not in a "shooter's stance." (PAMF 60.) Instead, he had already been struck by Van Dragt's Taser, seized up, and turned away from the officers. (PAMF 61.)

**E.    Contemporaneous Witness Reactions**

Witnesses at the scene were shocked that Silva used deadly force under the circumstances. Acosta, who witnessed the entire encounter, was shocked that Silva shot Alaniz; he did not believe lethal force was necessary and thought the officers should have used non-lethal means to take him into custody. (PAMF 62.) Clark also witnessed the incident and thought the same, stating that "they could have done anything they wanted to keep this man alive, but they fucking killed this man." (PAMF 63.) Van Dragt was not expecting gunshots and explained that he would not shoot someone just because the person is suicidal, even if they did position their body in a shooting stance. (PAMF 64.)

## III.    LEGAL STANDARD

**A.    Summary Judgment Standards**

Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56. The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). At summary judgment, a court's function is not to weigh the evidence, make credibility determinations, or determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In ruling on summary judgment, the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). A fact is "material" if its proof or disproof is essential to an element of the plaintiff's case. *Celotex Corp.*, 477 U.S. at 322–23. A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Even entirely circumstantial evidence is sufficient to create a triable issue of fact. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992).

Where there is video of the use of excessive force, the Court must view the facts in the light depicted by the videotape. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Even when there is video evidence, if reasonable factfinders could interpret it differently, summary judgment may be inappropriate. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1132–39 (9th Cir. 2019).

In deadly force cases such as this, where the decedent cannot testify, the Court must carefully examine all evidence in the record to determine whether the officers' story is internally consistent and consistent with known facts. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794–95 (9th Cir. 2014). The Court must also examine circumstantial evidence that, if believed, would tend to discredit the police officer's story, all to "ensure that the officer[s] [are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify." *Id.*

## B.    Mistakes of Fact in Excessive Force Cases

An officer's unreasonable factual mistake can lead to a constitutional violation. *See Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011) (reversing summary judgment because a jury could find that officer's mistake of fact was unreasonable); *Glenn*

*v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (holding that not all errors in perception or judgment are reasonable and that the Constitution does not forgive an officer's every mistake); *see also* Ninth Circuit Model Civil Jury Instructions § 9.25 (2024) (listing " whether a reasonable officer would have or should have accurately perceived a mistaken fact" as a factor *for the jury to consider* in excessive force cases).

When an officer's use of force is based on a mistake of fact, the question of whether the mistake was reasonable is a triable issue of fact. *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1042 (C.D. Cal. 2021).

### C.    Qualified Immunity

In analyzing §1983 claims of excessive force, courts engage in a two-pronged analysis to determine whether qualified immunity applies; an officer is not entitled to qualified immunity where "(1) facts viewed in the light most favorable to the injured party show that the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013). A right is clearly established where its "contours . . . [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. This requires "cases relevant to the situation [the officer] confronted," *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004), however it does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "[U]npublished decisions can be considered in determining whether the law was clearly established." *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004).

## IV.    ARGUMENT

This case comes down to two determinative questions: (1) did Silva believe he saw a gun, and (2) was his mistake reasonable. Viewing the facts in the light most favorable to Plaintiffs, a jury could find in Plaintiffs' favor on both questions, so the motion should be denied.  *Diaz*, 512 F. Supp. 3d at 1042 (denying summary judgment for similar reasons).

7

### A.      Fourth Amendment Claim

When evaluating a claim of excessive force, the inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Glen*, 673 F.3d at 871 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "This inquiry requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* The court must "balance the amount of force applied against the need for that force." *Bryan v. McPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010).

"The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). "Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat [of death or serious bodily injury] to the officer or others or is fleeing and his escape will result in serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). Governmental interests to balance against the type of force used include the following factors: "(1) the severity of the crime; (2) whether the suspect posed an immediate threat [of death or serious bodily injury] to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) Other significant factors to consider are the availability of alternative methods to effectuate an arrest or overcome resistance and whether the officer gave a warning that deadly force would be used. *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012).

Under the Fourth Amendment, an officer cannot shoot someone because he is not certain that the person is unarmed. *Garner*, 471 U.S. at 20 (when a suspect "appear[s] to be unarmed, though [the officer] could not be certain that was the case," under the Fourth Amendment that means the officer has "no articulable basis to think [the suspect] was armed.")

i.   <u>The Shooting Violated the Fourth Amendment</u>

The second *Graham* factor, which is most important of the three factors, weighs in Plaintiffs' favor because Alaniz was unarmed and posed no immediate threat of death or severe bodily injury to anyone. Further, at the time he was shot, he had already been struck effectively by Van Dragt's Taser such that any minimal threat posed had dissipated.

The Defendants appear to concede that Alaniz did not in fact pose an immediate threat of death or severe bodily injury. Instead, Defendants argue that Silva reasonably believed Alaniz posed such a threat because he mistakenly perceived Silva was pointing a gun at Van Dragt. This argument fails for two reasons: (1) there is compelling evidence that Silva did not mistakenly perceive a gun and that he concocted that story after the fact; and (2) even if he did mistakenly perceive a gun, his mistake was unreasonable because the object in Silva's hand looked nothing like a gun and two other witnesses who perceived the same events said they did not see Alaniz raise a gun at the officers.

a.   *Silva Did Not Mistakenly Perceive Alaniz Pointing a Gun*

Silva's claim that he saw a gun in Alaniz's hand is contradicted by both contemporaneous evidence and his own actions. Immediately after the shooting, Silva asked Van Dragt, "What did he have in his hand?"—a question that suggests he did not actually see a gun. If he had, there would be no need to ask. A jury could reasonably infer from this exchange that Silva never honestly believed Alaniz was armed.

Further, Silva's conduct during the incident undermines his credibility. He was trained to yell "Gun!" upon perceiving a firearm and to order an armed suspect to drop their weapon before using deadly force. Here, although five full seconds passed between when Silva claims he saw a gun and when he fired, he did neither. These omissions support the conclusion that Silva never actually perceived a gun. *See Diaz*, 512 F. Supp. 3d at 1042 (denying summary judgment where similar failures to react indicated an officer did not truly believe a suspect was armed).

Van Dragt's testimony that he saw nothing resembling a gun also creates a material dispute of fact as to whether Silva genuinely believed he saw one. *See C.V. by and*

9

1   *through Villegas v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016) (holding that

2   summary judgment was improper where officers' accounts differed on key points,

3   including whether a suspect reached for a weapon). Here, just as in *Villegas*, conflicting

4   testimony between officers undermines Silva's claim and raises a question that must be

5   resolved by a jury.

6   Plaintiffs also dispute whether Silva had time to perceive Alaniz's stance and react

7   accordingly. Silva's view of Alaniz was obstructed by Van Dragt's vehicle until just half a

8   second before he fired. After the shooting, Silva had the opportunity to review the footage

9   frame by frame and construct a justification for his actions, but a jury—watching the

10  incident unfold in real time—could conclude that he lacked sufficient time to perceive a

11  supposed 'shooter's stance' before firing. *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 707

12  (9th Cir. 2017) (finding a material dispute about "whether, as a matter of fact, [the officer]

13  could have had enough time to perceive the alleged "shooter's stance" at the moment he

14  claims to have done so and then shoot [the decedent] in response to that observation at the

15  time the videos show he shot him").

16  In *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014), the Ninth Circuit

17  recognized that circumstantial evidence can discredit an officer's claim that they

18  perceived a deadly threat. Officers in that case killed an unarmed man who they claimed

19  reached for his waistband. The Court found that a reasonable jury could determine that an

20  officer's testimony is implausible when it contradicted the physical evidence, eyewitness

21  accounts, or common sense. *Id.* Ultimately the Court denied summary judgment because a

22  jury "could [] reasonably conclude that the officers lied" about what they had perceived.

23  *Id.* at 1080.

24  Just as in *Cruz*, a jury could reasonably infer from the evidence that Silva did not

25  actually perceive a gun before shooting and that his assertion to the contrary in not

26  credible.

27

28

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

b.    *If Silva Did Mistakenly Perceive Alaniz Pointing a Gun, His Mistake Was Unreasonable*

Even if Silva was genuinely mistaken, summary judgment should still be denied because his mistake was not reasonable.

First, the object in Alaniz's hands looked nothing like a gun. Van Dragt stated that the object resembled a "subway sandwich" and said that the object did not look anything like a gun. The reasonableness of an officer's actions and beliefs must be evaluated from the perspective of a reasonable officer on the scene. *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014). The fact that another officer at the scene, Van Dragt, says that the object in Alaniz's hands did not look anything like a gun is compelling evidence showing that a reasonable officer at the scene would not have made Silva's mistake. Moreover, the object in Alaniz's hands was later identified as a gray sunglass case, which Silva himself admitted "obviously does not look like a gun." Additionally, Acosta, another witness, did not perceive anything in Alaniz's hand that resembled a gun.

Second, dispatch logs and witness testimony confirm that throughout the entire encounter, Alaniz was never reported to be armed. Silva arrived at the scene knowing he was responding to a mental health crisis, not a serious crime in progress. This contributes to the totality of the circumstances faced by Silva and makes it less reasonable to assume that the object in Alaniz's hand was a gun. *See Est. of Elkins v. Pelayo*, 737 F. App'x 830, 831 (9th Cir. 2018) (denying summary judgment in part because decedent was "unarmed at the time he was killed, he had no history of carrying firearms, no one had told the police that [he] was armed or had a history of using a gun").

Third, Silva had clear evidence that Alaniz was unarmed based on the actions of Van Dragt, who was positioned closer to Alaniz just prior to the shooting. Van Dragt holstered his firearm and drew his Taser at the same time Silva says he saw Alaniz take something out of his pocket. Had Van Dragt seen a gun at that point, he would not have put away his firearm in favor of a less-lethal alternative. Silva, who had a clear line of sight to Van Dragt, witnessed this decision and a reasonable officer would have taken that

11

into consideration as part of the totality of the circumstances in considering whether he was facing a lethal threat.

Fourth, Silva fired on Alaniz *after* Van Dragt successfully struck Alaniz with his Taser, causing Alaniz to seize up and turn away from the officers. Under these circumstances, a reasonable officer would not believe Alaniz was pointing a gun at the officers.

Finally, witness reactions to the shooting further confirm the unreasonableness of Silva's perception. Acosta and Clark, both of whom observed the incident in real-time, were shocked that Silva fired, and Van Dragt admitted he was surprised to hear gunshots under the circumstances. Van Dragt testified that he would not use lethal force on an unarmed suicidal person simply because they took a particular stance.

This case is nothing like the tragic cases where police officer mistake fake weapons for real ones, e.g., *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 617 (9th Cir. 2023), where officers thought the decedent had a gun but it turned out to be a be a replica gun, or *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 916 (9th Cir. 2024), where officers mistakenly believed a man had a bladed weapon, but he turned out to have a toy sword. Those cases held that the officer's mistake was reasonable because they could not be expected to tell the difference between objects that look so similar. But here, not only could a reasonable juror find that the object in Alaniz's hands did not look like a gun, Defendant Silva himself admits the object looks nothing like a gun.

Thus, for all the reasons above, a jury could find that a reasonable officer at the scene would have perceived that Alaniz was unarmed and pose no immediate threat of death or severe bodily injury. Therefore, the second *Graham* factor weighs in Plaintiffs' favor.

### c.    The Other Graham Factors Weigh in Plaintiffs' Favor

The first and third *Graham* factors also weight in Plaintiffs' favor. Alaniz had committed no serious crime, and courts have consistently held that when a suspect is not suspected of committing a violent crime, the first factor weighs against the use of

significant force. *See Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001). The third factor also weighs in Plaintiffs' favor because Alaniz was not in the act of fleeing nor was there any real risk of him escaping, given the number of officers at the scene and the helicopter monitoring events from above. *See Diaz*, 512 F. Supp. 3d at 1044.

Additional factors considered by the Ninth Circuit militate in favor of Plaintiffs, as well. The availability of less intrusive alternatives is a critical consideration in assessing the reasonableness of force. *Glenn*, 673 F.3d at 876. Here, less-lethal force was available and actively working when Silva fired. Unlike Silva, Van Dragt holstered his firearm and used his Taser, which effectively struck and incapacitated Alaniz. A jury could reasonably conclude that Van Dragt acted appropriately while Silva did not and that Silva erred by failing to assess whether non-lethal force had de-escalated the situation.

Another key factor is whether the suspect showed signs of mental illness or emotional distress. *Deorle*, 272 F.3d at 1283. Here, Silva knew that Alaniz was suicidal and had been running into traffic. "A jury could find that given [Alaniz's] behavior, officers perceived (or should have perceived), an emotionally disturbed individual acting out and in need of help, rather than a hardened criminal intending harm and in need of taking down." *Diaz*, 512 F. Supp. 3d at 1044. This factor further diminishes the government's interest in using deadly force.

Finally, the failure to warn before using deadly force weighs heavily against Silva. *Garner*, 471 U.S. at 11–12, emphasizes that warnings should be given when feasible. Silva had about five seconds from allegedly seeing a gun to firing but never issued a warning of any kind. A jury could find that a warning was feasible and Silva's failure to give one was unreasonable.

### d. *Defendants' Arguments Miss the Mark*

Defendants rely on a few zoomed-in frames from Silva's body-worn camera—expertly enhanced at their request—ignoring the well-established principle that the reasonableness of force must be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Courts assess video evidence as part of the totality of the circumstances but should avoid overemphasizing individual frames—each capturing only 0.03 seconds—at the expense of the full context. In *Longoria v. Pinal County*, the Ninth Circuit rejected a district court's frame-by-frame analysis of video footage, emphasizing that an officer at the scene does not perceive a "frozen frame" detached from the unfolding events. 873 F.3d at 706, Plaintiffs dispute that Silva perceived what he later described as a "shooter's stance" at the time of the shooting. His claim to have seen such a stance only emerged after he reviewed the footage, suggesting he may have shaped his account to fit the video. If the video had instead depicted Alaniz's hand moving toward his waistband, Silva would likely have framed his justification differently.

Even under a frame-by-frame analysis, material disputes remain. While some frames may suggest Alaniz briefly assumed something like a shooter's stance, the critical moments before the shots show otherwise—he was no longer in such a stance, and the footage supports Plaintiffs' claim that he was reacting to being struck by a Taser, seizing up, and turning away. Selecting only favorable frames while ignoring the rest distorts the summary judgment standard, which requires viewing the evidence in the light most favorable to the non-moving party.

Defendants claim that a "uniform body of case law" shows that Silva's use of deadly force was reasonable even though Alaniz had no weapon in his hands. (Motion at 22.) But what they provide the Court is a disingenuous mischaracterization of the law, stitched together from out-of-context excerpts—many of which come from cases that actually ruled *against* officers, like *Cruz*, 765 F.3d 1076 (summary judgment denied regarding use of deadly force), *Longoria*, 873 F.3d 699 (same), *Hyer v. City & Cty. of Honolulu*, 118 F.4th 1044 (9th Cir. 2024) (same); and *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018) (same).

Defendants misrepresent to the Court the holding of *Abuka v. City of El Cajon*, No. 17-CV-347-BAS-NLS, 2019 WL 1077495, at *7 (S.D. Cal. Mar. 7, 2019), claiming the court held that deadly force was objectively reasonable when a man pulled a metal object

from his pocket and moved into a shooter's stance. (Motion at 23:5–9.) The court held the exact opposite: "there are disputed issues of material fact as to whether the use of deadly force was reasonable in the situation." 2019 WL 1077495, at *7.[1] Defendants miscite *Barnes v. City of Pasadena*, 508 F. App'x 663 (9th Cir. 2013), as holding that deadly force was "objectively reasonable" (Motion 22:3–7, 25), but *Barnes* was not a Fourth Amendment case, so the Court did not rule that the officers' force was or was not objectively reasonable.[2]

Defendants cite several cases that are closer to being on point, but they are all unpublished and readily distinguishable. In *Arian v. City of Los Angeles*, No. CV1205261RGKPLAX, 2013 WL 12081081, at *1 (C.D. Cal. Apr. 30, 2013), the shooting happened at night, and in the poor lighting conditions *multiple officers* mistook a black phone for a gun when the decedent pointed it at them in a shooting stance. Here, it was daytime and two civilians and another officer at the scene said the object in Alaniz's hands did not look like a gun. In *Corrales v. Impastato*, 650 F. App'x 540 (9th Cir. 2016), the shooting happened during a high-risk undercover drug operation, and the decedent rapidly pulled his hand out from his waistband while approaching the officer in an aggressive manner. Here, Silva was responding to a mental health call, not dealing with a hardened criminal. Furthermore, in *Corrales*, there was no testimony to dispute that the decedent appeared to be drawing a gun, which is very different from here where Van Dragt says the object Alaniz was holding looked nothing like a gun.

For all the reasons above, a jury could find that Silva's use of deadly force was unreasonable under the circumstances.

---

[1] Defense counsel's mistake is surprising given that he was the lead attorney in the *Abuka* case and wrote the motion for summary judgment. While the Court did rule in Defendants' favor on qualified immunity grounds, that is a different issue.

[2] *Barnes* is distinguishable anyway since in that case, unlike here, "Plaintiffs pointed to no evidence suggesting that the officers did not believe, or should not have believed, [the object in decedent's hand] to be a gun" *Id.* at 665.

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

ii.    <u>Silva is Not Entitled to Qualified Immunity</u>

Silva is not entitled to qualified immunity for two reasons. First, there are critical disputed issues of material fact that preclude qualified immunity at this stage. Second, at the time of the shooting, it was clearly established that the use of deadly force against a non-threatening suspect is unreasonable.

First, disputed issues of material fact preclude granting qualified immunity on summary judgment. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995); Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate). This case mostly hinges on the resolution of these two factual disputes: (1) whether Silva believed he saw a gun, and (2) whether his mistake reasonable. But there are other disputed, such as: (1) whether Silva saw Alaniz take a shooting stance; (2) whether Alaniz had *any* object in his hand; (3) if he did have an object in his hand, whether that object was a grey sunglasses case; (4) whether the sunglass case look like a gun; (5) whether Alaniz was running toward the officers or turning away from them just prior to the shots; (6) whether it was feasible for Silva to give a warning; (7) whether alternative less-lethal force options were available and likely to be effective; (8) whether Van Dragt's use of the taser was effective; (9) whether Alaniz was running slowly or quickly. Summary judgment is not appropriate given the amount of factual disputes in this case. *See Newmaker v. City of Fortuna*, 842 F.3d 1108, 1117 (9th Cir. 2016) (holding that summary judgment was inappropriate where there was disputed evidence about whether the officers were telling the truth about when, why, and how the plaintiff was shot).

Second, Silva is not entitled to qualified immunity because on the date of the incident, it was clearly established that "the use of deadly force against a non-threatening suspect is unreasonable." *Zion*, 874 F.3d at 1076 (9th Cir. 2017). "It has long been clear that '[a] police officer may not seize an unarmed, nondangerous suspect by shooting him

dead.'" *A. K. H by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (citing *Garner*, 471 U.S. at 11).

Under these circumstances, viewing the facts in the light most favorable to Plaintiffs, no reasonable officer could believe that it was lawful to, without any warning, shoot and kill an unarmed person who posed no immediate threat to any law enforcement officer or anyone else. In other words, this case is the rare but "obvious one where *Graham* and *Garner* alone offer a basis for decision." *Brosseau*, 543 U.S. at 199; *see Estate of Kosakoff v. City of San Diego*, 460 F.Appx. 652, 654 (9th Cir. 2011) (denying qualified immunity on excessive force claim because, if jury were to find plaintiff "posed no significant threat[,]" fact that deadly force employed by officers was unconstitutionally excessive would be "obvious as a matter of law") (internal quotation marks omitted).

But even if this were not an obvious case, the law was established with sufficient particularity in many cases. In *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018), the Ninth Circuit found a plausible constitutional violation in a police shooting case where the "officers confronted a reportedly erratic individual that took refuge in a 7-Eleven, cut someone with scissors, asked officers to shoot him, simulated having a firearm, and ultimately charged at officers with something in his upraised hand." *Id.* at 1035. Although the *Vos* court determined that at the time of the event (May 29, 2014) existing precedent had not placed the conclusion that officers acted unreasonably in those circumstances beyond debate, the *Vos* court's decision put officers on notice (effective June 11, 2018 the date of the decision) that such conduct could result in a constitutional violation.

In *Deorle*, 272 F.3d 1272, the court denied summary judgment, holding that it is objectively unreasonable for an officer to shoot an unarmed, non-threatening individual who has committed no serious offense, is mentally or emotionally disturbed, receives no warning, poses no flight risk, and presents no reasonable threat. *Id.* at 1285.

In *Longoria*, 873 F.3d 699, an officer shot and killed Longoria after a high-speed chase, despite Longoria being struck with a less-lethal round and a Taser. The officer

17

claimed he saw Longoria in a "shooter's stance" holding a weapon, but the court found a jury could determine the officer either misperceived the stance or should have recognized Longoria was reacting to the non-lethal force rather than posing a threat. *Id*. at 708.

In *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, officers shot and killed an unarmed suicidal suspect hiding in an attic. One officer testified that she shot because she saw the suspect move his right arm and believed he would shoot her. The other testified that he saw something in the suspect's hands that looked like a gun. The court found the force could be determined unreasonable, as the suspect had no escape, was unarmed, and posed no threat to the public. *Id*. at 538.

In *Collender v. City of Brea*, 605 F. App'x 624 (9th Cir. 2015), the Ninth Circuit held that a jury could find an officer acted unreasonably in shooting a suspect, who had committed an armed robbery earlier but was unarmed at the time. When officer pointed their rifles at the suspect and told him to freeze, he instead ran across the street and faced the officer with his arms outstretched. He then lowered his left arm towards his left front pocket, at which point an officer shot and killed him. The court held a jury could conclude the suspect posed no immediate threat. *Id*. at 628–29.

Defendants rely on dicta in *Cruz*, 765 F.3d 1076, that it would be "unquestionably reasonable for police to shoot a suspect in [the decedent's] position if he reaches for a gun in his waistband, or even if he reaches there for some other reason." *Id*. at 1078. This type of dicta cannot be used to established the law for qualified immunity purposes. See *al-Kidd*, 563 U.S. at 741–42 (finding dicta to fall short of clearly establishing the law). Regardless, *Cruz* is distinguishable. There, officers knew the suspect was armed, had a felony firearm conviction, and was a gang member. A confidential informant also warned the suspect said he "was not going back to prison." During a traffic stop, he attempted to flee, backed into a patrol car, then exited and allegedly reached for his waistband. *Id*. at 1077–78. Here, none of those factors were in play.

For all the reasons above, the Court should find that Silva violated Alaniz's clearly established rights, and denied Defendants' motion.

### B.    Fourteenth Amendment

Contrary to Defendant's argument, "although most meritorious purpose to harm claims will involve evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use of force…, [i]n some cases, a use of force might be so grossly and unreasonably excessive that it alone could evidence a subjective purpose to harm." *Nehad*, 929 F.3d at 1140.

In this case, viewing the facts in the light most favorable to the Plaintiffs, Silva shot and killed an Air Force veteran suffering from a mental health crisis on the side of the road even though he could see he was unarmed and did not pose an immediate threat of death or serious bodily injury to anyone. Silva's force was so grossly excessive that it alone could evidence a subjective purpose to harm, and as such, a jury could find him liable under the Fourteenth Amendment.

As discussed above, qualified immunity should not be applied here given the amount of genuine disputes of material fact.

### C.    State Law Claims

Plaintiffs are entitled to a jury trial on their battery, negligence, and Bane Act claims for the same reasons they are entitled to one on their excessive force claim. *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1121 n.6 (2004) (excessive force claims and state battery claims require proof of an officer's unreasonable conduct, making federal cases instructive). Qualified immunity does not apply to state law claims, nor is Silva immune under any statute.

Silva's shooting of Alaniz also supports Plaintiffs' Bane Act claim. The Ninth Circuit in *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018), held that reckless disregard for constitutional rights demonstrates specific intent to deprive those rights. *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017), confirmed that the Bane Act does not require a separate "threat, intimidation, or coercion" beyond the constitutional violation itself. Whether Silva knew his actions were unlawful is irrelevant; reckless disregard of Alaniz's right to be free from excessive force is sufficient.

Given the facts, summary judgment must be denied on this claim under any applicable standard.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment.

Any appeal to the Ninth Circuit should promptly be deemed frivolous, as it would merely seek to avoid the jury's rightful role in resolving the factual disputes in this case.


Dated: February 7, 2025                    LAW OFFICES OF DALE K. GALIPO


                                           /s/ Cooper Alison-Mayne
                                           Dale K. Galipo
                                           Cooper Alison-Mayne
                                           *Attorneys for Plaintiffs*




## CERTIFICATION OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certify that this brief contains 6941 words, which complies with the word limit of L.R. 11-6.1.


Dated: February 7, 2025                    /s/*Cooper Alison-Mayne*
                                           Cooper Alison-Mayne
                                           *Attorneys for Plaintiffs*