**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA KIRKMAN, CARLOS ALANIZ, individually and successors-in-interest to JOHN ALANIZ, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF CALIFORNIA, RAMON SILVA, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-07532-DMG-SSC<br><br>**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**<br><br>Judge:    Dolly M. Gee<br>Hearing Date:    February 28, 2025<br>Hearing Time:    9:30 a.m.<br>Courtroom:    8C |

# PLAINTIFFS' STATEMENT ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56-2 and this Court Standing Order, Plaintiffs respectfully submit their Statement of Additional Material Facts.

Please take notice that the citations to page numbers to Plaintiffs' Supporting Evidence below reference the page the CM/ECF generated number in blue.

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| 1. On the morning of May 4, 2022, John Alaniz was experiencing a mental health crisis while he was walking alongside the shoulder of the westbound 105 freeway in Paramount, California. | **Exh. A**: Acosta Interview, May 4, 2022, p. 2:12-16<br>**Exh. B:** Truck Video: 1:40-1:50 |
| 2. Alaniz ran in front of a semi-truck that was travelling westbound at approximately 55 miles per hour. | **Exh. A**: Acosta Interview, May 4, 2022, pp. 2:12–14; 3:10<br>**Exh. B**: Truck Video: 1:40-1:50 |
| 3. He was struck and launched westward by the force of the impact, hitting his head against the pavement. | **Exh. B**: Truck Video: 1:40-1:50 |
| 4. The semi-truck and a white pick-up truck in the next lane both stopped to avoid running him over. | **Exh. B**: Truck Video: 1:40-1:50 |
| 5. Alaniz remained on the ground for nearly three minutes while witnesses got out of their cars to check on him and to call for help. | **Exh. A:** Acosta Interview: May 4, 2022, p. 4:2-4<br>**Exh. B**: Truck Video: 1:40 – 4:40 |
| 6. One of the witnesses, Acosta, exited his white pick-up truck to check on the Alaniz and saw that he was bleeding from the head and appeared unconscious. | **Exh. C**: Acosta Dep., pp. 2:20-21; 3:1-2 |
| 7. After about three minutes, Alaniz regained consciousness, stood up, | **Exh. C**: Acosta Dep., p. 3:1-5 |

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| and started stumbling along the freeway shoulder. | **Exh. D**: Acosta Interview, Sept. 27, 2022, p. 4:9-16 |
| 8. Acosta followed Alaniz because he was concerned for his safety. | **Exh. C**: Acosta Dep., p. 4:18-22 |
| 9. Acosta called 911 and reported that someone had been hit by a truck and was continuing to walk down the freeway, possibly trying to jump into traffic again. | **Exh. C**: Acosta Dep., p. 4:1-10 |
| 10. At one point, Alaniz put his head under the tire of a slow-moving semi-truck, but the driver stopped before running him over. | **Exh. C**: Acosta Dep., p. 5:12-20 |
| 11. As Alaniz continued to stumble west on the highway, Acosta followed him, trying to help him for approximately 12 minutes before CHP officers arrived. | **Exh. C**: Acosta Dep., p. 6:14-20 |
| 12. In that time, Alaniz never hurt or threatened to hurt anyone. | **Exh. C**: Acosta Dep., p. 11:9-11 |
| 13. He was clearly only intent on harming himself. | **Exh. C**: Acosta Dep., p. 6:3-4 |
| 14. At one point, he turned to Acosta, who was attempting to prevent him from doing so, and told him to save himself. | **Exh. C**: Acosta Dep., p. 5:11-13 |
| 15. Alaniz was concerned that Acosta might get hurt while trying to help. | **Exh. C**: Acosta Dep., p. 5:18-19 |
| 16. Alaniz was severely injured from the collisions; he was bleeding a lot from his head and blood was running down his face and jacket. | **Exh. D**: Acosta Interview, Sept. 27, 2022, pp 5:21-6:1 |
| 17. At approximately 11:31 a.m., Officer Ramon Silva arrived on | **Exh. C**: Acosta Dep., p. 7:8-25 |

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| scene, approaching from the opposite direction of traffic. | **Exh. E**: Dispatch Transcript, p. 4 |
| 18. Silva had learned from dispatch that Alaniz was suicidal, and he had been walking in lanes while bleeding, and actively trying to jump in front of vehicles. | **Exh. E**: Dispatch Transcript, pp. 2-3<br>**Exh. F**: Van Dragt Dep., p 2:8-10 |
| 19. Silva knew Alaniz was potentially suffering from a mental health crisis. | **Exh. E**: Dispatch Transcript, p. 3:12-17<br>**Exh. G**: Silva Dep., p. 2:2-8 |
| 20. Silva had no information indicating that Alaniz had a weapon. | **Exh. G**: Silva Dep., p. 3:1-9 |
| 21. He had no information that Alaniz had harmed or threatened to harm anyone but himself. | **Exh. G**: Silva Dep., p. 3:1-9 |
| 22. Unlike Acosta and the other Good Samaritans, who had been managing this situation admirably for more than 12 minutes, when Silva arrived he was agitated and erratic, shouting commands while inexplicably waving traffic to continue driving. | **Exh. H**: BWC 6:15 – 6:45 |
| 23. When Silva arrived, he saw Acosta, Alaniz, and another individual "standing around," near the shoulder of the highway. | **Exh. G**: Silva Dep., p. 4:2-5 |
| 24. Acosta, who has been helping Alaniz for nearly twenty minutes, approached Silva and tried to convey some information to him, but Silva ignores him and screams at him to get behind him, "Move! Move! Move! Move! Move! Move!" | **Exh. C**: Acosta Dep., p. 8:6-9<br>**Exh. H**: BWC 6:15 – 7:00 |
| 25. Silva does not even attempt to gather critical information from | **Exh. H**: BWC 6:15 – 7:00 |

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| Acosta to learn critical facts like whether anyone is injured, whether Alaniz is attacking or threatening anyone, or whether Alaniz has a weapon. | |
| 26. Van Dragt arrived in his patrol car around 10 seconds after Silva and positioned his vehicle at an angle to the shoulder between Alaniz and Silva, about 60 feet in front of Silva. | **Exh. H**: BWC 6:50 |
| 27. At the same time, Silva approached, unholstering his weapon and ordering Alaniz to show his hands. | **Exh. H**: BWC 6:58 |
| 28. Alaniz took his hands out of his pockets, in compliance with the order. | **Exh. H**: BWC 6:59 |
| 29. With his hands visible, Alaniz started walking toward Van Dragt before breaking into a slow run. | **Exh. C**: Acosta Dep., pp. 9:24-25; 10:1<br>**Exh. H**: BWC 7:00 |
| 30. Van Dragt saw that Alaniz did not have a gun or a knife | **Exh. F**: Van Dragt Dep., p. 3:10-21 |
| 31. As Alaniz rounded the rear of Officer Van Dragt's patrol unit, Van Dragt deployed his taser at Alaniz, striking him and causing him to seize up. | **Exh. H**: BWC 7:04 |
| 32.. The autopsy report indicates that the taser barbs penetrated Alaniz, which would likely mean the Taser was effective. | **Exh. I**: Autopsy Report, p. 4<br>**Exh. J**: Defoe Decl., ¶¶ 10-11 |
| 33. About one second after the Taser was fired, while Alaniz was seizing up from the effects of the Taser, Silva shot five rounds at Alaniz without warning, striking his left leg, his right leg, and his chest. | **Exh. I**: Autopsy Report, pp. 2–3<br>**Exh. J**: Defoe Decl., ¶¶ 10-11<br>**Exh. N**: Frame-by-frame version of Silva's BWC, frames 8–15. |

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| 34. Alaniz died from his injuries. | **Exh. I**: Autopsy Report, p. 4 |
| 35. Two and a half minutes after killing Alaniz, Silva and two other officers put his limp body in handcuffs. | **Exh. H**. BWC: 7:00 – 9:25 |
| 36.. A witness can be heard exclaiming, "You guys are going to handcuff a dead guy? He's dead! He's dead! You're handcuffing a dead guy!" | **Exh. K**. Red Truck Video |
| 37. Acosta saw the entire incident and testified that he did not perceive a gun in Alaniz's hand. | **Exh. C**: Acosta Dep., 10:8-18 |
| 38. Van Dragt did not see anything that even "looked like a firearm in any way." | **Exh. M**: Van Dragt Interview, May 109, 2022, p. 2:15-18 (this fact is a fair inference from his statement because did not shoot and he stated that he would have shot if he saw anything that looked like a firearm in any way) |
| 39. Acosta was positioned several feet west of Silva's motorcycle and saw the entire incident. | **Exh. D**: Acosta Interview, Sept. 27, 2022, pp. 2:9; 3:22 |
| 40. As Alaniz moved toward the officers, Acosta saw him put his hand into his pocket. | **Exh. C**: Acosta Dep., p. 10:13-20 |
| 41. But Acosta did not see the individual pull any object out of his pocket prior to the shots. | **Exh. C**: Acosta Dep., 10:8-18 |
| 42. Van Dragt saw Alaniz pull out an objection from his jacket pocket before he started running in his direction, but the object as looked like "a subway sandwich." | **Exh. F**: Van Dragt Dep., p. 7:6-16 |
| 43. The object in Alaniz's hands was probably the gray sunglass case that was found at the scene. | **Exh. F**: Van Dragt Dep., pp. 7:21-24; 8:20-9:18 |

6
PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| 44. He is certain that he did not see a gun, otherwise he would not have holstered his firearm. | **Exh. F**: Van Dragt Dep., p. 6:6-21 |
| 45. Seconds after the shooting, Silva and van Dragt have this important exchange:<br>**Silva**: What did he have in his hand? Was that a gun?<br>**Van Dragt**: No, it was nothing. | **Exh. H**: BWC: 7:16-7:21 |
| 46. According to Silva's own perception, the gray sunglass case that that was most likely the object in Alaniz's hands "doesn't look like a gun, obviously." | **Exh. G**: Silva Dep., pp. 10:19-11:4 |
| 47. Silva was trained to yell "gun" upon seeing an armed suspect, to warn other officers of the lethal danger. | **Exh. G**: Silva Dep. p. 6:16-20 |
| 48. He failed to do so. | **Exh. G**: Silva Dep., pp. 6:25-7:2 |
| 49. Silva was trained to order armed suspects to "drop the gun," giving them an opportunity to comply. | **Exh. G**: Silva Dep., p. 6:21-24 |
| 50. He gave no such command. | **Exh. G**: Silva Dep., p. 7:3-4 |
| 51. He was trained he only needed to take these action "when feasible." | **Exh. G**: Silva Dep., pp. 6:16-24; |
| 52. A felt sunglass case does not have the identifying features of a firearm such as a barrel, trigger, trigger guard, grip, or magazine. | **Exh. F**: Van Dragt Dep., pp. 4:11-5:7<br>**Exh. G**: Silva Dep., pp. 5:5-8; 10:19-11:4 |
| 53. If the object were something similar to a gun, it would be very unlikely that the two other witnesses would say they did not perceive what they thought could be a gun. | **Exh. C**: Acosta Dep., 10:8-18<br>**Exh. H**: BWC: 7:16-7:21<br>**Exh. M**: Van Dragt Interview, May 109, 2022, p. 2:15-18 |
| 54. Van Drag did not see anything that looked like a firearm in anyway. | **Exh. M**: Van Dragt Interview, May 10, 2022, p. 2:15-18 |

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| 55. Silva admits that he heard the Taser deploy before he opened fire. | **Exh. G**: Silva Dep., 8-9:3 |
| 56. Video footage from Silva's perspective clearly shows Van Dragt unholstering his Taser, aiming it, and successfully striking Alaniz. | **Exh. H**: BWC: 6:55-7:06 |
| 57. Alaniz's autopsy confirms that he was struck in two places, completing a full circuit, which explains why he seized up in reaction to the Taser. | **Exh. I**: Autopsy Report, p. 4<br>**Exh. J**: Defoe Decl., ¶¶ 10-11 |
| 58. The video further shows Alaniz turning away from the officers after being struck. | **Exh. H**: BWC: 7:00-7:06<br>**Exh. J**: Defoe Decl., ¶¶ 10-11 |
| 59. Silva—who heard and saw the Taser deploy, witnessed Alaniz seize up and turn away—chose to shoot even though non-lethal force had already been deployed and was actively neutralizing any perceived threat. | **Exh. H**: BWC: 7:00-7:06<br>**Exh. I**: Autopsy Report, p. 4<br>**Exh. J**: Defoe Decl., ¶¶ 10-11 |
| 60. When Silva opened fire, Alaniz was not in a "shooter's stance." | **Exh. N**: Frame-by-frame version of Silva's BWC, frames 8–15. |
| 61. Instead, he had already been struck by Van Dragt's Taser, seized up, and turned away from the officers. | **Exh. N**: Frame-by-frame version of Silva's BWC, frames 8–15.<br>**Exh. J**: Defoe Decl., ¶¶ 10-11 |
| 62. Acosta, who witnessed the entire encounter, was shocked that Silva shot Alaniz; he did not believe lethal force was necessary and thought the officers should have used non-lethal means to take him into custody. | **Exh. C**: Acosta Dep., p. 12:2-11 |
| 63. Clark also witnessed the incident and thought the same, stating that "they could have done anything they | **Exh. O**: Red Truck Video 2 |

| Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|
| wanted to keep this man alive, but they fucking killed this man." | |
| 64. Van Dragt was not expecting gunshots, and explained that he would not shoot someone just because the person is suicidal, even if they did position their body in a shooting stance, as alleged by Silva. | **Exh. F**: Van Dragt Dep., pp. 7:6-10 |
| 65. Silva's view of Alaniz was obstructed by Van Dragt's vehicle until a half second before he fired. | **Exh. H**: BWC: 7:00-7:06 |

Dated: February 7, 2025

LAW OFFICES OF DALE K. GALIPO

/s/ Cooper Alison-Mayne
Dale K. Galipo
Cooper Alison-Mayne
*Attorneys for Plaintiffs*