```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   SANDRA KIRKMAN, CARLOS ALANIZ,       )
     individually and successor-in-       )
 5   interest to JOHN ALANIZ, deceased,   )
                                          )
 6                  Plaintiffs,           )
                                          )
 7             vs.                        )Case No.
                                          )2:23-CV-07532-DMG-SSC
 8   STATE OF CALIFORNIA, RAMON SILVA,    )
     and DOES 1-10, inclusive,            )
 9                                        )
                    Defendants.           )
10   _____)

11

12

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                      JOHN VAN DRAGT

16                  TUESDAY, APRIL 9, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Work Order:  56268
```

```
 1     A.   At some point while I was on my way there on a
 2   traffic break it came out this party may be 1031 which is
 3   possible suicide.
 4     Q.   I was going to ask you about that because I think
 5   you referenced that number in your statement.
 6          Do you recall that?
 7     A.   Yes.
 8     Q.   So 1031, that's someone who is potentially
 9   suicidal?
10     A.   Yes -- code.
11     Q.   And were you thinking that, you know, maybe this
12   person was possibly trying to get hit by the vehicles when
13   you heard the 1031?
14     A.   So I was super confused at the moment because this
15   has now gone from a party being ran over in lanes, and then
16   on my way to this location I came across westbound 105 at
17   Lakewood a semi truck stopped in lanes and a person was
18   running towards me which was appeared to me the driver of the
19   semi truck.
20          Somehow he was trying to tell me that he was
21   involved somehow in this incident, and that he was pointing
22   down westbound like the person was continued that way.
23          So I was super confused because this has come out
24   near East LA'S area.  So I would -- I didn't know if this was
25   the same incident or if this is something different that this
```

1   Q.   And would you say he was in the shooting platform
2   also within the first few steps?
3   A.   From what I recall, yes, sir.
4   Q.   And were you still at the back of your vehicle, or
5   were you tactically repositioning at this point?
6   A.   So that -- he drew out in a shooting platform.
7        Based on -- on the -- being daylight and my
8   location, and I know firearms, what he was pointing at me
9   would have had to been a cannon from my perspective.
10       It was too round.  I described it as a Subway
11  sandwich like the width of like a sandwich.  So it's -- it --
12  to me the only reason that I didn't fire at that moment is
13  because it just looked like it was too big to be any kind
14  of -- it had to be a cannon.
15       And so I -- and I couldn't -- I couldn't determine
16  what it was.  It could have been a gun.  It could have been a
17  knife.  I don't know.
18       But due to the fact in that millisecond that I
19  determined that it was too big to be a gun, I tactically made
20  my way back around the patrol car.  I transitioned to my
21  Taser due to the fact that I felt I was being attacked.
22  Q.   So up to the point where this individual started
23  running, did you hear him saying anything to you?
24  A.   No, sir.
25  Q.   Did you hear him saying anything to anyone else?

Page 25

```
 1      A.   No, sir.
 2      Q.   Could you tell whether he was physically injured at
 3   that point?
 4      A.   No, sir.  He was standing on his two feet.
 5      Q.   And did you have a description of the individual
 6   that was possibly a 1031 before you got to the scene?
 7      A.   I don't recall a description.  I don't know if that
 8   was put out before I switched the radio.  But I don't recall
 9   knowing what the description was other than the male being
10   down, and then now running down the freeway.
11      Q.   **You, obviously, as a law enforcement officer have**
12   **some experience with firearms?**
13      A.   **Yes, sir.**
14      Q.   **And obviously, firearms have certain characteristics**
15   **that you're trained on; is that fair?**
16      A.   **Yes, sir.**
17      Q.   **I mean, just to throw out some examples there, you**
18   **know, it may have a barrel, a grip, a magazine, trigger,**
19   **trigger guard, things of that nature?**
20      A.   **A firearm can mean anything.  It could be -- it**
21   **could be -- and I've seen firearms in the academy on training**
22   **that people makes firearms out of a piece of pipe.  People**
23   **make homemade firearms -- the firearm can be -- yes, a**
24   **description like a way I understand it like my firearm, my**
25   **holster.  But a firearm can be anything that anyone can make.**
```

1  I've seen people make homemade shotguns out of pipes, and
2  they can fire them from -- pocket. So it could be
3  anything.
4      Q.  I realize that. But would you at least agree that
5  generally firearms have certain characteristics?
6      A.  Yes, sir. Like the one you would buy at a store,
7  yes, sir.
8      Q.  And it sounds like when you observed this object in
9  the individual's hand initially, you had your firearm out?
10     A.  Yes, sir.
11     Q.  And what type of firearm did you have?
12     A.  I carry a Smith&Wesson M&P, it's a 40-cal.
13         It's CHP-issued firearm.
14     Q.  Are you right-handed or left-handed?
15     A.  I'm right-handed, sir.
16     Q.  So do you ordinarily carry your holster for your
17 firearm on your right side?
18     A.  On my right hip.
19     Q.  And where would you normally carry the X2?
20     A.  It's on my left hip. So it's retrieved with my left
21 hand, and I would -- I would move it to my right hand to
22 deploy it.
23     Q.  Okay. And how far was this object or the individual
24 with the object from you when you first saw it?
25     A.  He's right back around on the shoulder a couple,

```
 1   maybe a step or two towards my location from his original
 2   location.
 3       Q.   So just a little bit closer than the 30 to 50
 4   feet?
 5       A.   Yes, sir.
 6       Q.   And if I'm understanding your testimony correctly,
 7   from your perspective when you saw it, you did not think it
 8   was a firearm; is that fair?
 9       A.   I could not clearly identify as a firearm.
10            I was -- I was unsure, and that's why I did not
11   deploy my firearm because I was unsure that -- what it was.
12            It could have been a firearm in a -- in a -- in a
13   case, but because of that case being so round, I could not
14   clearly identify it as a firearm.  So I did not fire my
15   weapon.
16       Q.   But is it fair to say if you thought it was a
17   firearm, you would not have holstered your weapon at that
18   point; is that a fair statement?
19       A.   I would have fired my firearm.
20       Q.   If you thought it was a firearm?
21       A.   Yes.
22       Q.   Okay.  But you holstered your firearm because at the
23   time you did not think it was a firearm; is that fair?
24       A.   I holstered my firearm because I could not -- I
25   could not identify it clearly as a firearm.  I knew it was
```

Page 28

1  something. I didn't know what it was. It could have been a
2  knife, it could have been a firearm.
3          But because of the round, the shape of it, I could
4  not deploy my -- I could not fire my -- my weapon at that
5  moment.
6     Q.   Do you recall in your statement that you, from your
7  perspective, you did not recognize the object in the person's
8  hands as a firearm?
9     A.   Yes. That's why I -- that's what I'm saying.
10         I didn't recognize it as a firearm. Like it was --
11 it would have to be a cannon.
12    Q.   Right. And do you recall in trying to explain based
13 on the size and the shape of it, in your opinion, you did not
14 think it was a firearm?
15    A.   Similar to what I said today, yes, sir.
16         I described it as a Subway sandwich, yes, sir.
17    Q.   Do you recall what color the object was?
18    A.   I don't recall what it was as he ran at me, but it
19 was -- from the photos later on, it was a gray object.
20    Q.   Do you know what material it was made out of?
21    A.   I don't, sir. It appeared to be a like a sunglass
22 case.
23    Q.   Like a gray sunglass case?
24    A.   Uh-huh.
25    Q.   Is that yes?

1  and has nothing in their hands, let's just assume you could,
2  you know, see their hands, and they're in a shooting stance,
3  but there is nothing in their hands.
4         Are you with me in my hypothetical?
5     A. Yes, sir.
6     Q. I mean, that based on your training, that would be a
7  situation where you wouldn't want to shoot the person just
8  because they were suicidal and in a shooting platform; is
9  that fair?
10    A. Absolutely, yes, sir --
11        MS. REYES: Let me object. Sorry.
12        Just belatedly object. It's vague, calls for
13 speculation, and it's an incomplete hypothetical.
14        COURT REPORTER: And could you repeat your answer
15 after absolutely?
16        Please, also slow down, please.
17        THE WITNESS: I don't recall, ma'am.
18 BY MR. GALIPO:
19    Q. Okay. Let me try.
20        I heard the absolutely, but I'm not sure if you
21 finished your answer or not. But let me try another
22 question.
23        So my first hypothetical was a situation where
24 someone might be suicidal; they have their hands in a
25 shooting platform with their hands pointed at you, but you

Page 45

```
 1            And we'll take a break in just a little bit because
 2   we've been going awhile now.
 3            MS. LEAP:  Can you all see that?
 4            MR. GALIPO:  We can see it.
 5            Go to Page 22, please.
 6            Okay.  That's about good.
 7   BY MR. GALIPO:
 8       Q.   Do you see -- are you able to see this on your
 9   screen?
10       A.   Yes.
11       Q.   Do you see some line numbers on the left-hand
12   side?
13       A.   I do.
14       Q.   And at about Lines 9 or 10, do you see when you're
15   being asked, "Do you know about what your distance was from
16   you to the suspect when you were able to identify that object
17   in his hand as not a firearm?"
18            Do you see that portion of the question?
19       A.   Yes, sir.
20       Q.   And your response says starting on Line 14, "Right
21   when he -- on -- when he was on the shoulder is when I can
22   see that.  To me it wasn't a firearm based on the size of
23   it."
24            Do you see that?
25       A.   Yes.
```

Page 46

```
 1      Q.   Okay.
 2           MR. GALIPO:  Thank you, Shannon.
 3           Oh, can you go back to that page real quick to Line
 4   21.
 5   BY MR. GALIPO:
 6      Q.   And then you see where you say, "I would say like I
 7   said, 30 feet."
 8           And you continue on Line 23, "30 to 35 feet."
 9      A.   Yes, sir, I see that.
10      Q.   Okay.
11           MR. GALIPO:  Thank you, Shannon.
12   BY MR. GALIPO:
13      Q.   That was the approximate distance you were from him
14   when you saw the object in his hands?
15      A.   Yeah.  The three car lengths, like I said.
16           That's when he spun on his heels and on that
17   shoulder is when came at -- he pulled it out of his right
18   pocket and began advancing on my location.
19      Q.   Okay.
20           MR. GALIPO:  Is this a good time to take a break for
21   ten minutes for everyone?
22           COURT REPORTER:  Yes.
23           THE WITNESS:  Yes, sir.
24           MS. REYES:  Yeah.
25           (Recess taken.)
```

Page 64

```
 1                         CERTIFICATE

 2                             OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8         That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15         Further, that the foregoing is an accurate

16   transcription thereof.

17         I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  April 9, 2024.

23
                              _____
24
                              Jinna Grace Kim, CSR No. 14151
25
```