SANDRA KIRKMAN, ET AL vs STATE OF CALIFORNIA, ET AL
Ramon Silva on 03/06/2024

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   SANDRA KIRKMAN, CARLOS ALANIZ,     )
     individually and successor-in-     )
 5   interest to JOHN ALANIZ, deceased, )
                                        )
 6              Plaintiffs,             )
                                        )
 7              vs.                     )Case No.
                                        )2:23-CV-07532-DMG-SSC
 8   STATE OF CALIFORNIA, RAMON SILVA,  )
     and DOES 1-10, inclusive,          )
 9                                      )
                Defendants.             )
10   _____)

11

12

13

14        REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    RAMON SILVA

16              WEDNESDAY, MARCH 6, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Work Order:  51529
```

1   vehicle contact, no, I don't recall.
2       Q.   And did you consider after hearing that information
3   that the person could be potentially suicidal if they were
4   trying to get hit by a vehicle?
5       A.   Yes.
6       Q.   And did you consider that the person may be
7   experiencing some type of mental health crisis?
8       A.   Potentially, yes.
9       Q.   What freeway was it on that this occurred?
10      A.   The 105.
11      Q.   And do you know what off-ramp or between what
12  off-ramps the incident occurred?
13      A.   I do.
14      Q.   And between what off-ramps?
15      A.   It was in the general area of the Paramount or the
16  Paramount overcrossing in the Garfield Avenue on-and
17  off-ramps.
18      Q.   Does the 105 generally run east and west?
19      A.   Yes.
20      Q.   And it appears from watching your body-worn camera
21  footage that at some point you were on the shoulder as you
22  were approaching the scene going in the opposite direction of
23  traffic; is that correct?
24      A.   That's correct.
25      Q.   And which direction were you going as you were

```
 1      Q.   Did you have any specific information that the
 2   person had a weapon?
 3      A.   Not that I recall.
 4      Q.   Any specific information that the person had
 5   verbally threatened to harm anyone?
 6      A.   Not that I'm aware of.
 7      Q.   Any specific information that the individual had
 8   actually injured another person?
 9      A.   Not that I'm aware of.
10      Q.   But you did have some understanding that the person
11   themselves might be injured?
12      A.   No.  No -- I didn't have any specific information
13   that this person was injured, no, sir.  Not that I recall.
14      Q.   Just some general information that they may have
15   been struck by a vehicle in an accident?
16      A.   Yes, sir.
17      Q.   Do you know if paramedics were called to stage in
18   the area prior to the shooting?
19      A.   So as I previously stated, I believe the initial
20   call came out as a traffic collision with an ambulance
21   responding.  So I would imagine, you know, I would assume
22   that fire was already -- or the ambulance and the fire
23   department were already responding to the scene.
24      Q.   So I wanted go up to the point in time now where
25   you're on your motorcycle and you're on the shoulder going
```

1  you're asking specifically who they were, I do not know.
2  Q. And what, if anything, did you observe the people on
3  the shoulder doing while you were still on your motorcycle?
4  A. I don't recall from my line of sight.
5     I just remember people standing around.
6  Q. Okay. And did you think to yourself that one of
7  them could possibly be the suspect?
8  A. I did.
9  Q. Did you identify any one of those three as the
10 suspect before you got off your motorcycle?
11 A. Not that I recall.
12 Q. Any other observations regarding the individuals or
13 Officer Van Dragt or his vehicle that you recall before you
14 got off your motorcycle?
15 A. Not that I recall that I have not already relayed.
16 Q. And where approximately did you position your
17 motorcycle when you came to a stop?
18 A. It would have been in the northern most lanes of 105
19 freeway. So possibly on the shoulder, maybe on the far right
20 lane, somewhere in that general area.
21 Q. And at the time you stopped your motorcycle, do you
22 know if Officer Van Dragt's patrol vehicle had come to a
23 stop?
24 A. Yes.
25 Q. And had it?

Page 37

1    Q.   How could you tell it was his firearm as opposed to
2    something else?
3    A.   Because I remember the black -- seeing the black
4    handgun similar to the one I carry.
5    Q.   I'm assuming your handgun has various parts to it;
6    trigger, trigger guard, barrel, grip, things of that
7    nature?
8    A.   Yes.
9    Q.   And did you see where Officer Van Dragt went after
10   he initially got out of your vehicle?
11   A.   Yes.
12   Q.   And where did he go?
13   A.   He walked towards the back of his patrol vehicle.
14   Q.   Did you see where these individuals were at that
15   time on the shoulder, the two or three that you described,
16   after getting off your motorcycle?
17   A.   I'm sorry.  Can you repeat the question?
18   Q.   Sure.  I think we talked about earlier, as you were
19   approaching while you were on your motorcycle, you saw two or
20   three individuals on the shoulder of the road.
21        Do you recall us generally talking about that?
22   A.   Yes, sir.
23   Q.   I'm wondering after you stopped your motorcycle and
24   got off, whether you observed any of those individuals.
25   A.   Yes.  I still observed them.

1   A.   Yes.

2   Q.   On how many occasions, approximately?

3   A.   More than a handful of times.

4   Q.   And had you ever seen suspects with guns on their
5   person?

6   A.   Yes.

7   Q.   How many times would that be, approximately?

8   A.   Like I said, maybe a handful of times.

9   Q.   And how about guns in vehicles, I'm sure you've seen
10  that many times?

11  A.   Yes.

12  Q.   Would it be fair to say that you were not trained to
13  shoot someone merely for seeing a gun in their hand; there
14  has to be more?

15  A.   Correct.

16  Q.   And is part of your training that if there are other
17  officers present and you see what you believe to be a gun,
18  one thing you could do is to yell out "gun" to alert your
19  fellow officers of your observations?

20  A.   When feasible, yes.

21  Q.   And are you also trained that if you do see a gun in
22  someone's hand, one command you can potentially give them is
23  to drop the gun?

24  A.   Yes.  When feasible.

25  Q.   At any time before this individual went out of your

Page 47

1  view, did you yell out "gun" or words to that effect?

2      A.   No.

3      Q.   Did you ever yell out "drop the gun" at any point?

4      A.   No.

5      Q.   Did you ever see the individual in what you would

6  characterize as a shooting stance before he went out of your

7  view?

8      A.   No.

9      Q.   Now, as the individual was getting closer to the

10 parole car when he was running, did you observe Officer Van

11 Dragt tactically reposition himself?

12     A.   No.

13     Q.   Did you ever see Officer Van Dragt creating distance

14 between himself and the individual running towards him?

15     A.   I recall him walking or moving maybe side-stepping

16 towards my direction.

17     Q.   Okay.  Because I think initially you said you saw

18 him get out of the driver side of the vehicle and go towards

19 the rear initially?

20     A.   Yes.

21     Q.   And then at some point you saw him moving along the

22 driver side of the vehicle towards the front?

23     A.   No.

24     Q.   What do you recall?

25     A.   Are you -- can you be more specific?

Page 51

1   Q.   Did you hear any pop before you fired your shots?

2   A.   I heard a gunshot.

3   Q.   Have you ever described it as a pop?

4   A.   Potentially, yes.  I would have to relook at my
5   statements, but it was consistent with a gunshot.

6   Q.   Was it also consistent with a Taser being
7   deployed?

8   A.   It's hard to say.  Just like I said, it's -- in the
9   static environment, it's -- it probably sounds the same.

10   Q.   When you say probably sounds the same, are you
11   saying on your -- strike that.

12        Your body-worn camera has an audio, I take it?

13   A.   Yes, sir.

14   Q.   And can you hear the initial -- you know now it's a
15   Taser deployment; correct?

16   A.   In hindsight.

17   Q.   Can you hear the Taser deployment on your body-worn
18   camera footage now?

19   A.   Obviously, with the benefit of hindsight, yes, I can
20   see that.  But at the time my frame of mind was it was a
21   gunshot.

22   Q.   I'm just wondering on your body-worn camera footage
23   now, does the Taser deployment to you sound the same as the
24   gunshots or different now?

25   A.   Now, it's the same.

1    Q.   So when you hear your body-worn camera footage, it
2    sounds like a gunshot to you, still?
3    A.   Yes, sir.
4    Q.   Could you tell where the pop or shot or whatever you
5    want to call it, the initial one, came from?
6    A.   Yes.
7    Q.   And where did it sound like it was coming from?
8    A.   From the general direction of the person running
9    towards me and Officer Van Dragt.
10   Q.   Did you know who fired that round at the time?
11   A.   No.
12   Q.   And when did you hear that in relation to your
13   shots?
14   A.   Right before.
15   Q.   And when you heard that, was it during the time
16   frame the individual was out of your view, or had he come
17   back in your view?
18   A.   It's kind of hard to tell because like I said, it
19   all happened so fast.  I would say it happened
20   simultaneously.
21   Q.   Simultaneously with what?
22        Him coming back in your view?
23   A.   Yes, sir.
24   Q.   Have you had any --
25        MR. GALIPO:  Okay.  That's fine.

Page 60

1  gray in color, but some object on the ground?

2  A.  I see an object, yes.

3  Q.  Is that the object that you believe he had in his
4  hands when you shot him?

5  A.  Specifically, I don't recall.

6  It's hard to tell.  You can't see the entire scene
7  from this photo.

8  Q.  Well, the object that you saw in his hand, did it
9  look like that object that we see on the bottom of Exhibit
10  2?

11  A.  The object I saw in his hand I would describe it as
12  a firearm.  So like I said, I don't -- it's kind of hard to
13  tell from the photo if I can't see the entire scene.

14  Q.  Let me just try a few that might be closer up.

15  MR. GALIPO:  Can we put up Exhibit 3 -- no, Exhibit
16  5.  I'm sorry.

17  (Exhibit 5 was marked for identification.)

18  BY MR. GALIPO:

19  Q.  Do you see that on your screen?

20  A.  Yes, sir.

21  Q.  Did you see that object after the shooting on the
22  ground near the person you shot?

23  A.  Not that I recall.

24  Q.  Do you think that object that we're seeing in
25  Exhibit 5 looks like a gun?

1  A.  Obviously, from this point of view in this it
2  doesn't look like a gun, obviously.
3  Q.  It does not look like a gun, would you agree?
4  A.  I would agree.
5  Q.  And do you know whether he had this object in his
6  hand when you shot him?
7  A.  I did not know if it was this specific object,
8  sir.
9  Q.  Do you recall seeing any other object on the ground
10 near him other than this object --
11 A.  Specifically -- I'm sorry.  Go ahead, sir.
12 Q.  After the shooting, I meant to say.
13 A.  Specifically, no.  I remember there was objects on
14 the ground, but I would be assuming.
15 Q.  Can we look again at Exhibit 2.
16     You can at least see the position of that object
17 relative to the patrol car?
18 A.  Yes.
19 Q.  And it looks like there is some blood on the ground
20 in between the object and the patrol car.
21     Do you recall seeing blood on the ground at some
22 point?
23 A.  No.
24 Q.  Do you know what that -- I don't know if it's a
25 backpack or what that is.

Page 77

1                         CERTIFICATE

2                             OF

3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

6  Stenographic Shorthand Reporter of the State of California,

7  do hereby certify:

8         That the foregoing proceedings were taken before me

9  at the time and place herein set forth;

10        That any witnesses in the foregoing proceedings,

11 prior to testifying, were placed under oath;

12        That a verbatim record of the proceedings was made

13 by me, using machine shorthand, which was thereafter

14 transcribed under my direction;

15        Further, that the foregoing is an accurate

16 transcription thereof.

17        I further certify that I am neither financially

18 interested in the action, nor a relative or employee of any

19 attorney of any of the parties.

20

21        IN WITNESS WHEREOF, I have subscribed my name, this

22 date:  March 6, 2024.

23

24                                _____
                                  Jinna Grace Kim, CSR No. 14151
25