UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA KIRKMAN and CARLOS ALANIZ, *individually and as successors-in-interest to John Alaniz, deceased,*<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA and RAMON SILVA,<br><br>Defendants. | Case No. CV 23-7532-DMG (SSCx)<br><br>**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [66]** |

Before the Court is a Motion for Summary Judgment filed by Defendants State of California ("State") and California Highway Patrol Officer Ramon Silva. [Doc. # 66 ("MSJ").] The MSJ is fully briefed. [Doc. ## 70 ("Opp."), 72 ("Reply").] The Court held a hearing on the MSJ on February 28, 2025. Because the Court finds that the "purpose to harm" standard applies to the Fourteenth Amendment claim and there is no evidence of Defendant Silva's subjective purpose to harm, the Court **GRANTS in part** Defendants'

-1-

MSJ. As will be explained further below, the MSJ is otherwise **DENIED** because there are triable issues of material fact that foreclose summary judgment.

## I.
## PROCEDURAL BACKGROUND

Plaintiffs Sandra Kirkman and Carlos Alaniz ("Plaintiffs" or "Parents"), parents of decedent John Alaniz ("Alaniz"), filed their Complaint in Los Angeles County Superior Court on July 28, 2023, suing in their individual capacities and as Alaniz's successors-in-interest. [Doc. # 1-1 ("Compl.").] The Complaint alleges six claims for relief: three claims under 42 U.S.C. section 1983 for violations of the Fourth and Fourteenth Amendments, one claim for battery, one claim for negligence, and one claim for violation of California's Bane Act, Cal. Civ. Code section 52.1. *Id.* On September 11, 2023, Defendants State of California and Ramon Silva removed the action to this Court, invoking federal question jurisdiction. [Doc. # 1 ("NOR").] Defendants now move for summary judgment on Plaintiffs' five remaining claims.[1]

## II.
## FACTUAL BACKGROUND[2]

### A. Video/Audio Evidence

When confronted with a videotape of the events in question, the Court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). And "[w]hen opposing parties tell two different stories, one of which is blatantly

---

[1] The parties stipulated to the dismissal of Plaintiffs' second section 1983 claim for denial of medical care. [Doc. # 61.]

[2] The facts in this section are uncontroverted, unless otherwise stated. Many of the parties' purportedly disputed facts are not in fact controverted by evidence, and the Court therefore cites to them as uncontroverted facts. Facts are drawn from Defendants' Statement of Undisputed Facts [Doc. # 66-2 ("SUF")], as set forth with Plaintiffs' Statement of Genuine Disputes and Additional Material Facts [Doc. # 70-1 ("SGD")], and Defendants' responses thereto [Doc. # 72-2 Responses to Genuine Disputes ("RGD") and Responses to Additional Facts ("RAF")]. The Court has reviewed the entire record but discusses only the uncontroverted material facts that affect its analysis.

contradicted by [the video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Courts also apply this logic to audio evidence. *See Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) (noting that "[w]hile *Scott* involved dashcam video footage, courts have since applied its logic to other types of evidence capable of objectively disproving witness testimony," including audio recordings).

**B.    Events Prior to The Incident**

    **1.    John Alaniz**

On May 4, 2022, decedent John Alaniz was experiencing a mental health crisis and walking along the shoulder of the westbound 105 freeway in Paramount, California. RAF ¶ 1. Alaniz ran in front of, and was struck by, a semi-truck travelling at approximately 55 miles per hour. RAF ¶ 2. The force from the collision with the semi-truck propelled Alaniz farther westward, causing Alaniz to hit his head on the ground and slide across the pavement for at least several feet. RAF ¶ 3; Declaration of Lee H. Roistacher ("Roistacher Decl."), Ex. 1 ("Semitruck Video") at 11:16:56–11:17:00 [Doc. # 66-5].

Immediately after Alaniz was struck, the driver of the semi-truck and two individuals in a white pickup truck driving in the next lane over stopped their vehicles, got out, checked on Alaniz, and called for help. RAF ¶¶ 4, 5, 9. One of the individuals from the white pickup truck, Andrew Acosta, noticed that Alaniz was bleeding from his head and appeared to be unconscious. RAF ¶ 6. Alaniz remained motionless on the ground for at least three minutes. RAF ¶ 5. After he regained consciousness, Alaniz got up and resumed walking along the shoulder of the freeway. RAF ¶ 7.

Emergency services received the first call regarding this incident at approximately 11:18 a.m., and California Highway Patrol ("CHP") dispatched information about the circumstances and location of the incident soon thereafter, at approximately 11:20 a.m. RGD ¶¶ 4, 5. While waiting for CHP or other emergency services to arrive, Acosta stayed with Alaniz because he was concerned for Alaniz's safety. RAF ¶ 8. Despite Acosta's

efforts, however, Alaniz continued to try to jump in front of vehicles, pushing Acosta out of the way and telling him to "save himself." RAF ¶ 14; RGD ¶¶ 3 (Alaniz tried to put his head under the wheels of another [stopped] semitruck); 7 (Alaniz jumped in front of another pickup truck), 9 (Alaniz was struck by a van). Acosta remained with Alaniz for approximately 12 minutes, until Defendant Officer Silva arrived at the scene at 11:31 a.m. RAF ¶ 17; RGD ¶ 12.

### 2. Officer Ramon Silva

On the date of the incident, Officer Silva was working his normal 6:00 a.m. to 2:30 p.m. weekday shift when he heard about Alaniz over the dispatch. Roistacher Decl., Ex. 9 ("Silva DOJ Int.") at 7:22–8:4 [Doc. # 66-13]. The dispatcher described the situation as "big rig versus a ped[estrian]" and that the pedestrian was "1031," which meant that he was potentially suicidal. *Id.* at 11:4–6; Roistacher Decl., Ex. 10 ("Dispatch Trans.") at 2:3, 2:19, 3:15. Dispatch also communicated that Alaniz was "full of blood," had been hit "several times" by vehicles, and that he was running in the lanes and across traffic. *Id.* at 4:13, 6:16–18, 7:7–8; Silva DOJ Int. at 11:13–16. After hearing "more and more information via dispatch about [Alaniz] continuously jumping in and out of traffic" and realizing that only one unit was responding to the situation, Silva decided to discontinue his original assignment and respond to the call about Alaniz instead. Silva DOJ Int. at 11:2–9, 11:14–16. While he was driving to the scene, he asked the dispatcher to send air support as well. *Id.* at 11:16–18. Silva approached the scene from the opposite direction of traffic, i.e., driving eastward on the westward side of the freeway. RAF ¶ 17.

Silva described the scene to which he arrived as "chaotic," "tense," and "uncertain." RGD ¶ 14. He said there were "a lot of people stopped," "cars stopped," and "a few individuals . . . standing around in the shoulder area." Silva DOJ Int. at 12:10–14. Silva observed the people at the scene and identified Alaniz as the individual who had been described by the dispatcher. *Id.* at 13:16–18.

//

### C. The Incident

When Silva first saw Alaniz, he reported to dispatch that Alaniz had his hands in his sweatshirt pocket. RGD ¶ 16; Silva DOJ Int. at 13:17–18; Deposition of John Van Dragt ("Van Dragt Depo.") at 21:15–17 (clarifying that Alaniz's hands were in his sweatshirt pocket, not in his shorts' pockets). At that point, Alaniz was approximately 50 to 100 feet away from Silva. RGD ¶ 17. Around 10 to 11 seconds after Silva informed dispatch about Alaniz's hands being in his pocket, Officer Van Dragt arrived in his patrol car. SGD ¶ 20; Roistacher Decl., Ex. 14 ("Silva BWC" [body-worn camera]) at 18:31:32–43.[3] Van Dragt positioned his vehicle at an angle to the shoulder between Alaniz and Silva. RGD ¶ 21; Silva BWC at 18:31:43 (showing Van Dragt's vehicle parked at an angle, with the front driver's side of the car being closest to Silva and the back passenger's side of the car being closest to Alaniz). Van Dragt then got out of his vehicle, leaving the driver's door open, moved toward the rear bumper, drew his gun, and ordered Alaniz to "show his hands." RGD ¶¶ 23, 25, 29; Silva BWC 18:31:45–55. Simultaneously, Silva began walking in the direction of Van Dragt and Alaniz, drew his gun, and ordered Alaniz to "show his hands" or "let me see your hands." RGD ¶¶ 28, 29; Silva BWC at 18:31:42–50.

Alaniz initially complied with the officers' commands to show his hands, but soon put his hands back into his pocket. SGD ¶ 27. The rest of the events happened in rapid succession, and many of the facts are heavily disputed. Initially, Alaniz was "three car lengths," or around 30 to 35 feet, away from Van Dragt, but Alaniz then began running quickly in Van Dragt's direction and pulled something from his pocket. Declaration of Cooper Alison-Mayne ("Alison-Mayne Decl."), Ex. F ("Van Dragt Depo.") at 46:13–18. Whether Alaniz pulled the item out in a "shooter's platform" or "shooter's stance" is a disputed fact. SGD ¶ 30. Van Dragt began tactically repositioning himself toward the front of his car and Silva advanced to provide cover to Van Dragt. Silva BWC at 18:31:51–

---

[3] The amount of time between Silva's arrival and Van Dragt's arrival is disputed, but it is clear from the body-worn camera footage that it was approximately 10 to 11 seconds.

54. While Van Dragt was still at the rear of his car, he holstered his gun because he could tell that the item Alaniz was holding was "too round" and "too big" to be a gun. Silva BWC at 18:31:50; Van Dragt Depo. at 24:10–20. Van Dragt compared the width of the item to "a Subway sandwich." Van Dragt Depo. at 24:10–11. Once he determined that the item likely was not a gun, Van Dragt transitioned to his taser. Silva BWC at 18:31:52; Van Dragt Depo. at 24:20–21.

Van Dragt then navigated around his open car door, Alaniz came around the back of the car, and Van Dragt deployed his taser. As this was happening, both Van Dragt and Alaniz were coming in Silva's direction. Silva BWC at 18:31:52–54. It is disputed whether Alaniz began to turn away after being struck with the taser. RAF ¶ 59. When Silva heard the taser deploy, he thought it sounded like a gunshot coming from Alaniz's direction, and he had not noticed that Van Dragt had transitioned from his gun to his taser. RAF ¶ 55; Alison-Mayne Decl., Ex. G ("Silva Depo.") at 50:23–25, 51:1–5. Silva thought the object he saw Alaniz holding was a "firearm" with "a long barrel." Silva Depo. at 59:17–20, 60:11–12. The precise distance between Alaniz and Silva at the time is disputed, but as Alaniz ran towards him, they were somewhere between 15 to five feet apart. RGD ¶ 51. Silva fired six shots at Alaniz, and Alaniz fell to the ground. Silva BWC at 18:31:54–56. Van Dragt reported "shots fired" at around 11:32 a.m. SGD ¶ 55.

**D.     After the Incident**

Once Alaniz was on the ground, Silva walked toward Van Dragt while both officers kept their guns drawn. After directing any bystanders to "get back," Silva asked Van Dragt "What did he have in his hand? Was that a gun?" Silva BWC at 18:32:05–09. Van Dragt responded "No, it was nothing." *Id.* at 18:32:10. Approximately two minutes later, the officers handcuffed Alaniz. Silva BWC at 18:34:04. The fire department arrived around two minutes later and took over providing medical care. RGD ¶ 57. Paramedics took Alaniz to the hospital, where he was pronounced dead at 12:08 p.m. SGD ¶ 58. The

autopsy report showed that Van Dragt's taser[4] and three of Silva's shots hit Alaniz—one shot in each leg and one in the chest. Alison-Mayne Decl., Ex I ("Autopsy Report") [Doc. # 70-12]. The projectile recovered from the lower portion of Alaniz's left lung entered his right upper chest, meaning that it "travel[ed] from his right to left, front to back and downward." *Id.* at 2.[5] The gunshot wound in Alaniz's right leg exhibited the same path, and the wound in his left leg showed a "front to back" path. *Id.* The gunshot wound to his chest was "imminently fatal." *Id.*

## III.
## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v.*

---

[4] The autopsy report shows that Van Dragt's taser struck Alaniz because the barbs were recovered from his clothing. *See* Autopsy Report at 1. Whether the taser made contact with Alaniz's skin—and thus successfully delivered an electric shock—is disputed.

[5] Page citations herein refer to the page numbers inserted by the CM/ECF system.

*City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

## IV.
## DISCUSSION

### A. Evidentiary Objections

The Court has reviewed Defendants' evidentiary objections to the Declaration of Plaintiffs' police practices expert, Scott A. DeFoe. [Doc. # 72-1.] The Court addresses only the objections relevant to this Order. To the extent the Court does not address any of Defendants' objections, it is because the Court did not rely on the objected-to evidence in reaching its ruling. Any objections to such evidence are **OVERRULED as moot**.

DeFoe was a police officer with the Los Angeles Police Department for over 20 years, 14 of which were in supervisory roles. Declaration of Scott A. Defoe ("DeFoe Decl.") ¶ 2 [Doc. # 70-13]. In providing his expert opinion, DeFoe reviewed certain materials relevant to this action, including "reports, Transcriptions of Digitally Recorded Depositions, [and] California Highway Patrol documents." Roistacher Decl., Ex. 36 ("DeFoe Rule 26 Report Excerpts") [Doc. # 66-40].

Defendants object to paragraphs 10 and 11 of DeFoe's declaration as improper opinions under Federal Rule of Evidence 701 and for lack of foundation under Federal Rules of Evidence 702–704. *See* Defendants' Evidentiary Objections ¶ 6. Based on DeFoe's background and experience as a police officer, the Court shall consider DeFoe's expert opinions as evidence that there are disputed facts regarding the effectiveness of Van Dragt's use of his taser against Alaniz. The Court therefore **OVERRULES** Defendants' fifth and sixth objections. To the extent Plaintiffs offer DeFoe's opinions about Van

Dragt's taser to provide a legal conclusion about the reasonableness of Silva's actions, however, the objections are **SUSTAINED**.

**B.   Federal Law Claims**

    **1.   Triable Issues of Fact Exist as to Whether Defendant Silva Violated Alaniz's Fourth Amendment Rights**

The Fourth Amendment permits police officers to use only so much force as is "reasonable" under the circumstances. *Scott*, 550 U.S. at 381. The reasonableness inquiry is both objective and attuned "to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In any particular case, the reasonableness of the force used must be judged from the perspective of a reasonable officer at the scene rather than with the perfect vision of hindsight. *Id*. Police officers often must make split-second judgments about the amount of force that is necessary in a particular situation under circumstances that are tense, uncertain, and rapidly evolving. *Id*. at 396–97. The inquiry is nonetheless an objective one: just as an officer's evil intentions will not turn an otherwise objectively reasonable use of force into a Fourth Amendment violation, an officer's good intentions will not make an objectively unreasonable use of force constitutional. *Id*. at 397.

Courts in the Ninth Circuit employ a three-step analysis in evaluating excessive force claims. The first step is to assess the severity of the intrusion on the plaintiff's Fourth Amendment rights based on the type and amount of force inflicted. Next, a court must evaluate the government's interests in light of the three *Graham* factors: (1) the severity of the crime; (2) the threat posed to officers or bystanders; and (3) any resistance to arrest and risk of flight. Finally, a court must balance the gravity of the intrusion on the plaintiff against the government's need for the intrusion. *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010); *see also Miller v. Clark County*, 340 F.3d

959, 964 (9th Cir. 2003). The Ninth Circuit has held that "[b]ecause the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Torres v. City of Madera*, 648 F.3d 1119, 1125 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

Plaintiffs argue that none of the *Graham* factors are satisfied here because: (1) Alaniz did not pose an immediate threat of death of severe bodily injury to the officers, (2) even if Silva did believe Alaniz had a gun, his belief was unreasonable, (3) Alaniz had not committed a serious crime, and (4) there was no real risk of Alaniz escaping. Because the "most important single element of the . . . factors" identified in *Graham* is whether the suspect poses an immediate threat to the safety of the police officers or others, the Court begins its analysis with this factor. *Id.* at 702 (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)).

The threat that Alaniz posed to Silva and Van Dragt at the time of the shooting is a triable issue and is thus inappropriate for resolution on summary judgment. Viewing the facts in the light most favorable to Plaintiffs, there are multiple disputed material facts regarding the reasonableness of Silva's belief that he was in immediate threat of death or severe bodily injury, such as: whether Alaniz was in a "shooter's stance" at the time he was shot (RGD ¶ 30; DeFoe Decl. ¶ 11; Silva DOJ Int. at 17:22–23; Alison-Mayne Decl., Ex. N ("Silva BWC Frame-by-Frame") at 13–14); whether it was reasonable to believe that the item Alaniz was holding—which was likely a gray felt sunglass case—looked like a gun (RGD ¶ 31; Van Dragt Depo. at 28:9–11, 28:21–22; Roistacher Decl., Ex. 7 at 34 (photo from the scene of the gray object)); whether it was reasonable to think the sound of the taser deploying was a gunshot (Van Dragt Depo. at 39:23–25; Silva Depo. at 50:23–25, 51:1–5); and whether Alaniz was charging toward the officers or whether he was

turning away as Silva fired his gun (Silva BWC at 18:31:52–54; DeFoe Decl. ¶ 11; Silva DOJ Int. at 17:22–23; Silva BWC Frame-by-Frame at 13; Autopsy Report at 2). For example, three individuals—Silva, Van Dragt, and Acosta—saw that Alaniz had something in his hands, but only Silva thought it was a gun. *See* Van Dragt Depo. at 24:10–20; Roistacher Decl., Ex. 4 ("911 Calls") at 12:20–22. Because of disputed facts of this nature, the Court cannot determine at this stage whether Alaniz posed an immediate threat to Officers Silva and Van Dragt.

Defendants assert that "Alaniz likely committed assault on a peace officer" when he charged at Van Dragt and Silva, and they also point to the danger that Alaniz posed to the public by jumping in front of cars on the freeway. MSJ at 25. The crime of "assault," however, requires both an unlawful attempt *and* "a present ability" "to commit a violent injury on the person of another." Cal. Pen. Code § 240. Here, given that Alaniz had already been hit by multiple vehicles, tased by Van Dragt,[6] and did not have a weapon, there is a triable issue whether Alaniz had the ability to violently injure the officers. Further, although it is certainly dangerous to run in front of cars on the freeway, there is no evidence that Alaniz ever attempted to harm anyone other than himself or that he was engaged in that activity when the officers arrived. Even if Alaniz's earlier actions on the freeway constituted a serious crime, the severity of the crime weighs less heavily "where no crime is in progress when police arrived." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019). As for the third factor, Defendants do not argue that Alaniz was attempting to flee. *See* Reply at 14.

The Court may consider factors besides the *Graham* factors. *See Nehad*, 929 F.3d at 1137–38. For example, a jury could consider Silva's failure to warn that he would use

---

[6] Whether Van Dragt's taser actually struck Alaniz is a disputed fact. *See* Autopsy Report at 1 ("projectile consistent with a barb recovered from clothing"), 4 ("a total of two projectiles are recovered from within the body"), 4 ("possible puncture marks are identified in the upper extremities, but . . . no definite evidence of the electronic control device contacting the skin is evident"); *see also* Roistacher Decl., Ex. 28 ("EMS Record") at 2–3 (medic believed Alaniz had been tased by CHP).

deadly force as evidence of objective unreasonableness. *See id.* ("The seemingly obvious principle that police should, if possible, give warnings prior to using force is not novel, and is well known to law enforcement officers . . . . A prior warning is all the more important where . . . the use of lethal force is contemplated."). Another relevant factor is "whether less intrusive alternatives to deadly force were available." *Id.* at 1137. Silva testified that "it would have been futile" to switch to a less lethal weapon, but a jury could find this to be unreasonable since Van Dragt did not come to the same conclusion. A jury could also take into account whether Silva adhered to officer training standards where Alaniz was in the throes of a mental breakdown or a "suicide by cop" scenario.

Under these circumstances, a reasonable jury could find that the use of deadly force was unreasonable and a violation of Alaniz's Fourth Amendment rights.

### 2. Silva is Not Entitled to Qualified Immunity

To determine whether officers are entitled to qualified immunity, the Court must answer two separate questions: (1) whether the officers violated a federal statutory or constitutional right, and (2) whether the unlawfulness of their conduct was "clearly established" at the time. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Demonstrating that the unlawfulness of an officer's actions was "clearly established" requires a showing that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589; *Hardwick v. Cty. of Orange*, 844 F.3d 1112, 1118 (9th Cir. 2017). The party asserting the injury bears the burden of "showing that the rights allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582 (2018).

A clearly established right cannot merely be implied by precedent, and Plaintiffs may not defeat qualified immunity by describing violations of clearly established general or abstract rights outside "an obvious case." *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Kisela v. Hughes*, 138

S. Ct. 1148, 1152 (2018) (the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality"); *Est. of Najera Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (citations omitted) (in an "obvious case," the *Graham* factors can "clearly establish" a constitutional violation "even without a body of relevant case law"). The Ninth Circuit has emphasized that "it is the facts of particular cases that clearly establish what the law is." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 (9th Cir. 2017). The standard, however, does not "require a case directly on point for a right to be clearly established," so long as "existing precedent" places "the statutory or constitutional questions beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).

It is clearly established that "the use of deadly force against a non-threatening suspect is unreasonable." *Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1548 (2018); *see also Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985); *Johnson v. Myers*, -- F.4th --, No. 25-349, 2025 WL 666365 at *5 (9th Cir. Mar. 3, 2025) (concluding officers were not entitled to qualified immunity where the decedent was holding a knife but it was disputed whether he had stopped moving forward when he was shot); *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). Binding precedent places this constitutional question—the right of a non-threatening suspect not to be killed— beyond debate. Therefore, if a jury accepts Plaintiffs' version of the facts—that Silva shot Alaniz despite knowing that he did not have a gun, he had already been hit with a taser, and he was turning away from Silva—then Silva's use of lethal force would be an "obvious case" involving the unreasonable use of deadly force against a non-threatening suspect. *See White*, 137 S. Ct. at 552. Given the disputed facts and the opposing inferences that can be drawn from them, the Court cannot determine on summary judgment that Silva did not violate a clearly established constitutional right. The Court therefore **DENIES** Defendants' MSJ on Plaintiffs' claim of excessive force.

### 3. Defendant Silva Did Not Violate Plaintiffs' Fourteenth Amendment Rights

"Children have a Fourteenth Amendment liberty interest in the companionship and society of their parents, and vice versa." *Wilkinson*, 610 F.3d at 554; *see Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). Official conduct that "shocks the conscience" in depriving children or parents of that interest in their family relationships is cognizable as a violation of due process. *Id.*; *see also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). In determining whether an officer's force shocks the conscience, the court first asks whether the circumstances of the case allowed the officer to have actual deliberation. *Wilkinson*, 610 F.3d at 554. Deliberation is impractical when a suspect's evasive actions force the officers to act quickly or when fast-paced situations pose safety concerns. *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014). In such fast-paced situations, the Court applies the purpose to harm standard, under which a plaintiff must show that the officer's goal was to cause harm unrelated to a legitimate law enforcement objective. *Porter*, 546 F.3d at 1140.

A court may determine whether the deliberate indifference standard or the purpose to harm standard applies if the undisputed facts clearly point to one standard. *Garlick*, 167 F. Supp. 3d 1117, 1165 (E.D. Cal. 2016). The Ninth Circuit has held that a five-minute altercation—in which the officer continually yelled at the suspect, the suspect did not comply with orders, and the officer shot the suspect—did not provide enough time for deliberation. *Porter*, 546 F.3d at 1139. Here, the entire incident between Silva and Alaniz played out in a matter of seconds, and Plaintiffs have not provided evidence to suggest that this was enough time for actual deliberation. Accordingly, the Court applies the "purpose to harm" standard.

Plaintiffs argue that Silva's use of force was so "unreasonably excessive" that his use of force, alone, is evidence of a subjective purpose to harm. Opp. at 24; *see Nehad*, 929 F.3d at 1140. The Court disagrees. Even viewing the facts in the light most favorable

to Plaintiffs, there is no evidence that Silva used force to "teach [Alaniz] a lesson," to "get even," or to "terrorize" him, or that he otherwise pursued a goal to cause harm that was unrelated to a legitimate law enforcement objective to stop an individual whom Silva believed—regardless of the reasonableness of that belief—was an immediate and severe threat to his own safety and that of his partner, Van Dragt. *See Zion*, 874 F.3d at 1077; *Porter*, 546 F.3d at 1140. The Court therefore **GRANTS** Defendants' MSJ on Plaintiffs' Fourteenth Amendment claim.

### C. State Law Claims against Silva

#### 1. Battery

Alaniz's battery claim under California law involves the same standards as that of an excessive use of force claim under the Fourth Amendment. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force."); *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012) ("[T]he same standards apply to both state law assault and battery and section 1983 claims premised on constitutionally prohibited excessive force . . . ."). The Court **DENIES** summary judgment on this claim for the same reasons as discussed in the analysis of the Fourth Amendment claim.

#### 2. Negligence

California negligence law "is *broader* than federal Fourth Amendment law" in deadly force cases. *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1122 (9th Cir. 2021) (citing *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 640, 305 P.3d 252, 263 (2013)) (emphasis added). Under California law, a trier of fact may consider "an officer's pre-shooting decisions" and find an officer's use of deadly force unreasonable under the totality of the circumstances, even if the officer's use of force might have been reasonable if the finder of fact considered the "moment of the shooting [. . .] in isolation." *Tabares*, 988 F.3d at 1125. Because the Court has found a triable issue under the Fourth Amendment with regard to Silva's conduct, there is a triable issue under California negligence law. For

these reasons, the Court **DENIES** Defendants' MSJ as to Plaintiffs' negligence claim.

### 3. Bane Act

California Civil Code section 52.1, known as the Bane Act, creates a cause of action against those who interfere with constitutional rights "by threat, intimidation, or coercion." Cal. Civ. Code § 52.1. In an excessive force case, the Bane Act requires not merely establishing a Fourth Amendment violation, but also "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. Cty of Sacramento*, 888 F.3d 1030, 1043 (2018) (quoting *Cornell v. City and Cty. of San Francisco*, 17 Cal. App. 4th 766, 801-802 (2017)). The specific intent requirement can be satisfied by "a reckless disregard for a person's constitutional rights." *Id.* at 1045. This claim essentially presents the same issues and conclusions as Plaintiffs' excessive use of force claims under section 1983. If a jury found Silva's use of force to be unreasonable, it could also find that Silva exhibited a "reckless disregard" for Alaniz's Fourth Amendment rights. Because the reasonableness of Silva's force is a triable issue, summary judgment on Plaintiffs' Bane Act claim is inappropriate for the same reasons as expressed in the Court's analysis above. Defendants' MSJ is **DENIED** with respect to Plaintiffs' Bane Act claim.

### D. State Law Claims Against State of California

As for the state law claims against CHP as an agency of the State of California, California imposes liability on public entities under the doctrine of *respondeat superior* for acts of state employees. *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) (citing Cal. Gov't Code § 815.2). The State is immune from a tort suit only to the extent that its employees are immune. *Id.* California denies immunity to police officers who use excessive force. *See Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 215 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct."). Accordingly, the State may be found liable for battery, negligence, and violation of the Bane Act if a jury finds that Silva's use of force was excessive and/or

displayed a reckless disregard for Alaniz's rights. The Court therefore **DENIES** Defendants' MSJ on Plaintiffs' state law claims.

## V.
## CONCLUSION

In light of the foregoing, the Court **GRANTS in part** Defendants' MSJ as to Plaintiffs' second claim against Silva for intentional interference with familial relations in violation of the Fourteenth Amendment. The Court **DENIES in part** Defendants' MSJ as to Plaintiffs' claim against Silva for use of excessive force in violation of the Fourth Amendment and Plaintiffs' state law claims against Silva and the State of California for battery, negligence, and violation of the Bane Act.

**IT IS SO ORDERED**.

DATED: March 5, 2025

_____
DOLLY M. GEE
CHIEF UNITED STATES DISTRICT JUDGE