**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA KIRKMAN, CARLOS ALANIZ, individually and successors-in-interest to JOHN ALANIZ, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA, RAMON SILVA, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-07532-DMG-SSC<br><br>*Honorable Dolly M. Gee*<br>*Hon. Mag. Judge Stephanie S. Christensen*<br><br>**DECLARATION OF COOPER ALISON-MAYNE IN SUPPORT OF PLAINTIFFS' *DAUBER* MOTION TO EXCLUDE TESTIMONY AND EXHIBITS OF ROD ENGLERT, NIKKI WAGNER AND CHERYL KANZLER**<br><br>Judge:   Dolly M. Gee<br>Hearing: March 25, 2025<br>Time:   2:00 p.m.<br>Dept.:   Courtroom 8C<br><br>FPTC:  March 25, 2025<br>Trial:   April 15, 2025 |

I, Cooper Alison-Mayne, hereby declare as follows:

1.      I am an attorney duly licensed to practice law in the State of California and the United States District Court for the Central District of California. I am one of the attorneys of record for the Plaintiffs Sandra Kirkman and Carlos Alaniz. I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgement. I have personal knowledge of the facts contained herein and could testify competently thereto if called.

2.      Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts from Rod Englert's deposition, taken by Cooper Alison-Mayne on February 20, 2025.

3.      Attached hereto as **Exhibit B** is a true and correct copy of relevant excerpts from David Blake's deposition, taken by Cooper Alison-Mayne on February 5, 2025.

4.      Attached hereto as **Exhibit C** is a true and correct copy of relevant excerpts from Rod Englert's February 10, 2025 expert report.

5.      Manually filed with the Court as **Exhibit D** is a true and correct copy of "Kirkman Animation Officer Van Dragt POV.mp4," a video reconstruction produced by Englert and his team.

6.      Manually filed with the Court as **Exhibit E** is a true and correct copy of "Kirkman Animation OTS View.mp4," a video reconstruction produced by Englert and his team.

7.      Manually filed with the Court as **Exhibit F** is a true and correct copy of "Kirkman Animation Side by Side Comparision OTS View and BWC.mp4," a video reconstruction produced by Englert and his team.

8.      Attached hereto as **Exhibit G** is a true and correct copy of a cropped screenshot of one frame from "Kirkman Animation Side by Side Comparision OTS View and BWC.mp4," i.e., Exhibit F, above.

1

2   I declare under penalty of perjury under the laws of the United States of America

3   that the foregoing is true and correct.

4

5

6   Executed this 14th day of March, 2025, at Woodland Hills, California.

7

8                               **LAW OFFICES OF DALE K. GALIPO**

9

10

11                      By:      */s/ Cooper Alison-Mayne*
                                 ———————————————————
12                               Dale K. Galipo, Esq.
                                 Cooper Alison-Mayne
13                               *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                            --oOo--

4

5   SANDRA KIRKMAN, CARLOS ALANIZ,
    individually and successors
6   in-interest to JOHN ALANIZ,
            Deceased,
7
            Plaintiffs,
8
    v.                    Case No.   2:23-cv-07532-DMG-SSC
9
    STATE OF CALIFORNIA, RAMON
10  SILVA, and DOES 1-10, inclusive,

11          Defendants.
    _____/
12

13

14          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15              DEPOSITION OF DEFENSE EXPERT

16                      ROD ENGLERT

17              THURSDAY, FEBRUARY 20 2025

18

19

20

21

22  Reported Stenographically by:

23  KIMBERLY D'URSO, CSR 11372, RPR

24  Job No.  136908

25

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 7

1   looked at the body-worn camera?

2      A.   If you look at my report and look at the still

3   frames, you can't determine whether it is or isn't.  And

4   in that posture, with a lot of things going on around

5   Officer Silva in that one moment in time, when he starts

6   shooting, he only has from the time that Alaniz is at

7   the driver's door, and the movement of his partner, who

8   he feels has been shot, because he hears a pop, he

9   starts firing his weapon.

10         And of course, going out of view would be

11   Alaniz.  But there's no chance for him in that very

12   short moment in time to change that posture to register

13   in Silva's mind that this is not a gun.  This looks like

14   a gun.  If you look at the report, as we've done in the

15   close-up, it looks like it.  And he's in a running

16   posture.

17      Q.   So I'm trying to -- there's a lot there.  But

18   in your opinion, just looking at the video, let's start

19   with did it appear to you that there was definitely an

20   object in the decedent's hand?

21      A.   Yes.  There was an object, and it had the

22   appearance of being an object when it was pointed at the

23   person of Officer Silva.

24      Q.   Just looking at the video, from your

25   perspective, can you tell anything more about the

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 36

1  training, that when those rounds start going off, he's

2  pointing -- you can see him pointing the gun at him.

3  And in less than a second, can he change his position

4  and stop and lower his hands and do anything different,

5  other than go to the ground?  So in that moment in time,

6  that when those shots are fired by Silva, he has made a

7  decision to protect his partner and protect himself.

8         And this is getting into practices, which, you

9  know, you can stop me if you want to.  But there's no

10  way to change.  He can't -- Alaniz can't change.  It's

11  just not humanly possible for him to stop, lower his

12  gun, and then he ends up about 12 feet further, carried

13  by his momentum.

14         And that's where all the evidence has dropped

15  to the ground, the object he was holding onto in his

16  hand.

17     Q.   Okay.  That wasn't really answering my

18  question.  My question was just:  Would you agree that

19  there's no video evidence showing the decedent's body at

20  the time of the second shot, because the video was

21  obstructed by Officer Silva's hands?

22     A.   So in the last three-quarters of a second, no,

23  you cannot see what happened.

24     Q.   So your opinion that the decedent was still

25  aiming at Officer Silva is an inference of some kind,

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 37

1  based on other information, since we don't have the

2  direct video of that moment?

3      A.   In that very short period of time, in like, I

4  guess, even half a second, for him to change position,

5  all I know is he's canted and he's going down.  And what

6  the position of his arms are at that point, I don't

7  know.

8          But common sense tells you that he's going to

9  the ground from the position that he was in when he's

10  pointing what appeared to be a gun in Officer Silva's

11  direction.

12      Q.   Okay.  So you would agree, then, that your

13  opinion at the end of the day is you don't know where

14  his arms were pointed at the time of the second shot?

15      A.   I disagree with that.

16          MS. NASH:  Objection.  Misstates prior

17  testimony.  Misleading to the witness.

18          (Reporter clarification.)

19          (Simultaneous speakers.)

20          THE WITNESS:  Go ahead.  I'm sorry.

21  BY MR. MAYNE:

22      Q.   I must have misunderstood your last answer.  So

23  I thought that you said you didn't know the exact

24  position of the decedent's arms at the time of the shot

25  to the chest.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 61

1    hands.  I'm wondering, how did you decide that that is

2    what happened when you were making the animation?

3        A.   Well, there's evidence of an object, and in

4    that one-second time period when the shooting occurs, we

5    know, based upon the evidence and the resting position

6    of Mr. Alaniz, that he did go down.

7             And at some point in there, there's no evidence

8    to know exactly when the evidence was dropped, but we

9    know it wasn't dropped at his feet where he's seeing

10   running by the car door, but that it is around his body.

11   So it went down with his body.

12            So you don't take it out.  You leave it in,

13   because at some point it came out of the hand.

14       Q.   Could it have left the hand before he fell to

15   the ground?

16       A.   No evidence of that.

17       Q.   But there's also no evidence that it was in his

18   hand at the moment he fell to the ground.  Would you

19   agree with that?

20       A.   No.

21       Q.   So what's the specific evidence that it was in

22   his hand at the time he fell versus a moment before,

23   when he hadn't quite fallen yet?

24       A.   The one second when we know that it was in his

25   hands based upon the body-worn camera, and in that one

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 62

1    second we know that what causes him to go down are

2    gunshots to his person.  And in that one second, you

3    can't have any non-display or display of the weapon,

4    because we don't know exactly during that one second

5    that he's shot and going down, which is all very, very,

6    very fast.  Nobody knows.

7            So it was kept to the point that it went to the

8    ground.  If it wasn't exactly in his hand, it's got to be

9    close to his hand.

10        Q.  So to restate your opinion, you're saying

11    nobody knows whether it was actually in his hand from

12    the time that the camera is obscured by Officer Silva's

13    hand and the time he falls to the ground; is that right?

14            MS. NASH:  Objection.  Misstates prior

15    testimony.

16            THE WITNESS:  You asked me to re-think it.  The

17    evidence shows that when those shots began in that

18    one-second period of time, from where the body is, we

19    know he goes down.  And that's to that momentum that we

20    were talking about, the 6 feet, the 12 feet.  And I don't

21    know if you understand that yet.

22            But he goes down, and in that short period of

23    time, could I say it's exactly:  No, he carried it all

24    the way down to the ground and then threw it?  No.  Can I

25    say that he lost it as soon as he was shot?  No.  But

# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                            --oOo--

4

5   SANDRA KIRKMAN, CARLOS ALANIZ,
    individually and successors
6   in-interest to JOHN ALANIZ,
             Deceased,
7
             Plaintiffs,
8
    v.                     Case No.    2:23-cv-07532-DMG-SSC
9
    STATE OF CALIFORNIA, RAMON
10  SILVA, and DOES 1-10, inclusive,

11           Defendants.
    _____/
12

13

14            STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15               DEPOSITION OF DEFENSE EXPERT

16                      DAVID BLAKE

17               WEDNESDAY, FEBRUARY 5 2025

18

19

20

21

22  Reported Stenographically by:

23  KIMBERLY D'URSO, CSR 11372, RPR

24  Job No.  00135673

25

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Expert David Blake on 02/05/2025**

Page 38

1          So you covered that you didn't see anything

2     that looked like a gun in the video.  That's the part

3     that we read back.  Did you see any object, anything

4     that you identified as an object in the decedent's hands

5     when you analyzed the video?

6          A.   It's kind of blurry.  You see the two-handed

7     shooting stance.  There's a darkness there, but I can't

8     identify it specifically as an object.

9          Q.   So it could be that he didn't have an object in

10    his hands?  It's a possibility?

11         A.   Well, I think that the totality of information

12    that we have leads -- would lead -- well, it leads me to

13    believe that he did have an object in his hands.

14    Anything is possible when video evidence doesn't clearly

15    show something.

16         Q.   Okay.  Okay.  So let me just try to ask this

17    question better and then let's take a break.

18          But what I'm trying understand is, if we just

19    take everything that you know about the case that formed

20    your opinion and we keep it all the same, except for we

21    take as an assumption that his hands were empty, could

22    be Van Dragt saw them empty, could be that we see them

23    empty in the video, does that change your opinion about

24    whether it was a reasonable mistake to perceive a deadly

25    threat?

# EXHIBIT C

**englert** FORENSIC CONSULTANTS

February 10, 2025

TO:        Lee Roistacher        via email: lroistacher@deangazzo.com
                 Esquire
                 Certified Appellate Specialist
                 Dean, Gazzo, Roistacher LLP
                 440 Stevens Avenue
                 Suite 100
                 Solana Beach, CA 92075

FROM:     Rod Englert

RE:       **EXPERT'S SUPPLEMENTAL RECONSTRUCTION REPORT**
         *Kirkman v. California Highway Patrol (case no. 2:23-cv-07532-DMG-SSC)*

**This supplemental report is prepared pursuant to Federal Rule of Civil Procedure 26. Should a party seek my deposition in this matter, I will make myself available as feasible and request that the party coordinate with defense counsel to facilitate such deposition.**

***NOTE: Because Englert Forensic Consultants (EFC) were prevented from performing an evidence inspection on November 21, 2024, this supplemental report is being submitted pursuant to a full evidence inspection and reconstruction testing on January 24, 2025.***

## CHRONOLOGY

01/24/25     Englert Forensic Consultants traveled to Riverside, CA and conducted an evidence review at the Department of Justice Bureau of Forensic Services laboratory, and performed reconstruction efforts.

01/27/25     Received additional case materials.

01/28/25     Received additional case materials.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 2

## MATERIALS/RECORDS REVIEWED

| DESCRIPTION | Quantity |
|---|---|
| **Case File Materials** | |
| Blake Consulting Human Factors in Law Enforcement Expert Report | 70 pages |
| National Justice Consultants, Inc. Report of Defendants' Police Practices Expert | 20 pages |
| Plaintiff's Rule 26 Initial Expert Disclosure | 221 pages |
| Scene2go *unable to open file* | |
| Scanned digital images of autopsy *Numerous files appear to be duplicates* | 108 images |
| Scanned digital images of scene, evidence, and autopsy *Numerous files appear to be duplicates* | 3,126 images |
| 74 Audio Recordings from the Department of Justice *Numerous files appear to be duplicates* | |
| State of California Department of Justice Investigation Report by SA Oratovsky, dated 05/05/22 | 36 pages |
| State of California Department of Justice Investigation Report by SA Hernandez, dated 05/04/22 | 2 pages |

**The foregoing list underscores those additional records to which I have devoted substantial consideration. In the event any items reviewed were inadvertently omitted from the foregoing list, this expert will gladly supplement this list upon questioning and under oath and reserves the right to supplement this list in a supplemental report.**

## ANALYSIS OF PHYSICAL EVIDENCE

Date:        01/24/2025

Time:        8:30 a.m.

Location:    California Department of Justice (DOJ)
             Bureau of Forensic Services (BFS)
             7245 Mission Boulevard
             Riverside, CA

Present:     Lee Roistacher, Attorney, Dean Gazzo Roistacher LLP (observer)
             Elissa Mayo, Assistant Director, DOJ BFS (observer)
             Casey Jones, Attorney, DOJ (observer)

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 3

> Caroline Kim, Lab Manager, DOJ BFS (observer)
> Gina Williams, Senior Criminalist, DOJ BFS (evidence custodian)
> Cheryl Kanzler, Analyst, Englert Forensic Consultants
> Nikki Wagar, Analyst/Photographer, Englert Forensic Consultants

On January 24, 2025, at approximately 8:30 a.m., members of Englert Forensic Consultants examined selected items of evidence that had been collected by the Department of Justice, Bureau of Forensic Services during their investigation. This included clothing worn by John Joseph Alaniz at the time of the incident. Senior Criminalist Gina Williams acted as the evidence custodian and opened and resealed each item of evidence.

*NOTE: For purposes of this report, all substances that have the appearance, color, and physical characteristics of blood will be referred to as blood or blood-like.*

*NOTE: All measurements are approximations.*

*NOTE: Not all bloodstains or bloodstain patterns will be described in this report.*

**(Coroner #035-001) – One (1) large brown paper bag containing six individual bags (EFC #1 through #6).**

## EFC #1

One (1) Columbia brand dark blue-colored (or black) zip front fleece jacket with stand up collar, size 3X. There were numerous medical intervention cuts to the front and sleeves of the jacket.

- The jacket measured 23 inches in overall length. The sleeves measured 22 inches in length. The sleeve cuffs measured 4 inches wide. The waist of the jacket measured 25 inches wide.
- Blood was present on the front upper right and left chest of the jacket, the collar, near the lower right sleeve around the seam, and on the lower back left quadrant.
- Debris was present on the back of the jacket.
- Scuff-like marks/tears were present on the exterior left collar, upper left sleeve, and back shoulder area which did not perforate the fabric. Two (2) defects were present on the upper left chest and lower left quadrant of the jacket respectively, which appeared to have burnt edges and did not appear to be associated with bullet defects. Additional defects were present on the back shoulder area, which also did not appear to be associated with bullet defects.
- No apparent punctate defects were located on either sleeve of the jacket that could be consistent with a taser probe; however, medical intervention cuts were located on both sleeves, which could have obscured such defects.
- Three (3) defects that appeared to be associated with bullet defects were noted to the jacket:

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 4

- o Defect labeled 1A: one circular defect was noted to the upper right chest, located 3 inches right of the right front zipper and 9 inches down from the shoulder seam.
  - ▪ Defect 1A measured 1/4-inch by 1/4-inch.
  - ▪ Blood was present on the interior chest surface surrounding Defect 1A.
- o Defect labeled 1B: one large irregular shaped defect was noted to the front right pocket area, located along the pocket seam and 2-1/2 inches up from the bottom edge.
  - ▪ Defect 1B measured 2 inches horizontally and 1 inch vertically.
  - ▪ The defect exhibited fabric bridging and irregular edges.
  - ▪ The defect was horizontally elongated.
  - ▪ The defect perforated the exterior layer of the jacket, but did not enter into the pocket layers. One (1) very small defect was present on the interior most pocket layer, however, there was no associated defect on the outermost pocket layer.
  - ▪ The zipper and zipper pull of the pocket were broken and/or missing parts.
  - ▪ *During the second examination of the jacket pocket, a minute copper fragment was observed imbedded in the fabric to the right of the front jacket pocket near Defect 1B. The copper fragment was consistent with a copper jacket fragment from a projectile.*
- o Defect labeled 1C: one circular defect consistent with a bullet defect was noted to the right aspect of the collar of the jacket, located along the edge of the collar and 7 inches in from the right collar zipper.
  - ▪ Fibers of the defect protruded outward (toward the back of the jacket) at the 7-9 o'clock position.



*Image 1: Overall image of jacket with Defects 1A, 1B and 1C indicated.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 5



*Images 2 and 3: Defect 1A to the upper right chest of the jacket; left image overall & right image close-up.*



*Images 4 and 5: Defect 1B to the lower right pocket area of the jacket; left image overall & right image close-up.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 6



Image 6: Small defect to the interior most layer of the right front pocket of the jacket.



Image 7: Defect 1C to the upper collar of the jacket with outward protruding fibers.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 7



*Image 8: Copper jacket fragment located next to the right front jacket pocket.*

**<u>EFC #2</u>**

One (1) Hanes brand black-colored short sleeve t-shirt, size XL with a logo on front and back.

- Numerous medical intervention cuts were located on the front of the t-shirt.
- The t-shirt measured 24 inches in overall length. The sleeves measured 7 inches in length. The sleeve cuffs measured 7 inches wide. The waist of the shirt measured 21 inches wide.
- The shirt was stiff with saturated blood and debris was located on the front of the shirt.
- Multiple defects were noted to the front and back of the t-shirt:
  - <u>Defect labeled 2A</u>: one circular defect was noted to the upper right chest, located 5 inches left of the right shoulder seam and 6-1/2 inches down from the right shoulder seam.
    - The defect measured 1/4 inch by 1/4 inch and perforated the front of the shirt.
    - The threads of the defect protruded inward
  - <u>Defect labeled 2B</u>: one small punctate defect was noted to the lower right quadrant, located 3 inches up from the bottom edge and 5-1/2 inches left of the right side.
  - <u>Defect C was not labeled on this item</u> – as no corresponding defect to the jacket collar (1C) was located on the t-shirt.
  - <u>Defect labeled 2D</u>: two punctate defects straddling the right shoulder seam, one located to the front of the seam, and the second located to the back of the seam.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 8

- The defects were located 1 inch in from the right sleeve seam and 3/4 inch apart.
  - <u>Defect labeled 2E</u>: one punctate circular defect was noted to the upper left shoulder.
    - The defect was located 1 inch forward of the left shoulder seam and 4-3/4 inches in from the left shoulder seam.



*Image 9: Defect 2A to the upper right chest of the black shirt.*



*Image 10: Close-up of Defect 2A to the upper right chest of the black shirt.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 9


*Image 11: Defect 2B to the lower right quadrant of the black shirt.*


## EFC #3

One (1) Gildan brand blue-colored short sleeve t-shirt, size medium with logo design on the front.

- Numerous medical intervention cuts were located on the front of the t-shirt.
- The t-shirt measured 22 inches in overall length. The sleeves measured 6 inches in length. The sleeve cuffs measured 6-1/4 inches wide. The waist of the t-shirt measured 18 inches wide.
- The shirt was stiff and heavily saturated with blood. Blood and biological material was present on the interior left lateral side of the shirt below the armpit.
- No apparent punctate defects were observed on the left and right shoulder areas.
- Two (2) defects were noted to the front of the t-shirt:
  - <u>Defect labeled 3A</u>: one horizontally oriented rectangle shaped defect was noted to the upper right chest, located 5 inches left of the right sleeve seam and 6-1/2 inches down from the right shoulder seam.
    - The defect measured 1/4 inch vertically by 1/2 inch horizontally.
    - Blood and biological material was present on the interior of the shirt around defect 3A.
  - <u>Defect labeled 3B</u>: two vertically oriented small punctate defects were noted to the lower right quadrant, located 3/4 inches apart.
    - The defects were located 2 inches up from the bottom edge and 3-1/2 inches left of the right side.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 10



*Image 12: Defect 3A to the upper right chest of the blue shirt.*



*Image 13: Close-up of Defect 3A to the upper right chest of the blue shirt.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 11



*Image 14: Two minute Defects 3B to the lower right quadrant of the blue shirt.*

The minute defects to the lower right quadrants of the t-shirts were possibly created by a fragmented projectile associated with an intermediate target (right front pocket jacket zipper).

## EFC #4

One (1) pair of green/gray-colored Wrangler brand camo shorts, size 38 relaxed fit.

- Medical intervention cuts were located on the front legs of the shorts.
- The shorts measured 20 inches in overall length. The waist measured 16-1/2 inches wide. The inseam measured 8 inches in length. The leg cuff of the shorts measured 10 inches wide.
- Saturated blood was located on the lower left leg.
- Multiple vertically oriented tear-like defects were located on the left lateral side near the seam and to the back of the shorts just below the waistband and edges of the back pockets.
- One (1) defect that appeared to be associated with a bullet defect was noted to the shorts:
  - Defect labeled 4A: one large elongated defect with irregular edges to the upper front, located 5 inches down from the waist and 3-1/2 inches left of the right hip seam.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 12

- ▪ The defect fully perforated the pocket and was diagonally oriented.
- ▪ Defect 4A measured 2 inches in overall length and 3/4 inch wide.
- ▪ Blood and biological material were present on the interior pocket closest to the leg surface.



*Image 15: Overall image of shorts with Defect 4A to the right waist/hip of the camo shorts.*



*Image 16: Close-up image of Defect 4A to the right waist/hip of the camo shorts.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 13



*Image 17: Interior defects to pocket of Defect 4A of the camo shorts.*

## EFC #5

One (1) pair of Champion brand boxer briefs, size large, measuring 11-1/2 inches long.

- Medical intervention cuts were present to the right leg.
- Saturated blood was present to the interior back waistband.
- One (1) crescent shaped defect was located to the back left side of the boxer briefs when the briefs were turned right side out.
  - No blood or biological material surrounded the defect.

## EFC #6

One (1) pair of Puma brand black and gray-colored socks.

- Multiple defects were present to the footbox of both socks and the ribbing of one sock.
- When turned inside out, there was saturated blood present on the upper ribbing of the sock with the defect in the ribbing.

## EFC #7 (Coroner #035-002)

One (1) envelope containing two inner envelopes.

## EFC #7A (envelope 1 of 2)

One (1) badly deformed and flattened copper jacketed projectile – reportedly collected from the right leg soft tissue.

- One (1) side of the projectile was heavily flattened.
- Biological material was present on the concave lead nose area of the projectile.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 14



*Images 18 and 19: Both images of Projectile 7A - Deformed and flattened copper jacketed projectile from the right leg soft tissue (images of projectile rotated on different sides).*

EFC #7B (envelope 2 of 2)

One (1) mushroomed copper jacketed projectile – reportedly collected from the left lung lower lobe.

- The petals of the projectile appeared to be intact.



*Images 20 and 21: Both images of Projectile 7B - Mushroomed copper jacketed projectile from the left lung (images of projectile rotated on different sides).*

**EFC #8** (Coroner #035-003)

One (1) taser probe measuring 1-1/2 inches long with small amount of taser wire attached to the end, reportedly collected from the jacket at autopsy.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 15

*NOTE: Upon review of crime scene photographs, an additional taser probe with attached wire was observed; however, EFC has been unable to locate any property evidence receipts indicating who and/or if this taser probe was collected from the scene.*



*Image 22: Scene image depicting apparent taser probe with wires at the scene.*

**EFC #9** (DOJ #6)

One (1) gray-colored fabric/felt-type glasses case with blue-colored zipper, containing red/black-colored glass smoking pipe. The zipper pull read "Jet Blue".

- The glasses case measured 5-1/4 inches in length. The case measured 3 inches in width. The opening of the case unzipped measured 1-1/2 inches wide.
- The glass pipe measured 3-1/2 inches in overall length. The largest end of the pipe measured 1-3/4 inches in diameter. The smaller end of the pipe that contained a hole measured 1 inch in diameter.

*NOTE: A review of the scene photographs revealed that the glasses case was unzipped at the scene and the smaller end of the pipe with the hole was pointed toward the opening of the case.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 16



*Image 23: Gray fabric glasses case with glass smoking pipe.*



*Image 24: End of gray fabric glasses case with glass smoking pipe inserted as found at the scene.*

**<u>EFC #10</u>** (DOJ #8)

One (1) black-colored Stizzy brand plastic vape device with cartridge packaged with a zipper fragment.

- The vape device measured 4-1/4 inches in length, 3/4 inch wide, and 3/16 inch deep. The cartridge portion of the device measured 1 inch long.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 17

- A separate small, black-colored piece of plastic or metal was located in the packaging with the vape device.
  - The fragmented item measured 1/2 inch in length and 1/2 inch wide on the largest end and 1/4 inch wide on the smallest edge.
  - A gray-colored area was exposed on the largest end.

*NOTE: While examining the fragmented piece of material, the jacket was opened again. The plastic/metal piece was consistent with coming from the broken zipper mechanism of the right front jacket pocket.*

*During the second examination of the jacket pocket, a minute copper fragment was observed imbedded in the fabric to the right of the front jacket pocket near Defect 1B. The copper fragment was consistent with a copper jacket fragment from a projectile.*



*Image 25: Vape device and plastic/metal fragment packaged together.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 18



*Images 26 and 27: The plastic/metal zipper fragment pictured next to the zipper mechanisms of the jacket pockets.*

### EFC #11 (DOJ #14)

One (1) deformed copper jacketed projectile with two petals bent back, reportedly recovered from underneath the semi-truck.

- The projectile had a black-colored substance on the surfaces with one piece of black-colored material adhering to the nose of the copper jacket.
- A purple-colored dot was located on one of the bent copper petals.



*Images 28 and 29: EFC 11 - Deformed copper jacketed projectile from underneath the semi-truck (projectile rotated on opposite sides).*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 19

## EFC #12 (DOJ #15)

One (1) deformed copper jacketed projectile with flattened nose, reportedly recovered from inside the semi-truck trailer.

- A piece of black-colored material adhered to the nose of the bullet.



*Images 30 and 31: EFC 12 - Deformed copper jacketed projectile from inside semi-truck trailer (projectile rotated on opposite sides).*

## EFC #13 (DOJ #16)

One (1) copper jacket fragment with a small fiber on one end, reportedly recovered from the roadway.



*Image 32: Copper jacket fragment from roadway.*

## EFC #14 (DOJ #7)

Cut taser wires with no probes. Nothing of evidentiary significance.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 20

**EFC #15** (DOJ #17)

One (1) black-colored tri-fold wallet containing the driver's license of John Joseph Alaniz.

- No defects were noted to the item. Nothing of evidentiary significance.

At approximately 12:30 p.m., EFC analysts concluded examination of the evidence and departed the listed location.

**RECONSTRUCTION OF SHOOTING INCIDENT**

Date:          01/24/2025

Time:          1:00 p.m.

Location:      Ben Clark Training Center
               Riverside County Sheriff
               16791 Davis Avenue
               Riverside, CA

Present:       Lee Roistacher, Attorney, Dean Gazzo Roistacher LLP (observer)
               Ramon Silva, Officer, California Highway Patrol
               Samir Lyons, Animator, All Rise Animations
               Tucker Lemmu, Animator, All Rise Animations (model)
               Cheryl Kanzler, Analyst, Englert Forensic Consultants
               Nikki Wagar, Analyst/Photographer, Englert Forensic Consultants

On January 24, 2025, at approximately 1:00 p.m., Englert Forensic Consultants conducted a reconstruction of the shooting incident at the Riverside County Sheriff's Ben Clark Training Center. The reconstruction was based upon the physical evidence, investigative reports, scene processing reports and photographs, interviews, statements, lab reports, autopsy report and photographs, and scene scans.

A model was used to represent John Joseph Alaniz, while Officer Silva represented himself. Approximate bullet entry and projectile recovery locations were marked on the model with red and black circle with X respectively. The injuries were exaggerated in size for photography and demonstrative purposes. The chest wound recovery location was placed on the front of the model's body for purposes of body position testing and photography.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 21

 

*Images 33 and 34: Model with wound placement.*

Significant locations and items located within the scene were mapped out at the training facility based on approximate Leica scan/diagram measurements. Those pertinent areas and items included the motorcycle and SUV, two drain grates nearest the incident, lane six and the shoulder of the highway, white striped line nearest the SUV, as well as the locations of evidence items DOJ 6 (glasses case), DOJ 8 (vape device), and DOJ 16 (copper jacket fragment).

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 22



*Image 35: Overview image of scene with pertinent locations within the scene marked.*

During the reconstruction, it became apparent that this incident occurred quickly and within close proximity. The reconstruction was sectioned into multiple phases to depict body positions, trajectories, and general placement within the scene. The phases and approximate measurements collected during the reconstruction are as follows:

**Throughout the reconstruction, a range of body positions were tested to determine the most probable body positioning given the physical evidence.**

**PHASE 1** – Silva dismounted his motorcycle and Alaniz was seen standing on the side of the road near the drain grate east of the patrol SUV. Alaniz had his hands in his pockets. Alaniz's body position was with his chest forward toward the lanes of traffic. Van Dragt arrived on scene, parked and got out of his SUV, followed by drawing his firearm.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 23



*Image 36: Phase 1 forensic animation still depicting Silva's view of Alaniz when he first dismounted his motorcycle.*

**PHASE 2** – Officer Silva saw Van Dragt draw his firearm and due to the incident circumstances (Alaniz's hands in his pockets and Van Dragt drawing his firearm), Silva drew his firearm and gave commands for Alaniz to show his hands.



*Image 37: Phase 2 forensic animation still depicting Silva's view of Alaniz when he first drew his firearm and issued commands.*

**PHASE 3** – Alaniz ran/charged toward the back of the SUV where Van Dragt was located, which is when Silva lost all visual of Alaniz. Alaniz then emerged at the left rear bumper of the SUV, which is when Silva first recalled observing Alaniz with arms raised in front of

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 24

his chest holding an item in a shooting-type stance. The measurements below were
collected during the reconstruction.

- Approximately one second or less elapsed between the time Alaniz was seen on
  the BWC emerging from behind the SUV to when Silva began firing.
- 44.4 feet from center of the grate where Alaniz was first observed, to the left rear
  bumper of the SUV.
- 11 feet, 4 inches from the left rear bumper of the SUV to the beginning of the white
  striped lane line.
- The white striped lane line adjacent to evidence placards 8 and 16 measured 12
  feet.
- Alaniz and Silva were approximately 29 feet, 5 inches apart.



*Image 38: Overview image of scene with pertinent locations within the scene marked and measurements
collected during the reconstruction.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 25



*Image 39: Phase 3 forensic animation still depicting Silva's view of Alaniz when he first rounded the SUV
in a shooting stance; approximately 29 feet 5 inches apart.*

**PHASE 4** – Alaniz continued forward movement toward the driver door of the SUV, where
the taser was deployed and Silva fired five shots simultaneously.

- The taser and gunshots occurred within sequential proximity to one another, as
  Silva began firing approximately half a second after Van Dragt deployed his taser.
- A total of five gunshots were observed on the video recording for an extent of
  approximately 1.25 seconds or less.
- The gunshot wounds Alaniz sustained to the right chest and front right leg are
  consistent with Alaniz slightly twisted to his left while bent forward at the waist,
  leaning forward and/or falling forward. The front right leg injury aligned with Silva's
  position if the leg was raised and extended back.
- Alaniz and Silva were approximately 20 feet, 2 inches apart.
- From Silva's first estimated shooting position to the left front bumper of the SUV
  was approximately 17 feet.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 26



*Image 40: Phase 4 forensic animation still depicting Silva's view of Alaniz during the shot to the right upper chest; approximately 20 feet 2 inches apart.*

**PHASE 5** – The final resting position of Alaniz was just next to the white striped lane line adjacent to evidence placards 8 and 16. The approximate location of Alaniz's head position was established based on scene photographs, body worn camera recordings, dash camera videos, and witness video recordings.

- Alaniz continued to advance toward Officer Silva along a continuum from the approximate location of the opened driver's door to his final resting position.

| Location 1 | Location 2 | Distance Apart |
|---|---|---|
| Left rear bumper of SUV | Final head position of Alaniz on ground | 25 feet |
| Silva first engaged with shots | Final head position of Alaniz on ground | 6 feet |
| Silva's final estimated shooting location | Final head position of Alaniz on ground | 12 feet |

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 27



*Image 41: Phase 5 forensic animation still depicting Silva's view of Alaniz during the shot to the right thigh.*

At approximately 3:40 p.m., EFC analysts concluded reconstruction efforts and departed the listed location.

**Along with the other forensic work described herein completed, but not limited to the examination of the physical evidence, review of investigative documents and photographs, autopsy report and photographs, audio and video recordings, scene reports and photographs, the reconstruction was used as a basis for preparing digital photographs to aid in the development of a forensic incident animation.**

## CONCLUDING OPINIONS

**The following are the forensic incident reconstruction opinions I have formed to a reasonable degree of scientific probability based upon my review of the evidence in this case.**

## The Shooting Incident Occurred Rapidly and Within Close Proximity

During the reconstruction, it became apparent that the actual shooting incident occurred within close proximity, as follows.

- Silva and Alaniz were approximately 29 feet, 5 inches apart when Officer Silva first observed Alaniz appear next to the left rear bumper of the SUV.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 28

- o Approximately one second or less elapsed between the time Alaniz was seen on the body worn camera emerging from behind the SUV to when Silva began firing.
- As Alaniz continued to advance toward Officer Silva during the shooting, the distance between the two reduced.
  - o Silva and Alaniz were approximately 20 feet, 2 inches apart when Alaniz approached the location of the open door of the SUV.
  - o Silva and Alaniz were approximately 12 feet apart from the last position Officer Silva recalls firing and Alaniz's final position on the ground.
  - o A total of five gunshots were fired within approximately 1.25 seconds or less.
- Approximately four seconds elapsed between the time Alaniz began advancing toward officers from the shoulder of the road and the first shots being fired.
  - o The taser and gunshots occurred within sequential proximity to one another.
    - ▪ Silva began firing approximately half a second after Van Dragt deployed his taser.

**Alaniz Advanced Toward the Officers**

The evidence supports that Alaniz advanced quickly toward officers and continued advancement toward Officer Silva until he went down on the ground in his final resting place.

- Alaniz advanced a minimum of 55 feet toward the officers, beginning on the shoulder of the road near the drain grate and ending on the ground next to the white segmented lane line.
  - o A distance of 44 feet, 4 inches from the shoulder of the highway near the drain grate to the left rear bumper of the SUV.
  - o A distance of 11 feet, 4 inches from the left rear bumper of the SUV to the beginning of the white lane line.
  - o The white lane line where Alaniz fell to the ground measured 12 feet long.
- Based upon the BWC recording when Alaniz is last observed prior to the shooting and where he came to rest, it is apparent that Alaniz was advancing towards Officer Silva during/after the shots being fired.
  - o Alaniz advanced approximately 23 feet from the location at the left rear bumper area of the SUV toward Officer Silva where he fell to the ground.
  - o Based upon the body position Alaniz was last observed in the BWC recording when the taser was deployed just prior to Officer Silva firing, Alaniz was advancing toward Officer Silva along a continuum from the approximate location of the opened driver's door to his final resting position following the shots being fired.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 29

## Alaniz Held a Glasses Case with his Hands Raised in Front of his Chest

The evidence supports that Alaniz pointed an item toward Silva while in a shooting stance.

- Alaniz was observed on the body worn camera video recording emerging from behind the SUV holding an object with both hands at chest level with his arms extended outward as he advanced towards Silva just prior to Silva discharging his weapon.
  - Based upon my training and experience, the stance of Alaniz is common and consistent with a shooting stance.
  - Officer Silva's statement that Alaniz charged at him in a shooting stance while holding a cylindrical item he believed to be a firearm, is consistent with the body worn camera video evidence.



*Image 42: Zoomed-in BWC image of Alaniz with hands raised in front of his chest, holding a dark-colored item with both hands pointed toward Silva.*

- An unzipped, gray-colored eyeglass case, containing a glass smoking pipe was recovered from the scene just beyond (west) of the location Alaniz fell to the ground.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 30

- o The glasses case measured 5-1/4 inches long, by 3 inches wide. With the opening unzipped, the opening of the case measured 1-1/2 inches wide.


*Image 43: Fabric case containing glass pipe.*

## <u>Gunshot Wound Injuries Corresponding to Clothing Defects</u>

A total of three shots impacted Alaniz. Three (3) gunshot entry wounds to the front of the body were reported in the autopsy report, while only one exit wound was reported. Projectiles associated with the gunshot wounds to the right chest and right thigh were recovered from the body. The black jacket, black shirt, blue shirt, and camo shorts exhibited entrance defects to the front surfaces that corresponded with the gunshot wounds reported during the autopsy.

**GSW 1** – entered through the upper right chest with no exit wound. The projectile was recovered from the left lung and appeared to be intact.

- The bullet traveled right to left, front to back, and downward.
- The bullet entered the upper right chest of the black jacket (Defect 1A) and perforated the underlying black and blue shirts (Defects 2A and 3A respectively) prior to entering the chest.
- Significant blood and biological materials were present on the interior surface of the blue shirt surrounding the defect to the upper right chest (Defect 3A).

**GSW 2** – entered through the anterior right thigh with no exit wound. The projectile was recovered from the right leg soft tissue and appeared badly deformed.

- The atypical entrance wound to the anterior right thigh of Alaniz is indicative of the bullet impacting an intermediate target prior to entering the thigh.
  - o Purple-pink contusion and punctate abrasion cluster just inferior to the wound could be representative of pseudo-stippling caused by fragmented

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 31

pieces impacting the leg from an intermediate target (jacket pocket zipper).

- o There was a cylindrical black colored vape pen recovered beside Alaniz that appeared to have an associated broken piece (DOJ 8).
  - ▪ Upon further inspection, the fragmented piece of plastic/metal located next to the vape device was consistent with a portion of the zipper mechanism of the right front pocket of the jacket.
  - ▪ Review of the scene photographs also indicate that another part of the zipper mechanism was located on the roadway adjacent to the vape device and broken material fragment.
- o There was a copper jacket fragment recovered on the ground beside Alaniz (DOJ 16) which is consistent with originating from the projectile recovered from Alaniz's right leg, as the projectile recovered from the right leg was badly deformed and missing copper jacket pedals.
- o A minute copper jacket fragment was recovered from the jacket next to the right front jacket pocket.
- A likely explanation for the atypical entrance wound to the right thigh is that the bullet impacted the zipper portion of the jacket pocket, fragmenting the bullet and breaking the zipper mechanism, prior to perforating the camo shorts.
  - o Defect 1B to the jacket was elongated with irregular edges.
  - o Defect 4A to the shorts was elongated with irregular edges.

**The jacket pocket zipper (while in the unzipped position) acted as an intermediate target.**



*Images 44 and 45: Irregular defects to the jacket and shorts.*

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 32



*Image 46: Scene photograph with zipper mechanism on roadway adjacent to vape device; not collected.*



Images 47 and 48: Autopsy photographs of irregular GSW #2.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 33

**GSW 3** – entered the anterior left shin, causing a shallow wound where the medical examiner reported that the projectile was likely dislodged prior to examination.

- There are no corresponding defects to Alaniz's clothing, as the wound appears to have occurred below the shorts and above the sock location.

**Defect 1C** – to the back collar of the jacket appeared to travel from front to back and cannot be eliminated as being caused by one of the rounds that impacted the truck (scene Defects A or B).

- It is likely that as Alaniz was bent forward at the waist, the right inner collar was exposed to the path of a bullet, causing a defect to the collar.
- Defect 1C has no corresponding gunshot wound injuries.

**Body Positioning/Trajectories**

All three gunshot wounds were clustered, occurring within close proximity to one another with Alaniz bent forward and/or falling forward. Two (2) of the gunshots missed Alaniz's body prior to impacting the semi-truck.

- <u>Defect A</u>: The projectile responsible for Defect A (to top of fender below sleeper cab) appears to have missed Alaniz, impacting the passenger side of the semi-truck at approximately 3 feet, 2 inches up from the ground.
  - o The projectile recovered from under the semi-truck is consistent with corresponding with Defect A.
  - o No biological material was noted on the projectile recovered from under the semi-truck.
  - o Black material on the projectile is consistent with impact to the truck.
- <u>Defect B</u>: The projectile responsible for Defect B (front of truck trailer) appears to have missed Alaniz, impacting the front side of the semi-truck trailer at approximately 4 feet, 11 inches up from the ground.
  - o No biological material was noted on the projectile recovered from inside the semi-truck trailer.
  - o Black material on the projectile is consistent with impact to the truck.
- <u>Defects C & D</u>: The projectile(s) responsible for Defects C (front passenger tire) and D (black plastic flap below the steps/fender below sleeper cab) appear to be consistent with being caused by a tumbling and fragmented projectile.

*NOTE: One of the projectiles recovered from underneath the semi-truck trailer or within the semi-truck trailer are likely associated with Defect 1C to the back collar of the jacket.*

- <u>Upper Right Chest GSW</u>: The entrance wound to the upper right chest would position Alaniz in a slightly upright and twisted position, with the right side of his body exposed to Officer Silva's muzzle location.

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 34

- o The path of travel is consistent with Alaniz positioned in front of and slightly to the left of Officer Silva, with his right arm lowered and his upper torso bent forward at the waist.
- <u>Anterior Thigh GSW</u>: The entrance wound to the anterior thigh would position Alaniz with the right side of his body exposed to Officer Silva's muzzle location.
  - o The path of travel is consistent with Alaniz positioned in front of and slightly to the left of Officer Silva, with his body falling forward, bent at the waist, with his right leg extended backward.
  - o The bullet impacting the right thigh likely first impacted an intermediate target (jacket pocket zipper) prior to entering the thigh, causing an irregular entrance wound.



Image 49: Forensic animation still image of the overall area/trajectory of Silva's shots during the shooting incident; represented by a cone.

**The physical evidence presented <u>does not</u> contradict Officer Silva's recollection of the incident.**

**The foregoing conclusions are based on Engert Forensic Consultant's review of the above-listed materials in addition to training, knowledge, and experience. Discovery is ongoing and all opinions stated herein are, therefore, preliminary. This expert reserves the right to amend or supplement his opinions as further pertinent evidence is discovered.**

Lee Roistacher
**EXPERT'S PRELIMINARY RECONSTRUCTION REPORT**
*Kirkman v. California Highway Patrol*
February 10, 2025
Page 35

## EXHIBITS AND ANIMATION

Digital images of the incident reconstruction were collected as a template for illustration and in preparation for development of a forensic incident animation exhibit. Should such exhibits be pertinent for trial purposes, exhibits will be sent separately to this report as an incident reconstruction animation prepared at my direction to illustrate my forensic opinions regarding the death of John Joseph Alaniz. Exhibits will be based on my review of the materials, statements, photos, medical records, and investigative reports of this case; and on my own forensic investigation associated with this case.

## MISCELLANEOUS

Also attached is Rod Englert's complete CV, which includes a listing of all cases in which he has participated. In compliance with Federal Rule 26, cases involving his deposition and/or testimony within at least the last five years are listed with a "T" or "D" in the last section of his CV. See Fed. R. Civ. P.26(a)(2)(B)(iv-v).

## FEE SCHEDULE

Compensation for Englert Forensic Consultants is at the rate of $575 per hour plus travel time and expenses.

I have reviewed this report and its exhibits and believe it accurately summarized my conclusions/opinions in this case, and the methodology and evidentiary and other basis underlying such conclusions.

Rod Englert
Englert Forensic Consultants

RE/nw
Attachments

1  Dean Gazzo Roistacher LLP
   Lee H. Roistacher, Esq. (SBN 179619)
2  440 Stevens Avenue, Suite 100
   Solana Beach, CA  92075
3  Telephone:  (858) 380-4683
   Facsimile:  (858) 492-0486
4  E-mail:      lroistacher@deangazzo.com

5  Attorneys for Defendant
   State of California by and through California
6  Highway Patrol and Officer Ramon Silva

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10  SANDRA KIRKMAN AND              Case No.: 2:23-cv-07532-DMG-SSC
    CARLOS ALANIZ,
11  INDIVIDUALLY AND AS            **CERTIFICATE OF SERVICE**
    SUCCESSORS-IN-INTEREST TO
12  JOHN ALANIZ, DECEASED,          Courtroom:  8C
                                    Judge:      Hon. Dolly M. Gee
13              Plaintiff,
                                    Complaint Filed: July 28, 2023
14         v.                       Trial Date: April 15, 2025

15  STATE OF CALIFORNIA;
    RAMON SILVA; AND DOES 1-10,
16  INCLUSIVE,

17              Defendant.

18

19      I, Maria E. Kilcrease, declare:

20      1.    That I am and was at the time of service of the papers herein referred

21  to, over the age of 18 years, and not a party to the action; and I am employed in

22  the County of San Diego, California, in which county the within-mentioned

23  mailing occurred. My business address is 440 Stevens Avenue, Suite 100, Solana

24  Beach,    California    92075,    and    my    electronic    address    is

25  mkilcrease@deangazzo.com.

26      On February 12, 2025, I served the following documents described as:

27  ///

28

                              1

**SUPPLEMENTAL EXPERT REPORT BY DEFENDANTS STATE OF CALIFORNIA BY AND THROUGH CALIFORNIA HIGHWAY PATROLA AND OFFICER RAMON SILVA**

on all interested parties in this action addressed as follows:

Dale K Galipo
Cooper Alison-Mayne
Law Offices of Dale Galipo
21800 Burbank Boulevard Suite 310
Woodland Hills, CA 91367
818-347-3333
Fax: 818-347-4118
Email: dalekgalipo@yahoo.com
       cmayne@galipolaw.com
       ldeleon@galipolaw.com
       slaurel@galipolaw.com

**Attorneys for Plaintiffs**

___     BY ELECTRONIC SERVICE: On the date stated above, I served the documents via CM/ECF described above on designated recipients through electronic transmission of said documents; a certified receipt is issued to filing party acknowledging receipt by CM/ECF's system. Once CM/ECF has served all designated recipients, proof of electronic service is returned to the filing party.

___     BY FACSIMILE: By use of a facsimile machine, telephone number (858) 494-0486, at approximately _____ a.m./p.m. on _____, I served a copy of the documents described above on all designated recipients.  The facsimile machine I used complied with California Rules of Court, Rule 2033(3) and no error was reported by the machine.

_X_     BY E-MAIL: On the date stated above, I caused to be served the document via e-mail described above on designated recipients.

___     BY MAIL: By placing an envelope for collection and mailing following our ordinary business practices. I am readily familiar with the office's practice of collecting and processing of documents for mailing. Under that practice it would be deposited with the United States Postal Service on the same day in a sealed envelope with first-class postage prepaid at Solana Beach, California in the ordinary course of a business day.

___     BY OVERNIGHT DELIVERY: I enclosed the documents in an envelope or package provided by an overnight delivery carrier and

2

addressed to the persons at the addresses above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 12, 2025.

*Maria E. Kilcrease*

_____

Maria E. Kilcrease, Declarant

3

# EXHIBIT D

CONVENTIONALLY FILED - Kirkman Animation Officer Van Dragt POV.mp4

# EXHIBIT E

CONVENTIONALLY FILED - Kirkman Animation OTS View.mp4

# EXHIBIT F

CONVENTIONALLY FILED - Kirkman Animation Side by Side Comparision OTS View and BWC.mp4

# EXHIBIT G

