1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA KIRKMAN, CARLOS ALANIZ, individually and successors-in-interest to JOHN ALANIZ, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA, RAMON SILVA, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-07532-DMG-SSC<br><br>*Honorable Dolly M. Gee*<br>*Hon. Mag. Judge Stephanie S. Christensen*<br><br>**DECLARATION OF COOPER ALISON-MAYNE IN SUPPORT OF PLAINTIFFS' *DAUBER* MOTION TO EXCLUDE TESTIMONY AND EXHIBITS OF DAVID BLAKE**<br><br>Judge:    Dolly M. Gee<br>Hearing:  March 25, 2025<br>Time:     2:00 p.m.<br>Dept.:    Courtroom 8C<br><br>FPTC:    March 25, 2025<br>Trial:    April 15, 2025 |

I, Cooper Alison-Mayne, hereby declare as follows:

1. I am an attorney duly licensed to practice law in the State of California and the United States District Court for the Central District of California. I am one of the attorneys of record for the Plaintiffs Sandra Kirkman and Carlos Alaniz. I have personal knowledge of the facts contained herein and could testify competently thereto if called.

2. Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts from David Blake's deposition, taken by Cooper Alison-Mayne on February 5, 2025.

3. Attached hereto as **Exhibit B** is a true and correct copy of relevant excerpts from David Blake's expert report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of March, 2025, at Woodland Hills, California.

**LAW OFFICES OF DALE K. GALIPO**

By:     */s/ Cooper Alison-Mayne*
Dale K. Galipo, Esq.
Cooper Alison-Mayne
*Attorneys for Plaintiffs*

# EXHIBIT A

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Expert David Blake on 02/05/2025**

```
1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4

5   SANDRA KIRKMAN, CARLOS ALANIZ,
    individually and successors
6   in-interest to JOHN ALANIZ,
            Deceased,
7
            Plaintiffs,
8
    v.                    Case No.   2:23-cv-07532-DMG-SSC
9
    STATE OF CALIFORNIA, RAMON
10  SILVA, and DOES 1-10, inclusive,

11          Defendants.
    _____/
12

13

14          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15              DEPOSITION OF DEFENSE EXPERT

16                    DAVID BLAKE

17            WEDNESDAY, FEBRUARY 5 2025

18

19

20

21

22  Reported Stenographically by:

23  KIMBERLY D'URSO, CSR 11372, RPR

24  Job No.  00135673

25
```

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Expert David Blake on 02/05/2025**

Page 38

1           So you covered that you didn't see anything
2    that looked like a gun in the video.  That's the part
3    that we read back.  Did you see any object, anything
4    that you identified as an object in the decedent's hands
5    when you analyzed the video?
6        A.   It's kind of blurry.  You see the two-handed
7    shooting stance.  There's a darkness there, but I can't
8    identify it specifically as an object.
9        Q.   So it could be that he didn't have an object in
10   his hands?  It's a possibility?
11       A.   Well, I think that the totality of information
12   that we have leads -- would lead -- well, it leads me to
13   believe that he did have an object in his hands.
14   Anything is possible when video evidence doesn't clearly
15   show something.
16       Q.   Okay.  Okay.  So let me just try to ask this
17   question better and then let's take a break.
18           But what I'm trying understand is, if we just
19   take everything that you know about the case that formed
20   your opinion and we keep it all the same, except for we
21   take as an assumption that his hands were empty, could
22   be Van Dragt saw them empty, could be that we see them
23   empty in the video, does that change your opinion about
24   whether it was a reasonable mistake to perceive a deadly
25   threat?

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Expert David Blake on 02/05/2025**

Page 50

1          What we had before is extremely, in my opinion,

2     validating to that perception.

3          Q.    Okay.  Thanks for bearing with me.  I feel like

4     I did not ask those questions as well as I could have.

5          A.    That's fine.

6          Q.    So Officer Silva was shown in his deposition a

7     picture of the actual sunglasses case that was found at

8     the scene, and he said it looked nothing like a gun.

9          Do you remember reviewing that testimony?

10         A.    That sounds familiar, yes.

11         Q.    Have you seen a picture of the sunglass case?

12         A.    Quite a few.

13         Q.    Would you agree it looks nothing like a gun?

14         MR. ROISTACHER:  Vague as time.

15         (Reporter clarification.)

16         THE WITNESS:  The sunglasses case I saw on the

17    side of the roadway did not look like a gun.

18    BY MR. MAYNE:

19         Q.    Some of your opinions are about how human

20    perception of live events can be different from when you

21    sit down and watch the video in a comfortable, easy

22    chair; is that right?

23         A.    Yes.

24         Q.    So would you agree that it's important to get

25    the testimony of people who are actually there to see

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Expert David Blake on 02/05/2025**

Page 51

1    what -- how they perceived the events as they actually

2    happened in realtime versus just looking at the video?

3        A.    I think both are helpful and important.

4        Q.    Was it important in your consideration of

5    whether Officer Silva faced a deadly threat, to consider

6    Van Dragt's testimony, that he thought the object in the

7    decedent's hand looked like a Subway sandwich?

8            MR. ROISTACHER:  Let me object.  I think the

9    first part misstates his opinion.  I think you said -- I

10   think you left out "perception of a deadly threat."  But

11   I could be wrong.

12   BY MR. MAYNE:

13       Q.    I'll shortcut it and say:  Did it affect your

14   opinion in this case that Van Dragt said that the object

15   he perceived in the decedent's hands looked like a

16   Subway sandwich?

17       A.    Yes.  And if you'll bear with me a little bit

18   on my answer.  I think Officer Van Dragt said a lot of

19   things beyond that.  He said he -- he initially thought

20   it was gun, and then he changed his mind after having

21   additional time to view it.

22           But throughout his various descriptions of what

23   occurred, I come away with the perception that he was

24   unsure of what it was, and he still believed it posed a

25   threat to him.  So he initially thought it was a gun;

# EXHIBIT B

**BLAKE CONSULTING**

*"Focusing on Human Factors in Law Enforcement"*

1
2
3
4          United States District Court
5          Central District of California
6
7          SANDRA KIRKMAN and CARLOS
8          ALANIZ, individually and as
9          successors-in-interest to JOHN
10         ALANIZ, deceased; Plaintiff
11         VS.
12         STATE OF CALIFORNIA; RAMON
13         SILVA; and DOES 1-10, inclusive, Defendants
14         Case No. 2:23-cv-07532-DMG-SSC
15
16
17
18         Rule 26 Report
19         Authored by:
20         David M. Blake, PhD
21
22         January 12, 2025
23
24
25
26
27

# Table of Contents

**Summary of Knowledge, Education and Experience** ................................................................3

**Publications Authored In The Previous 10 Years**.................................................................5

**Previous Depositions and Testimony** ....................................................................................7

**Facts or Data Considered In Forming Expert Opinions** ......................................................9

**Exhibits Supporting Opinions** .............................................................................................13

**Statement of Compensation** ................................................................................................13

**Foundational Information**....................................................................................................14

    Method ..................................................................................................................................14

    Scene ....................................................................................................................................15

    Incident Summary & Timeline ...........................................................................................16

    Weapons ...............................................................................................................................17

**ANALYSIS & OPINIONS** ......................................................................................................18

    Opinion 1 .............................................................................................................................18

    Opinion 2 .............................................................................................................................23

    Opinion 3 .............................................................................................................................33

    Opinion 4 .............................................................................................................................34

    Opinion 5 .............................................................................................................................34

    Opinion 6 .............................................................................................................................35

**ANNEX** ...................................................................................................................................48

    Involved Officer Interview Summaries ...............................................................................48

    Literature Review Summaries…………………………………………………………….52

    Curriculum Vitae……………………………………………………………………...….57

EXPERT REPORT
Author: David M. Blake, PhD.

# Summary of Knowledge, Education and Experience

## David M. Blake, PhD

**Police Practices.** Dr. David Blake has over 20 years of experience (sworn/non-sworn) in both federal and state law enforcement. He was employed with the following agencies while holding the listed titles: (a) Department of Energy Security Police Officer III (3 years), (b) San Francisco Bay Area Rapid Transit Police Officer (2 years), (c) Livermore Police Officer (11.5 years), and (d) an Alameda County Sheriffs Officer Regional Training Center Instructor (5 years). A summary of relevant training and experience in police practices is summarized below:

- Positions held: patrol officer, field training officer (FTO), acting sergeant, special operations unit officer, gang unit detective, special weapons and tactics team (SWAT), force options training unit instructor, assistant range master, public information officer (PIO), commission on accreditation for law enforcement agency (CALEA) unit, regional training center instructor.

  These positions were associated with significant operational experience in areas of traffic enforcement and pedestrian stops, arrests, search warrants, risk assessments, operations plans, high-risk operations, surveillance, supervising, planning and conducting training, cross-jurisdictional operations, community engagement, gang enforcement, report writing and supervisory review of subordinate reports, policy compliance, special projects, community outreach, deescalation / communication and the application of reasonable force.

- Dr. Blake received a Bachelor of Science in Criminal Justice Management from Union Institute & University. He held positions as an adjunct criminal justice professor at Delta College and Las Positas College where he also instructed in each institution's respective police academies. He taught the following Ca. POST courses to police recruits: (a) LD20; Use of force, (b) LD21; Patrol techniques, LD24; Disputes/Crowd control, LD35; Firearms/Chemical agents, and LD36; Information systems.

- Dr. Blake obtained the following law enforcement credentials (not all-inclusive):  California peace officer standards and training (CA-POST) advanced certificate, Department of Energy SPO III certification, firearms instructor, arrest and control instructor, force options simulator instructor, field training officer, police academy instructor, SWAT certification, explosive breaching certification, reality-based training instructor, police academy instructor and scenario evaluator and the AXON Taser © Instructor certification. Dr. Blake has received over 2500 hours of law enforcement training while facilitating a minimum of 2500 hours of training to law enforcement personnel.

**Human Factors Psychology.** Dr. Blake earned a M.Sc. from Kaplan University (Psychology) and a Ph.D. from Grand Canyon University (Performance Psychology) after completing courses (not all inclusive) on behaviorism, foundations of performance psychology, psychomotor performance, performance enhancement, learning and behavior, neuropsychology, cognitive psychology, and qualitative / quantitative research methods. Dr. Blake completed extensive

research projects on the application of human factors psychology to officer-involved shootings. His additional training and experience in the field of human factors psychology is summarized below:

- Received >100 hours of formal training on human factors psychology and its application to critical incidents/use of force. This training includes the CA-POST Officer-Involved Shooting Course, The Human Performance Training Institute's (HPTI) Force Encounters and Human Factors courses, the Force Science Analyst certification through the Force Science Training Institute ®, as well as other sources of formal training. He has also completed extended coursework on perception/response time, human error investigations and biomechanics provided by the Association of Force Investigators (AFI).

- Provided over 1000 hours of human factors psychology instruction to police officers, law enforcement executives, risk managers, and attorneys. The topics of instruction included response time, attention, perception, vision, psychophysiology, neuroscience, decision-making, and memory.

- A member of the Human Factors and Ergonomics Society (HFES), Dr. Blake has served on the HFES Government Relations Subcommittee on Law Enforcement, is a member and past chair of the HFES Forensic Professionals Technical Group and has conducted academic peer review for HFES symposium papers. He has also provided subject matter expertise to graduate students conducting law enforcement related human factors research and conducted peer-review for criminal justice journals on human factors topics. Dr. Blake was mentored by former United States Military Academy at West Point and University of Southern California Professor Craig Geis (Lt. Col. Ret.) who previously served as the U.S. Army's lead safety specialist in aviation human factors. Dr. Blake was also mentored by human factors psychology professor Dr. Joel Suss, formerly a tenured professor at Wichita State University.

**Digital Media Evidence (DME).** Dr. Blake has over 180 hours of DME training. The training received focused on methods of video recovery, authentication, analysis, and enhancement; as well as the potential bias created from standalone video review. Dr. Blake has written articles in both academic peer-review journals and professional periodicals on human visual capabilities in relation to video recordings. He has significant experience working with DME from body worn cameras and other sources. Dr. Blake has obtained a Law Enforcement and Emergency Services Video Association (LEVA) Video Technician Certification and continues to expand his knowledge with ongoing training.

**Consulting/Training.**  Dr. Blake has consulted as a subject matter expert in police practices / human factors psychology with both the International Association of Chiefs of Police (IACP) and the California Commission on Peace Officer Standards and Training (CA-POST) for the development of use of force and related training programs. He has consulted as a subject matter expert in police practices / human factors psychology and/or digital media evidence with the United States Department of Justice, The Arizona Department of Justice, California District Attorneys, Colorado District Attorneys, criminal and administrative defense attorneys, civil

plaintiff and defense attorneys, and individual police agencies. He has facilitated training for the Contra Costa County District Attorney's Office, the California Department of Justice, the California District Attorneys Association, the Ventura County District Attorney's Office, The Washington Association of Sheriffs and Police, the California Reserve Police Officers Association, the California Force Instructors Association, and Police1 online. He has testified as a subject matter expert in California, Colorado, Texas, and Connecticut.

**Additional Experience.** Dr. Blake has published over 50 articles in both academic peer-reviewed journals and professional periodicals on police practices, use of force and human factors psychology. Dr. Blake is a member of the Human Factors and Ergonomics Society (HFES), the International Association of Chiefs of Police (IACP), the Association of Force Investigators (AFI), the California Force Instructors Association (CFIA), the Law Enforcement and Emergency Services Video Association International (LEVA), and the Academy of Criminal Justice Sciences (ACJS).

***Full CV in Annex***

# Publications Authored In The Previous 10 Years.

**Peer-Reviewed Journals:**

1. *Examining the use of interactive video-based simulators in law enforcement human performance research: A scoping review* (2024) – Journal of Experimental Criminology.
2. *Multi-Disciplinary Approach to a Use-of-Force Investigation: Case Study* - International Journal of Forensic Engineering (2024).
3. *Curb Sitting: An Evidence Based Policing Practice or an Officer Safety Myth?* - Police Practice and Research (2022).
4. *A skeptical reflection: Contextualizing police shooting decisions with skin-tone* – Behavior and Brain Sciences (2022).
5. *A Systems-Based Exploration of Police Mistake-of-Fact Shootings in the United States* – ProQuest (2020).
6. *Holster & Handgun: Does Equipment Effect Response Time* – Law Enforcement Executive Forum (June 2018)
7. *Cognitive Bias and Use of Force Investigations* – Investigative Sciences Journal (9(3) 2017)
8. *De-Policing in America: The Effects of Media and Leadership on Officer's Discretionary Enforcement* – Law Enforcement Executive Forum (17(1) 2017)
9. *Factoring Fatigue into Deadly Force Encounters: Decision Making and Reaction Times* – Law Enforcement Executive Forum (15(1) 2015)
10. *LE Body Worn Cameras; Comparing Human & Device to Ensure Unbiased Investigations* – Law Enforcement Executive Forum (15(4) 2015)

**Periodicals & Professional Journals:**

*11. Digital media evidence and force investigations: 5 methods to assist in writing accurate reports and conducting thorough investigations* – Police One

*12. Developing Evidence-Based 'Alternative Tactics' for Deescalation* – ILEETA Journal

13. *Research to watch /Curb-sitting: Evidence-based tactic or illusion of safety* – Force Science

14. *Using a systems-based perspective to analyze the Uvalde school shooting response* – Police One

15. *Force Science Validates Legacy Research Findings* – Force Science

16. *3 recommendations to mitigate TASER/Firearm capture errors* – Police One

17. *Lost in transition: How science can help inform evidence-based deescalation practices* – Police One

18. *Police simulation training: developing proficiency* – Virtra News

*19. Fact Checking the need to reform education requirements for California cops* – Police One

*20. Peace officer's duty to intercede: Common sense or muddy waters?* – Calibre Press

*21. A letter to the American public: Why 'shoot them in the leg' is not an effective strategy* – Police One

*22. Today's Cops NEED to be use of force experts: Here's how* – Police One

23. *Use of force: Time to "geek it up"* – Calibre Press

24. *Why we cannot leave our safety to luck* – Police One.

*25. Use of force: risk-management for the new era of law enforcement* – International Law Enforcement Educators and Trainers Association Journal.

26. *Training Day: Setting up use of force training for community education* – Police One.

27. *California battle over use of force legislation rages on* – Police One.

28. *Got Graham? How AB931 could impact California use of force law* – Police One

29. *How human factors impact police safety during emergency driving* – Police One

30. *8 -Ways to Prevent Blue-on-Blue Shootings* – Police One

31. *External Vest Carriers* – An Officer Safety Issue? – International Law Enforcement Educators and Trainers Association Journal.

32. *Does De-escalation Endanger Police Officers or Save Lives?* – Police One

33. *2 Under-Discussed Issues With Body-Worn Cameras* – Police One (Special Editorial)

34. *Force Options Simulators: An Underutilized Training Tool* – International Law Enforcement Educators and Trainers Association Journal (7(2) 2017).

35. *Police Warning Shots: A consensus lacking agreement* – Police One

36. *What we Don't Know CAN Hurt US*: *Training for Low-Light Encounters* – The Police Chief

37. *Tactical Flashlights: What We Don't Know Will Hurt Us* – International Law Enforcement Educators and Trainers Association Journal (6(3) 2016)

38. *Unpacking Implicit Bias in Policing* – Police One

39. *Guardian v. Warrior: The many roles of a police officer* – Police One

40. *Survey: Is proactive policing slowing down?* – Police One

6

41. *How UOF evaluation is changing (and how to improve UOF decision making)* – Police One
42. *Replica Weapons*: *A collective effort to stop mistake of fact shootings* – American Military University Edge
43. *The "21-foot kill zone" myth: What officers really need to know* – Police One
44. *How to improve officer training for high-risk traffic stops* – Police One
45. *Officers Facing Criminal Charges: Faulty Decision Making?* - Internal Law Enforcement Educators and Trainers Association Journal (5(4) 2015)
46. *Efficacy of Police Body Cameras for Evidentiary Purposes: Fact of Fallacy* – International Association of Chiefs of Police *(May 2015)*
47. *Officer Fatigue and OIS – A Deadly Combination for Error* – International Law Enforcement Educators and Trainers Association Journal (5(1) 2015)
48. *What agencies need to know about the limitations of body cam technology* – Police One
49. *Officer Fatigue and Officer-Involved Shootings – A Deadly Combination for Error* – International Association of Chiefs of Police *(Oct 2014)*
50. *2 Pedestrian Stop safety tips that could save your life* – Police One
51. *Truly Test your officers with reality-based training* – Police One
52. *Dispatchers don't need stress training – right?* – 911 Magazine
53. *How to apply Force Science findings to policy and training* – Police One
54. *Distance and Shielding equals' time: A safer approach to pedestrian contacts* – Academy of Criminal Justice Sciences

# Previous Depositions and Testimony

1. (2020) *Officer-Involved Shooting of Arturo Rodriquez*, (T) (PP/UoF) Officer-Involved Shooting (Tulare County ADA: Sean Sangree). Grand Jury.

2. (2021) *Merced County v. Damian Sparks* (T) (PP/UoF) Officer-Involved-Shooting (Messing, Adam, & Jasmine / Attorney Lina Cockrell). Defense.

3. (2022) *Ledyard Township. v. Bobby Kempke* (T) (PP/UoF) Excessive Force (Council 4 AFSCME / Attorney: Lorin Dafoe). Defense.

4. (2022) *State of California vs. Delano Malang,* Case No. CR2102316 (T) (PP/UoF/Video) Unlawful Detention / Excessive Force (Humboldt County DA: Trenton Trimm). Prosecution.

5. (2022) *State of California v. Douglas Popke,* Case No. MF2000950 (T) (PP/UoF/Video) Officer-Involved Shooting, Video (Mariposa County DA: Walter Wall).

6. (2022) *Shannon v. Sacramento County et al.* Case: 2:15-CV-00967-KJM-CKD (D) (PP/UoF) Officer-Involved-Shooting (Rivera, Hewitt, Paul LLP / Attorney Wendy Motooka). Defense

7

7. (2022) *Stephon Clark et al., v. City of Sacramento et al.* Case: 2:19-cv-00171 JAM(EFB) (D) (PP/HF)
Officer-Involved-Shooting (City of Sacramento: Chance Trimm). Defense

8. (2022) *Randi McGaugh et al., v. Tyler Naudet, et al.,* Case 2016-CV14902: (D) (PP/UoF)
Officer Involved Shooting (The Popham Law Firm LLC, Attorney Thomas Porto/Brandy Cook). Plaintiff.

9. (2022) *State of California v. Thomas Ortiz.* Case No. 18010746 (T) (HF/UoF/Video)
Civilian Self-Defense (San Francisco Public Defender / Attorney: Yali Corea-Levy). Civilian self-defense.

10. (2023) *State of Texas v. Carmen Decruz*, Case No. FR 81938 (T) (PP/HF)
Officer-Involved Shooting (Robert M. McCabe, PLLC. / Attorney: Robert McCabe.)

11. (2023) *Tabares v. City of Huntington Beach et al.,* Case: 30-2021-01200297 (D) (HF)
Officer-Involved Shooting (Manning-Kass / Attorney: Gene Ramirez)

12. (2023) *J. Young v. City of Menifee et al.,* Case: 5:17-cv-1630-JGB (SPx)(D) (HF/UoF/Video)
Civilian Self-Defense (Dean, Gazzo, Roistacher LLP. / Attorney: Heather Paradis)

13. (2023) *McCoy v. City of Vallejo et al.,* Case: 2:19-cv-01191-JAM-CKD (D) (HF)
Officer Involved Shooting (Colantuono, Highsmith @ Whatley, PC / Andrew Rawcliffe)

14. (2024) *State of California v. Mark Waters.* Case: 221119971 (Testimony) (HF/Video/Glock)
Civilian Shooting (Law Offices of Steven Clark / Steve Clark).

15. (2024) Randi McGaugh et al., v. Tyler Naudet, et al., Case 2016-CV14902: (T) (PP/UoF)
Officer Involved Shooting (The Popham Law Firm LLC, Attorney Thomas Porto). Plaintiff.

16. (2024) *Williams et al., v. County of Los Angeles.,* Case: 21STV43009 (D) (HF)
Officer Involved Shooting (Collins + Collins LLC, Attorney Chandler Parker. Defense.

17. (2024) *Wallis v. County of Riverside.* Case: CVR12302384 (D) (HF)
Officer Involved Shooting (Manning & Kass / Attorney: Geoffrey Plowden. Defense

18. (2024) *Los Angeles Sheriff's Department v. Dep. Julian Manriquez* (T) (HF/PP/Video)
Use of Force (Rains, Lucia, Stern, St. Phalle & Silver / Attorney Chris Kucharski. Defense

8

1    # Facts or Data Considered in Forming Expert Opinions

2

| Description | Electronic Folder / File |
|---|---|
| | |
| Complaint | Complaint.pdf |
| Report on the Investigation into the Death of John Joseph Alaniz on May 4, 2022 (CA DOJ) | 95577357.pdf |
| DOJ Shooting Investigation Team Reports | STATEOFCA006791-006814  OIS2022-0035 Overview-Final Report_Redacted.pd<br>STATEOFCA005209-005212 BI-LA2022-00016 ROI 01 Opening.pdf<br>STATEOFCA005213-005242  BI-LA2022-00016 ROI 02 Crime Scene_Redacted.pdf<br>STATEOFCA005243-005248  BI-LA2022-00016 ROI 03 Officer Processing.pdf<br>STATEOFCA005249-005284 BI-LA2022-00016 ROI 04 Hospital-Coroner Records.pdf |
| DOJ Forensic Services Reports | STATEOFCA004809-004811  Addendum No. 8 RI-22-001100-0001.PDF<br>STATEOFCA004921-004922  Addendum No. 11 RI-22-001100-0002_Redacted.pdf |
| CHP Investigation Report | STATEOFCA004509-004662  Addendum No. 1 CHP 2022-01088-550_Redacted.pdf |
| TASER Report | STATEOFCA004663-004664  Addendum No. 2 Taser Report.pdf |
| Employee Profiles and Background Information | 000013 I. c. Employee Profile_Redacted - Copy.pdf |
| Description of Critical Incident | STATEOFCA000003-000005 Description of Critical Incident_Redacted - Copy.pdf |
| Decedent Information | STATEOFCA000014-000015 I. d. Suspect Profile_Redacted - Copy.pdf |
| Firearms Analysis / Round Count | STATEOFCA000023-000026 III. a. Firearms Weapons_Redacted - Copy.pdf |
| Interview Transcript - Silva | |
| Interview Transcript – Van Dragt | STATEOFCA000067-000091 V. b. Statement Ofc Van Dragt - Copy.pdf |
| Interview Transcript - Ramos | STATEOFCA000092-000099 V. c. Statement Ofc Ramos - Copy.pdf |
| Investigative Report – J. Leblanc | STATEOFCA000115-000181 VIII. d. Area Report no CLETS_Redacted.pdf |
| Evidence Report | STATEOFCA000182-000189 VIII. e. CHP 36-Evidence Report.pdf |
| Handgun and Taser Inspection | STATEOFCA000219-000226 VIII. i. Academy Firearm Inspection Taser Deployment_Redacted.pdf |
| CAD Notes | STATEOFCA000227-000311 VIII. j. LACC CAD Logs_Redacted.pdf<br>STATEOFCA004923-005006  Addendum No. 12 CHP Dispatch Log_Redacted.pdf |
| MAIT Report | STATEOFCA000352-000442 VIII. t. MAIT Report.pdf<br>STATEOFCA004694-004715  Addendum No. 5 SS-034-22.pdf |

| | STATEOFCA004716-004805  Addendum No. 6 SS-035-22.pdf |
|---|---|
| POST Profile - Silva | STATEOFCA002376-002379 RamonSilva_POST ProfileReport - Copy_Redacted.pdf |
| Risk Management Use of Force Report | STATEOFCA002406-002436 CHP 275.pdf |
| CHP / CA POST Training and CHP Use of Force Policy | STATEOFCA002466-002644 CHP TRAINING.pdf STATEOFCA002811-002832 HPM 70.6, Chapter 1.pdf |
| CA POST Learning Domain 20 Version 5.4 | STATEOFCA002645-002766 LD 20, Use of Force.Deescalation.pdf |
| Use of Force Training PowerPoints | STATEOFCA002846 LD20-MOD 2.pptx STATEOFCA002847 LD20-MOD 3.pptx STATEOFCA002848 LD20-MOD 4.pptx STATEOFCA002849 LD20-MOD 5.pptx STATEOFCA002845 LD20-MOD 6.pptx |
| Graham v. Connor Training | STATEOFCA002850-002853 LD 20.pdf |
| Depositions Silva Van Dragt Andrew Acosta Cecil Verdugo Sandra Kirkman Carlos Alaniz | Ramon Silva 03-06-2024_full.pdf John Van Dragt 04-09-2024_full.pdf ACOSTA ANDREW 11-14-2024_full.pdf VERDUGO CECIL DANIEL 11-19-2024_full.pdf KIRKMAN, SANDRA 06-19-2024_full.pdf ALANIZ, JR., CARLOS LOPEZ 06-19-2024_full.pdf |
| Interviews /Processing (Transcript/Audio) Silva | STATEOFCA000471 Admin Interview Officer R. Silva.mp3 STATEOFCA007506  220509_1232.mp3 STATEOFCA000040-000066 V. a. Statement Ofc R. Silva - Copy.pdf STATEOFCA 3763 DOJ interview of Officer R. Silva .mp3 STATEOFCA 3768 DOJ inverview of Officer R. Silva 2 - Copy.mp3 STATEOFCA007504  220504_Off Silva Process.MP3 STATEOFCA007506  220509_1312.mp3 STATEOFCA005643-005712  BI-LA2022-00016 ROI 19 CHP Off. SILVA, Ramon.pdf |
| Interviews (Transcript/Audio) Van Dragt | AUDIO TRANSCRIPTION, INTERVIEW OF OFFICER JONATHAN VAN DRAGT_full.pdf STATEOFCA004813-004890  VANDRAGT. Jonathan 5-10-22.pdf STATEOFCA 3766 DOJ Interview with Officer Van Dragt 1 - Copy.mp3 STATEOFCA 3767 DOJ interview with Officer Van Dragt 2 - Copy.mp3 STATEOFCA000067-000091 V. b. Statement Ofc Van Dragt - Copy.pdf STATEOFCA000469 Admin Interview Officer Van Dragt.mp3 STATEOFCA007507  220510_1008.mp3 STATEOFCA005715-005794  BI-LA2022-00016 ROI 21 CHP Off. VAN DARGT.pdf |
| Interviews Ramos | AUDIO TRANSCRIPTION, INTERVIEW OF OFFICER ENRIQUE RAMOS  full.pdf |

| | |
|---|---|
| | STATEOFCA000092-000099 V. c. Statement Ofc Ramos - Copy.pdf<br>STATEOFCA007505  220509_1121.mp3<br>STATEOFCA005612-005642  BI-LA2022-00016 ROI 18 CHP Off. Ramos.pdf |
| Interview Emilio Martinez | STATEOFCA007503  220504_1519.mp3 |
| Witness Andrew Acosta Interview | STATEOFCA007510  BI-LA2022-00016 - ACOSTA, Andrew Mario (911 RP- 2 of 2).mp3 |
| Helicopter Pilot Abbott Transcribed Interview | STATEOFCA004429-004451  ABBOTT, Roland 7-12-22.pd |
| Witness Andrew Acosta Transcribed Interview | STATEOFCA004452-004477 ACOSTA, Andrew 5-4-22.pdf<br>STATEOFCA004478-004508  ACOSTA, Andrew 9-27-22.pdf |
| Witness Cecil Verdugo Transcribed Interview | STATEOFCA004891-004919  VERDUGO, Cecil 5-4-22 (1).pdf |
| Witness Evencio Horbino Transcribed Interview | STATEOFCA005286-005313  BI-LA2022-00016 ROI 06 HORBINO, Evencio.pdf |
| Witness Jasmin Zamora Transcribed Interview | STATEOFCA005314-005344 BI-LA2022-00016 ROI 07 ZAMORA, Arialey-Jazmin.pdf |
| Witness Roger Martinez Transcribed Interview | STATEOFCA005345-005412 BI-LA2022-00016 ROI 08 MARTINEZ, Roger L.pdf |
| Witness Jacob Simpson Transcribed Interview | STATEOFCA005413-005440 BI-LA2022-00016 ROI 09 SIMPSON, Jacob.pdf |
| Witness Long Ma Transcribed Interview | STATEOFCA005441-005500 BI-LA2022-00016 ROI 10 MA, Long.pdf |
| Witness Mayra Castillo Transcribed Interview | STATEOFCA005544-005566  BI-LA2022-00016 ROI 16 CASTILLO, Mayra.pd |
| Witness Geovani Castillo Transcribed Interview | STATEOFCA006005-006008  BI-LA2022-00016 ROI 39 Castillo II.pdf |
| Witness Ariley Zamora Transcribed Interview | STATEOFCA007452-007464  ZAMORA, Ariley 5-04-2022.pd |
| Witness Yang Zhou Transcribed Interview | STATEOFCA007481-007502 ZHOU, Yang 5-04-2022.pdf |
| Dispatch Transcripts | STATEOFCA006342-006370  DispatchTransmission-5-4-22.pdf |
| California POST Learning Domain #20 (Version 5.4) | LD_20_V-5.4.pdf |
| California POST Learning Domain #33 (Version 5.1) | LD_33_V-5.1.pdf |
| California POST Learning Domain #35 (Version 2.5) | LD_35_V-2.5.pdf |
| CHP Use of Force Training | STATEOFCA002466-002644 CHP TRAINING.pdf<br>STATEOFCA002767-002810 HPM 70.8, Chapter 3.pdf<br>STATEOFCA002811-002832 HPM 70.6, Chapter 1.pdf<br>STATEOFCA002845 LD20-MOD 6.pptx<br>ST STATEOFCA002848 LD20-MOD 4.pptx<br>STATEOFCA002849 LD20-MOD 5.pptx<br>STATEOFCA002847 LD20-MOD 3.pptx<br>STATEOFCA002846 LD20-MOD 2.pptx |
| Fachner, G. & Carter, S. (2015). An assessment of deadly force in the Philidelphia Police Department (USDOJ). | Fachner_Carter_TPFs.pdf |
| Yin, R. K. (2014). *Case study research: Design and methods*. Sage. | |

11

EXPERT REPORT
Author: David M. Blake, PhD.

| | |
|---|---|
| Graham v. Connor, 490 U.S. 386 (1989) / Koussaya v. City of Stockton, 54 Cal.App.5th 909 (2020) | |
| Granot, Y., Balcetis, E., Feigenson, N., & Tyler, T. (2017). In the eyes of the law: perception versus reality in appraisals of video evidence. *Psychology, Public Policy, and Law.* 24(1). | Granot_Video Perception.pdf |
| Faden, E. (2019). Visual Disturbances. *Journal of Videographic Film & Moving Image Studies.* | https://mediacommons.org/intransition/visual-disturbances |
| Aldredge, J. (2017). 6 Tutorials for Filming Realistic Fight Scenes. *The Beat.* | https://www.premiumbeat.com/blog/6-realistic-fight-scene-tutorials/ |
| Nishizono, R., Saijo, N., & Kashino, M. (2023). Highly reproducible eyeblink timing during Formula Car Driving. *iScience, 26*(6), 106803. https://doi.org/10.1016/j.isci.2023.106803 | Eyeblink Timing.pdf |
| Oramas Mora, D., Terrill, W., & Foster, J. (2023). A Decade of Police Use of Deadly Force Research (2011–2020). *Homicide Studies, 27*(1), 6-33. https://doi.org/10.1177/10887679221123591 | oramas-mora-et-al-2022-a-decade-of-police-use-of-deadly-force-research-(2011-2020).pdf |
| TG4 (2009). The more you watch, the more you see (YouTube). | https://www.youtube.com/watch?v=x9EdIbxZAyE&t=2s |
| HFES (2024). What is Human Factors and Ergonomics. | https://www.hfes.org/About/What-Is-Human-Factors-and-Ergonomics |
| Human Factors and Ergonomics Society (2021). Human factors and ergonomics society policy statement on reducing the use of deadly force by law enforcement. | HFES policy law enforcement - FINAL_1.pdf |
| Dror, I.I., (2007). Perception of risk and the decision to use force. *Policing.* doi:10.1093/police/pam041 | Dror_Perception_UOF.pdf |
| Schmidt, R. A., & Lee, T. D. (2014). *Motor learning and performance: From principles to application.* Human Kinetics. | |
| Goldstein, E. B. (2011). *Cognitive psychology connecting mind, research, and everyday experience.* Third Edition. Wadsworth. | |
| American Psychological Association Dictionary of Psychology | |
| Campell, A., Roelofs, A., Davey, P., & Straker, L. (2013). Response time, pistol fire position variability, and pistol draw success rates for hip and thigh holsters. Human Factors. 55(2). DOI: 10.1177/0018720812453466 | Campbell_2013.pdf |
| DeCicco, K. (2024, April 15). The 3 shooting stances: Which one's right for you? PoliceOne | Shooting stances_ Which one is right for you.pdf |
| Kahneman, D., & Klein, G. (2009). *Conditions for intuitive expertise: A failure to disagree. American Psychologist, 64(6), 515–526.* doi:10.1037/a0016755 | Intuition20Kahneman2009.pdf |
| Blair, J.P., Pollock, J., Montague, D., Nichols, T., Curnutt, J., & Burns, D. (2011). Reasonableness and reaction time. *Police Quarterly.* 14(4) | BLAIR2011_SCENARIOBASED.pdf |
| Taylor, P.L. (2019). Beyond false positives, A typology of shooting errors. Criminology and Public Policy. DOI: 10.1111/1745-9133.12460 | |

EXPERT REPORT
Author: David M. Blake, PhD.

| | |
|---|---|
| Taylor, P. L. (2020). Dispatch Priming and the Police Decision to Use Deadly Force. Police Quarterly, 23(3), 311-332. https://doi.org/10.1177/1098611119896653 | TAYLOR_DISPATCH.pdf |
| Taylor, P. L. (2021). "Engineering Resilience" Into Split-Second Shoot/No Shoot Decisions: The Effect of Muzzle-Position. *Police Quarterly*, *24*(2), 185-204. https://doi.org/10.1177/1098611120960688 | Taylor_Engineering Resilience.pdf |
| Vickers, J. N., & Lewinski, W. (2012). Performing under pressure: Gaze control, decision making and shooting performance of elite and rookie police officers. Human Movement Science, 31(1), 101–117. https://doi.org/10.1016/j.humov.2011.04.004 | vickers2012.pdf |
| Shane, J., & Swenson, Z. (2018). Unarmed and Dangerous: Patterns of Threats by Citizens During Deadly Force Encounters with Police (1st ed.). Routledge. https://doi.org/10.4324/9780429443749 | |
| Moore, M. (2023). Los Angeles Police Department use of force year-end review 2022. | 2022-Year-End-Review.pdf |
| Police Executive Research Forum. (2012). An integrated approach to de-escalation and minimizing use of force. ISBN: 978-1-934485-20-0 | an integrated approach to de-escalation and minimizing use of force 2012.pdf |
| Abuka v. City of El Cajon et al, No. 3:2017cv00089 - Document 64 (S.D. Cal. 2019) | Abuka v El Cajon.pdf |
| Estate of Gabriel Strickland, et al., v. Nevada County et al., No. 22-15761 (9th Cir. 2023) | |
| *Torres v. City of Madera*, 648 F.3d 1119, 11 Cal. Daily Op. Serv. 10744, 2011 Daily Journal D.A.R. 12758 (9th Cir. 2011) | |

# Exhibits Supporting Opinions

1. TG4 "The more you watch, the more you see" downloaded from YouTube (https://www.youtube.com/watch?v=x9EdIbxZAyE&t=2s)
2. Charts or Tables found in this report.
3. Charts or Tables found in references.

# Statement of Compensation

**Fee Schedule:**

*Consulting, Research, Report Preparation, and Expert Services*..... $350 per hour
*Court Appearances, Depositions, Site Visit*... ... .........................$500 per hour (4 hour minimum)
*Travel (Air) & Accommodations*.........................................Full Cost (business class)
*Travel Time*.................................................................. $250 per hour

EXPERT REPORT
Author: David M. Blake, PhD.

# Foundational Information

*Foundational Information Relevant for Opinions*

## Method

My method for developing reliable opinions is like a qualitative case study.[1] The case study is a well-established and widely accepted research design that is used extensively in a wide variety of disciplines, particularly in the social sciences. A case study can be defined in a variety of ways, the central tenet being the need to explore an event or phenomenon in depth and in its natural context. Research questions for a case study can be both quantitative and qualitative but frequently focus on concepts such as explain, explore, describe, and understand.

Answers to research questions are presented in the form of thematically developed opinions. Themes are developed based upon a process of immersion in the data including but not limited to documents, archival records, interviews, observations, research, and physical artifacts. Themes are analyzed through the lens of my own scientific, technical, and other specialized knowledge to form opinions intended to assist the trier-of-fact to understand the evidence or to determine a fact in issue. According to qualitative research methods, triangulation (evaluating multiple sources of data enhances the validity) enhances the validity of qualitative research results. The resulting opinions are intended to assist the trier of fact to understand the evidence or to determine a fact in issue.

---

[1] Yin, R. K. (2014). *Case study research: Design and methods*. Sage.

EXPERT REPORT
Author: David M. Blake, PhD.

1  # Scene
2
3  **Figure 1**
4  *Overview of Location of the Officer Involved Shooting[2]*



5
6  **Figure 2**
7  *Multidisciplinary Accident Investigation Team Diagram[3]*



8
9

---

[2] STATEOFCA000123
[3] STATEOFCA000362/000366

EXPERT REPORT
Author: David M. Blake, PhD.

1   # Incident Summary & Timeline[4]
2
3   **Table 1.**
4   *Incident Summary & Timeline*

| Time | Description |
|---|---|
| 1119 | California Highway Patrol (CHP) Los Angeles Regional Transportation Management Center (LARTMC) received a 9-1-1 cellular phone call from an unidentified caller, who advised a big rig collided with a pedestrian on the roadway of interstate 105 (1-105/Glenn Anderson Freeway) westbound at Garfield Avenue. Public Safety Dispatcher (PSD) Olga Palacios, ID A12300, who had received the initial 9-1-1 call created an incident log documenting the details of the phone call to be broadcast to the CHP East Los Angeles Area units (Log# 220504LA01407). |
| | |
| 1121 | PSD Palacios, broadcast the information about the big rig versus the pedestrian, with the pedestrian being a possible suicidal party. PSD Palacios provided further information that the suicidal party was purposely jumping in front of additional vehicles and running in traffic lanes ofl-105 westbound at Garfield Avenue. |
| | |
| 1122 | East Los Angeles Area Unit, Officer R Silva, ID 19056, acknowledged the radio call, requested an airship, and responded from Interstate 710 (1-710/Long Beach Freeway) southbound at Cesar Chavez A venue. |
| | |
| 1123 | East Los Angeles Area Units, Officer E. Ramos, ID 18633, and, Officer N. Gonzalez, ID 22120, acknowledged the radio call and began responding. |
| | |
| 1127 | LARTMC received additional calls from independent witnesses reporting the pedestrian was covered in blood on the roadway, was unstable, and wanted to kill himself. Witnesses also reported people trying to stop the pedestrian from running in lanes. |
| | Los Angeles Sheriff Department Helicopter 8 (LA-Air 8), Deput Abbott, ID 511821 (Pilot), and Deputy J. Guerrero, ID 520679 (Observer), arrived on scene overhead and advised the pedestrian was walking on the right shoulder area ofl-105 westbound approaching Garfield A venue. |
| | |
| 1129 | Santa Fe Springs Area Unit - Officer J. Van Dragt, ID 18412, acknowledged the call and started a traffic break I-105 westbound, from Paramount Boulevard. |
| | |
| 1131 | Officer Silva arrived on scene, 1-105 westbound west of Garfield Avenue on the 1-710 transition road, and observed the pedestrian on the right shoulder area standing with his hands in his pockets. Officer Silva began walking eastbound on the shoulder area to contact the pedestrian. |
| | Officer Van Dragt arrived on scene and stopped his patrol vehicle facing a northwesterly direction, partially on the shoulder area and # 2 lane of the 1-105 westbound b I-710 transition road between the pedestrian and Officer Silva. Officer Van Dragt exited his patrol vehicle and positioned himself to the rear of his patrol vehicle with a clear line of sight of the pedestrian standing on the right shoulder area with his hands in his pockets. Officer Van Dragt gave the pedestrian repeated commands to take his hands out of his pockets. The pedestrian refused to obey Officer Van Dragt's commands. The pedestrian suddenly took both hands out ofhis pockets, pulling an object out of his right-side pocket with his right hand, and positioned himself in a shooting stance, with both hands holding an unknown object, and both |

---

[4] STATEOFCA000003-000005 Description of Critical Incident_Redacted - Copy.pdf / STATEOFCA000468 COR 05 048 22R.wav

EXPERT REPORT
Author: David M. Blake, PhD.

| | |
|---|---|
| | arms locked out straight. The pedestrian ran towards Officer Van Dragt while maintaining a shooting stance. Officer Van Dragt retreated to the front of his patrol vehicle. The pedestrian ran around the back of the patrol vehicle and continued to advance in a shooting stance with the unknown object in his hands. |
| | |
| 1132 | Officer Silva utilized lethal force to stop the threat of the pedestrian advancing in a shooting stance. Officer Van Dragt simultaneously fired l cartridge from his electronic control device (ECD). Officer Van Dragt advised LARTMC, "Shots fired." After the exchange of gunfire, personnel on scene, including East Los Angeles Area Unit -, Officer E Ramos, ID 18633, who arrived on scene at approximately 1134 hours, approached the pedestrian and placed him in handcuffs without further incident. Personnel then provided medical care to the pedestrian, which consisted of the application of a tourniquet to the pedestrian's right leg. |
| | |
| 1135 | Patient care was transferred to Los Angeles County Fire Department personnel. The pedestrian was transported from the scene to St Francis Medical Center for treatment of the injuries he sustained. |
| | |
| 1208 | The pedestrian succumbed to his injuries at the hospital and was pronounced deceased by attending physician, Doctor Strumwasser). |

1

# Weapons

2
3
4    **Table 2**
5    *Officer Silva*

| | |
|---|---|
| Handgun: Smith & Wesson Model M&P .40 caliber<br>Holster: Safariland Level II SLS<br>TASER: X-2 with (2) 25-foot cartridges<br>Impact Weapon: Peacekeeper RCB | STATEOFCA000008-000009 |
| Weapon's inspection found one live round in the chamber and 10 rounds in the magazine (in weapon). | STATEOFCA000023-000026 |
| 5 shell casings were identified at the scene. | STATEOFCA000363 |
| A complete internal / external inspection of the firearm was conducted. There were no defects noted. All safety mechanisms were intact and functioning properly. There were no non-factory modifications or alterations found.  Trigger pull was approximately 6.25 pounds. | STATEOFCA000219-000226<br>STATEOFCA004921-004922  Addendum No. 11 RI-22-001100-0002  Redacted.pdf |

6

7    **Table 3**
8    *Officer Van Dragt*

| | |
|---|---|
| Handgun: Smith & Wesson Model M&P .40 caliber<br>Holster: Safariland Level II SLS<br>Taser: X-2 with (2) 25-foot cartridges<br>Impact Weapon: Peacekeeper RCB | STATEOFCA000010-000012 |
| | |
| Taser inspection: X-2 was activated (armed) on 4 May 2022 @ 11:34:04 hours.<br>X-2 Trigger Press occurred on 4 May 2022 @ 11:34:05 hours. | STATEOFCA000225 |

9

EXPERT REPORT
Author: David M. Blake, PhD.

# ANALYSIS & OPINIONS

## Opinion 1:

**Care must be taken in interpreting video evidence. Human factors such as vision, perception, attention, and memory will likely ensure differences between the officer's experience and some part of the impression provided by the video. A passive observer must be aware of the biasing effects of watching a video and assuming their experience is the same as those operating in the actual environment.**

1. Although it is not my intent to cite case law or inform the trier-of-fact of any legal precedence, it is important to understand that California Peace Officers are generally taught that the reasonableness of an officer's use of force must be judged from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight.[5] The use of video recordings (full speed, single frame, slow-motion, frame advance, multi-view, various angles, and multiple viewings) has the potential to provide the trier-of-fact a perception unlike that of the human officer operating in the moment.

   1.1. It is not my intent to give the impression that a detailed analysis and interpretation of video evidence is unnecessary for a reasonably well-formed opinion. However, the trier-of-fact should be provided with some tools which will allow them to view the video evidence with a critical eye while being reminded their experience is unlike that of the involved person(s).

2. There are several potential differences between a human viewing a scene in real time and the recorded images provided by a body worn camera. For example, the body worn camera is affixed to a location on the officer's body that provides a field of view from a static position on the officer's torso. The static view is generally 12 – 18 inches below the officers' eyes and does not account for head and eye movements.[6] Objects may obscure the camera's field of view but not the wearer's and vice versa. The camera's entire field of view is recorded with a consistent level of high definition while human vision degrades toward the periphery and may selectively focus on specific aspects of the visible environment in lieu of others. In summary, the camera may capture information not perceived by the wearer or the wearer may perceive information not captured by the camera.

---

[5] Graham v. Connor, 490 U.S. 386 (1989) / Koussaya v. City of Stockton, 54 Cal.App.5th 909 (2020)
[6] Officer Silva's BWC was affixed to his center chest at about shoulder height (See STATEOFCA009231 IMG_9218.JPG).

EXPERT REPORT
Author: David M. Blake, PhD.

3.  According to Granot et al., (2017), human factors can influence a trier-of-fact's perception of video evidence. In some cases, people may overestimate the accuracy of their interpretations of video without realizing their assessment is flawed. Little research exists that might be relied upon to assist in providing stakeholders with guidelines for presenting video evidence in a manner intended to reduce bias. However, Granot et al., (2017) provides insight and concludes their research on this issue by stating, "*In the courtroom, judges and juries are asked to examine evidence, evaluate its credibility, weight its importance, and use it to inform fair, evenhanded decisions. When it comes to video evidence, decision-makers confront what is often highly probative evidence, often unaware of the blinders they wear. What one person sees or "chooses" not to see may differ from what another does. For legal decision-makers to be optimal fact finders, researchers and legal policymakers must collaborate to encourage people to view video with a more critical eye.*"[7]

4.  The processing of any environmental information is based upon the capabilities and limitations of human attention. Attentional resources are limited, and people tend to focus on what is important to them in the moment. Several well-known and widely accepted psychological concepts influence the human ability to perceive information to include:

4.1. Change Blindness is defined as "*a failure to notice changes in the visual array appearing in two successive scenes. This is surprisingly common whenever the brief movement (the transient) that usually accompanies a change is somehow masked or interrupted.*"[8] An example often found in scientific and lay experiments in which a participant approaches a subject and asks for directions. During the conversation, the subject's view is briefly obscured, and a new participant replaces the first. Often the subject does not notice the change.

4.2. Inattention Blindness is defined as "*a failure to notice unexpected but perceptible stimuli in a visual scene while one's attention is focused on something else in the scene. This phenomenon occurs even when items are visible for several seconds.*"[9] An example from a scientific experiment demonstrated that participants focused on one team passing a ball in a circle, about 50% fail to see a "gorilla" walk through the middle of the scene.

4.3. Selective Attention is defined as "*concentration on certain stimuli in the environment and not on others, enabling important stimuli to be distinguished from peripheral or incidental ones.*"[10] An example can be found in driving an automobile, where attention is generally

---

[7] Granot, Y., Balcetis, E., Feigenson, N., & Tyler, T. (2017). In the eyes of the law: perception versus reality in appraisals of video evidence. *Psychology, Public Policy, and Law.* 24(1).
[8] American Psychological Association
[9] American Psychological Association
[10] American Psychological Association

EXPERT REPORT
Author: David M. Blake, PhD.

focused on the vehicles in front of the driver. The driver is unaware of the details about cars in other lanes or of people in the nearby park.

4.4. Divided Attention is defined as *"attention to two or more channels of information at the same time, so that two or more tasks may be performed concurrently."*[11] An example can be found in operating a vehicle when attention is divided between switching ones focus between the driving task and operating a cellular phone. While it is possible to rapidly shift attention, task #1 is briefly unintended to while the focus is on task #2. In the driving environment, this can result in catastrophic outcomes.

5. It is well known and widely accepted that filmmakers manipulate viewers' focus of attention.[12] Filmmakers know they can manipulate perception using angles, blurred backgrounds, and camera movement. For example, "Stacking" is a film making method of creating a perception that an actor was struck by a punch when the punch missed by inches or feet.[13]

6. An understanding of frame rates and some well-known and widely accepted human limitations affecting visual perception (real world and video based) will assist the trier of fact in analyzing and interpreting video evidence. For example, a single frame from a video may be presented at trial as an example of what visual information was available to an involved party during the recorded incident. The trier of fact must be informed that a single frame of a video presenting at 30 frames per second represents about 33/1000ths of a second. Therefore, the extended presentation of a single frame for seconds / minutes does not accurately represent the extremely short amount of time the information was available to the involved parties, nor does it account for the difference between a jurors focus of attention being directed to the visual information when the involved party may have focused their attention on other visual stimuli or been scanning the scene.

Additionally, human beings may blink their eyes 10 – 30 times in a minute with eye closures creating a loss of vision for about 200ms.[14] A hypothetical correlation between a 200ms loss of vision with viewing a video recording at 30 frames per second demonstrates that a person who blinks during those 30 frames could miss up to 6 individual frames of visual information. Therefore, a single frame presented for several seconds or minutes may provide

[11] American Psychological Association
[12] Faden, E. (2019). Visual Disturbances. *Journal of Videographic Film & Moving Image Studies.* https://mediacommons.org/intransition/visual-disturbances
[13] Aldredge, J. (2017). 6 Tutorials for Filming Realistic Fight Scenes. *The Beat.* https://www.premiumbeat.com/blog/6-realistic-fight-scene-tutorials/
[14] Nishizono, R., Saijo, N., & Kashino, M. (2023). Highly reproducible eyeblink timing during Formula Car Driving. *iScience*, *26*(6), 106803. https://doi.org/10.1016/j.isci.2023.106803

the observer with visual information that could have reasonably gone unrealized by the involved party. Similarly, an observer viewing a series of frames at full speed may not see information that was available to the individual experiencing the live event.

7. In this case I was provided with Ofc. Silva's body worn camera recording as well as Ofc. Van Dragt's in-car camera video.

7.1. Ofc. Silva's BWC video file was uploaded to Amped-Five forensic video software (Revision 34212). The meta-data showed the file presented at 29.97 frames per second which matched the embedded timer (1 second = 30 frames).
The SHA256 HASH is:
72532ceb9dfbc74e945447e0073c1c0d01c88232fe9af267a6b95c7da0344d20.

7.2. Ofc. Van Dragt's in-car camera video file was uploaded to Amped-Five forensic video software (Revision 34212). The meta-data showed the file presented at 59.94 frames per second.
The SHA256 HASH is:
3EC96E5ECD60171D419E1C3CCEE026AE9539FB52338525F27B3961EAF5B27541

8. The following steps were taken to encode new video work products that were used to analyze and interpret the incident and are intended as exhibits:

8.1. Using the original files (BWC and In-Car Video), I created a synchronized side by side video with an overlay representing the time (hours:minutes:seconds:milliseconds) and frame number (File: STATEOFCA007879  Axon Body 2 Video X81626525 2022-05-04 112520-241118141634.mp4).

8.2. Using the original file (Silva BWC), I created a new video with an overlay representing the time (hours:minutes:seconds:milliseconds) and frame number (File: SILVA BWC_FULL VERSION w ANNOTATION.mp4).

8.3. I created a shortened video sequence from the original file (Silva BWC) focused on the time proximal to the shooting. The sequence was encoded with an overlay representing both the original time/frame number as well as the current video time/frame number (File: SILVA BWC_SEQUENCE w ANNOTATION.mp4)

8.3.1. Cropped, zoomed and stabilized the BWC video to render a sequence of 24 frames capturing visual information intended to focus on Alaniz's hand/arm movement on the side of the roadway. The 24 frames were placed in the folder as individual images and

compiled within a pdf file (Folder: SILVA BWC_SEQUENCE_STABILIZED w ZOOM / PDF File: SILVA BWC_SEQUENCE_STABILIZED w ZOOM.pdf).

8.3.2. Cropped, zoomed and stabilized the BWC video to render a "picture in picture" sequence of 12 frames capturing visual information intended to focus on Alaniz's hand/arm movement on the side of the roadway. The 12 frames were placed in the folder as individual images and compiled within a pdf file (Folder: SILVA BWC_R HAND MOVEMENT / PDF File: ALANIZ_SIDE OF ROAD_ZOOM.pdf).

8.3.3. Cropped and zoomed the BWC video to render a sequence of 16 frames capturing visual information intended to focus on Alaniz hand/arm movement (perceived as a shooting stance) just prior to and at the time of the first shot. The 16 frames were placed in a folder as individual images and compiled within a pdf file (Folder: SILVA BWC_SEQUENCE w ZOOM_SHOOTING STANCE / PDF File: SHOOTING STANCE.pdf).

8.3.4. Adjusted the brightness/contrast of the above (16) frames. The 16 frames were placed in a folder as individualized images and complied within a pdf file (Folder: SILVA BWC_SEQUENCE w ZOOM_SHOOTING STANCE_CONTRAST ADJ / PDF File: SHOOTING STANCE_CONTRAST ADJ.pdf).

8.4. See Table 3 for the video analysis and interpretation.

**Table 3**

*Video Analysis & Interpretation*

| FN | OBSERVATIONS |
|---|---|
|  |  |
| 12148 - 12287 | Officer Silva has stopped and is getting off his motorcycle. A subject in an orange shirt and yellow vest is running toward Ofc. Silva as Silva motions this person toward him. A second subject (Alaniz) can be seen in the distance standing on the side of the road. The subject in the orange shirt/yellow vest ultimately moves past Ofc. Silva. |
|  |  |
| 12316 - 12375 | Ofc. Van Dragt's police vehicle (overhead emergency lights on) drives past Alaniz and pulls to the side of the roadway and ultimately stops at an angle between Alaniz and Ofc. Silva. |
|  |  |
| 12375 – 12464 | Ofc. Van Dragt exits his police vehicle as Ofc. Silva moves forward. Alaniz remains static on the side of the roadway. |
|  |  |
| 12464 – 12519 | Ofc. Van Dragt moves toward the rear driver's side of his vehicle as Ofc. Silva continues to move forward. During this time, Alaniz appears to turn toward the officers. |
|  |  |
| 12559 – 12582 | Alaniz moves his left arm from his waistband area to a position up and in front of his chest. After this movement, Ofc. Silva raises and points his firearm in the direction of Silva. |
|  |  |

EXPERT REPORT
Author: David M. Blake, PhD.

| 12598 – 12647 | Ofc. Silva lowers firearm. Alaniz begins running toward Ofc. Van Dragt. Ofc. Van Dragt draws TASER and moves backward. |
|---|---|
| | |
| 12647 – 12708 | Alaniz moves out of view of the camera and behind Ofc. Van Dragt's patrol vehicle. Ofc. Van Dragt continues to retreat backwards as Ofc. Silva's camera field of view turns toward the roadway. |
| | |
| 12710 – 12724 | Ofc. Silva's camera field of view turns back toward Ofc. Van Dragt. Alaniz is visible moving around the side of Ofc. Van Dragt's vehicle. Alaniz is running forward with his arms outstretched and both hands joined at about chest level. Ofc. Van Dragt fires his TASER and Ofc. Silva fires his handgun within ½ second of Alaniz appearance. |
| | |
| 12724 | Shot #1 / Split Time: 0 (06.840) |
| | |
| 12734 | Shot #2 / Split Time: 0.33s (07.173) |
| | |
| 12742 | Shot #3 / Split Time: 0.28s (07.440) |
| | |
| 12749 | Shot #4 / Split Time: 0.23s (07.674) |
| | |
| 12757 | Shot #5 / Split Time: 0.27s (07.941). Total: 5 shots in 1.1s |

1 \*Time from Alaniz movement toward officers till first shot: ~4 seconds

2 **Opinion 2:**

3

4 **Officer Silva reportedly perceived Mr. Alaniz as a deadly threat based upon the incident**
5 **context and specific behaviors of the decedent. A comprehensive analysis of the available**
6 **video evidence provides objective support for Officer Silva's perception.**

7

8 9. Ofc. Silva and Ofc. Van Dragt individually described the scene as confusing or chaotic. Both
9 officers expressed concern about Alaniz hands being in his pockets. Both officers
10 objectively demonstrated their concern by having their handguns unholstered. Ofc. Silva and
11 Ofc. Van Dragt both described Alaniz as removing his hands from his pockets and presenting
12 what they both believed to be a handgun. However, Ofc. Van Dragt stated that due to his
13 proximity to the decedent, he then perceived the object as not being a handgun. Ofc. Van
14 Dragt continued to express uncertainty about the object in Alaniz hand and indicated he was
15 fearful of being injured by the object. Officer Silva, at a farther distance and having less time
16 to view the moving object, continued to believe in his initial perception (See Annex: Table 4
17 *Silva Statement May 9, 2022 @ 1232 & 1359 hours*, Table 5 *Ofc. Silva Deposition March 6,*
18 *2024*, Table 6. *Ofc. Van Dragt Statement May 10, 2022 @ 1007 & 1135 hours*, and Table 7
19 *Van Dragt Deposition April 9, 2024*).

20

21 10. Ofc. Silva's body worn camera presents visual information showing Alaniz facing the
22 roadway before turning and facing in the direction of the officers. Alaniz then moves his left
23 arm from near his waistband area to a position up near his chest. In apparent response, Ofc.

EXPERT REPORT
Author: David M. Blake, PhD.

1    Silva raised and pointed his weapon at the decedent. A split second after, Alaniz runs toward
2    the rear of Ofc. Van Dragt's police vehicle. The video is not of sufficient quality to identify
3    an object in Alaniz's hands (See Figure 3 *Alaniz Left Arm Movement*).

4
5
6                                    *Intentionally Left Blank*
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35

                                                                                        24

EXPERT REPORT
Author: David M. Blake, PhD.

1 **Figure 3**

2 *Alaniz Left Arm Movement*



5

EXPERT REPORT
Author: David M. Blake, PhD.



1

2

3

EXPERT REPORT
Author: David M. Blake, PhD.



EXPERT REPORT
Author: David M. Blake, PhD.



11. Ofc. Van Dragt stated he was in fear of being attacked as Alaniz ran toward his position. Ofc. Van Dragt further described Alaniz as presenting himself in a shooting stance. Ofc. Silva stated he feared for Ofc. Van Dragt as Alaniz ran toward him (Van Dragt). Ofc. Silva stated that he lost sight of Alaniz for a time as Alaniz moved toward Ofc. Van Dragt. Ofc. Silva stated he then saw Alaniz reappear while presenting himself in a shooting stance. Ofc. Silva said he heard a popping noise and saw Ofc. Van Dragt make a "weird" sidestepping movement that made Ofc. Silva believe Ofc. Van Dragt could have been shot. Ofc. Silva said he had little time to decide what to do and reacted consistently with his training (See Annex: Table 4 *Silva Statement May 9, 2022 @ 1232 & 1359 hours*, Table 5 *Ofc. Silva Deposition March 6, 2024*, Table 6. *Ofc. Van Dragt Statement May 10, 2022 @ 1007 & 1135 hours*, and Table 7 *Van Dragt Deposition April 9, 2024*).

12. Ofc. Silva's body worn camera presents visual information showing Alaniz quickly running toward Ofc. Van Dragt's patrol vehicle. Alaniz is then obscured from the camera's field of view while behind Ofc. Van Dragt's vehicle and while Ofc. Van Dragt retreats backward. Once Ofc. Van Dragt moved to the front of his vehicle, and then began sidestepping to the left. Proximate in time, Alaniz reappears in view of the camera (from behind the patrol

28

EXPERT REPORT
Author: David M. Blake, PhD.

vehicle) while quickly moving forward. At this time, Alaniz is presenting with both his arms raised in front of him with his hands together – consistent with a two-handed shooting stance. Ofc. Van Dragt deploys his TASER in the direction of Alaniz and Ofc. Silva raises his weapon to utilize deadly force. A popping noise is heard proximal to the TASER deployment. Ofc. Silva's first shot fired approximately 4 seconds after Alaniz begins moving in the officer's direction and about 0.50s after Alaniz is visible on the body worn camera emerging from around the back of Ofc. Van Dragt's police vehicle (See Figure 4 *Alaniz Two-Handed Shooting Stance*).

*Intentionally Left Blank*

EXPERT REPORT
Author: David M. Blake, PhD.

1    **Figure 4**

2    *Alaniz Two-Handed Shooting Stance*



3

4

5

EXPERT REPORT
Author: David M. Blake, PhD.





1





2



3

4

5

EXPERT REPORT
Author: David M. Blake, PhD.

13. The object presented by Alaniz was later determined to be an eyeglass case containing a pipe. The evidence photographs from the scene show only the eyeglass case with zipper end open. It is unknown to me whether the pipe, when held by Alaniz, may have extended from the case or been visible to Officer Silva. Due to the quality of the available video, the object is not seen and it cannot be determined if the pipe was visible to Officers at the time (See Figure 5. Eyeglass case & pipe).

**Figure 5**

*Eyeglass Case & Pipe[15]*

 

*Intentionally Left Blank*

---

[15] STATEOFCA008181  IMG_0007.JPG / STATEOFCA008182  IMG_0008.JPG

32

EXPERT REPORT
Author: David M. Blake, PhD.

**Opinion 3:**

**Academic (peer-reviewed/published[16]) research as well as grey literature[17] on the topic of officer involved shootings present a generally consistent pattern of factors associated with the use of deadly force on unarmed subjects. A portion of these incidents are associated with titles/descriptions such as "false-positive errors", "threat-perception errors", "cell-phone shootings", and "mistake-of-fact shootings". The trier-of-fact may benefit from an understanding of factors that have been found to be associated with these types of shootings.**

13. A holistic view of the both the gray area and peer-reviewed research literature on police shootings has long identified suspect behavior (i.e., armed, fleeing, fighting) as the most prominent variable associated with police shootings.[18]

14. While police shootings resulting in the death of an unarmed individual is statistically rare[19], the research data suggests common patterns of suspect behavior preceding the shooting. The pattern(s) of behavior, discussed in more detail below, include non-compliance, attacking officers, reaching toward areas where weapons are commonly kept, and pointing an object at police in what is often described as a shooting stance.

15. The academic literature identifies mistake-of-fact shootings as occurring when an officer misperceives behaviors/movements/objects as a deadly threat. The literature has induced these errors in experimental research (See Annex Table 8 *A Sample of Peer Reviewed and Published Literature on Police Shooting Errors).*

16. The grey literature also acknowledges mistake-of-fact shootings occur when an officer misperceives behaviors/movements/objects (under the totality of the circumstances) as a deadly threat (See Annex Table 9 *A Sample of Law Enforcement Publications on Police Shooting Errors*).

---

[16] Research publications written by experts in the field, based on research, follow a scientific protocol, are subjected to peer review, published in academic journals and are considered reliable sources of information.

[17] Describes a wide range of information produced outside traditional academic peer-reviewed publications (i.e., government or industry reports).

[18] Oramas Mora, D., Terrill, W., & Foster, J. (2023). A Decade of Police Use of Deadly Force Research (2011–2020). *Homicide Studies*, *27*(1), 6-33. https://doi.org/10.1177/10887679221123591

[19] The Washington POST Fata Force Database identifies 102 fatal shootings of unarmed subjects in California over a span of 9 years (2015-2024). According to the CA DOJ, there were over 3 million arrests in California over a span of 9 years (2014-2023). (0.0034% of arrests).

EXPERT REPORT
Author: David M. Blake, PhD.

**Opinion 4:**

**Previous incidents like the one under review are demonstrative of how police officers, regardless of jurisdiction, may perceive and subsequently fear subjects who draw hidden objects/point objects at officers as a deadly threat. The pattern of subject behavior (i.e., pointing objects at police) linked with the deadly outcome is evidence of a similarly trained response of police across the nation**.

17. There have been several officer involved shootings of unarmed subjects across the country that are associated with subjects presenting an object in a simulated a shooting stance. The consistent theme is that officers across the nation recognize a similar set of behaviors as a deadly threat (See Annex Table 10 *A Sample of Mistake of Fact Shooting Incidents*).

**Opinion 5:**

**Police officers' standards and training is informed by federal case law. Peace officers are taught they do not need to wait to fully experience the outcome of an assault before taking protective action based on their perception of unfolding circumstances. There is an allowance for reasonable mistakes-of-fact based upon the totality of the circumstances.**

18. While I do not intend to discuss case law, dicta from the courts appear to provide an allowance for reasonable mistakes of fact associated with a law enforcement officers use of deadly force (See Annex Table 11 *Summary Federal Court Statements Associated with Police Shooting Errors*).

19. As a former police officer and police trainer, I have taken part or facilitated in 1000's of live action and simulated police shooting scenarios. I have been trained and have trained others that their "reasonable" perception of a deadly threat must be based on objective factors that other officers would also perceive in a similar way. I have been trained and trained other officers that police officers are generally reactive to a threatening action and therefore at a reactionary disadvantage. Therefore, Officers are taught pre-assaultive indicators and learn to recognize behaviors that are consistent with a threat. For example, Officers are consistently taught to react to the threat of individuals reaching for and presenting weapons. Patterns of threatening behavior can become ingrained, recognized, and quickly responded to.

EXPERT REPORT
Author: David M. Blake, PhD.

**Opinion 6:**

**Human performance capabilities are limited, especially when operating in complex environments where rapidly unfolding circumstances present a potential threat to life. The trier-of-fact may benefit from understanding some aspects of human capabilities and limitations under circumstances such as the case under review.**

20. Human factors and ergonomics is concerned with the application of what we know about people—their abilities, characteristics and limitations—to the design of products they use, environments in which they live and work and jobs they perform. The primary goals of the field of HF/E are to reduce human error, increase productivity and enhance safety, comfort and enjoyment for all people. The field is a combination of numerous disciplines, such as psychology, sociology, engineering, biomechanics, industrial design, physiology, anthropometry, interaction design, visual design, user experience and user interface design.[20]

21. According to the Human Factors and Ergonomics Society Policy Statement on Reducing the Use of Deadly Force by Law Enforcement: *"It is well known from research on law enforcement activities, as well as human performance in many other domains, that decision making and behavior is the outcome of many factors, including: Organizational policies, procedures, management, and culture, Contextual factors associated with the work, including stress and time of day, Training and Experience, and Technology, including the design of information displays and tools. Research has shown that a number of factors can influence the outcome of a police-citizen encounter, including organizational, supervisory, environmental, and situational factors, as well as citizen and officer behaviors. For example, human factors research has shown that police shooting decisions can be affected by stress, fatigue, anticipation and priming of threats, external factors such as street noise, and citizen behaviors. Any attempt to reduce unwanted and avoidable negative outcomes must consider the effects of these factors on human behavior and systematically address them through countermeasures such as improved training, procedures and tools.*[21]

22. According to the International Association of Chiefs of Police Psychological Services Division*: "Officers and agencies, and all those involved in investigating and making official determinations about officer-involved shootings, should become informed about the science*

---

[20] HFES (2024). What is Human Factors and Ergonomics. Retrieved from https://www.hfes.org/About/What-Is-Human-Factors-and-Ergonomics
[21] Human Factors and Ergonomics Society (2021). Human factors and ergonomics society policy statement on reducing the use of deadly force by law enforcement.

1    *of human performance factors that influence behavior during high stress, time pressured,*
2    *deadly force confrontations."*

3

4    23. Harvard trained Psychologist Dr. Itiel Dror, who has an extensive academic research
5    background in areas of cognition and human performance, authored a peer-reviewed paper
6    on police use of force decision-making and stated [22],

7

8    *Many police procedures and guidelines determine if and how officers need to respond to a*
9    *given situation. However, the crucial element in determining an action is not regulation, but*
10   *how one perceives, interprets, and evaluates a situation. It is relatively easy to ascertain and*
11   *instruct that under situation X, action Y should be taken. This, however, hinges on properly*
12   *assessing the situation and considering the choice of alternatives, which involves complex*
13   *cognitive processes that depend on a whole range of factors. Thus, it is important to*
14   *understand how perception and decision-making play key roles in human performance and*
15   *policing...The overall decision to use force is dependent on decision factors (such as*
16   *decision complexity and choice of alternatives), internal factors (such as emotions and state*
17   *of mind of the decision maker), and external factors (such as time pressure and context).*

18

19   24. From a human factors perspective, the reasonableness framework taught to peace officers
20   (objective reasonableness) can be linked to evaluating human performance within a system.
21   The reasonableness standard describes performance in tense, uncertain, and rapidly evolving
22   circumstances where split second decision-making is required. From a Human Factors
23   perspective, (a) tense circumstances represent stress and its influence on performance (b)
24   uncertain circumstances represent complex situations and sense-making, (e) rapidly evolving
25   circumstances represent time compression and response time, and (f) split-second decisions
26   represent heuristic-based decision making.

27

28   The aforementioned factors are well known and widely accepted both in academia and law
29   enforcement as associated with imperfect processing of environmental/situational
30   information that can lead to mistakes or errors of judgment. The reasonableness framework
31   taught to officers is similar in practical application to a human factors assessment in that
32   every mistake or error in judgment is not de facto cause to place blame upon the individual.
33   Rather, human capabilities and limitations should be evaluated to determine the influence of
34   the system on individual and team performance. The below information reviews the
35   contextually relevant psychological concepts/literature that would likely apply to the current
36   incident.

---

[22] Dror, I.I., (2007). Perception of risk and the decision to use force. Policing. doi:10.1093/police/pam041

EXPERT REPORT
Author: David M. Blake, PhD.

## Perception/Judgment

23. This section begins with a discussion of what is well-known and widely accepted in academia on the topic of perception. The next section will describe what is well-known and widely accepted in academia on the topic of decision-making. Each section will apply the scientific constructs to the information found in the current case.

24. Perception is defined as *"the process or result of becoming aware of objects, relationships, and events by means of the senses, which includes such activities as recognizing, observing, and discriminating. These activities enable organisms to organize and interpret the stimuli received into meaningful knowledge and act in a coordinated manner."*[23]

   24.1. Ofc. Van Dragt initially perceived Alaniz as holding a handgun. Ofc. Van Dragt's perception changed, and he judged the object as not being a handgun. However, Ofc. Van Dragt remained unsure of the nature of the handheld object and still considered it a threat. Ofc. Van Dragt recognized Alaniz as presenting himself in a shooting stance.

   24.2. Ofc. Silva perceived Alaniz as holding a handgun and recognized him (Alaniz) as presenting in a shooting stance while also hearing a popping noise and seeing Ofc. Van Dragt move awkwardly to the side.

25. Visual perception can be influenced by several factors to include visibility, context, emotion, previous experience, and pattern matching.[24] [25] [26] This section discusses some of the issues of perception that are likely related to this case.

   25.1. <u>Visibility/Identification.</u> Distance, Contrast, Movement, Observation Time, Obstructions, and the Focus of Attention are critical issues linked to the ability of a human being to identify visual stimuli (i.e., handheld object). This section of the report discusses these issues in the context of this incident.

---

[23] American Psychological Association Dictionary of Psychology.
[24] Schmidt, R. A., & Lee, T. D. (2014). *Motor learning and performance: From principles to application.* Human Kinetics.
[25] Schmidt, R. A., & Lee, T. D. (2014). *Motor learning and performance: From principles to application.* Human Kinetics.
[26] Goldstein, E. B. (2011). *Cognitive psychology connecting mind, research, and everyday experience.* Third Edition. Wadsworth.

EXPERT REPORT
Author: David M. Blake, PhD.

25.1.1. <u>Distance</u>. The ability to recognize the details of an object is influenced by the viewing distance. As distance increases, the object takes up less of the field of vision and leaves a smaller image on the retina. For example, if a black handgun is placed on a table, perpendicular to the viewing point, and was viewed from a foot away – the imprinted make, model and serial number can be seen. As the viewing distance increases, this level of detail is no longer observable. However, the barrel, trigger guard, trigger, and some ridge details may still be seen from a few feet away. As distance increases, these details will become less visible. At some point, the item is no longer recognizable as a firearm and might simply be described as a black object.

25.1.1.1. Ofc. Silva perceived the decedent as about 5 to 10 feet away just prior to the shooting, but he was much further away for the initial observation. Ofc. Van Dragt described the decedent as 3-5 feet away from him when he fired his Taser and was much closer than Silva during the initial observation.

25.1.2. <u>Contrast</u>. Contrast is defined as *"a measure of spatial resolution based on an individual's ability to detect subtle differences in light and dark coloring or shading in an object of a fixed size."* For example, a dark object can be seen more readily when placed against a white background and becomes less visible when presented against a black background.

25.1.2.1. In this case, the decedent was wearing dark clothing and pointed a dark grey colored object at the officers.

25.1.3. <u>Motion</u>: Visual acuity for an object of interest is based on the image being aligned with the fovea. Rapid movement increases the difficulty of attaining or maintaining a foveal view of the object and therefore reduces visual acuity. For example, an unknown object is moved quickly in and out of view. The observer may recognize that an object is in the person's hand without being able to correctly identify the object.

25.1.3.1. In this case, the decedent was running and closing the distance with officers just prior to the shot being fired.

25.1.4. <u>Observation Time:</u> The time available to view and identify an object. An object moved into view must be attended to prior to perception. If not attended, the object will not be seen, processed or available to memory. The length of time the object is visible can impact one's ability to identify the item as humans tend to discern shape before detail. For example, a brief glance inside one's refrigerator may provide the ability to identify items generally (containers), but longer observation times are needed to identify a specific item (orange juice vs. milk container).

EXPERT REPORT
Author: David M. Blake, PhD.

25.1.4.1. Based on the body worn camera footage, the area from which the decedent emerged (behind patrol car) is out of view for about 0.5s (15 frames @ ~30FPS) before the decedent is visible. From the moment a portion the decedent becomes visible until Ofc. Silva fired his weapon is about 0.5s. Based on the body worn camera footage, Ofc. Silva likely had less than 1s to observe the item in the decedent's hands. It should be noted that Officer Silva is seen raising his weapon in preparation to fire within the last 0.5s (Divided visual attention).

25.1.5. <u>Obstructions</u>: An item or angle that obscures an object or part of an object from view. For example, one object in front of another will impact the amount of visual information available to the observer. This is as true for objects in a refrigerator as it is for objects held in the hand. While the first example is intuitive, the second may be experienced by simply extending one's thumb out at arm's length and attempting to cover much larger objects at 15 or more feet away. As discussed later, observers may rely on what can be seen to make inferences about the identity of the object.

25.1.5.1. Although the body worn camera's field of view and the officer's field of view may be different, Alaniz was likely obscured from Silva's view by the police vehicle. Silva's arms, hands, and weapon likely obscured a portion of his view as he raised and fired his weapon.

25.1.6. <u>Focus of Attention</u> is defined as *"that aspect of an internal or external event to which attention is directed."*[27] The focus of attention within a complex visual scene may vary (i.e., selective (i.e., tunnel), divided attention) with visual details that are unattended to being unavailable for perception and future decision-making. For example, driving while using a cellular telephone has been shown to be problematic. Attentional resources are limited and when dividing attention between the phone and driving one task will suffer the consequences (see also: Opinion 1).

25.1.6.1. Ofc. Silva said he saw Ofc. Van Dragt made an awkward sidestep motion when he heard a popping noise. The sidestep motion is partially visible on the body worn camera. Ofc. Silva's awareness of the sidestep proximal to the shooting is an indicator that his attention could have been divided to a certain degree. Additionally, Ofc. Silva was in the process of raising his firearm and aligning it with Alaniz which could also divide attention.

---

[27] American Psychological Association Dictionary of Psychology.

EXPERT REPORT
Author: David M. Blake, PhD.

25.1.7. <u>Context</u>: Context can be correlated with the totality of the circumstances or information known to the officer prior to the use of force. People tend to make sense of their environment by processing information in a bottom-up / top-down fashion. Meaning, sensory information (bottom-up), especially ambiguous information, is influenced by prior knowledge, experience and expectations (top-down). This process helps humans make sense of their environment. An example of bottom-up / top-down processing is seen in Figure 6 *Bottom-Up / Top-Down Information Processing Example*. The central alphanumeric may pop out as a "B" without any further information (Bottom-Up). However, the additional information (context) will cause the central alphanumeric to be processed differently depending on the context.

**Figure 6**
*Bottom-Up / Top-Down Information Processing Example.*



25.1.8. The context of this incident is representative of the totality of the circumstances. The decedent was reportedly jumping in front of moving vehicles on the freeway. Officers Silva and Van Dragt described the scene consistent with an evolving critical incident – "chaotic" and "confusing". Based on the pre-incident information he received, Ofc. Silva believed that Alaniz was a danger to the public and capable of violence based on his behavior of jumping in front of vehicles. Officer Ramos also described the information he received from dispatch as creating some confusion and concern over Alaniz intentions. Alaniz was observed concealing his hands in a location both officers recognized as an area where weapons are often located. Alaniz then produced an object both officers initially perceived as a handgun. Ofc. Van Dragt's perception changed but Ofc. Silva continued to believe the object was a handgun. The decedent charged at officers while presenting in a recognizable shooting stance.

25.2. <u>Emotion</u>: Fear is an emotion associated with threat. Fear is a stressor that influences human psychophysiology and can influence perception. The psychophysiological response is predominantly described as the fight or flight response in which stimulant hormones are

EXPERT REPORT
Author: David M. Blake, PhD.

released within the body as part of an evolutionary survival mechanism. The stress response can have both positive and negative influences on performance. Research has demonstrated that stress is associated with an increase in performance deficits in perception, cognition, motor-performance, and memory.  Stress based performance is often discussed using the Yerkes/Dodson Inverted U (See Figure 7 *Yerkes/Dodson Inverted U*). An example of emotion influencing performance may be found in sports. Too low or too high levels of emotion in sport can lead to poor performance (i.e., choking under pressure).

**Figure 7**

*Yerkes/Dodson Inverted-U*



25.2.1. Officers are taught that *"reasonable fear may result when an officer experiences an increased tension in response to a potential threat. The officer may experience reasonable fear as a result of (a) a sudden or erratic movement by the subject, (b) the sight of a weapon in a subject's possession, (c) the knowledge that a person is in danger of bodily harm, (d) a sudden sound produced outside the officer's field of vision, and (e) unresponsive, unexpected response to the officer's action."[28]*

25.2.2. Officers are taught, *"When a person experiences fear, the body reacts, often by an increase in adrenaline, heart rate, and breathing. In addition, some common body and mind responses to fear may include, (a) blood clotting enzymes flow into the system to minimize damage from wounds, (b) vision and hearing become more acute and focused (e.g., tunnel vision and auditory exclusion/auditory suppression), (c) increased muscle tension and perspiration, (d) raised pain thresholds, (e) time distortion, (f) color distortion, and (g) impaired fine motor skills."[29]*

---

[28] California Peace Officer Standards and Training Learning Domain #20.
[29] Ibid / California Peace Officer Standards and Training Learning Domain #35

41

EXPERT REPORT
Author: David M. Blake, PhD.

1  25.2.3. While it is not possible to empirically identify the level of stress and arousal experienced
2      by either officer, empirical research has demonstrated that under similar conditions, officers
3      experience a significant elevation in subjective and objective stress response measurements.
4
5  25.1.10. <u>Previous Experience and Pattern Matching</u>: Researchers have recognized that decision-
6      making is influenced by matching environmental/situational information (cues) with
7      stored memory (Schema). Schema is a pattern of knowledge stored in memory. The
8      pattern of knowledge is developed through training and life experience. For example,
9      people intuitively recognize facial expressions as having meaning. For instance, people
10     may be shown a series of faces and intuitively identify if the person is sad, happy,
11     anxious, or fearful. This is not an innate skill, but one that is learned through experience.
12
13 25.1.10.1. Police officers are taught to be aware of and concerned about the location of subject's
14     hands as well as the locations where weapons may be stored (i.e., waistband/pockets).[30]
15     Police officers receive significant amounts of training and have experiential knowledge
16     about where weapons are commonly stored on the body, pre-assaultive indicators, and
17     the pattern of movement consistent with a shooting stance (Figure 8 *Isosceles and*
18     *Weaver Shooting Positions*).[31] There is a clear similarity between these known shooting
19     stances and Alaniz's presentation (Figure 9 *Alaniz Shooting Stance*).
20
21
22
23
24
25                              *Intentionally Left Blank*
26
27
28
29
30
31

---

[30] California Peace Officer Standards and Training Learning Domain 33.
[31] California Peace Officer Standards and Training Learning Domain 35

EXPERT REPORT
Author: David M. Blake, PhD.

**Figure 8**

*Isosceles and Weaver Shooting Positions*[32]

 

**Figure 9**

*Alaniz Shooting Stance*



## Decision Making

26. The scientific community has developed well-known and widely accepted theories on decision-making. The most contextually relevant decision-making models are linked to experts making real-world decisions under time pressure. The following narrative presents these theories to assist the trier of fact in understanding how rapid-decisions in ambiguous and time-compressed situations are made.

26.1. Dual Processing Theory *is a decision-making theory stating that judgment and reasoning involve two separate processes: intuitive decision making (System 1) and rational decision making (System 2). in the dual process theory of reasoning and decision making, a mode of*

---

[32] DeCicco, K. (2024, April 15). The 3 shooting stances: Which one's right for you? PoliceOne.

EXPERT REPORT
Author: David M. Blake, PhD.

*thought comprising rapid, implicit, and automatic cognitive operations. System 1 is contrasted with the slow, explicit, and controlled processes of System 2. In other words, System 1 is intuitive and affective (i.e., what "feels right"), whereas System 2 is logically analytical and deliberate (i.e., what "makes sense"). Additionally, System 1 relies on associative memory and thus has a high capacity and entails little effort; System 2 relies on working memory and thus has a limited capacity and entails greater effort. Errors of judgment arise from concurrent failures in both systems: The automatic operations of System 1 generate a faulty intuition, which the controlled operations of System 2 fail to detect and correct. For example, when deciding whether it is more dangerous to travel by car or airplane, a person may quickly recall horrific images of airline disasters and erroneously conclude that flying is more dangerous. This might then be compounded by a failure to think analytically about the total number of automobile versus airline accidents.*[33]

26.2. Recognition Primed Decision Making describes many of the qualities that expert decision makers exhibit in high-stress environments. RPDM Variant 1 describes expert decision making when there is a simple match between a familiar event and a well-known response (i.e., If this…Then that). RPDM Variant 1 is found in situations where typical cues are present and where the task is one of recognition followed by a known action (Figure 10 Recognition Primed Decision-Making Variant 1).

**Figure 10**

*Recognition Primed Decision-Making Variant 1*



---

[33] *American Psychological Association.*

EXPERT REPORT
Author: David M. Blake, PhD.

26.3. Dr.'s Daniel Kahneman and Gary Klien, the seminal authors representing Dual Processing Theory and Recognition Primed Decision Making (respectively) agree that Heuristics are a fundamental aspect of both constructs.[34] A Heuristic is an experience-based strategy for solving a problem or deciding that often provides an efficient means of finding an answer but cannot guarantee a correct outcome. Heuristics may be based upon faulty perceptions of patterns regularly known to exist within the environment.

27. In this case, Ofc. Van Dragt had more time to view the decedent's handheld object/actions and although he initially thought the object was a gun, he ultimately decided it was not. Based on his perception, Ofc. Van Dragt decided to transition to his Taser. However, he remained concerned that the object was some type of weapon as he expressed his fear of being attacked with that object. Ofc. Silva had less time to view the decedent's handheld object. He perceived the object as a gun – likely based off the area it was retrieved from as well as the manner the object was presented in a recognizable shooting stance. Additionally, Ofc. Silva heard a popping sound and saw Ofc. Van Dragt move awkwardly. It is likely that Ofc. Silva recognized the pattern of information as consistent with a shooting stance and the decision to shoot was quick. Ofc. Silva described his response as "*automatic, what he was trained to do"* which is consistent with the "if this-then that" foundation for RPDM Variant 1, System 1 (dual processing), and heuristic based decision making.

28. I have run 100s of officers and civilians through a rapid simulation involving a subject presenting a chrome revolver and pointing it towards officers. The presentation of the handgun occurs in about 1-2 seconds. I have found through debriefing that many officers are unable to accurately define the barrel, slide, trigger mechanism, or even the color of the gun. In most cases the handheld object is described in ambiguous terms as having a black L-shaped appearance and perceived to be a semi-automatic firearm like a Glock. Officers described the manner the "suspect" presented the weapon (pointed toward them) and the context (felony traffic stop of potentially armed subject) was a key factor in their decision to shoot.

## Total Response Time

29. An officer who perceives a handgun pointed at him is at a reactionary disadvantage.[35] The suspect only needs to pull the trigger – an act that can take as little as 100 milliseconds. Each

---

[34] Kahneman, D., & Klein, G. (2009). *Conditions for intuitive expertise: A failure to disagree. American Psychologist, 64(6), 515–526.* doi:10.1037/a0016755

[35] Campell, A., Roelofs, A., Davey, P., & Straker, L. (2013). Response time, pistol fire position variability, and pistol draw success rates for hip and thigh holsters. Human Factors. 55(2). DOI:

EXPERT REPORT
Author: David M. Blake, PhD.

1   successive rapid fire trigger press generally takes about 0.25s with the potential to fire 5
2   rounds in 1 second. Once the officers perceive a handgun pointed toward them, they must
3   acquire, raise and point their weapon – which takes time.  Officer response times can vary,
4   but in one peer-reviewed and published experiment, officers expecting a lethal encounter
5   with their handgun already drawn and pointing at a suspect, responded to a threatening
6   movement and fired their weapons in an average of just under 0.40s.[36]

7

8   30. An understanding of Perception Response Time / Total Response Time can be understood
9   via the following visual (Figure 11 *Stopping Sight and Driver Reaction Time*).

10  **Figure 11**

11  *Stop Shooting Sight and Driver Reaction Time*



12

13  **Bias**

14

15  31. Two predominant decision-making biases people engage in when judging other people's
16  performance should be acknowledged and controlled for.

17

18  31.1. Hindsight Bias is a tendency, after an event has occurred, to overestimate the extent to
19  which the outcome could have been foreseen. This is often referred to as the "I knew it all
20  along" phenomenon.

21

22  31.2. Outcome bias is a tendency to evaluate decisions based on the outcome rather than the
23  quality of the actual decision made in the moment. An often-cited example is when a
24  medical practitioner, based on the information available, provides a medical course of
25  action. If the outcome is positive, the decision on the medical course of action is judged as

10.1177/0018720812453466
[36] Blair, J.P., Pollock, J., Montague, D., Nichols, T., Curnutt, J., & Burns, D. (2011). Reasonableness and reaction time. *Police Quarterly.* 14(4).

1    positive. If the outcome is negative, the decision about the course of action is judged
2    negatively.

3

4    The findings and opinions contained in this report are based on my review of the discovery items
5    provided to me at this time. I will alter, amend, enhance, or delete my findings and opinions as
6    necessary following my review of any additional discovery in this case.

7

8

9    Signed *David M. Blake*_____ Date: January 12, 2025
10                David M. Blake, Ph.D.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

EXPERT REPORT
Author: David M. Blake, PhD.

# ANNEX

## Involved Officer Interview Summaries

1. Officer Silva was interviewed twice on May 9, 2022. The back-to-back interviews were conducted by the Ca. Department of Justice (DOJ) and the California Highway Patrol (CHP). I summarized the content of those combined interviews (See Annex Table 4 *Silva Statement May 9,2022 @ 1232 & 1359 hours*). It should be noted that the DOJ interview was initially provided to me as two audio files without transcription while the CHP interview was transcribed. Therefore, audio timestamps will be used as a reference for statements made during the DOJ interview and page numbers are used as a reference for the CHP interview. The audio timestamps are preceded with a (1) or (2) to identify the audio file it was received from. Both the audio summary and reference time from the second interview are highlighted.

2. Officer Silva was deposed on March 6th, 2024. I summarized the content of the deposition (See Annex Table 5 *Silva Deposition March 6, 2024*)

3. Officer Van Dragt was interviewed twice on May 10th, 2022. The back-to-back interviews were conducted by the Ca. Department of Justice (DOJ) and the California Highway Patrol (CHP). I summarized the content of those interviews (See Annex Table 6 *Van Dragt Statement May 9,2022 @ 1007 & 1359 hours*). The DOJ interview references are in bold print.

4. Officer Van Dragt was deposed on April 9, 2024. I summarized the content of the deposition (See Annex Table 7 *Van Dragt Deposition April 9, 2024*).

**Table 4**
*Silva Statement May 9, 2022 @ 1232 & 1359 hours*

| Statement | Page/Time |
|---|---|
| | |
| Silva stated he was wearing sunglasses at the time of the incident. | 9 |
| | |
| Silva stated he self-dispatched to this call (pedestrian versus tractor trailer) based on dispatch updates that the pedestrian was attempting to get hit by other cars. While enroute, Silva requested air support. The air support arrived on scene and provided additional updates regarding the persons jumping in front of cars and causing a disturbance on the freeway. Silva stated the call was abnormal. He believed the nature of the call indicated the suspect was capable of violence and capable of inflicting harm on others. He requested air support as he felt it was an important additional resource for a global view of the incident. The air support provided updated information that confirmed the original dispatch. | (1)08:20-12:20 (2)01:00-04:30 |
| When asked about his thoughts when responding to the call, Silva said, *"I did not personally receive this call. You know, I wasn't assigned the call. I just monitored the radio traffic, and I* | 12-14 |

*made a conscious decision on my own to respond. My mindset at the time, you know, it's not something I don't feel I can adequately describe in words. You know, I'm a patrolman. There's, you know, I'm just trying to get to the call, sir. In terms of you know, what I'm thinking of, there's not a lot. it's just more of a reaction if I can adequately describe it. So, I just respond to a call. My goal is to take care of business."*

When asked about the frequency of this type of call, Silva said, *"I can give you a number but the area's proximity to the LA River and the underpass is, you know, that whole area is a hotbed for, you know, people, transients, people experiencing homelessness walking on the freeway. So, I can't give you an adequate number, but we've received several calls in that general vicinity of people walking on the freeway."*

| | |
|---|---|
| Upon arrival, Silva described seeing a lot of people in what appeared to be a chaotic scene. He described trying to make sense of what was going on as he arrived. He identified a person that matched the suspect's description and began trying to move people/cars away to attempt to isolate the source of the call. He identified the suspect standing with his hands in his pockets (Silva later described this as scaring "the shit out of me."). For this reason, Silva advised dispatch he was going to wait for additional units to arrive. Silva noticed a CHP unit performing a traffic break and felt they had a tactical advantage allowing for them to "put handcuffs on and get him out of there". | (1)12:20-23:09<br>(2)07:30-11:45<br>(2)14:00-16:00<br>(2)17:00-17:50<br>(2)18:00-20:00<br>(2)21:30-22:30<br>(2)24:00-24:30<br>(2)32:00-32:40 |

The CHP unit performing the traffic break (Van Dragt) passed by the subject and parked his patrol car in between Silva and the suspect. Silva saw Van Dragt exit his patrol vehicle and draw his firearm. Silva also had his firearm drawn and described the following events as occurring rapidly. Silva said they gave the suspect commands to see his hands. The suspect started "charging" Van Dragt. The suspect removed his hands from his pockets while presenting a long silver cylindrical object which Silva stated he identified (at the time) as a firearm. Silva momentarily lost view of the suspect when the suspect ran behind Van Dragt's police vehicle. Silva described being concerned about a crossfire situation and not being able to assist Van Dragt as what he believed was an armed suspect ran toward him (Van Dragt). Silva described having a short amount of time to decide on what to do. He described having no cover and preparing himself to get shot. Silva said he heard a "pop" that he perceived at the time was a gunshot. Silva observed Van Dragt make "a weird" sidestep motion that he perceived could have been Van Dragt being struck by gunfire. In the same moment, he saw the suspect continuing to charge him in "*a shooting stance*". Silva said the rest was "*automatic, what he was trained to do.*" Silva described the suspect as presenting a lethal threat and he responded with lethal force.

Silva described first seeing the suspect with both hands in his pockets when the suspect was 50-100 feet away from him. When the suspect began to charge Van Dragt, he (suspect) removed his hands from his pockets. At the time, Silva was concerned the suspect could have a weapon and was fearful for Van Dragt's life. Silva said the suspect closed with Van Dragt to about 10-15 feet. Silva described seeing an object in the suspect's hands that he perceived to be a weapon. Silva described the object as a metallic/silver colored cylindrical firearm.

Silva stated he saw the object in the suspect's hand prior to losing sight of him (the suspect) briefly. Silva described not seeing exactly what Van Dragt was doing as his focus was on the suspect.

Silva stated that he did not believe he had time to switch from his firearm to his Taser as the suspect approached.

Silva said that when the suspect reappeared from behind Van Dragt's vehicle – he (the suspect) had his hands fully outstretched in front of him in a shooting stance. The suspect was charging

EXPERT REPORT
Author: David M. Blake, PhD.

| | |
|---|---|
| toward Silva in this position. At the time, he perceived the suspect "within arm's reach" of Van Dragt and about 10 feet away from his position while exhibiting the described behavior. | |
| As the suspect approached, Silva said he heard a pop. Silva described his perception of the popping sound as consistent with a gunshot. | |
| Silva stated that after the shooting, he saw the object on the ground that he perceived was a firearm. | |
| Silva stated he did not feel he had the ability to deploy non-lethal weapons as he was facing a lethal threat. Silva said he did not feel he had an opportunity to deescalate as the suspect was charging toward him. | |
| Silva described the decedent's behaviors on his arrival as, *"He had his hands in his pockets"* and *"he was failing to comply with my commands of showing me his hands"*<br><br>Silva was asked what his thoughts were when the decedent was moving toward the patrol unit on the scene and replied, *"you stated walking, sir, but he wasn't walking. He was actively running. It was fear. Fear for my partner's life."*<br><br>Silva was asked what his thoughts were when the decedent moved out of his view and replied, *"That I lost sight of an armed subject, and I didn't know where it was going to pop out from."* | 15-17 |
| Silva is asked to describe the decedent's actions upon reappearing in his view and replied, *"So, he was -- when he reappeared it was simultaneous to the shot, I heard being fired. And at that point he was, you know, in the moments thereafter, like I said, like, it happens the blink of an eye. I hear the shot and then I see the person, the pedestrian, still charging towards me and my partner with his hands above his waist directly in front of him, imitating a shooting platform."* Silva went on to agree that the decedent punched out both of his hands as if he was going to discharge a firearm. | 18 |
| Silva said he knew he fired six rounds because the round count was conducted in his presence. He stated that he fired until the threat was ended. | 22-23 |
| Silva stated that he did not initially approach the decedent after the shooting because he believed the decedent had a weapon. | 20 |
| Silva does not recall being aware of any Taser deployment at the time of the incident. He did not hear any Taser announcement when on scene. | 24-25 |
| Silva described his BWC being affixed to his upper chest. | (2)31:19-31:40 |

1

2  **Table 5**

3  *Ofc. Silva Deposition March 6, 2024*

| Statement | Page |
|---|---|
| | |
| Silva described the initial call as follows, "I don't remember exactly what was said. The general nature of the call relayed over the radio was I believe at first it was a traffic collision with an accident responding, but then it came out as somebody, a person jumping in front of cars trying to, you know, cause accidents or trying to get hit intentionally." | 22-23 |
| Silva said he was wearing sunglasses at the time of the incident. | 29 |
| Silva estimated his motorcycle was parked about 10 to 15 feet in front of Van Dragt's patrol car. | 36 |
| When Van Dragt exited his patrol car, Silva saw a firearm in his hand. | 36 |
| Silva said that he *"immediately noticed somebody on the shoulder matching the description provided to us by dispatch, and I immediately observed this person place his hands in his pocket."* Silva described the hands going into a sweatshirt pocket at the waistband level. Silva | 39-42 |

50

EXPERT REPORT
Author: David M. Blake, PhD.

| | |
|---|---|
| described the subject as being between 25 and 50 feet away from him. Silva said he believes he ordered the subject to show his hands because he had been trained that people carry weapons in their pockets or waistband. | |
| After removing his hands from his pocket, the subject ran toward Ofc. Van Dragt. The subject went out of view momentarily. Silva believed Van Dragt was retreating in his general direction. Silva did not see the subject in any type of shooting stance before he (the subject) went out of view. | 42-44, 47 |
| Silva did not see Ofc. Van Dragt transition from his handgun to Taser. Silva heard a gunshot before he fired. He agreed that in hindsight it was Ofc. Van Dragt's Taser that he heard, but at the time he believed it was a gunshot. | 50-52 |
| Silva said he was trained to continue to assess during a shooting sequence (when he can). Silva also stated that he is trained to be aware of his background when firing his weapon, but at the time he did not see the tractor-trailer combination. | 57 |
| Silva stated that he "saw the barrel of a gun, a long barrel" in the subject's hands. | 58 |
| Silva said that post-shooting and after looking at the ground and not seeing a gun, he asked Van Dragt, "what did he have in his hands? Was that a gun?" | 64 |
| Silva said he was aiming at the center of mass when he fired and was 5 to 10 feet from the subject when he fired. He was not using his sights when firing. | 66-67 |

1

2    **Table 6**

3    *Ofc. Van Dragt Statement May 10, 2022 @ 1007 & 1135 hours*

| Statement | Page |
|---|---|
| | |
| Van Dragt was working overtime for a Caltrans detail when he heard a request for assistance involving a subject that had been struck multiple times by vehicles. While responding, Van Dragt began a traffic break, but ultimately proceeded to the shoulder as he saw a person he thought was involved running toward Silva. He realized the suspect was behind him and saw the suspect had his hands in his pockets. Van Dragt ordered the suspect to show his hands. The suspect complied but then put his hands back in his pockets and began running toward Van Dragt. The suspect *"withdrew something out of his right pocket and put it into a shooting platform and aimed it towards my direction."* Van Dragt perceived the item in the suspect's hand was not a firearm because it was too big, too round, and the muzzle didn't match a firearm. However, Van Dragt was not sure what it was, but stated the suspect was *"aiming something at me."* Van Dragt moved backwards and deployed his Taser and fired at the suspect. He then heard a volley of shots. Van Dragt said he wasn't sure if the suspect had shot at him. | **16-20** |
| Van Dragt said he was about 3 car lengths or 30-35 feet away from the suspect when he saw the suspect's hands in his pockets. He described the shooting platform taken by the suspect as having both hands together pointing straight at him. Van Dragt said he first perceived the object in the suspect's hands as a firearm based on the way he presented it. He went on to state that because he was close to the suspect, he could see the object in his hands was too big to be a firearm. That said, Van Dragt said he perceived the suspect running towards him as assaultive. Van Dragt later said he was still unsure whether the suspect had a gun and that when he heard shots, he was in fear that he had been shot. Van Dragt described being in a bad position, perceiving he was going to be attacked, and stumbling (felt like he was going to fall) as he attempted to create distance. Van Dragt described checking Silva for bullet holes.<br><br>Van Dragt said, *"I was in fear that I was going to be – just the way he was running towards me, it was a very just aggressive fast run with his hands in a shooting platform…he wasn't running up to say hello, it was he was running at me like aggressively, and I was in fear that he was going to assault me with whatever was in his hand and I was just hoping that I hadn't* | **28, 31-35, 37-39, 44-45** |

| | |
|---|---|
| *misjudged it and it wasn't a firearm."* Van Dragt stated that Silva was in fear that he had been shot and asked Van Dragt to check him.<br><br>Van Dragt said he did not believe he had time to consider other options and believed it was necessary to use a firearm. When asked why Van Dragt said, *"Anyone else there that didn't have that clear line of sight, this looked like a weapon, this looked like a…clearly, he was in a shooting platform. Only the fact that I was so close to the back of the patrol car is the fact that I didn't fire. If I was in that motor's position…I would have fired my firearm."*<br><br>Van Dragt said that after the shooting he believed Silva asked, "where's the gun" and then said, "is it a gun" or something similar. Van Dragt said the object he had seen in the suspects hand was on the ground. Van Dragt described the object as a sunglass case, but also said he saw a "weed pipe". The sunglass case was described as bluish or purplish and described the weed pipe as long. | |
| Van Dragt is asked about his mindset in responding to this call for service and replied, *"I was concerned with the party that had been run over, that was being reported was run over multiple times…just wanted to get there and help out"* | 10-11 |
| Van Dragt was asked about his initial observations upon arriving on scene and replied, *"Like I told you earlier the, semitruck driver pointing and jumping up and down and running -- or running towards me, that seemed like he was kind of in fear. Like, something was going on, but…the first initial semitruck I came<br>across, he ran at me and told me on the information, pointing, like almost jumping, like, he's that way. And then the initial pedestrian that I saw that was a pedestrian, he was running towards the motor."* | 11-12 |
| Van Dragt is asked about his mindset based on his observations on scene and replied, *"It was a little confusion like what's going on? Like what's -- how is this -- this came out as a ped that's getting run over and lanes and we're so far from that semitruck. How are they -- I was just more like how is this all involved? Kind of, you know, like, because we're far. It's got to be, I want to say, a mile. I mean, it's a long way, so."* | 12 |
| Van Dragt is asked about his perceptions of the decedent and replied, *"I saw he was with his hands in his pockets that and just staring off in the lanes that<br>immediately just brought my awareness up like, okay, something's going on. So, he I can say that could be a threat with your hands in your pockets, right?"* He further described his perceptions of the decedent running towards the patrol unit, *"I was afraid he was going to attack me. That was my immediate process and giving myself more space due to him advancing on me so quickly."* Van Dragt described his perception of a threat as follows, *"I had him in view the whole time, and entire time, he was up in a shooting platform running towards me because as I advanced or I mean not advance. As I made my way around the patrol car, he was still coming at me. So, I don 1 t -- I never lost contact with him…I was in fear of being injured. Yes, I would say I could be in fear for my life…I just didn't know what was going to happen…he seemed very aggressive…I was definitely in fear of being injured by whatever he had in his hands."* | 12, 15-16 |
| Van Dragt described his interaction with the decedent as follows, *"I initially advised him to let me see your hands and that was the only way I could get<br>any that was only verbiage I can get out due to him advancing me so quickly, trying to get time and distance and transitioning[37] all at once all in a-matter of seconds…I was moving -- I was still moving to the front of my patrol vehicle, so like almost at the right. In my mind when I tased when I deployed my taser, I was at the right front of the patrol car like, and then I* | 13-14 |

---

[37] Van Dragt stated he initially had his firearm in his hand and transitioned to his Taser.

EXPERT REPORT
Author: David M. Blake, PhD.

| | |
|---|---|
| *continued my movement. I ended up over here so I believe my taser deployment happened somewhere at the left front vendor or on the front of the patrol vehicle as he was still advancing on me."* | |
| Van Dragt stated that he did not initially approach the decedent after shots were fired, *"Due to just assessing the scene, checking the other officer in case there -- obviously, if he had other weapons on him, we're trained to not approach immediately due to the fact that I had seen the whatever he -- whatever it was the objects on the ground."* | 17 |
| Van Dragt said he perceived the object in the decedents hand was not a firearm based on it's size. He said he was 30 to 35 feet away at the time and near the back of his patrol vehicle. | 22 |
| Van Dragt said Ofc. Silva thought he may have been shot and that Ofc. Silva asked Van Dragt to check him (for wounds?). | 23 |

1

2  **Table 7**

3  *Van Dragt Deposition April 9, 2024*

| Statement | Reference |
|---|---|
| | |
| Van Dragt discussed finding out the suspect in this call was behind him. He identified the suspect as being about 30 to 50 feet away from him standing with his hands in his pockets.<br>Van Dragt ordered the suspect to show his hands, which the suspect did prior to placing his hands back in his sweatshirt pockets. Van Dragt described the suspect almost immediately beginning to run toward him, taking his hand out of his pocket (holding object) and presenting in a shooting stance toward him. Van Dragt said that he perceived at the time, the handheld object was too big to be a firearm. He said it could have been a gun or a knife, but that he didn't know. Therefore he made the decision to reposition and transitioned to his Taser | 17-19, 21-24 |
| Van Dragt discussed his previous use of a Taser and stated it was not effective because he missed. In this case, Van Dragt believed the suspect was 3 to 5 feet away when he deployed the Taser. Van Dragt described the popping sound of a Taser as similar to that of a 22 caliber weapon. He went on to say that he would not be able to differentiate between the sound of a Taser being discharged and the sound of a firearm (minus the electrical arcing noise).  When Van Dragt heard gunshots, he was not sure where they were coming from and thought for a moment that he may have misjudged the item in the suspect's hand. | 35,39-40,42 |
| Van Dragt is asked to identify what he said was recorded by the BWC. According to the description, Van Dragt was referring to something on the ground and said, "no, no, it's that thing". The object was the grey sunglass case. Van Dragt went on to review exhibits showing the sunglass case and stated it was similar in shape to what he recalled seeing in the suspect's hand. | 57,60-61 |

4

5

6

7

8

EXPERT REPORT
Author: David M. Blake, PhD.

# Literature Review Summaries

1

2  **Table 8**

3  *A Sample of Peer Reviewed and Published Literature on Police Shooting Errors*

| |
|---|
| An article presenting a typology for police shooting errors developed primarily from human error and decision-making theories. Of particular interest is the subcategory of "misdiagnosis errors" often linked to "cell phone shootings", "mistake-of-fact shootings", and "perception-only shootings". The article presents a case study example, "The police were dispatched to the call of a man with a gun. When they arrived, the police confronted a man who matched the dispatched description of the person with a gun and had his hands in his pockets. When the man rapidly removed one of his hands from his pocket with an object in it, the police shot and killed him only to discover the object was a crucifix."[38] |
| An experiment evaluating the influence of (2) dispatch priming conditions (dispatch information = Gun Condition/Phone Condition) on police shooting behaviors. The participant police officers (N = 306) engaged in a force options simulator scenario where a subject either rapidly pulled a handgun or a cell phone from his pocket and pointed the device at officers. Across all conditions, officers fired when a cell phone was pointed at them (Range 6% to 62%). However, information from dispatch about the suspect having a gun was significantly associated with an increase in firing shots when a cell phone was pointed toward officers. The author linked the results to heuristic decision-making. [39] |
| An experiment evaluating the influence of (3) shooting positions (Aimed, High-Ready, Low-Ready) on police shooting behaviors. The participant police officers (N = 313) engaged in a force options simulator scenario where a subject either rapidly pulled a handgun or a cell phone from his pocket and pointed the device at officers. Participants were given a dispatch stating the suspect was armed with a handgun. Across all conditions, officers fired when the cell phone was pointed at them (Range 30% to 64%). Groups in the high-ready and aimed groups fired more often in cell phone condition than those in the low ready position. The author opined that the low-ready position reduces the potential for a shooting error.[40] |
| An experiment evaluating the influence of (2) scenario conditions (Gun / Cell phone) and visual gaze patterns on police shooting behaviors. The participant police officers (N = 24) engaged in a live action scenario where a subject either rapidly produced a handgun or a cell phone while turning and pointing the device at officers. Participants were briefed of a potential armed encounter. Participants from both rookie and elite groups fired when the cell phone was produced (18% and 61% respectively). The location and duration of eye fixations were linked to shooting error.[41] |
| A book authored by researchers who reviewed patterns of subject behaviors associated with officer involved shootings organized a portion of those shootings into a category identified as *"perceptual threat of an imminent assault."* The definition of a perceptual threat included, "when an offender communicates by a gesture that simulates and attack although a physical attack does not occur. Physical gestures that simulate an attack include when an offender is: "*1) reaching into his/her waistband, pockets, or behind their back, or otherwise concealing* |

[38] Taylor, P.L. (2019). Beyond false positives, A typology of shooting errors. Criminology and Public Policy. DOI: 10.1111/1745-9133.12460

[39] Taylor, P. L. (2020). Dispatch Priming and the Police Decision to Use Deadly Force. Police Quarterly, 23(3), 311-332. https://doi.org/10.1177/1098611119896653

[40] Taylor, P. L. (2021). "Engineering Resilience" Into Split-Second Shoot/No Shoot Decisions: The Effect of Muzzle-Position. *Police Quarterly*, *24*(2), 185-204. https://doi.org/10.1177/1098611120960688

[41] Vickers, J. N., & Lewinski, W. (2012). Performing under pressure: Gaze control, decision making and shooting performance of elite and rookie police officers. Human Movement Science, 31(1), 101–117. https://doi.org/10.1016/j.humov.2011.04.004

EXPERT REPORT
Author: David M. Blake, PhD.

*their hands from the officers view during the course of committing a crime or flight therefrom; 2) reaching under the car seat or into the car during the course of committing a crime or flight therefrom; 3) issuing verbal threats; 4) advancing or charging at the officer; 5) assuming a shooting or fighting stance (with no handheld objects); 6) simulating a shooting stance with an object other than a weapon (vaping device, metal pen, cell phone)); or 7) engaging in unspecified threatening or aggressive movements.*" In their evaluation of 112 shootings that involved unarmed suspects, the authors found that 14 (12.5%) were involved a suspect advancing/charging toward the officer, 11 (9.8%) involved a suspect with their hands in pockets, waistband, or behind back, or otherwise concealed from officer during a crime or flight therefrom, 6 (5.4%) involving a suspect in a shooting or fighting stance (empty handed), and 5, (4.5%) involving a suspect simulating shooting stance/gesturing as if armed with object other than a real weapon (vaping device, cell phone, metal pen).[42]

1

2 **Table 9**

3 *A Sample of Law Enforcement Publications on Police Shooting Errors*

A U.S. Department of Justice review of Philadelphia Police Department Officer Involved Shootings found 29 cases between 2007 and 2013 where officers perceived that a suspect is armed due to the misidentification of a nonthreatening objective (e.g., a cell phone) or movement (e.g., tugging at the waistband).[43]

The Los Angeles Police Department Annual Use of Force Review Report provides a category for officer involved shootings entitled "perception shooting-no firearm found". Between 2019 and 2023, LAPD has categorized 12 officer involved shootings within this category.[44]

A meeting of police chiefs and other law enforcement leaders discussed perceptual errors linked to officer involved shootings and resulted in a formal research report, that stated in part, *"Police officials report that shootings often result from what are called "perception" issues, in which a suspect, often during a foot pursuit, makes a sudden movement that is perceived as reaching for a firearm. It is only in hindsight that it becomes known that the person was reaching for a cellphone or other object. It can be extremely difficult for officers to assess such situations and ensure their own safety, especially when they have only seconds to make a judgment. For this reason, police chiefs speak of the advantages of "slowing down" difficult encounters and thinking through tactics so as not to box themselves into a highly charged incident."*[45]

4
5
6
7
8
9
10
11

---

[42] Shane, J., & Swenson, Z. (2018). Unarmed and Dangerous: Patterns of Threats by Citizens During Deadly Force Encounters with Police (1st ed.). Routledge. https://doi.org/10.4324/9780429443749

[43] Fachner, G. & Carter, S. (2015) An assessment of deadly force in the Philadelphia Police Department. Collaborative Reform Initiative. Washington, DC. Office of Community Oriented Policing Services.

[44] Moore, M. (2023). Los Angeles Police Department use of force year-end review.

[45] Police Executive Research Forum. (2012). An integrated approach to de-escalation and minimizing use of force. ISBN: 978-1-934485-20-0

EXPERT REPORT
Author: David M. Blake, PhD.

1   **Table 10**
2   *A Sample of Mistake of Fact Shooting Incidents*

| |
|---|
| El Cajon police officers (Ca.) shot a man who pointed an e-cigarette at officers in a two-handed shooting stance[46] |
| NYPD officers shot a man pointing a small metal pipe at officers[47] |
| Albuquerque police officers (NM) shot a man who took a shooting stance in their direction[48], |
| Salt Lake City officers shot a man who reached into his waistband, pulled out a cell phone and pointed it at officers[49], |
| LAPD officers shot a man pointing a metal object (butane torch) at them[50], |
| Wagoner (OK) officers shot a man who extended both hands together in a shooting stance and pointed toward officers[51]. |

3   **Table 11**
4   *Summary Federal Court Statements Associated with Police Shooting Errors*

| |
|---|
| *However, the most important factor is whether Olango posed an immediate threat to the safety of the officer. See Graham,490 U.S. at 396. Gonsalves believed Olango was armed, but Plaintiffs argue this belief was unreasonable. Based on the evidence and the videos of the incident, the Court finds Gonsalves could have reasonably believed Olango was armed at that time Gonsalves used deadly force against Olango. It is true Lucy had informed the reporting officer during her 911 call that her brother did not have any weapons, (Dispatch Log, ECF No. 54-2, at 18 ("no weapons" reported at 12:58:29)), and may have even personally informed Gonsalves that her brother was not armed. (See Lucy Depo., ECF No. 56-4, at 130:8–10.) But the officers had reason to believe otherwise due to Olango's suspicious behavior of holding his hand in his pocket despite repeated clear and calm requests to remove his hand. And after disobeying these commands, Olango quickly pulled a metal object from his pocket, and while holding the object in his hands, moved into a "shooting stance" with his hands pointed at the officer. Gonsalves thus had a reasonable basis to suspect Olango was armed. "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." George, 736 F.3d at 838.[52]* |
| *Of all the use-of-force factors, the "most important" is whether the suspect posed an "immediate threat." Bryan v. MacPherson, 630 F.3d 805, 826 (9thCir. 2010); Mattos v. Agarano, 661 F.3d 433, 441 (9thCir. 2011) (en banc). Because our inquiry is about objective reasonableness, there must be "objective factors "to justify an officer's "fear [for his safety or the safety of others." Deorle, 272 F.3d at 1281. In other words, "the objective facts must indicate that the suspect pose[d]an immediate threat to the officer or a member of the public." Bryan, 630 F.3d at 826. "This analysis is not static, and the reasonableness of force may change as the circumstances evolve." Hyde, 23 F.4that870.* |

[46] https://www.bbc.com/news/world-us-canada-37503048
[47] https://abc7ny.com/nypd-police-shooting-involved-crown-heights/3301666/
[48] https://www.koat.com/article/man-unarmed-when-shot-by-police/4409941
[49] https://www.deseret.com/2019/5/24/20674364/5-officers-cleared-in-fatal-shooting-of-utahn-who-reached-for-cellphone/
[50] https://oag.ca.gov/news/press-releases/california-department-justice-releases-report-death-matthew-james-sova
[51] https://www.cbsnews.com/news/oklahoma-police-shooting-andrew-henson-video-unarmed/
[52] Abuka v. City of El Cajon et al, No. 3:2017cv00089 - Document 64 (S.D. Cal. 2019)

EXPERT REPORT
Author: David M. Blake, PhD.

*Reasonableness also doesn't "always require [ officers to delay their fire until a suspect turns his weapon on them." George, 736 F.3d at 838. Officers shouldn't have to "wait until a gun is pointed at [them] before [they are] entitled to take action." Anderson v. Russell, 247 F.3d 125, 131 (4thCir.2001). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." George, 736 F.3d at 838.*

*These principles apply even when officers are reasonably mistaken about the nature of the threat. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of" an immediate threat, and "in those situations courts will not hold that they have violated the Constitution." Saucier v. Katz, 533U.S. 194, 206 (2001).*

*Thus, the Constitution even allows for officer's action that resulted from a reasonable "mistake of fact." Pearson v. Callahan, 555 U.S. 223, 231(2009). When an officer's "use of force is based on a mistake of fact, we ask whether a reasonable officer would have or should have accurately perceived that fact." Torres, 648 F.3d at 1124.[53]*

*We recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," Graham, 490 U.S. at 397, 109 S.Ct. 1865, and that these judgments are sometimes informed by errors in perception of the actual surrounding facts.*

*Not all errors in perception or judgment, however, are reasonable. While we do not judge the reasonableness of an officer's actions "with the 20/20 vision of hindsight," id. at 396, 109 S.Ct. 1865, nor does the Constitution forgive an officer's every mistake. See Maryland v. Garrison, 480 U.S. 79, 87 n. 11, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Rather, we adopt "the perspective of a reasonable officer on the scene ... in light of the facts and circumstances confronting [her]." Graham, 490 U.S. at 396, 109 S.Ct. 1865. Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or should have accurately perceived that fact. Jensen v. City of Oxnard, 145 F.3d 1078, 1086 (9th Cir.1998).[54]*

1
2
3
4
5
6
7
8
9
10
11
12
13

---

[53] ESTATE OF GABRIEL STRICKLAND, ET AL V. NEVADA COUNTY, ET AL, No. 22-15761 (9th Cir. 2023)
[54] *Torres v. City of Madera*, 648 F.3d 1119, 11 Cal. Daily Op. Serv. 10744, 2011 Daily Journal D.A.R. 12758 (9th Cir. 2011)

EXPERT REPORT
Author: David M. Blake, PhD.

# David M. Blake
# Curriculum Vitae

**Blake Consulting & Training**                                   **April 2015 – Present**

A sole proprietorship, Blake Consulting & Training provides consulting and expert witness services to law enforcement agencies and attorneys for administrative, civil, and criminal cases. Consulting and training service areas include police practices, use of force, human factors psychology and digital media evidence.

**Human Performance Training Institute, Inc.**          **April 2014 – Jan. 2020**

The Human Performance Training Institute (HPTI) is a premier provider of specialized, cutting-edge training products, safety and risk management services to law enforcement, government agencies, and aviation. During my tenure, I was the lead instructor facilitating a 24-hour CA-POST certified course entitled *Force Encounters Analysis.* This course presented the human factors psychological science applicable to human performance during critical incidents and primarily officer-involved shootings. Subject matter included human factors psychology topics such as physiological arousal, attention, perception, reaction time, decision-making, and memory.

**Alameda County Sheriff's Department**                **Sept. 2014 – Jan. 2020**

The Alameda County Sheriff's Office is a full-service law enforcement agency accredited through the Commission on Accreditation for Law Enforcement Agencies (CALEA) and the American Correctional Association (ACA). I was a part-time Regional Training Center Instructor responsible for providing continued professional training to sworn officers and academy recruits. My primary assignment as a Force Options Simulator instructor involved teaching the following topics: constitutional law, officer safety, tactics, and the lawful applications of lethal and less lethal use of force. The training was conducted in a realistic stress-based environment allowing for observation of officer performance and an instructor-led debrief on student decisions.

**Las Positas College**                                      **Jan. 2018 – Jan. 2020**

Las Positas College is an accredited 2-year institution of higher learning, and oversees a CA-POST certified police academy. I was employed as an adjunct professor of criminal justice, and a CA-POST certified police academy instructor. I previously provided Police Academy recruits use of force training (CA-POST Learning Domain 20) and firearms training (CA-POST Learning Domain 35).

58

## Martinelli & Associates                           April 2015 – Jan. 2018

Martinelli & Associates is a nationally recognized and highly successful forensic investigation, experting and law enforcement practices training and consulting firm. I was contracted as a law enforcement practices/use of force consultant.

## San Joaquin Delta College                        Jan. 2014 – May 2016

Delta College is an accredited 2-year institution of higher learning, and oversees a CA-POST certified police academy. I was employed as an adjunct professor of criminal justice, and a CA-POST certified police academy instructor. I was employed as an adjunct professor of criminal justice, and a CA-POST certified police academy instructor. I previously provided Police Academy recruits training in crimes in progress (CA-POST Learning Domain 23), Crowd Control (CA-POST Learning Domain 24), Information Systems (CA-POST Learning Domain 36) and was a scenario evaluator.

## Livermore Police Department                       Nov. 2002-Feb. 2014

The Livermore Police Department is a mid-sized full-service municipal law enforcement entity. As a CA-POST certified peace officer, I was responsible for conducting law enforcement operations inclusive of criminal patrol, traffic enforcement, detailed criminal investigations, problem-solving and special projects. I held positions in; supervision, narcotics unit, SWAT, gang unit, CALEA, field training, and in the use of force training unit. During my tenure as a police officer I conducted hundreds of investigations, authored and executed search warrants, managed confidential reliable informants, planned & participated in tactical operations, worked gangs/narcotics, completed criminal and administrative reports, and trained/supervised officers. As a member of the force options training unit, I planned, coordinated, and implemented large intra/inter-agency training evolutions on topics including but not limited to officer safety, patrol tactics, SWAT, firearms, active shooter, arrest and control, police policy and procedures, and gang investigations.

## S.F.  Bay Area Rapid Transit Police Department   Dec. 2000–Nov. 2002

The S.F. BART Police Department is a large full-service municipal law enforcement entity responsible for transit operations in several jurisdictions in the San Francisco Bay area. As a CA-POST certified peace officer, I was responsible for conducting law enforcement operations inclusive of criminal patrol, traffic enforcement, and criminal investigations. The unique transit policing system allowed for exposure to multiple jurisdictions and their specific law, policy, procedure, and practices

## Lawrence Livermore National Laboratory           Jan. 1998–Oct. 2000

The LLNL Protective Force Division is a Department of Energy (DOE) guided law enforcement organization (Section 161 of the Atomic Energy Act of 1954). As a Department of Energy Certified Security Police Officer III, I was responsible for conducting law enforcement operations inclusive of security patrols, traffic enforcement, crowd control, and response to

59

emergencies. During my tenure, I was a member of the special response team with the specific mission of protecting category 1 special nuclear materials.

# Academic Achievement

| | | | |
|---|---|---|---|
| Ph.D. | Psychology (Performance) | Grand Canyon University | 2020 |
| M.Sc. | Psychology | Kaplan University | 2014 |
| B.Sc. | Criminal Justice Mgmt. | Union Institute and University | 2010 |

All listed institutions are accredited by the Higher Learning Commission

Doctoral Coursework: Behaviorism, Theories of Inquiry, Foundations of Performance Psychology, Statistics, Psychomotor Performance, Qualitative/Quantitative Research Methods, Performance Enhancement.

Dissertation: *A Systems-Based Exploration of Police Mistake of Fact Shootings*
Chair: Dr. Jennifer Seymour, Grand Canyon University
Content Expert: Dr. Joel Suss, Wichita State University, Applied Cognition & Expertise Lab.

Master's Coursework: Lifespan development, Learning and Behavior, Neuropsychology, Qualitative Analysis, Cognitive Psychology, Advanced Research Methods, Applied Statistics for Psychology Research.

Thesis: *Factoring Fatigue into Police Deadly Force Encounters: Decision-Making and Reaction Times.*
Chair: Dr. Edward Cumella, Kaplan University

Undergraduate Coursework: Rhetoric and Research, Contemporary Issues in CJ Management, Supervision in the Criminal Justice Field, Human Biology, CJ Management Information Systems

**Doctoral Dissertation Advisor**

*An Analysis of Online Law Enforcement Decision-making Training and Human Performance Research Practices with Law Enforcement Interactive Video-based Simulators* - ProQuest

PhD Student: Dakota Scott / Advisor: Dr. Joel Suss / Wichita State University Applied Cognition & Expertise Laboratory

**Academic Peer Reviewer**

*Cognitive load and capacity for law enforcement officers in high-stress conditions* – Police Practice and Research (2/2023).

60

EXPERT REPORT
Author: David M. Blake, PhD.

*Advancing a Theory of Police Officer Training Motivation and Receptivity* – Justice Quarterly (7/2019).

*It's Complicated: Educational Attainment, Critical Reasoning, and Police Shooting Decisions* – Justice Quarterly (7/2018).

Human Factors and Ergonomics Society Advanced Systems and Practices through Innovation, Research and Education (ASPIRE) Annual Conference:

*Taking time to reflect on perception response time*

*Forensic analysis of a traffic crash involving human factors in design management of an industrial facility.*

*The role of human factors, ergonomics, and 3D modeling when evaluating incidents involving micromobility devices, An E-scooter fall case.*

*Evaluating the slip resistance of various walking surface contaminants.*

**Human Factors & Ergonomics Society**

Past Program Chair & Member: HFES Forensic Professional Technical Group

HFES Technical Group Peer Reviewer / ASPIRE (2024)

Committee Member (2021): HFES Policy Statement Reducing the Use of Deadly Force by Law Enforcement with Dr. Paul Taylor, Dr. Mica Endsley, Dr. Joel Suss, Dr. Jonathan Wender, Dr. Jennifer Riley, & Dr. Brian Lande

# Professional Certifications

*Certifications are identified based upon the controlling authority's standards to fill a position or provide services (i.e., CA POST).*

Law Enforcement and Emergency Services Video Association Certified Forensic Video Technician (Exp. May 31, 2027)

Amped Five Certified Examiner (Exp. March 29, 2026)

California Peace Officers Standards and Training Peace Officer Advanced Certificate

California Peace Officers Standards and Training Field Training Officer

California Peace Officer Standards and Training Academy Instructor Certification Course

California Peace Officer Standards and Training Scenario Evaluator Training

61

EXPERT REPORT
Author: David M. Blake, PhD.

1    California Peace Officer Standards and Training Force Options Simulator Instructor

2    California Peace Officer Standards and Training Defensive Tactics Instructor

3    California Peace Officer Standards and Training Firearms Instructor

4    Axon Taser Instructor (Exp. December 20, 2025)

5    # Specialized Training / Education

6    **Use of Force / Deescalation**

7    1.  *Safe Wrap System*. California Force Instructors Association. 1 hour (Rener Gracie Nov.
8        2024).
9
10   2.  *Use of Force Legal Principles*. California Force Instructors Association (Phil Downs, Esq.
11       Oct. 2024)
12
13   3.  *5 Essential Use of Force Practices for Agencies in 2024*. The Briefing Room 1.5 hours (Phil
14       Downs Esq. Scott Savage & Jason Louis. 2024).
15
16   4.  *Cops charged criminally: Does the Graham standard & qualified immunity apply in my
17       jurisdiction?* Calibre Press. 1-hour (Att: Laura Scarry & Scott Wood. 2023)
18
19   5.  *Reasonable force expert panel discussion 835(a).* California Force Instructor's Association
20       1-hour (Att: Mike Rains, Phil Downs, & DA Vern Pierson, 2023).
21
22   6.  *Criminal and non-criminal barricade response: Understanding tactics, decision-making and
23       the law* 2-hours (Police1 / Lexipol (2023).
24
25   7.  *Use of Force for Command Staff 8-hours*. (Savage Training Group -Sgt. Jason Louis Ventura
26       SO (2023).
27
28   8.  *Use of Force Investigations Under Penal Code Section 835a: Legal and Practical
29       Considerations 3-hours.* Rains, Lucia, Stern, St. Phalle & Silver (Mike Rains Esq., Maureen
30       Okwuosa Esq., and Andrew Ganz Esq. 2022)
31
32   9.  *Police Liability: Developments in 1983 Actions 1-hour: Missouri Sheriff's Association*
33       (Wayne C. Beyer, JD, 8/12/2022).
34
35   10. *Use of Force Decision Making* 2-hours: Missouri Sheriff's Association (Kevin Merritt –
36       Missouri Sheriff's Association, 8/11/2022).
37
38   11. *Investigating the Duty to Intervene*: Association of Force Investigators – Dan King (8-weeks
39       – 8/12022).

62

EXPERT REPORT
Author: David M. Blake, PhD.

12. *Deescalation: Enhancing Strategies for Everyday Encounters*: CA-POST (3/22/2022).

13. *Officer Created Jeopardy: Association of Force Investigators:* Von Kliem Consulting: Von Kliem, JD (8-weeks – 1/29/2022).

14. *Officer Involved Shooting Investigations:* ILET: Kevin Davis (9/29/2021).

15. *Use of force in a Corrections Setting*: Association of Force Investigators: Ohio Department of Rehabilitation and Correct Director Ed Voorhies (8-weeks - 9/30/2021).

16. *Practical De-Escalation and Tactical Conduct*: Savage Training Group: Sgt. Scott Savage (9/29/2021)

17. *Legal Considerations in Use of Force Investigations* Association of Force Investigators: Attorney Angela Powell (9-weeks - 2021):

18. *Spit Mask Webinar.* Institute for the Prevention of In-Custody Deaths (IPICD): John Peters, Jr., CLS, Ph.D., Mark Kroll, Ph.D., & Michael Brave, Esq. (5/7/2021).

19. *Use of Force: Policy or Tactics.* Lexipol: Laura Scarry, Esq. & Mike Ranalli, Esq. (3/4/2021).

20. *New California Use of Force Laws – 5 Things You Need to Know.* Savage Training Group (2/19/2020).

21. *Duty to Intercede: Conceptual, Cultural and Legal Aspects*. Laura Scarry, Esq. & Mike Ranalli, Esq. (12/9/2020).

22. *Use of Force Investigations Under the New Law: Legal and Practical Considerations* by Mike Rains, Esq. & Maureen Okwuosa, Esq. (12/7/2020).

23. *Moving beyond best practice: Experiences in police reform and a call for evidence to reduce officer-involved-shootings* by Robin Engel, Ph.D., Police Foundation (7/10/2020).

24. *Prone Restraint* by Darrell Ross, Ph.D. AELE (7/10/2020)

25. *The Use of Force Continuum – Seriously?* By Daigle Law Group (6/25/2020)

26. *Officer Use of Force Statements.* Lexipol (2/24/2020)

27. *CA AB392 Training Video*, CA POST (1/1/2020)

28. *CA AB392 Training Video*, Lexipol Webinar (10/2019)

29. *California District Attorneys Association OIS conference* (1 day: 10/2019)

30. *Taser Instructor: Certification for X26, X2, Taser 7* (Axon – 2019, 2021, 2023)

63

EXPERT REPORT
Author: David M. Blake, PhD.

31. *Safe street encounters: Threats, human performance dynamics, and the law* (Lexipol - 2019)

32. *De-escalation, When and how to make it work* (Lexipol - 2018)

33. *Legal Update, Use of Force* (Attorney Missy OLinn- 2017)

34. *Taser X2 Transition Training* (Alameda County Sheriff's Department - 2016)

35. *Force Options Simulator Instructor* (San Jose Police - 2010)

36. *Communications – Keeping your Edge* (CA POST – 2007)

37. *Tactical Communication* (Livermore Police Department – 2003)

38. *California POST Basic Academy* (Contra Costa County - 2001)
    Defensive Tactics, OC Spray, Baton, & Firearms

39. *Department of Energy Security Police Officer and Special Response Team Academy*
    (Livermore Laboratory - 1998) Defensive Tactics, OC Spray, Baton, Firearms, & SWAT
    ~640 hours

**Human Performance & Biomechanics**

1.  Biomechanics from video evidence. GTD Scientific: Geoff Desmoulin, PhD (5.17.2023)

2.  Initial Response to Critical Incidents. CA-POST (3/22/2022).

3.  Perception-Response Times for OIS Investigations (8-week course): Association of Force
    Investigators: Paul Taylor, PhD. (12/1/2021)

4.  Beyond Human Performance – Officer Created Jeopardy: ILET: Von Kliem, JD -
    (9/29/2021).

5.  Scenario-Based Training Roundtable: ILET: Chris Cushion, PhD, Terry Wollert, PhD, Lon
    Bartel, Tony Blauer, Kelly Keith – (9/29/2021).

6.  Investigating Human Error (Association of Force Investigators / Paul Taylor, PhD – 2020)

7.  The Science of Violence: Injury Biomechanics (GTD Scientific / Geoff Desmoulin, PhD –
    2020)

8.  Force Science Institute Conference (FSI – 2019)

9.  Admissibility Standards and Behavioral Science (ACFEI - 2016)

10. Cognitive Factors (ACFEI - 2016)

EXPERT REPORT
Author: David M. Blake, PhD.

1    11. California POST Force Encounters Analysis (Davis PD - 2013)

2    12. California POST Human Factors; Risk Management (Davis PD - 2013)

3    13. Force Science Certified Analyst (FSI - 2010)

4    **Special Weapons and Tactics**

5    1. Tactical Breacher – 80 hours (CA POST / ITR – 2007)

6    2. Advanced Tactical Operations – 48 hours (CA POST / ITR – 2006)

7    3. Advanced Special Weapons and Tactics – 24 hours (CA POST 2006)

8    4. Advanced Special Weapons and Tactics – 24 hours (CA POST 2005)

9    5. Advanced Special Weapons and Tactics – 24 hours (CA POST 2004)

10   6. Special Weapons and Tactics – 80 hours (CA POST 2003).

11   **Firearms**

12   1. Basic Police Academy – 80 hours (Contra Costa County Sheriff – 2000)

13   2. Combat Firearms – 8 hours (BART PD – 2001)

14   3. Firearms / Tactical Rifle – 24 hours (Alameda SO – 2003)

15   4. Firearms Instructor – 80 hours (Alameda SO – 2005)

16   5. Firearms – 8 hours (Livermore PD – 2008)

17   6. Firearms – 12 hours (Livermore PD - 2009)

18   7. Firearms – 16 hours (Livermore PD – 2010)

19   8. Firearms –12 hours (Livermore PD – 2011)

20   9. Firearms - 8 hours (Livermore PD – 2012)

21   10. Firearms – 8 hours (Livermore PD – 2013)

22   **Arrest & Control**

23   1. Security Police Officer II 40 hours (Department of Energy)

24   2. California Peace Officer Academy 80 hours (Contra Costa Sheriff's Department)

65

EXPERT REPORT
Author: David M. Blake, PhD.

3. Arrest and Control 22 hours (Livermore PD)

4. Defensive Tactics Instructor 40 hours (SCJCTC)

**Restraint / Positional Asphyxia**

1. Legal Update: Positional Asphyxia (GC 7286.5): CA-POST (3/22/2022).

2. Recognizing and Managing Abnormal Breathing: LEO – Institute for the Prevention of In-Custody Deaths, Inc. (Feb 2021).

**Investigations / Expert Consultation**

1. Courtroom Testimony for Expert Witnesses (LEVA, Dr. Jonathan Hak, 2024 (24 hours)).

2. Expert Witness Symposium (AELE – 2023).

3. An introduction to IPAAM: A Methodology for Force Analysis (AFI – 2022).

4. Role, Purpose, and Function in the Investigation and Review of Critical Incidents (AFI - 2022).

5. Succeeding as an Expert (AFI - 2020).

6. California POST ICI Officer Involved Shooting and Force Investigations 40 hours (South Bay Regional - 2016)

7. Certified Criminal Investigator (ACFEI - 2015)

8. Gang Awareness and Investigations (2006, 2007, 2011)

9. Interview and Interrogation (2008)

10. Search Warrants (California Narcotics Officers Association – 2004)

11. Traffic Collision Investigator (Livermore Police Department - 2003)

12. Evidence Collection (Livermore Police Department - 2003)

**Miscellaneous LE Training**

1. Traffic Collision Investigations (2003)

2. Domestic Violence (2005, 2012)

3. Field Training Officer (2009)

4. Northern California Gang Investigators Association Conference (2006)

EXPERT REPORT
Author: David M. Blake, PhD.

5. California Narcotic Officers Association Conference (Sacramento & San Diego - 2003, 2004)

6. Radar Operator (Livermore Police Department - 2004)

7. Drug Recognition Expert (Livermore Police Department - 2003)

8. Driving under the Influence Detection (Livermore Police Department – 2003)

9. Racial Profiling (Livermore Police Department – 2003)

**Digital Media Evidence**

1. Why Video Footage and a Cop's Memory Will Always be Inconsistent (Calibre Press, May 9, 2024. Instructors Jamie Borden & Jim Glennon).

2. Amped FIVE Certified Examiner (Expires 29 March 2026).

3. Measurements and Speed Estimation (Amped Software: December 5-7, 2023, Instructor: Blake Sawyer (16 hours)).

4. Advanced Forensic video Interrogations: An In-Depth Examination of Video Analysis Processes (LEVA: Nov. 20-22, 2023, 20 Instructor: Ed Baker (20 hours))

5. Forensic Image and Video Enhancement with Amped Five. (Amped Software: June 12-16, 2023, Instructor: Melissa Kimbrell (20 hours)).

6. The Analysis of Human Performance Through the Digital Lens. (Association of Force Investigators Feb 1, 2023 - March 31, 2023, Instructor: Justin Guthrie / Cpl. Kevin Silverian).

7. INPUT-ACE Video Evidence Symposium. Topics: Video evidence presentation in Court (Dr. John Black), Interpolation (Andrew Fredericks), Video & Memory (Dr. Paul Taylor). (12 hours/March 2022).

8. Law Enforcement and Emergency Services Video Association (LEVA) Level 2. Instructors: Jonathan Hak, Q.C., Scott Kuntz, Dane County Sheriff's Office (40 hours/May 2021)

9. Law Enforcement and Emergency Services Video Association (LEVA) Level 1. Instructors: Jonathan Hak, Q.C. (40 hours/April 2021).

10. Online International Law Enforcement Training Summit (2020) - "Investigator Influence on Video Examination" (1.5 hours)

EXPERT REPORT
Author: David M. Blake, PhD.

# Consultations / Training

## Consultations

1. *California POST Peace Officer Standards and Accountability Advisory Board (2022)* – SME assistance for the development of training curriculum on use of force for the new state mandated advisory board for decertification (SB2).

2. *International Association of Chief of Police. (August -September 2021)* – SME assistance for the development of a national use of force training linked to the Elevate Blue Program sponsored by the U.S. Department of Justice. (Project Lead: Lance Anderson, PhD. HumRRO).

3. *California POST Duty to Intervene Project (May 2021)*– SME assistance for the development of a statewide video training on law enforcement officers' duty to intercede (Project Lead: Nick Muyo).

4. *Human Factors and Ergonomics Society (HFES) (2020-Present)* Government Relations Subcommittee on Law Enforcement. (Project Lead: Mica Endsely, PhD)

5. *Milo Range (July 2018)* – Consultation concerning Human Factors involved in use of force.

6. *Carleton University (May 2018)* – Interviewed for academic research project entitled, "Evaluating best practices in non-escalation, de-escalation, and use of force training" (Project Lead: Craig Bennell, PhD).

7. *University of Toronto (May 2018)* – Interviewed to assist in the development of a Police Use of Force Decision Making Model.

8. *ICF Project "Advanced Tactical Decision-Making Immersive Training Capability (January 2018)* – Subcontract consult on use of force decision making and tactics.

9. *California POST Use of Force Video Project (San Diego, 2016 / 2017)* – SME assistance for the development of a statewide video training project on the use of reasonable force (Project Lead: Larry Ellsworth).

10. *California POST Force Options Simulator Community Outreach Course Development (Sacramento, 2017)* – Creating a formal program presenting the use of force to community members (Project Lead: Casey Bokavich).

11. *California POST Force Options Simulator Meeting (Sacramento, 2016)* – Two-day session discussing trends in training use of force.

12. *Applied Research Associates Project "Simulation Training to Make Decisions During Use of Force Incidents (March 2016)* – Subcontract consult on use of force decision making and tactics.

68

13. *California POST Decision Making Study (2015)* – Part of a two-day group session with Dr. Gary Klein working to understand decision making during critical incidents.

14. *Paladin Data Systems Seminar on Police Training (2014)*– Webinar Series *"Restoring Public Trust in Law Enforcement"* (Sept 2015) – National discussion on policing (Training & Use of Force)

## Facilitated Training

1. *California Department of Justice Division of Law Enforcement* (Feb. 2024) (Police Shooting Investigation Team & Deputy Attorney General's) – PC 835a / Human Factors Psychology.

2. *Human Factors Applied to Law Enforcement Use of Force.* Presented to the Contra Costa County District Attorney's Office (2023).

3. *AB 392 / PC 835a Training.* A presentation provided to law enforcement officers at the California Reserve Police Officers Association annual conference in Lake Tahoe (2023).

4. *Total Response Time / Curb-Sitting Research.* A presentation provided to membership of the California Force Instructors Association (2023).

5. *Improving police decision-making under stress.* Co-presented a national webinar with Harvard trained neuroscientist Dr. Melis Yilmaz-Balban. Topics covered include the influence of stress on the human brain and police officer performance (February 2022).

6. *Human Factors Applied to Law Enforcement.* Facilitated expert panel discussion for a Human Factors and Ergonomics Society Forensic Professional Technical Group webinar. (September 2022).

7. *Perception & Response Time.* Presented to the California Force Instructors Association (August 2022).

8. *Human Factors Psychology Applied to Police Use of Force.* Presented to associate attorneys at the law firm Porter Scott (June 2022).

9. *California POST / STC, & MCLE certified "Force Encounters Analysis".* Presented in Arizona, California, Colorado, Texas, and Washington. (April 2014 – January 2020)

10. *California POST / STC Certified "Human Factors: Threat and Error Management,"* Presented in California and Washington. (April 2014 – January 2020)

11. *California District Attorneys Association Officer-Involved Shooting Conference.* Presented human factors psychology correlated with officer-involved shootings (October 2019).

12. *California POST Force Options Simulator Instructor.* Presented at The Alameda County Sheriff's Regional Training Center. (Began: September 2014 – January 2020).

69

13. *California POST Learning Domain #35 (Firearms) Instructor.* Presented at The Alameda County Sheriff's Regional Training Center. (Began: April 2017 – January 2020).

14. *Human Factors & Use of Force:* Presented at the Ventura County District Attorney's office for MCLE credit (2018).

15. *California POST Learning Domain #20 (Use of Force) Instructor.* Presented at The Alameda County Sheriff's Regional Training Center. (2017).

16. *Human Performance, Use of Force, & Force Options Simulator*, Presented at Stanislaus County Sheriff's Department, Modesto, California (2017).

17. *Human Performance & Officer Involved Shootings.* Presented at The Washington Association of Sheriffs & Police Chiefs Conference, Lake Chelan, Washington. (2016)

18. *California POST Learning Domain #23 (Crimes in Progress) Instructor.* Presented at San Joaquin Delta College (January 2014 – May 2016)

19. *California POST Learning Domain #24 (Crowd Control) Instructor.* Presented at San Joaquin Delta College (January 2014 – May 2016).

20. *California POST Learning Domain #36 (Information Systems) Instructor.* Presented at San Joaquin Delta College (January 2014 – May 2016).

21. *California POST Certified Firearm's Instructor.* Presented for the Livermore Police Department. (2005 – 2012).

22. *Reality Based Training Instructor.* Presented for the Livermore Police Department (2007 – 2013)

# Professional Memberships

International Association of Chiefs of Police (IACP)
Human Factors & Ergonomics Society (HFES)
Academy of Criminal Justice Sciences (ACJS)
Association of Force Investigators (AFI)
California Force Instructors Association (CFIA)
Law Enforcement and Emergency Services Video Association International (LEVA)
Awards / Recognition

# Awards / Recognition

Alameda County Police Officer of the Year

70

EXPERT REPORT
Author: David M. Blake, PhD.

1    Distinguished Service Medal

2    Blue Star Medal

3    Multiple executive commendations

4    Police Academy Ethics Award

5

6

7

8

9

10

71

EXPERT REPORT
Author: David M. Blake, PhD.