# EXHIBIT 2



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SANDRA KIRKMAN AND CARLOS )
ALANIZ, INDIVIDUALLY AND AS )
SUCCESSORS-IN-INTEREST TO JOHN )
ALANIZ, DECEASED, )
)
      Plaintiff, )
)
vs. ) Case No.:   2:23-cv-
) 07532-DMG-SSC
)
STATE OF CALIFORNIA; RAMON )
SILVA; AND DOES 1-10, )
INCLUSIVE, )
)
      Defendant. )
_____)

DEPOSITION OF SERGEANT SCOTT NORRIS
VIA VIDEOCONFERENCE
SAN DIEGO, CALIFORNIA
JANUARY 30, 2025

REPORTED BY MANDY L. KERSH, CSR No. 10674

Sergeant Scott Norris, 1/30/2025

1   your answers.  But I'll just caution you that any attorney
2   involved in this case can argue that a material change
3   like a yes to a no, they can argue that that affects your
4   credibility.
5           Do you understand that?
6   A.   Yes.
7   Q.   Okay.  Can you tell me where you're currently
8   employed?
9   A.   Sure.  I'm a police sergeant with the Torrance
10  Police Department.
11  Q.   How long have you been a sergeant?
12  A.   I've been a sergeant for a little over two years,
13  and I've been a sworn police officer for 16 years.
14  Q.   Is Torrance PD the only place you've worked?
15  A.   Yes.
16  Q.   How old are you?
17  A.   I am 40 years old.
18  Q.   So we're here to talk about an incident that
19  occurred on October 14, 2021, at a place called Steve's
20  Charburger involving a man named John Alaniz.
21          Do you recall that incident?
22  A.   I do.
23  Q.   Have you reviewed your report that you wrote from
24  that incident?
25  A.   Yes.  I reviewed my report and watched my

7

Sergeant Scott Norris, 1/30/2025

1  body-worn camera.
2      Q.   Oh.  So you do have body-worn camera?
3      A.   Yes.
4      Q.   Okay.  I don't have the body-worn camera.  But I
5  can take that up with someone else, the lawyer or the
6  records' clerk at your department.
7      A.   Yes, sir.
8      Q.   Before you read your report, did you have a
9  recollection of the incident?
10     A.   Yes.
11     Q.   Okay.  Is there a reason why you recall that
12 incident?
13     A.   Yes.  Because in the 16 years of police work, it
14 is probably one of the most, if not the most, significant
15 incident that I've been involved in.
16     Q.   We're going to go through your report.  But can
17 you just generally describe for me the incident?
18     A.   Sure.  So I was working as a field training
19 officer on that date and time.  So I had a police trainee
20 as my partner.  We received -- or the Torrance Police
21 Department received a call of a man with a rifle at the
22 Steve's parking lot.
23          So we began responding to the location Code 3,
24 which is lights and sirens, to the location.  As we were
25 responding, we were receiving updated information about

**8**

Sergeant Scott Norris, 1/30/2025

1  the subject who was in the parking lot armed with a rifle.
2  We continued our response.  I was the one that was
3  driving.
4         We stopped -- or I stopped the vehicle short --
5  or before I reached the actual parking lot, so south of
6  the location on a street called Prairie, and we entered
7  the lot on foot because of the risk of a person that was
8  allegedly armed with a rifle.
9         We entered the lot, and there was a parked white
10 truck in the lot.  And I positioned myself behind it or
11 just -- just to the side of it.  And I observed a subject
12 approximately 20, 30 yards east of me.  And the subject
13 that I observed was the subject that was described in the
14 call as the person that was armed with a rifle.  So they
15 described him as subject wearing dark or black clothing.
16 I saw him.  And I immediately began giving the person
17 commands to get on the ground.  And right away, as soon as
18 I began giving him commands to get on the ground, the
19 subject turned and sprinted directly at me.
20      Q.   Let me just stop you right there for a second.
21           When you -- when you initially arrived or
22 initially were 20 to 30 yards from the subject, could you
23 see his hands?
24      A.   Yes.
25      Q.   Was there anything in his hands?

9

Sergeant Scott Norris, 1/30/2025

1  A. He was not armed. No.
2  Q. Okay. And how long -- let me ask you this: You
3  were in uniform; correct?
4  A. Yes.
5  Q. And you had arrived in a patrol car?
6  A. Yes.
7  Q. And did you have another officer there with you?
8  A. So my partner, who is the training officer, was
9  with me. And then simultaneously as I ran into the
10 parking lot with my partner a motor officer pulled in on
11 his motorcycle, so he was right there as well.
12 Q. And both those two other officers were in
13 uniform?
14 A. Yes.
15 Q. Okay. And you said he sprinted at you?
16 A. Yes.
17 Q. And you mean a sprint like running fast?
18 A. As fast as he -- it looked like he could run. He
19 was running towards me with his arms swinging as if
20 somebody was running. And he was grunting and, like,
21 yelling as he was running at me.
22 Q. Could you hear what he was yelling?
23 A. Could I hear what he was yelling? No. He wasn't
24 yelling anything specific. He was just, like, yelling,
25 like, screaming, essentially.

10

Sergeant Scott Norris, 1/30/2025

1   Q.   And he was running right at you?

2   A.   Yes.

3   Q.   Okay.  What happened after he started running at
4   you?

5   A.   So in my 16 years of law enforcement experience,
6   I can't think of a different time or an incident where
7   somebody ran directly at me when I was ordering them to
8   get on the ground.  Typically people try to run away from
9   us.  So this experience was very unusual.

10         So as he was running directly at me, I was trying
11   to decide what my best course of action would be to
12   protect myself.  I ultimately holstered my gun, because I
13   had my gun drawn as I entered the lot at a low ready.  And
14   my gun was at a low ready as I was giving him commands to
15   get on the ground.  So as he started running at me --

16   Q.   Let me just interrupt you there for one second.
17   Sorry.

18         So explain to me what "low ready" is?

19   A.   So my pistol was out, and I was holding it with
20   two hands.  And I was pointing it in a direction that was
21   towards the ground and not actually at somebody.  And so
22   low ready is in a sense that it's not up on a target.
23   It's pointed at a downward direction but ready to
24   basically come up on target at that point if needed.

25   Q.   Okay.  And at any time that the suspect was

11

Sergeant Scott Norris, 1/30/2025

1  run -- well, let me back up.
2          Do you know what a shooting stance is?
3      A.  Do I know what a shooting stance is?
4      Q.  Yes.
5      A.  Yes.
6      Q.  And just so we're clear, it's both arms out,
7  pointed forward, legs spread apart?
8      A.  Yes.
9      Q.  Okay.  At any time did the suspect get into a
10 shooting stance?
11     A.  No.  Not that I can remember.
12     Q.  Okay.  So he's running directly at you,
13 sprinting, and you holstered your firearm; correct?
14     A.  Yes.  So there was a moment where I lowered my
15 gun to holster it, and then I brought it back up to a low
16 ready to kind of evaluate and perceive like what I needed
17 to see and then realized -- confirmed that he was not
18 armed.  He had nothing in his hands.  And then I holstered
19 my gun at that point.  Yes.
20     Q.  Right.  So the reason you holstered your gun, you
21 were able to see that he didn't have a weapon in his
22 hands; correct?
23     A.  Yes.
24     Q.  Okay.  Continue on.
25     A.  So as he was running at me, I holstered my

12

Sergeant Scott Norris, 1/30/2025

```
 1   weapon, and he came directly towards me.  And so I reacted
 2   in the best, I guess, sense of what I felt like was I
 3   guess the best way to protect myself.  And he was charging
 4   me what I perceived as like he was going to tackle me like
 5   a football tackle where he was running directly at me.  So
 6   I raised my arms to defend myself and used my shoulder and
 7   my elbow and my forearm to block him.  So I elbowed and,
 8   like, kind of shouldered him in the upper -- I guess
 9   probably towards his face.  And that immediately knocked
10   him back backwards, and he -- he hit the parked car that I
11   had positioned myself behind.  And as soon as he hit the
12   car, he kind of regained his balance and came directly
13   back towards me.  And then at that point I used my hands
14   along with the other two officers, and we took him to the
15   ground to try to put him in handcuffs and to arrest him.
16        Q.   Were you able to do that at that point?
17        A.   So it was a significant challenge to arrest him
18   and put him in handcuffs.  Probably more than any other
19   person I've had to deal with.
20             As we were going to the ground, he grabbed my
21   pistol that was in my holster, and he tried to pull it out
22   of the holster.  And I had voiced to my partners that
23   "He's got my gun.  He's got my gun."  And so we were
24   struggling to get him into custody, and he was trying to
25   remove my gun from my holster.  At that point, I removed
```

13

Sergeant Scott Norris, 1/30/2025

```
 1   my department-issued Taser and tased him to overcome his
 2   resistance and to gain some compliance.  The Taser
 3   appeared to have zero effect on him, and ultimately I had
 4   tased him multiple times to try to gain control of him.
 5   It took approximately four officers including myself to
 6   finally get him in handcuffs.  And we had to use two sets
 7   of handcuffs because it was difficult to get just one pair
 8   of handcuffs on him.
 9           Once we were able to get him in handcuffs, he was
10   still flailing and, like, swinging and resisting us and
11   would not calm down.  So we used something called a hobble
12   where we restrain -- it's a restraint device used to
13   restrain people -- their legs, essentially from moving.
14   And we put the hobble around his legs.  And we used a
15   technique called a TARP, where you take the hobble and you
16   string it through the handcuffs so that his hands and his
17   legs were immobile.  However, he was still able to manage
18   to, like, break free from the TARP.  We had to TARP him a
19   second time.  And even when he was handcuffed and TARP'd,
20   he was still flailing his body and actually slamming his
21   head into the concrete -- or into the pavement trying to
22   cause harm to himself or break free from us keeping him
23   restrained.
24       Q.  Let me jump back to the Tasers.
25           I looked through your report, and it appears that
```

14

Sergeant Scott Norris, 1/30/2025

1   were able to medicate him, we -- they loaded him into the
2   paramedic -- or the ambulance, and then myself and my
3   partner rode with him to the hospital to provide him with
4   medical attention.
5       Q.   Anything -- do you recall -- did they give him
6   Versed?
7       A.   I have no idea what they gave him.
8       Q.   Okay.  Did that calm him down?
9       A.   Not really.  No.
10      Q.   Anything happen in the back of the ambulance
11  of -- you know, that stands out to you?
12      A.   Nothing that -- nothing that -- no.  No.
13      Q.   Did he ever say anything that you could
14  understand?
15      A.   The entire incident when we were trying to get
16  him into custody, he never said -- I can't remember him
17  saying a single word.  He started to communicate a little
18  bit in the ambulance, but it wasn't anything that I was
19  able to understand or articulate, like, what he was
20  actually saying.
21      Q.   ==Did you form any impression on why he may have==
22  ==charged at you?==
23      A.   ==So in my opinion, based on my training and==
24  ==experience and the 16 years that I've been a sworn police==
25  ==officer and in the courses that I've -- and certifications==

17

Sergeant Scott Norris, 1/30/2025

1   I've received related to narcotic influence and then
2   mental illness, I -- I formed the opinion that he was
3   suffering from a mental illness and -- in combination with
4   being under the influence of a controlled substance.
5        Q.   I know in your report it said excited delirium,
6   and it was okay to say that at that point in time.  I
7   think you have to use different terms now.  But I
8   understand what you -- what you're saying.
9             Did you form the impression at all that he may
10  have been suicidal?
11       A.   Yes.  And I base that on, well, you know, the
12  totality of the circumstances.  So everything that I
13  experienced from the call comments on to my contact with
14  him, the fact that he had armed himself with a rifle and
15  turned out to be an air rifle but it was a replica rifle,
16  the fact that he armed himself with that.  And then after
17  the fact we learned that he -- it was taken away from him
18  just prior to our arrival.  That combined with the fact
19  that he was trying to -- well, one, that he charged me,
20  and two, that he tried to remove my pistol from my -- from
21  my holster, and then that he was slamming his head into
22  the concrete, I perceived that he wanted to hurt himself.
23  And it was almost as -- like he wanted us to use deadly
24  force on him like a "suicide by cop" situation.
25       Q.   Do you know if Mr. Alaniz was -- I don't know

18

Sergeant Scott Norris, 1/30/2025

1   what the correct term is -- but was put under a 5150?
2        A.   He was.  Yes.
3        Q.   And do you have to sign off on that based on what
4   you observed?
5        A.   So my partner wrote the 5150 hold.  So yeah.
6   We -- we -- we wrote the hold for the hospital to put him
7   on basically a psychiatric hold.
8        Q.   Okay.  And do you remember the hospital?
9        A.   Little Company -- Providence Little Company of
10  Mary in Torrance.
11       Q.   So after you gave him over to the hospital,
12  finished the 5150 form, you basically left?  That was the
13  end of your involvement?
14       A.   Correct.  There were pending criminal charges.
15  So assault on a peace officer and resisting arrest.  But
16  however due to the 5150 hold and then his need for medical
17  attention, we -- he was released from our custody into the
18  custody of the hospital and then we left.
19       Q.   Do you know whatever happened with the charges?
20       A.   I do not know.  No.
21       Q.   Okay.  I'm going to -- do you have your report in
22  it front of you?
23       A.   I do.  It's right here.
24       Q.   All right.  I'm just going to -- for the purposes
25  of the record, I'm just going to share my screen for a

19

Sergeant Scott Norris, 1/30/2025

1    A.   Yes.

2    Q.   And at some point he grabbed your gun?

3    A.   Yes.

4    Q.   Is that right?

5    A.   Yes.

6    Q.   And at that point, did you consider using lethal
7  force?

8    A.   So I did not because he didn't remove my gun.  He
9  wasn't able to remove my gun from my holster.  But I had
10 voiced the fact that he was trying to grab my gun.  I
11 actually said, "He's got my gun."  And so I can't speak
12 for other officers.  But I know they told me afterwards
13 that they considered it and ultimately did not.

14       But they looked down to see -- when I said, "He
15 has my gun" -- where my gun actually was.  And they at
16 that point considered using deadly force.

17   Q.   But yourself, you didn't consider using force or
18 asking your fellow officers to use deadly force; is that
19 right?

20   A.   I did not consider using deadly force.  I used
21 force and obviously considered using force and was
22 constantly reevaluating the amount of force we needed.
23 But I did not ask anyone to use deadly force.  And I
24 myself did not use deadly force.

25   Q.   You mentioned that he ended up being held on a

25

Sergeant Scott Norris, 1/30/2025

1  5150, and that even though there were charges of assault
2  and battery on an officer, he was released to the
3  hospital.
4          How was that decision made that he would go to
5  the hospital on the 5150 versus go to jail for assaulting
6  officers?
7      A.   So the decision was made that he would go for
8  5150 hold rather than jail was due to his assaultive
9  behavior and his, I guess, lack -- the lack of his ability
10 to follow directions and -- and it seemed like his lack of
11 ability to understand, like, what was going on.  And he
12 had injuries that needed to be treated.  So we -- you
13 know, we decided that -- we determined that it was best to
14 go to the hospital for his treatment and his medical
15 condition rather than jail at that point because the
16 criminal charges can always be pursued at a later date.
17     Q.   When you arrest somebody, is part of your
18 training to arrest them in a way that uses the least force
19 possible while still keeping you and your fellow officers
20 and other citizens safe?
21     A.   Yes.
22     Q.   So when he was running at you, was that part of
23 your thought process of how can I take this person into
24 custody but in a way that uses the lease force necessary
25 and does it in a way that could potentially take him into

26

Sergeant Scott Norris, 1/30/2025

1          REPORTER'S CERTIFICATE

2          I, Mandy L. Kersh, CSR No. 10674, a Certified

3    Shorthand Reporter within and for the State of

4    California, do hereby certify:

5          That, prior to being examined, the witness

6    named in the foregoing deposition solemnly stated that

7    the testimony given in this deposition would be the

8    truth, the whole truth, and nothing but the truth;

9          That said deposition was taken before me at the

10   time and place set forth and was taken down by me in

11   shorthand and thereafter reduced to computerized

12   transcription under my direction and supervision, and I

13   hereby certify the foregoing deposition is a full, true,

14   and correct transcript of my shorthand notes so taken;

15         Further, that is the foregoing pertains to the

16   original transcript of deposition in a federal case, before

17   completion of the proceedings, review of the transcript

18   [X] was [ ] was not requested.

19         I further certify that I am neither counsel

20   for, nor related to, any party to said action, nor in any

21   way interested in the outcome thereof.

22         Dated this 14th day of February,

23   2025, at Los Angeles, California.

24   _____

25   MANDY L. KERSH, CSR No. 10674


Peterson Reporting Video & Litigation Services