# EXHIBIT 9

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                            --oOo--

4

5    SANDRA KIRKMAN, CARLOS ALANIZ,
     individually and successors
6    in-interest to JOHN ALANIZ,
              Deceased,
7
              Plaintiffs,
8
     v.                      Case No.   2:23-cv-07532-DMG-SSC
9
     STATE OF CALIFORNIA, RAMON
10   SILVA, and DOES 1-10, inclusive,

11            Defendants.
     _____/
12

13

14            STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15                 DEPOSITION OF DEFENSE EXPERT

16                        ROD ENGLERT

17                 THURSDAY, FEBRUARY 20 2025

18

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  136908

25

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 14

1   have working on this with you?

2       A.   The same rate.

3       Q.   **You mentioned some colleagues, but can you list**

4   **the full list of colleagues or employees who are working**

5   **on this with you?**

6       A.   Yes.  That would be Samir Lyons from Trial

7   Ready, the animation.  Nikki, N-I-K-K-I, Waygar,

8   W-A-Y-G-A-R.  She's one of my associates.  And then

9   Cheryl, C-H-E-R-Y-L, Kanzler, K-A-N-Z-L-E-R, another one

10  of my associates.  They're analysts.  Their expertise is

11  in reconstruction.

12      Q.   **What did you understand your assignment to be**

13  **in this case?**

14      A.   To reconstruct this OIS, this officer-involved

15  shooting.

16      Q.   **Some parts of your report discuss the**

17  **trajectory of the bullet, based on the wounds that are**

18  **found later and in the autopsy report.  Could you**

19  **describe just broadly for me, how you go from seeing**

20  **injuries in an autopsy to determining what the**

21  **trajectory of the bullet was through the body?**

22      A.   Yes.  The first thing that we will do is look

23  at the autopsy report, then look at the autopsy

24  photographs, and then look at the physical evidence,

25  which has been kept, and analyze the physical evidence

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 15

1    and see if those wounds correspond to the defects on the

2    clothing and the pathway through the body.

3           And any exits become important.  Any missed

4    shots become important.  And where that terminates --

5    where that bullet terminates -- there's like internal

6    ballistics, transitory ballistics, and terminal

7    ballistics.

8           And then where those terminate, that can tell

9    you the pathway of that bullet, even if it goes through

10   an object or goes through a body, where it terminates.

11   And in this instance, the truck is where some of that

12   terminated, and Mr. Alaniz's person -- am I saying that

13   right, Alaniz, your client?

14       Q.   Alaniz.

15       A.   Okay.  So where that terminates gives us a

16   pathway.  And it's reverse engineering.  And you work

17   backwards -- in the body, you work backwards.  And that

18   give you right to left, up to down, type of pathway,

19   which is called a "trajectory," which is considered to

20   be ballistics.

21       Q.   Okay.  I apologize for the really basic

22   question here, but if you have an entry wound and an

23   exit wound, are you essentially drawing a line from one

24   to the other to get the trajectory?  Is that how it

25   works?

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 16

1      A.   That's true, if there's no deflection within

2   the body or within the object, and deflection or

3   ricochet is very evident.  In other words, if a bullet

4   goes in from the side of my ribcage and exits out of my

5   chest, that doesn't compute, unless it ricocheted off of

6   something, the spine or something, which is extremely

7   rare.

8      **Q.   And so the same method of -- you know, would**

9   **that apply to internal -- when you find a bullet**

10  **internally?  So would you take the entry wound and then**

11  **make a line between that and where the bullet is**

12  **recovered in the body to get to where the trajectory is?**

13     A.   Yes.

14     **Q.   In this case, did you think that there were any**

15  **of those rare internal deflections of the bullet that**

16  **you just mentioned?**

17     A.   Not within the body, no.

18     **Q.   Could you go through your opinion of the**

19  **trajectory of each shot fired by Defendant Silva, in**

20  **this case?**

21     A.   I will start with my opinion regarding what I

22  think is the first shot, and it has to do with the

23  termination of those rounds within the body and against

24  a semi-truck.  And as Alaniz is running towards Officer

25  Silva, Officer Silva fires, within just like a second,

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 17

1   five rounds.

2          And working construction backwards, there's a

3   semi as his backdrop.  And 4 feet up on the semi, at the

4   bed of the semi -- at the bed of the semi, a bullet

5   strikes.  And that was a miss, but it's most probable

6   that that miss went through the right collar of the

7   jacket worn by Alaniz.  And it was a bullet defect,

8   showing the entrance and the exit -- the threads will

9   always go the direction of the bullet -- and it hits the

10  truck.

11         Okay.  That shot is higher than the rest that

12  is about to occur, that I'm going to explain.  And that,

13  in my opinion, is most probable, number one.  Because as

14  determined at the end of the shots that are fired, the

15  last one is going to hit the ground.

16         So just thinking that through, if that hits the

17  ground and it's much lower than the first one, that

18  shots are tracking Alaniz as he's running and as Officer

19  Silva is in his position.

20         So then the next shot, in my opinion, is while

21  Alaniz has to be canted to his left as he's running, and

22  he's shot in the right chest.  The garment that he's

23  wearing corresponds to that wound, and that's just below

24  the shot through the collar that didn't touch Alaniz.

25  So that's considered a miss, the one that hits the semi.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 18

1        So number two is the chest, and then it goes in

2   a pathway from right to left and lodges in the left

3   lung.  That gives you a pathway and direction that's

4   in-line with the first shot that went and hit the truck.

5        And then the next shot, in my opinion, number

6   three, goes through and hits what's called an

7   "intermediate target," which is the zipper on the garment

8   that Alaniz was wearing.  And when that bullet goes

9   through the zipper hitting that intermediate target, it

10  breaks up and creates what's called an "atypical wound,"

11  which is in the right thigh.

12       And that being in the right thigh, it shows

13  it's atypical because there's portions of the zipper that

14  broke off and hit the right thigh.  And that would be, in

15  my opinion, number three.  Because as you can see, if you

16  think of the truck, now, 4 foot 3, the rest of the shots

17  that hit the truck are much lower.  And this happens in

18  like less than a second.

19       So to break away from what I'm explaining and

20  go to the ground shot, there's no way that there's even

21  any time for Officer Silva to shoot high, low, and then

22  shoot high again.

23       Do you follow the sequence?  It's just common

24  sense.

25       And then the next shot that hits Mr. Alaniz is

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 19

```
 1   in his left shin bone.  And that's an unusual shot

 2   because -- it is so unusual it's also called "atypical."

 3   That -- it appears that that bullet of that last round

 4   that went through, probably hit the ground, the pavement,

 5   although there was no investigation that showed that

 6   there was a gouge in the asphalt, or what have you -- and

 7   grazes the shin, breaks up, and hits two other locations

 8   on the truck, the lowest being the tire.  It hit the

 9   right front tire of the semi.

10             So you see we go back to the bed, and if you

11   follow the impacts to the side of the door of the truck,

12   down by the running board, and it's low.  And even lower

13   is the tire.  So as I'm showing you with my hands now, up

14   high there's shooting, and the shooting.  And the

15   shooting goes on hitting the truck, those that miss, and

16   hitting the body of Mr. Alaniz.

17             And he's in a bent-over position.  So if you

18   take the right thigh shot and then the right shoulder, as

19   he's bent over, that is a very short diameter.  That's

20   like you could put a basketball over that and that's how

21   -- because he's bent over, makes it look as though --

22   well, it shows us that those shots were placed very

23   quickly as he's running.  And some of them miss as he's

24   running.

25             So Officer Silva is backing up, and as he's
```

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 20

1  being charged in that less than one second, those five

2  shots fired.

3      **Q.   Thank you.  I think I understand the answer,**

4  **but I just want to go over it really quick to make sure**

5  **I got it.**

6         **So the first shot, your opinion is, it went**

7  **through the right collar and then into the truck?  Is**

8  **that right?**

9      A.   Yes, the bed of the truck, where it was lodged

10  and found.

11      **Q.   Then the second shot went into the decedent's**

12  **chest.  And the third shot hit the zipper and then went**

13  **into his right leg?**

14      A.   Right thigh leg, yes.

15      **Q.   And then could you explain again the fourth and**

16  **fifth shot, what your opinion about those is?**

17      A.   The fourth shot came in contact with the -- the

18  fourth or a fifth came in contact with the left shin

19  bone, and it had broken up, most probably, prior to

20  hitting the shin bone, separated, and then a portion of

21  it hit the tire, which was not recovered.  Flattened the

22  tire.  And then a portion of it hit the running board,

23  just above the running board, like 3 feet from the

24  ground.

25         So the bed of the truck was 4, the running

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 21

1  board is like 3 in inches, and then the tire is about

2  the same.  So it's just tracking from down -- or from up

3  to down.

4      **Q.   So one of the bullets -- a single bullet struck**

5  **the ground, broke apart, and then hit the left shin and**

6  **two places on the truck; is that right?**

7      A.   Possibly, yes.  A portion of it did hit the

8  shin.  And based upon our investigation and another --

9  Dr. Graham -- it's most probable.  That shin bone is a

10  very atypical and unusual wound.  And the medical

11  examiner can address it better than I can, which

12  indicates that the target --

13          (Reporter clarification.)

14          THE WITNESS:  Dr. Graham evaluated it and came

15  to the same opinion.  I read his report.  He came to the

16  same opinion that it had to have been most probably an

17  intermediate target, meaning it's something between the

18  shin bone that was struck and the shooter.

19  BY MR. MAYNE:

20      **Q.   Okay.  So we talked about this one bullet,**

21  **either the fourth or the fifth that broke apart and hit**

22  **the shin, and then the truck in two places.**

23          **So there's one bullet left to talk about.**

24  **Could you describe what you think happened to that one?**

25      A.   Don't know.

SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Rod Englert on 02/20/2025

Page 22

1    **Q.   Do you have any possibilities that you have in**

2    **mind, or do you just have no idea what happened to that**

3    **bullet?**

4    A.   Well, two bullets were found:  one in the truck

5    and one on the ground, and we can't place where that

6    came from.  The one on the collar probably went into the

7    bed of the truck, and then you have two that go into the

8    body of -- then you've got the one that breaks up, and

9    another one -- and then there was another bullet found

10    underneath the truck.

11         So cannot sequence that.  And then it's not

12    guesswork, you have to depend upon the evidence.  That's

13    what the evidence tells us.

14    **Q.   Okay.  Is there anything you can say about the**

15    **trajectory of that bullet -- and I understand we don't**

16    **know it's the fourth or fifth -- but I'm talking about**

17    **the bullet that came towards the end and was not the one**

18    **that injured the decedent's chin?**

19    A.   We don't have evidence that it's the one that

20    did it, but everything is from Silva's shooting towards

21    the east -- it would be the southeast, shooting towards

22    the southeast with all the shots.

23         And if you go to my report, you'll see we made

24    a cone shape.  Everything is from his position and where

25    it hits the truck and, reverse engineering, you can put

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 23

1   within that cone shape.  That shadowing, you can place

2   Mr. Alaniz.  Everything lines up.

3           And as I told you at the beginning, I said

4   these shots are most probable.  I'm not saying with

5   absolute certainty that the one through the collar was

6   the first one, but it's most probable.

7           It's a common sense thing, is everything goes

8   from up to down; and Silva, from his left to his right;

9   and in the body of Mr. Alaniz, his right to left.

10       **Q.   Okay.  So just to make sure I'm understanding**

11  **this, you have an opinion about the trajectory of four**

12  **of the bullets, but not the fifth?**

13       A.   Everything is laying in the direction of the

14  truck, whether it's under the truck or in the truck.

15  So, yes, it's the same.  And when you look at the BWC,

16  the body-worn camera, you will see that the shell

17  casings that were coming out, they go towards -- it's

18  going towards the truck.  The gun is aimed toward the

19  truck.

20       **Q.   So you do have an opinion about that fifth**

21  **bullet we're talking about, and you think it's**

22  **trajectory went in the direction of the truck; is that**

23  **fair?**

24       A.   All shots that were fired went the direction of

25  the truck, yes, the background.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 28

```
1              THE WITNESS:  -- 11 foot 4 inches, plus 12

2    feet, I would say he's approximately 20 feet away when

3    he sees that.  20 feet, approximately.

4              Now, he's moving, but these are the distances

5    where the event occurred and measured.

6    BY MR. MAYNE:

7         Q.   And about how far was Officer Silva from

8    Van Dragt when Van Dragt pulled out his Taser?

9         A.   It would have been about the same distance,

10   about 20 feet.

11        Q.   When you said earlier that Officer Silva --

12   sorry.  When you said earlier that the decedent was

13   canted to his left at the time of the shot to his chest,

14   could you be more specific about that?  Like, how far

15   canted do you think he was?

16        A.   He was canted to the point to where as he is

17   canted to his left -- meaning his left shoulder is

18   pointed back towards the truck behind him -- allowed for

19   the entry into his right chest to go into the pathway to

20   the left lung, where it lodged.  So that's a pathway.

21             That's a pathway that, if I were facing you as

22   we are now, and you shot me, that bullet would be front

23   to back.

24             This one is from right to left, lodged in the

25   left lung.  That's the trajectory path.
```

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 29

1      Q.   So if I'm facing you, I would -- let's say I

2  describe this as, you know, we're zero degrees when

3  we're facing each other.  How would you describe the

4  decedent's chest, in terms of the degrees, in relation

5  to Officer Silva?

6      A.   It would be in such a degree that his right

7  side had to be turned towards Officer Silva.  To give

8  you a degree, you don't do that in degrees because

9  there's too much there, too much bulk.  You can't

10 determine that.

11      But we know a medical term for medical

12 examiners that you have right to left, front to back, up

13 to down, slightly this, slightly that.  And so this one

14 is from right to left.

15      And when it lodges in the left lung, that's a

16 pretty sharp degree.  It's an acute angle.  As he would

17 have had to have been -- as I am doing to you on this

18 Zoom, you're looking at me 90 degrees.  And when I turn

19 my right shoulder to you and as your eyes look at me

20 were to hit my right chest, where would that lodge?  It

21 certainly wouldn't be in the right back.  It would have

22 to be in the pathway, as the medical examiner has noted,

23 in the left lung.

24      Q.   Do you think at that point he was still

25 pointing the object in his hands at Officer Silva?

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 30

 1    A.   When he shot?

 2    **Q.   The second shot.**

 3    A.   What do you mean "at that point"?  What do you

 4  mean "at that point"?

 5    **Q.   So we're talking about the second shot, the one**

 6  **that went through the decedent's chest.  And I'm just**

 7  **asking, at that point, based on your reconstruction**

 8  **analysis, do you think the decedent was pointing the**

 9  **object in his hands at Officer Silva?**

10    A.   Yes.  When Officer Silva started firing, it's

11  noted by the BWC, he's got it in his hand.  It hasn't

12  dropped.  He's coming at him.  And he's coming at him

13  fast because the momentum carries him quite a few feet

14  beyond where he was shot, that you wouldn't do that if

15  you're standing still.  You just go straight down and

16  collapse, if you're incapacitated.

17        And he was incapacitated, but yet his momentum

18  carried him further at the time that he was pointing the

19  gun and shot.  At no point is there any evidence that

20  his hands were lowered and not pointing.

21    **Q.   At what point do you think he was**

22  **incapacitated?**

23    A.   Totally incapacitated?  When he died at the

24  scene.  But "incapacitated" meant that he went down

25  pretty quickly.  I mean, he was in a forward movement.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 31

1    And when he was shot, he just continued down.

2           But his momentum carried him; and it's in a

3    table that we made, how far he was carried.  He carried

4    himself, his momentum.  That doesn't happen in

5    shootings, only on television where someone gets shot

6    and they're blown backwards or forward.  I mean, your

7    momentum -- the energy from a projectile cannot overcome

8    the momentum of your body.

9           My question was a little different earlier.  I

10   was just asking whether you think, at the time of the

11   second shot, the decedent was pointing the object in his

12   hands at Officer Silva?

13           (Simultaneous speakers.)

14           (Reporter clarification.)

15       MS. NASH:  Asked and answered.

16       THE WITNESS:  The time element is so short that

17   it would have been still pointed at him as he's going

18   down.  There's no evidence to say otherwise.

19           It's all about that time threshold.  It is so

20   short.  It's like snapping my finger; and not many things

21   can happen in the snap of a finger.

22   BY MR. MAYNE:

23       **Q.   At some point was the decedent directly facing**

24   **Officer Silva in the way we talked about earlier, that**

25   **I'm directly facing you?**

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

1    A.   Well, you can see that in the video, as he's

2   coming around approaching the door, yes, he's facing

3   him.  But the evidence, which is very strong, is the

4   pathway of the bullet's through the body, that he had to

5   be canted and turned towards him.

6    **Q.   So in the time, you know, that he was able to**

7   **cant or turn to the left, wouldn't that also be enough**

8   **time for his arms to move, so that he's no longer aiming**

9   **his arms at Officer Silva?**

10    A.   I don't know.  I don't know.  Not seeing

11   that -- it's such a compressed amount of time, like less

12   than a second, that not much can happen.

13       Without having seeing it on the video, I can't

14   say that it would.  But there's no indication that his

15   arm was lowered, and most probably not -- only because

16   that compressed amount time, I mean, less than a second.

17       I'm pointing my hand at you, and I drop my hand

18   like that, it would be where you practically cannot see

19   it in that short amount of time.

20    **Q.   Right.  So going back to just -- I know I have**

21   **asked it a few times, but I just was hoping to get a**

22   **clearer answer.  It could be either "yes," "no," or "I**

23   **don't know" if, in your opinion, based on your**

24   **reconstruction, was the decedent pointing the object in**

25   **his hands at Officer Silva at the time of the second**

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 33

```
 1   shot?

 2       A.   Yes.

 3            MS. NASH:  Objection.  Asked and answered.

 4            Did you hear his response?

 5            MR. MAYNE:  Yes.

 6            MS. NASH:  Okay.

 7   BY MR. MAYNE:

 8       Q.   Do you have any reason to think that, outside

 9   of the testimony of Officer Silva?

10       A.   The evidence does not support him having

11   dropped his hand when the shots are fired.  They

12   eventually go down, yes, but not to the point that he is

13   charging and running and puts his hand down to say "I

14   give up."

15            Now, when you consider all the circumstances

16   that happened prior, him trying to jump in front of

17   trucks, put his head under a truck, those kind of

18   things, there is no indication or evidence that he

19   lowered his hand.  And you wouldn't see it.  It would

20   not happen because of that short amount of time.

21            So I can't answer that "yes" or "no," other

22   than, in my opinion, he's still pointed at him when the

23   shots are fired.  The shots are fired in less than a

24   second.

25       Q.   Right.  Okay.  So the fact that his body is
```

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 34

 1   actually canted left, not facing Officer Silva, you

 2   don't think that that is some evidence that he was no

 3   longer pointing anything at Officer Silva?

 4       A.   Not during that time period.

 5       Q.   What if he had turned all the way around so he

 6   was canted, so that he was looking away from Officer

 7   Silva?  In that case, hypothetically, would you think

 8   that that's evidence that he's not aiming at Officer

 9   Silva?

10       A.   I can't --

11            (Simultaneous speakers.)

12            MS. NASH:  Objection.  Incomplete hypothetical.

13            THE WITNESS:  Yeah.  I cannot address that.  If

14   he turned all the way around, the hand could still be

15   pointed as he turns, but that's just guesswork.

16            We have the solid evidence of what happened,

17   not only based upon what we see in the BWCs, but looking

18   at the physical evidence, the clothing, and the

19   interviews.  All that is evidence.

20   BY MR. PAYNE:

21       Q.   Okay.  So what's the specific evidence that

22   makes you think that he was pointing at Officer Silva at

23   the time of the second shot?

24       A.   Look at the video.  I mean, the video is very

25   clear that he's coming at him, and with such momentum,

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 35

1    there's no way for him to change direction.  He's

2    running as fast as -- he's running --- as supported by

3    witnesses, as supported by Van Dragt, as supported by

4    Silva -- he's moving at a very fast pace.

5         You can see it in his legs.  And for him to

6    just stop and transition, it just doesn't make sense.

7    So he's still pointed when those five rounds go off,

8    less than a second to protect his partner, who he think

9    has been shot and to protect himself, who has no cover,

10   that being Silva.

11   **Q.  So the only reason you think that he -- that**

12   **the decedent was still aiming at Officer Silva at the**

13   **time of the second shot is your review of the body-worn**

14   **camera and how, at some point, he is aiming at Officer**

15   **Silva; is that right?  Or is there other evidence?**

16        MS. NASH:  Objection.  Misstates prior

17   testimony and misleading the witness.

18        THE WITNESS:  Ask it again.

19   BY MR. MAYNE:

20   **Q.  I'm just trying to understand -- so let me**

21   **phrase it this way:  I mean, would you agree that**

22   **there's no video evidence of the exact moment when the**

23   **second shot is fired for us to actually see the**

24   **decedent's body at that moment?**

25        A.   In my opinion, based upon my experience and

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 36

1    training, that when those rounds start going off, he's

2    pointing -- you can see him pointing the gun at him.

3    And in less than a second, can he change his position

4    and stop and lower his hands and do anything different,

5    other than go to the ground?  So in that moment in time,

6    that when those shots are fired by Silva, he has made a

7    decision to protect his partner and protect himself.

8         And this is getting into practices, which, you

9    know, you can stop me if you want to.  But there's no

10   way to change.  He can't -- Alaniz can't change.  It's

11   just not humanly possible for him to stop, lower his

12   gun, and then he ends up about 12 feet further, carried

13   by his momentum.

14        And that's where all the evidence has dropped

15   to the ground, the object he was holding onto in his

16   hand.

17   **Q.   Okay.  That wasn't really answering my**

18   **question.  My question was just:  Would you agree that**

19   **there's no video evidence showing the decedent's body at**

20   **the time of the second shot, because the video was**

21   **obstructed by Officer Silva's hands?**

22   A.   So in the last three-quarters of a second, no,

23   you cannot see what happened.

24   **Q.   So your opinion that the decedent was still**

25   **aiming at Officer Silva is an inference of some kind,**

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 37

1   based on other information, since we don't have the

2   direct video of that moment?

3       A.   In that very short period of time, in like, I

4   guess, even half a second, for him to change position,

5   all I know is he's canted and he's going down.  And what

6   the position of his arms are at that point, I don't

7   know.

8            But common sense tells you that he's going to

9   the ground from the position that he was in when he's

10  pointing what appeared to be a gun in Officer Silva's

11  direction.

12      Q.   Okay.  So you would agree, then, that your

13  opinion at the end of the day is you don't know where

14  his arms were pointed at the time of the second shot?

15      A.   I disagree with that.

16           MS. NASH:  Objection.  Misstates prior

17  testimony.  Misleading to the witness.

18           (Reporter clarification.)

19           (Simultaneous speakers.)

20           THE WITNESS:  Go ahead.  I'm sorry.

21  BY MR. MAYNE:

22      Q.   I must have misunderstood your last answer.  So

23  I thought that you said you didn't know the exact

24  position of the decedent's arms at the time of the shot

25  to the chest.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 38

1      A.   I don't think I said that.  Maybe go back and

2   read it to me.

3      **Q.   That's okay.  Let's just think about it this**

4   **way:  So beyond the body-worn camera video, is there any**

5   **other evidence that leads you to infer that the decedent**

6   **was aiming his arms at Officer Silva at the time of the**

7   **shot to the chest?**

8      A.   It's pretty clear in the BWC, body-worn camera,

9   that he was pointing what appeared to be a gun at him.

10   And that the first shot would have been high, through

11   the collar, which was -- as Officer Silva said, it was a

12   shot towards his midbody to stop the threat.  And there

13   is no evidence that he could have changed, other than go

14   to the ground.

15      **Q.   So, I'm sorry, I'm not a biomechanist, or**

16   **whatever, so this question might be a little bit naive.**

17   **But if there's time for his body to physically cant to**

18   **the left, then why wouldn't there be time for his arms**

19   **to cant with his body?  Wouldn't that take the same**

20   **amount time?**

21      A.   Well, if his body cants to the left, his arm is

22   going to follow.

23      **Q.   So his arms were canted to the left, along with**

24   **his body, at the time of the second shot?**

25      A.   It would have been, yes.  It would just follow

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

1    his body for it to go into the chest in a pathway from

2    right to left.

3        **Q.   So your earlier stated opinion that he was**

4    **still aiming his arms at Officer Silva at the time of**

5    **the shot to the chest is not accurate?  It's not your**

6    **actual opinion?  Your opinion is that he was no longer**

7    **aiming his arms at the officer?**

8        A.   No, not at all.

9            MS. NASH:  Objection.  Misstates prior

10   testimony.

11   BY MR. MAYNE:

12       **Q.   Okay.  We're really speaking different**

13   **languages here.  I thought you just said that the arms**

14   **would track with the body and be canted to the left.**

15   **Did I mishear that?**

16       A.   That doesn't mean that the pointing of the arm

17   would have changed at him.  As he turns left, his

18   shoulder is going to follow.  He's got a two-hand hold,

19   and you can see that in the video.

20           And again, don't neglect to consider there's a

21   time element here, like less than a second.  Not much

22   can happen, other than the continuance of his running

23   towards Officer Silva.  There's nothing, as I'm

24   understanding you -- and I know where you're going with

25   this -- or I think I do -- that as he turns, he's going

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 40

1    straight down to the ground.  He's already been hit.

2    The truck has been hit before he even hits the ground.

3          So you're talking -- nothing can happen in that

4    very short period of time to change positions to do

5    anything different.

6    **Q.    Okay.  That helps.  That makes sense.**

7    **So since nothing can happen to change positions**

8    **in this very short time, would you agree that the**

9    **decedent's position at the time of the shot through the**

10   **chest was about the same as the decedent's position when**

11   **the shots started?**

12   A.    Yes, I would, because of the fact the shot

13   through his garment and hitting his right thigh and

14   hitting his left shin, it happened so fast that he's in

15   that canted position.  Now, I mean, he's not 90 degrees

16   to him, because that would have put a different pathway

17   through the thigh and all through the chest.

18          He's just canted.  And canted is not an extreme

19   turning.  But his arm and shoulder would have

20   followed -- it's so simple -- not a lot -- as he's

21   coming towards him when he disappears out of the view of

22   the BWC because of the shooting.

23   **Q.    So given that you agree, even at the time of**

24   **the first shot he was -- the decedent was canted to the**

25   **left, is it possible he was not aiming his arms at the**

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 41

1    **officer at that point, that his arms were in line with**

2    **the rest of his body, body pointing towards the left of**

3    **where the officer was?**

4        A.   If this was a time interval of five, ten

5    seconds, anything could have happened; but in less than

6    a second, when the shots were being fired, to change to

7    a totally alternate position is not -- in my opinion,

8    it's not possible.  It's just too fast.

9            I mean, Officer Silva sees what's coming at

10   him, that he believes to be a gun, and he shot because

11   he thought his partner had been shot.  And once that

12   identification is made by his eyes, transfers that to

13   his brain, to pull the trigger, and it's over in less

14   than a second.

15           Not much can happen with the person that's

16   running at him with what appears to be a gun, as far as

17   stopping the threat:  Hey, I'm done.  Dropping what he

18   had in his hands.  What he had in his hands continued on

19   with his body because it was out around him.  That

20   didn't just drop to the ground.  There was no stopping.

21       **Q.   Did you review Officer Van Dragt's testimony**

22   **that the object in the decedent's hands was most likely**

23   **a glasses cases?**

24       A.   He did not know that until at the end.  He said

25   a cylindrical object was in his hands.  He did not know

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 50

1    Q.   So the best estimate I can get from this is he

2    backed up from somewhere between a centimeter and 30

3    feet.  Is that consistent with your opinion?

4            MS. NASH:  Objection.  Misstates testimony and

5    argumentative.  Lacks foundation.  It is seeking to

6    solicit speculative answers from this witness.

7            THE WITNESS:  I don't know.

8    BY MR. MAYNE:

9    Q.   Okay.  In the video that you made, how did you

10   decide how many steps and how far back Officer Silva

11   should go in the reconstruction of the shooting?

12   A.   Well, first of all, we don't determine how far

13   he should go.  We go by the reconstruction with him that

14   took place at this -- at the location where we did the

15   reconstruction.

16           And there was no measurement of how far he

17   backed up because, in his own mind, he doesn't know.  He

18   didn't run.  He didn't turn.  He had no cover.  And he

19   defensively stepped back in that one second in time --

20   which how far can you go, that one second in time when

21   the shots are fired?

22           So there was no way, other than having video --

23   which we don't have.  And you can't tell on the shots

24   that are fired.  When his gun is up in front of him, you

25   can't tell how far.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 51

1           But he didn't run back to his motorcycle.  He

2    didn't run to the unit.  He didn't go forward.  He

3    defensively came back to stop the threat.  What that

4    exact measurement is, nobody knows.

5        Q.    So when you were doing the reconstruction, was

6    Officer Silva present there?

7        A.    Yes.

8        Q.    Who else was present?

9        A.    Nikki Waygar.  Nikki Waygar, Cheryl Kanzler.

10   The ones that I previously mentioned.

11       Q.    Were there any attorneys there?

12       A.    Mr. Roistacher was there.  I'll tell you

13   exactly who was there.

14           Officer Silva.  Samir Lyons, that I mentioned

15   earlier.  And then one of his associates, Tucker Lemmu;

16   T-U-C-K-E-R is the first name, and then L-E-M-M-U.  And

17   then Ms. Kanzler and Ms. Waygar.  And the attorney,

18   Mr. Roistacher.

19       Q.    Was David Blake there?

20       A.    No.

21       Q.    Did you talk to Officer Silva about his

22   recollection of events during that reconstruction

23   meeting?

24       A.    It was discussed, yes.  And I talked to him

25   previous to that, when I made a trip in November to look

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 52

1   at physical evidence.  And he was with us present at

2   that time, and I talked to him.

3       Q.   Did he -- did he tell you during that

4   conversation that he thought the decedent was pointing

5   the object in his hands at him, at Officer Silva?

6       A.   Yes.  His life, he felt, was threatened.

7       Q.   But did he tell you that the decedent was

8   pointing the object in his direction?

9       A.   That -- yes, that he was pointing a gun at him.

10      Q.   Do you remember reviewing Officer Silva's

11  deposition in which, under penalty of perjury, he

12  testified that the decedent was pointing the object in

13  his hands at his partner, Officer Van Dragt?

14      A.   No.  He thought Officer Van Dragt had been shot

15  when the person was coming towards him with the gun.

16  And he was -- he didn't have any cover and he thought --

17  he thought, "Well" -- you know what he thought, he said,

18  "I thought of my kids."

19      Q.   But you don't recall the deposition testimony

20  of Officer Silva, saying that he thought the decedent

21  was pointing the object in his hands at Officer

22  Van Dragt?

23      A.   Which would have been the same direction of --

24           (Simultaneous speakers.)

25           (Reporter clarification.)

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 53

```
1            THE WITNESS:  -- himself, also, Silva.

2            MS. NASH:  Yeah.  The objection was that it

3    assumes facts, Misstates the prior testimony, and

4    argumentative.

5            Mr. Engler, before you answer a question, could

6    you just kind of pause, so that I can get in an

7    objection?  Actually, so much time goes by that my

8    objection gets lost, and it's hard for the court reporter

9    to take both of us down.

10           So if you could just kind of hold back on your

11   answer just a minute -- just a second, actually, and I

12   can get in and lodge an objection, I think that will make

13   things go more smoothly.

14           THE WITNESS:  Okay.  And your video is going in

15   and out.  I don't know what you would -- how would you --

16   it stops and, like, you're frozen now.

17           MS. NASH:  I'm frozen now?  Okay.  I'll switch

18   devices.  We can go forward or go off the record for just

19   a minute, and I'll switch from the device I'm on now to

20   another one.

21           MR. MAYNE:  We can just stay quiet for a minute

22   while we wait for you.

23           MS. NASH:  All right.

24           (Pause.)

25           (Break taken.)
```

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 54

1  BY MR. MAYNE:

2      Q.   Okay.  First, I just wanted to go back to

3  something that came up earlier and make sure we're on

4  the same page.

5           Do you recall that inside the glasses case

6  there was a pipe found?

7      A.   Yes.

8      Q.   And that at the scene there was also a black

9  vape found on the ground?

10     A.   That is correct.

11     Q.   I just want to make sure I got it right, that

12  your opinion is that the object in the decedent's hands

13  was the glasses case with the pipe inside, and not the

14  black vape?

15     A.   Don't know which.

16     Q.   So in your report, could you please turn to --

17  one second, as I find the page.

18     A.   "Second" refers to "report."

19     Q.   In your February 10th report, could you turn to

20  page 29?

21     A.   I have it.

22     Q.   Here you have a heading that says:  "Alaniz

23  held a glasses case with his hands raised in front of

24  his chest."

25           But even though that's in your report, you're

SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Rod Englert on 02/20/2025

Page 55

1  saying now that you're not sure that it was a glasses

2  case that was in his hands?

3      A.   No.  I did not say that.

4           MS. NASH:  Objection.  Misstates prior

5  testimony.

6           (Reporter clarification.)

7           THE WITNESS:  I did not say that.

8  BY MR. MAYNE:

9      Q.   Okay.  So just so we have a clear record, in

10  your opinion, having reviewed all the evidence and the

11  testimony, what object do you think was in the

12  decedent's hands at the time he was shot?

13     A.   In my opinion, the glasses case was in his

14  hands.  It's 3 by 5 inches in size, brown.  And inside

15  of it was like a glass.  Not the vape, but the other

16  sort of smaller than the glasses case object.  That was

17  also in it when we looked at it.

18     Q.   When you had that meeting where you were doing

19  the reconstruction, did you take any video of the

20  meeting?

21     A.   No, there was no video.  There was the -- the

22  animators took video, but my team did not take video.

23     Q.   Did anybody take photos?

24     A.   Photos were taken that you should have.  They

25  were sent to you, I think.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 56

1    Q.   And in your report, you said part of the

2    process was to test different positions to see what was

3    consistent with the evidence; is that right?

4    A.   Yes.

5    Q.   Were pictures taken of the positions you took

6    that didn't end up being your conclusion?  In other

7    words, did you take pictures of the whole process or

8    only of the conclusion?

9    A.   The conclusions.

10    Q.   The shot that you think happened first went

11    through the collar.  And my understanding from your

12    report was you think that that was possible because the

13    decedent was bending forward and blading his body at

14    that time; is that right?

15    A.   Yes.  That would have been possibly the first

16    shot -- probably the first shot because of the height of

17    it was on Mr. Alaniz, and the height at 4 feet that it

18    was on the truck bed, the bed of the truck, as he was

19    bladed and going down.

20         He was a bent-over position as he was going

21    down.  Based upon a fact beyond change.  A fact beyond

22    change is something that can never be changed.  You have

23    the impact into the trailer.  You also have the entrance

24    and the lodged bullets in his person and in the collar.

25    Those can never be changed.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 57

1          And you depend upon those, and that's what

2    leads us toward giving the concluding opinion, all of

3    those facts.  People can lie, but the evidence can never

4    lie.

5       **Q.   And based upon the evidence, you're saying he**

6    **was bent forward because he was in the process of going**

7    **down?**

8       A.   Yes.  That he was bent forward as he was

9    charging, because he's going at a fast pace and that he

10   was bladed and bent forward.  That's why, if you take

11   the right thigh shot and you take the shoulder shot and

12   the collar, those are really close together only when

13   you're bent over, not when you're standing up.

14      **Q.   Now, could you turn to page 25 of your February**

15   **10th report?**

16          **On the third bullet point it says that:  "At**

17   **the time of the shot to the chest, Alaniz was leaning**

18   **forward and/or falling forward."**

19          **Did you mean that you're not certain whether he**

20   **was falling at that point?**

21      A.   Don't know; because it could have been a

22   combination of both, when, mind you, again, it's less

23   than a second.

24      **Q.   So, in your opinion, he could have been falling**

25   **at that point?**

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 58

 1     A.   He was falling at that point.

 2     Q.   **And we're on the same page that we're talking**

 3   **about the time of the shot to the chest?**

 4     A.   Yes, bullet point No. 3.

 5     Q.   **Did you physically examine the Taser barbs that**

 6   **came from Officer Van Dragt's Taser?**

 7     A.   Yes.  They were -- one of them was missing and

 8   was not booked into evidence, and then there was a Taser

 9   barb that had no indication on it that it had impacted.

10     Q.   **Did you test it for DNA or biological material?**

11     A.   No.

12     Q.   **Is it possible for small amounts of biological**

13   **material to be on an object but not visible to the naked**

14   **eye?**

15     A.   Yes.

16     Q.   **Can you rule out in your opinion that in this**

17   **case there was some small amount of biological material**

18   **on the barb that you examined?**

19     A.   There was no evidence that the barbs went into

20   anything biological.  The body was examined.  There was

21   no evidence.  Doesn't mean that it wasn't there.  And

22   then upon looking at the clothing itself, specifically,

23   it was examined to see if there were any barbs not only

24   in it, but a defect where a barb had gone in, and

25   there's no evidence of that.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 59

1    Q.    What would evidence of a barb going into

2    somebody's skin be?  Would a puncture wound be evidence

3    of that?

4        A.    Well, it would be considered a puncture wound,

5    like a little defect in the skin.  But this -- mind you,

6    there were a lot of abrasions and contusions that could

7    have been disguised if it were there, too.

8        Q.    Do you recall in the autopsy that there were

9    two puncture wounds noted on the decedent's right arm?

10       A.    No.  I don't recall two puncture wounds.  Could

11   you show that to me?

12       Q.    Yes, I can pull it up.

13       A.    And the picture, also.

14       Q.    While I find that, let me ask you a

15   hypothetical:  If there were two puncture wounds to the

16   right side of his body, given what you know about

17   everybody's position at the scene, would that be some

18   evidence that the Taser deployment was successful?

19            MS. NASH:  Objection.  Incomplete hypothetical,

20   Lack of foundation.

21            THE WITNESS:  It was specifically -- the body

22   was searched for darts penetrating the body, and there

23   was no evidence of that.  That --

24            And that was something that we also look for.

25   And so the medical examiner would have to have reported

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 60

1  that.  Could they miss it?  Yes.  But there's no evidence

2  of it, not only on the body, but also on the clothing.

3  There was no evidence of that.  And I'd like to see what

4  you're talking about.

5  BY MR. MAYNE:

6      **Q.   Yeah.  I'll pull up this page.  Can you see it?**

7      A.   Yes, sir, I can.

8      **Q.   Can you see on the right side it says:**

9  **"Possible puncture on the right arm of the decedent"?**

10     A.   I do.

11     **Q.   And then:  "Possible puncture on the left arm**

12 **of the decedent"?**

13     A.   I do.

14     **Q.   Did you consider that in forming your opinion**

15 **of whether the Taser barbs punctured the decedent's**

16 **body?**

17     A.   Well, Taser barbs have a unique puncture-type

18 wound because they have little barbs on it.  And there's

19 no evidence that these are Taser barbs.  And the medical

20 examiner would have noted that because he or she -- all

21 autopsies look for -- if there's a situation like this,

22 for Taser punctate.  None reported.

23     **Q.   Okay.  In the animation, the decedent has the**

24 **object in his hands all the way till the end when he**

25 **falls on the ground, and then the object leaves his**

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 61

1    hands.  I'm wondering, how did you decide that that is

2    what happened when you were making the animation?

3        A.    Well, there's evidence of an object, and in

4    that one-second time period when the shooting occurs, we

5    know, based upon the evidence and the resting position

6    of Mr. Alaniz, that he did go down.

7              And at some point in there, there's no evidence

8    to know exactly when the evidence was dropped, but we

9    know it wasn't dropped at his feet where he's seeing

10   running by the car door, but that it is around his body.

11   So it went down with his body.

12             So you don't take it out.  You leave it in,

13   because at some point it came out of the hand.

14       Q.    Could it have left the hand before he fell to

15   the ground?

16       A.    No evidence of that.

17       Q.    But there's also no evidence that it was in his

18   hand at the moment he fell to the ground.  Would you

19   agree with that?

20       A.    No.

21       Q.    So what's the specific evidence that it was in

22   his hand at the time he fell versus a moment before,

23   when he hadn't quite fallen yet?

24       A.    The one second when we know that it was in his

25   hands based upon the body-worn camera, and in that one

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 62

1  second we know that what causes him to go down are

2  gunshots to his person.  And in that one second, you

3  can't have any non-display or display of the weapon,

4  because we don't know exactly during that one second

5  that he's shot and going down, which is all very, very,

6  very fast.  Nobody knows.

7         So it was kept to the point that it went to the

8  ground.  If it wasn't exactly in his hand, it's got to be

9  close to his hand.

10     **Q.   So to restate your opinion, you're saying**

11  **nobody knows whether it was actually in his hand from**

12  **the time that the camera is obscured by Officer Silva's**

13  **hand and the time he falls to the ground; is that right?**

14         MS. NASH:  Objection.  Misstates prior

15  testimony.

16         THE WITNESS:  You asked me to re-think it.  The

17  evidence shows that when those shots began in that

18  one-second period of time, from where the body is, we

19  know he goes down.  And that's to that momentum that we

20  were talking about, the 6 feet, the 12 feet.  And I don't

21  know if you understand that yet.

22         But he goes down, and in that short period of

23  time, could I say it's exactly:  No, he carried it all

24  the way down to the ground and then threw it?  No.  Can I

25  say that he lost it as soon as he was shot?  No.  But

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 63

1  it's all right where his body is.

2           And we know that he started going down, and his

3  momentum has carried him forward to where the evidence is

4  around his body.  It's just common sense.

5  BY MR. MAYNE:

6      **Q.   Right.  I agree it's common sense.  I'm just**

7  **trying to understand what the scope of your opinion is.**

8           **So do you have an actual opinion about at what**

9  **point he lost contact with the gun [sic]?  Or is your**

10  **opinion that we can't really know that; that it happened**

11  **sometime between the first shot and the last shots?**

12           MS. NASH:  Objection.  Misstates prior

13  testimony.  And this witness has already asked and

14  answered this question.

15           You can go ahead and do it again, if you feel a

16  clarification is necessary.

17           THE WITNESS:  First of all, you called it a

18  "gun."  It wasn't a gun.

19  BY MR. MAYNE:

20      **Q.   Freudian slip.**

21      A.   That's okay.

22           But there's no way to know because it's out of

23  view.  But we know that in that short period of time --

24  again, less than a second -- when he's shot, he's going

25  to the ground.  He's already turned himself to the

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 64

1    shots, and he's going to the ground, and he's got the

2    "gun" [sic] pointed at him.  I said it, too, what is

3    thought to be a gun, when he goes down.

4        **Q.    Okay.  Thank you for bearing with me.  That**

5    **helps me understand.**

6            **So based on what you just said, it is possible**

7    **that at the moment of the shot to the chest --**

8            (Reporter clarification.)

9    BY MR. MAYNE:

10       **Q.    Based on what you just said, would you agree it**

11   **is possible that the decedent lost contact with the gun**

12   **a moment after the shot to the chest?**

13       A.    No, I won't agree to that.  You got to think

14   about time and momentum.  And at some point in that

15   time, the -- what was thought to be a gun is found next

16   to his body.  And that's somewhat, you know, away from

17   where the shooting first started, because of his

18   momentum.

19           So the camera does not pick up that at all.

20   But we know in that short amount of time, that less than

21   a second, that he's going down and is on the ground with

22   the objects around him.  Not back by the door.  Not back

23   where it started.  Not straight at his feet.  But it's

24   carried with that momentum of his person, his body.

25       **Q.    Okay.  Maybe it will help to look at the frame**

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 65

1    by frame, and I have some other questions about that,

2    too.  So I'll share this exhibit.  One second.

3            (Exhibit Number 1 was marked.)

4    BY MR. MAYNE:

5        Q.   So that is a frame-by-frame version of the

6    body-worn camera that was also zoomed in.  It was

7    produced by a defense expert, David Blake.

8            Have you seen this before?

9        A.   Yes.

10       Q.   Okay.  So --

11           (Simultaneous speakers.)

12       A.   I've seen it, but from our standpoint.  I don't

13   recall seeing it from David Blake.

14       Q.   Okay.  So I'm just going to scroll through and

15   just ask a couple questions.

16           At this point, does it appear that the decedent

17   is facing the body-worn camera?

18       A.   I cannot tell.  His head is pointed toward --

19   let's say I'm the body-worn camera, and it appears to be

20   looking at me, yes.  And it's in a running posture.

21       Q.   Could you describe, in your view, what

22   direction the decedent's body is going relative to the

23   camera?

24       A.   Straight at the camera.

25       Q.   And for the record, sorry, we were referring to

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 66

1    frame 7.  Is that -- can you just confirm that that's

2    your opinion about frame 7?

3        A.   Yes.

4        Q.   Do you notice a difference in the decedent's

5    posture between frame 7 and frame 9?

6        A.   Back up again to 7.  Okay.  Go forward again.

7             The leg has transitioned -- the left leg has

8    transitioned, yes, in a running posture.

9        Q.   This is frame 11.  Do you see the Taser to the

10   left on the frame?

11       A.   I do.

12       Q.   Is this around the time when the Taser had been

13   deployed?

14       A.   It would be around the time, yes.

15       Q.   Do you think the decedent's hands at this point

16   are still up and pointing the object at Officer Silva?

17       A.   Well, if you go to our photographs, they're a

18   little bit better than what you have here.  But you

19   can't tell with that particular photograph, from

20   Mr. Blake's rendition.

21       Q.   Okay.  So now getting back to the object in the

22   hand, here do you see in the video evidence that the

23   decedent still had an object in his hands?

24            MS. NASH:  Objection.  Lack of foundation.

25   You're asking this witness who did his own stills to talk

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 67

1  about somebody else's and interpret them.  I imagine you

2  have his stills.  But at any rate, it's still lack of

3  foundation, with this witness, with these particular

4  photographs or pictures, exhibits.

5          (Reporter clarification.)

6  BY MR. MAYNE:

7      Q.   **You can still answer, if you can.**

8      A.   Well, these photographs are insufficient and

9  not as having the same quality as the ones we have on

10  page 30.  If you look at that, you can clearly see.

11  It's from the BWC, with his hands in front of him,

12  holding a dark-colored item, with both hands pointed

13  towards Silva.

14          What your showing me there compared to what I

15  have on page 30 of my first report is totally different.

16  This one is not -- this is a frame by frame.  But if

17  you -- again, there's more there that can be seen as

18  opposed to what you see here.

19          Clearly, you see the Taser.  You see Van Dragt

20  trying to run away.  And that's the chaotic part of this

21  that I talked about.  And you can see Silva with his

22  weapon pointed toward this very dark object.  So if

23  that's all that I could see, then I would -- then I

24  would be in error to say he's holding an object.

25          But when you look at it clearly, based upon

SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Rod Englert on 02/20/2025

Page 68

1   this report that's in front of you, I think you can even

2   see what appears to be something pointed at him that he

3   interprets as a gun, as he's coming around -- rounding

4   the corner around the driver's door.

5       Q.   Understood.  So at this point I'll ask it this

6   way -- at this point, in your opinion, does he still

7   have that object in his hands?

8       A.   Upon looking at what you're showing me on the

9   Zoom call?

10      Q.   No.  Just based on your opinion of what

11  happened.  Not based on this picture.

12      A.   Yes.

13      Q.   Okay.  That's all I was trying to get at.

14           Now, going forward, at this point, frame 13,

15  Officer Silva's hands start to come up and obscure our

16  view of the decedent and his hands.  Would you agree

17  with that?

18      A.   Yes.

19      Q.   Would you agree that after this point, we no

20  longer have a visual on the decedent's hands?

21      A.   Your question --

22           MS. NASH:  Objection.  Foundation.  Misleading

23  to the witness.

24  BY MR. MAYNE:

25      Q.   I can go through, first, just the frames.  So

SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Rod Englert on 02/20/2025

Page 69

1    we'll start at 13, and I'll just go through the

2    shooting, so give me one second to do that, and you can

3    look along.

4           Oh, I think I stopped a little early.  One

5    second.

6           Okay.  So I don't want to waste too much of our

7    time trying to find the right exhibit.  So what I'm

8    trying to get at is there's a period of time between when

9    Officer Silva's hands come up, obscuring our view of the

10   decedent's hands and the time that the decedent's body is

11   seen on the ground later in the body-worn camera.

12          Would you agree that between those times, we

13   don't see the decedent's hands.

14   A.    I agree you don't see what has happened, what

15   the evidence shows us.  I do see that.  That doesn't

16   change the opinion, because of time, compressed time of

17   less than a second.

18   Q.    So in your opinion, you stated that the

19   shooting happened over the course of about 1.25 seconds;

20   is that right?

21   A.    The shooting occurred -- all the five shots

22   occurred less than a second.  The Taser went off

23   simultaneous, just like a half-second before that

24   occurred.  And all of this occurred within a 4-second

25   time period from the time that Alaniz left the shoulder

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 70

1   of the road, ran around out of view of Silva, around the

2   back of the car, and out of the view because of the car

3   door being opened, when he sees something pointed at him

4   and someone running at him and decides to shoot.

5           And in that short period of time, again, you

6   don't see what the evidence tells you.

7       **Q.   On page 25 much your February 10th report, on**

8   **the second bullet point it says:  "A total 5 gunshots**

9   **were observed on the video recording for an extent of**

10  **approximately 1.25 seconds or less."**

11          **Is that still your opinion today?**

12      A.   Yes.

13      **Q.   So the time --**

14          (Simultaneous speakers.)

15          THE WITNESS:  Wait.  What page was that?  I'm

16  sorry to interrupt.  I want to look.

17  BY MR. MAYNE:

18      **Q.   25, of your February 10th report.**

19      A.   Yes.

20      **Q.   So would you agree that the five shots**

21  **happened -- we're measuring from the first shot to the**

22  **last shot -- in approximately 1.25 seconds?**

23      A.   Or less than a second, yes.  It's right at a

24  second.  And we're giving a conservative opinion and not

25  lower.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Rod Englert on 02/20/2025**

Page 71

1      Q.    Okay.  So let's say a second.  What I'm trying

2    to get at is it only takes a fraction of a second to

3    drop an object; right?  I mean, you can drop it -- it

4    doesn't take a second for an object to lose contact with

5    somebody's hand.  Would you agree with that?

6      A.    That's correct.

7      Q.    So what I'm trying understand is how you

8    decided in your opinion when the object in the

9    decedent's hand lost contact with his hand?  I know it

10   happened sometime within that one second of the gunshots

11   or shortly thereafter.  But how, in your reconstruction

12   of events, did you pin down the exact moment that the

13   gun lost contact with the decedent's hand?

14        MS. NASH:  Objection.  Misstates prior

15   testimony.  Object to the form of the question based on

16   Counsel's paraphrasing of prior answers.

17        THE WITNESS:  It wasn't stated by myself that

18   we determined when it was dropped.  It's real simple.

19   It's right next to his body.  And his body, with the

20   momentum, has carried him further than the point to where

21   the shooting started.

22        So that object is there, carried with the body.

23   Where it was dropped from his hand intentionally or

24   unintentionally, and in this case, in my opinion,

25   unintentionally because of force science, police

SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Rod Englert on 02/20/2025

Page 72

1  practices -- and I don't want to get into that, because

2  that was not my assignment -- but it's just simple that

3  it didn't drop by his side at any point by the car door

4  where the shooting began, but it was along side him where

5  he went to his position of rest.

6  BY MR. MAYNE:

7      **Q.   So I'm just trying to understand how you looked**

8   **at the evidence and ruled out that he could have lost**

9   **contact with the gun, let's say, at the time of the shot**

10  **to the chest, and that the gun -- I'm sorry -- the**

11  **object that was mistaken for a gun, carried on with its**

12  **momentum to rest where it ended up being found?**

13     A.   Well -- there's no evidence -- I'm sorry.  Go

14  ahead.  I'm sorry.

15          MS. NASH:  Objection to the form of the

16  question.  Compound.  Counsel is testifying, and so it

17  assumes facts not in evidence, and misstates the witness.

18          Sorry.  Go ahead.

19          THE WITNESS:  The evidence located the thing

20  that he had in his hand, shows that it was near his body

21  and not near the car door where the shooting started.  So

22  it's pretty easy to know that it had to still be in his

23  hands when he's carrying it to the ground when he's

24  incapacitated by the shots to his person, mainly the one

25  that would be fatal to his chest.

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 73

1          So as he's going to the ground, the item is

2    going with him.  And in force science, that is not going

3    to happen.  He's not going to throw it down.  And the

4    officer, when he decides to shoot, when he sees the

5    threat, it happened so fast.  And during that time, we

6    know the gun didn't go up -- I said the "gun," too -- we

7    know the glasses case didn't go up above the view of the

8    BWC, but it went below it.

9          And it's carried along with where he comes to a

10   position of rest.  Had it dropped before that or thrown

11   down before that?  There's no evidence of that.

12   BY MR. MAYNE:

13       Q.   I'm just going to share one page from your

14    report.

15       A.   What page?

16       Q.   It's page 13 from your January 10th report.

17    And I have it here on the screen.

18          Can you see that?

19       A.   Yeah.  But I can look at it better on this

20   because that's -- it shows up on Zoom very small.

21          You said "page 13"?

22       Q.   Page 13 of the January 10th report.

23       A.   I have it.

24       Q.   So I'm just looking at the orange circle you

25    have around what's identified as the "eyeglass case."

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 74

1    And are we on the same page that the decedent's body was

2    found where the white line is -- or I'll let you

3    describe --

4         A.    Where the white line is --

5               (Simultaneous speakers.)

6    BY MR. MAYNE:

7         Q.    -- or your understanding where the decedent's

8    body rested relative to the white line?

9         A.    Yes.  He's in that area where the kit is from

10   one of the CHP units.

11        Q.    So the eyeglass case wound up some distance

12   away from the decedent's body.  Do you have an estimate

13   about how far that would be?

14        A.    No, I do not.

15        Q.    And the eyeglass case ended up there presumably

16   because it had forward momentum at the time it was

17   released from the decedent's hand; is that accurate?

18        A.    Yes, all the items that you have there.

19        Q.    So at the time of the first shot, if the

20   decedent's moving forward with the object in his hand

21   and loses contact with it, wouldn't that object still

22   have forward momentum to move forward?

23        A.    If he's moving with it, yes.  Especially if

24   he's running, yes.

25        Q.    So how do we know that the object fell out of

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 75

1  the decedent's hand after the shot, versus losing

2  contact with the decedent's hand at the time of the

3  first shot?

4      A.   This happened so fast, again, that after the

5  first shot, if he lost contact with it, there's no

6  evidence of it because that would have been back by the

7  car door of the CHP unit or closer to it.  Not ahead of

8  where the decedent has fallen, near that striped line,

9  the white line -- traffic lane line.

10          And he's in that area, but yet the glasses case

11  is in front of him.  He's not on this side of it, "this

12  side" meaning toward the large circle, where the

13  cartridge cases are.

14      Q.   Okay.  Thank you for bearing with me.

15          (Reporter clarification.)

16          MS. NASH:  Since we've been referring to the

17  reports and the witness has been testifying about that,

18  can we just mark each of them as exhibits?

19          MR. MAYNE:  Sure.  That's fine.  We can make

20  those Exhibits 2 and 3.  That's no problem.

21          So we'll make the January report Exhibit 2 and

22  the February report Exhibit 3.

23          (Exhibit Number 2 was marked.)

24          (Exhibit Number 3 was marked.)

25  BY MR. MAYNE:

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 76

1    Q.   Did you take any notes on the -- I think -- I

2    hope I haven't asked this already.  Have you taken any

3    notes related to the reconstruction meeting you had?

4    A.   Yes, you have those.  They were sent you to

5    yesterday.  A lot of -- a lot of notes.  There's two

6    sets of notes that I have here.

7          And the first set, you should have that.

8    That's our first meeting that went nowhere, in November.

9    And then you have 20-some-odd pages, 23 pages.  You have

10   those.

11         MR. MAYNE:  Okay.  Let me just look over my

12   notes.  I think we're almost done.  I want to see if I

13   missed anything, and then I'll finish up.  So maybe just

14   five minutes, and then we'll come back and wrap things

15   up.

16         (Break taken.)

17   BY MR. MAYNE:

18   Q.   Could you turn to page 40 of your January 10th

19   report, please?

20   A.   Okay.

21   Q.   In reviewing the evidence, how many shots did

22   you determine were shot by Officer Silva?

23   A.   Five.

24   Q.   And when you listened to the audio of the

25   body-worn camera, could you hear the Taser be deployed

**SANDRA KIRKMAN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
Rod Englert on 02/20/2025

Page 79

```
1  STATE OF CALIFORNIA)
                      ) ss:
2  COUNTY OF ALAMEDA  )

3

            I, KIMBERLY E. D'URSO, do hereby certify:
4

5           That the witness named in the foregoing

6  deposition was present remotely and duly sworn to testify

7  to the truth in the within-entitled action on the day and

8  date and at the time and place therein specified;

9           That the testimony of said witness was reported

10 by me in shorthand and was thereafter transcribed through

11 computer-aided transcription;

12          That the foregoing constitutes a full, true and

13 correct transcript of said deposition and of the

14 proceedings which took place;

15          Further, that if the foregoing pertains to the

16 original transcript of a deposition in a federal case,

17 before completion of the proceedings, review of the

18 transcript [x] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20 a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22 my hand this 7th day of March, 2025.

23 _____

24 KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```