**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA KIRKMAN, CARLOS ALANIZ, individually and successors-in-interest to JOHN ALANIZ, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA, RAMON SILVA, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-07532-DMG-SSC<br><br>*Honorable Dolly M. Gee*<br>*Hon. Mag. Judge Stephanie S. Christensen*<br><br>**DECLARATION OF COOPER ALISON-MAYNE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE #3 TO EXCLUDE OPINIONS OF PLAINTFFS POLICE PRACTICES EXPERT DEFOE**<br><br>Judge:      Dolly M. Gee<br>Hearing:   March 25, 2025<br>Time:       2:00 p.m.<br>Dept.:       Courtroom 8C<br><br>FPTC:     March 25, 2025<br>Trial:        April 15, 2025 |

I, Cooper Alison-Mayne, hereby declare as follows:

1.      I am an attorney duly licensed to practice law in the State of California and the United States District Court for the Central District of California. I am one of the attorneys of record for the Plaintiffs Sandra Kirkman and Carlos Alaniz. I have personal knowledge of the facts contained herein and could testify competently thereto if called.

2.      Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts from the expert report of Plaintiffs' police practices expert Scott DeFoe, dated January 11, 2024.

3.      Attached hereto as **Exhibit B** is a true and correct copy of relevant excerpts from the expert report of Defendants' police practices expert Clarence Chapman, dated January 2, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of March, 2025, at Woodland Hills, California.

**LAW OFFICES OF DALE K. GALIPO**


By:    */s/ Cooper Alison-Mayne*
_____
Dale K. Galipo, Esq.
Cooper Alison-Mayne
*Attorneys for Plaintiffs*

# EXHIBIT A

## On-Scene Consulting

January 11, 2024

Mr. Dale K. Galipo, Esq.
Ms. Shannon Leap, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**SANDRA KIRKMAN and CARLOS ALANIZ, individually and as
successors-in-interest to JOHN ALANIZ, deceased; Plaintiffs,
vs.
STATE OF CALIFORNIA; RAMON SILVA; and DOES 1-10, inclusive,
Defendants.
Case No. 2:23-cv-07532-DMG-SJC.**

Dear Mr. Galipo and Ms. Leap,

Thank-you for retaining me to analyze and render opinions regarding the May 4, 2022, Officer-Involved Shooting incident at I-105 W/B, W/of Garfield Avenue, Paramount, California, which resulted in the death of Mr. John J. Alaniz. Pursuant to the requirements of Rule 26, I have studied reports, Transcriptions of Digitally Recorded Depositions, California Highway Patrol documents, and other material (<u>as listed under Materials Reviewed</u>) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Complaint for Damages, Case No. 23CMCV01174.

2. County of Los Angeles, Autopsy Report, No. 2022-04841, John Alaniz & Miscellaneous Documents.

3. Deposition Transcript and Exhibits of John Van Dragt taken on April 9, 2024.

4. Deposition Transcript and Exhibits of Ramon Silva taken on March 6, 2024.

5. Mental Health Services Resource Guide for the California Highway Patrol, (State of California 003800-003905).

6. California Highway Patrol Crisis Intervention, Course Control Number: 1270-20801, Expanded Course Outline, (State of California 003918-003919).

7. CITC Learning Activities, Learning Activity #1, "Stigma," (State of California 003920-003923).

8. Crisis Intervention Training Course, (CITC), 16-Hour Lesson Plan, August 2020, (State of California 003924-003969).

9. CITC Annex C, Media List, (State of California 003970-003971).

10. CITC Power Point, Crisis Intervention Training, (State of California 003972-004059).

11. CITC Pre-Test 2019, (State of California 004060-004061).

12. CITC Annex A, Safety Brief, (State of California 004062).

13. CITC Annex A, Safety Plan, (State of California 004063-004066).

14. California Highway Patrol, Crisis Intervention Training Unit, Course Hourly Time Line, Crisis Intervention Training Course, (State of California 004067-004068).

15. POST Learning Domain 37, Power Point, (State of California 004069-004153).

On-Scene Consulting

16. State of California, Health and Human Services Agency, Application for up to the <u>72-Hour</u> Assessment Evaluation and Crisis Intervention or Placement for Evaluation and Treatment, (<u>State of California 004154-004155</u>).

17. California Highway Patrol Manual, <u>100.69</u>, <u>Chapter 13-2020</u>, (<u>State of California 004156-004173</u>).

18. California Highway Patrol Manual, <u>Chapter 13, Crisis Intervention,</u>
(<u>State of California 004172-004189</u>).

19. November 15, 2021, Expanded Course Outline, Regular Basic Course, <u>Learning Domain No. 37,</u> People with Disabilities, (<u>State of California 004190-004196</u>).

20. California Highway Patrol, <u>Learning Domain No. 37</u>, People with Disabilities, Hourly Distribution 2021, (<u>State of California 004197</u>).

21. <u>Learning Domain No. 37</u>, People with Disabilities Lesson Plan,
(<u>State of California 004198-004222</u>).

22. <u>Learning Domain No. 37</u>, Scenario Presentation,
(<u>State of California 004223-4229</u>).

23. Training and Testing, Specifications for Learning Domain No. 37, People with Disabilities, 4/1/2022, (<u>State of California 004230-004237</u>).

24. Basic Course Book Workbook Series, Student Manuals, Learning Domain No. 37, People with Disabilities, (<u>State of California 004238-004375</u>).

25. Lanterman Petris Short Act-5150 Welfare & Institution Code, Detainment Advisement, (<u>State of California 004376-4377</u>).

26. California Department of Justice, Ramon Silva, Transcript of Interview of CHP Officer Enrique Ramos, <u>ROI-BI-LA2022-00016</u>, (<u>DOJ 00001-68</u>).

27. Transcript of Audio-Recorded Interview of Jonathan Van Dragt taken on 5/10/22, (<u>DOJ 00069-146</u>).

On-Scene Consulting

28. Transcript of Recorded Dispatch Transmissions on 5/4/22, (DOJ 02425-2453).

29. Taser Pulse Log Graph, Serial No. X3000524V, 5/4/22, (DOJ 02614-2615).

30. Los Angeles Communication Center, Incident Log and Log Letter,
(State of California 000227-311).

31. Axon Body 2, X81626525, Silva, 5/4/22, Video Redacted, (9:33),
(State of California 00001).

32. California Highway Patrol, 36, Evidence Report, (State of California 00182-189).

33. California Highway Patrol, Crime Scene Log, (State of California 00200-218).

34. Academy Firearm Inspection Report, Taser Deployment Report & Miscellaneous
Documents, (State of California 00219-226).

35. State of California, CHP 271-Critical Incident, Potential Liability
Documentation/Material Checklist, (State of California 00312-313).

36. State of California, CHP 330-Emergency Medical Report, Enrique Ramos,
(State of California 00315-318).

37. California Highway Patrol, Employee Training Records Request Training Records,
Officer Ramon Silva, ID No. 019056, (State of California 00337-348).

38. State of California, Department of California Highway Patrol, Multi-Disciplinary
Accident Investigation, Team Narrative/Diagram, Agency Case No. C22-501-003, MAIT
Supplemental, (State of California 00352-442).

39. Photographs, (State of California 00443-459).

40. Administrative Audio-Recorded Interview/Voluntary Statement of Officer E. Ramos,
220509_2302, (5:38).

41. After-Incident Handheld Video, (0:38), DSC_8073, (State of California 01095).

42. After-Incident Handheld Video, (0:35), DSC_8074, (State of California 01096).

On-Scene Consulting

43. Scene Photographs, (<u>State of California 001097-2253</u>).

44. CHP Training for CHP Officer Ramon Silva, (<u>State of California 02380-2395</u>).

45. California POST Training for Ramon Silva, <u>Badge No. 01956</u>, (<u>State of California 02396-2405</u>).

46. State of California, Department of California Highway Patrol, Risk Management, Use of Force Report for CHP Officer Ramon Silva, (<u>State of California 02406-2436</u>).

47. California Highway Patrol Academy/Cadet Training/Subject/Instructor Listing, CTC 1-08 & Miscellaneous Documents, (<u>State of California 02456-2644</u>).

48. California Highway Patrol, <u>HPM 70.8</u>, <u>Chapter 3</u>, Shooting Qualification and Training, Revised 1/2021, (<u>State of California 02767-2810</u>).

49. California Highway Patrol, <u>HPM 70.8</u>, <u>Chapter 1</u>, Use of Force, Revised 2020, (<u>State of California 02811-2832</u>).

50. California POST Training and Testing, Specifications for Learning Domain #20, Use of Force/De-Escalation, 4/1/2022, (<u>State of California 02833-2841</u>).

51. California Highway Patrol, <u>HPM 70.6</u>, <u>Chapter 6</u>, Radio Control Head, (<u>State of California 02842-2844</u>).

52. California Highway Patrol, Power Point Training, Learning Domain <u>No. 20</u>, <u>Modules 2-6</u>, (<u>State of California 02845-2853</u>).

On-Scene Consulting

<u>**California POST Basic Learning Domains as Follows:**</u>
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #15: "Laws of Arrest.
5. #20: "Use of Force."
6. #21: "Patrol Techniques."
7. #23: "Crimes in Progress."
8. #33: "Arrest and Control."
9. #34: "First Aid, CPR, and AED."
10. #35: "Firearms/Chemical Agents."
11. #37: "People with Disabilities."

<u>**Summary**</u>

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the <u>Materials Reviewed Section</u> of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

<u>**Statement of Facts:**</u>

On May 4, 2022, John Alaniz was likely experiencing a mental health crisis. At around 11:00 a.m. on that date, Mr. Alaniz walked alongside the right-hand shoulder of the westbound 105 freeway in Paramount, California. At some point, Mr. Alaniz jumped in front of a semi-truck that was travelling westbound. Mr. Alaniz was struck but survived. Mr. Alaniz then jumped in front of a pickup truck and then into the side of a van but also survived these impacts. Several witnesses to these impacts called 9-1-1, to report Mr. Alaniz's potential injuries. Dispatch sent a call out for an ambulance, and California Highway Patrol Officers also received notice of the pedestrian and vehicle impact, and several CHP Police Officers arrived on scene.

California Highway Patrol Officer Ramon Silva arrived on scene on his motorcycle unit around the same time as California Highway Patrol Officer Jonathan Van Dragt arrived in his SUV Patrol Unit. Officer Van Dragt parked his unit facing west bound at a 45-degree angle in the first lane to the left of the shoulder. Officer Silva drove his motorcycle unit eastbound on the shoulder and parked west of Van Dragt's Unit. Mr. Alaniz was walking along the shoulder, east of Van Dragt's unit. Officer Van Dragt approached Mr. Alaniz, who had his hands in his sweatshirt pockets. Van Dragt gave

On-Scene Consulting

orders to Mr. Alaniz to take his hands out of his pockets, to which Mr. Alaniz complied, showed that his hands were empty, and then put his hands back in his pockets. Van Dragt had his firearm unholstered at this time. Mr. Alaniz walked and then ran towards Officer Van Dragt, who repositioned to the west side of his patrol unit. As Mr. Alaniz approached ran towards Officer Van Dragt, with an object in his hands, Officer Van Dragt recognized that the object was not a firearm and therefore holstered his own duty weapon and unholstered his taser. Officer Van Dragt deployed his taser at Mr. Alaniz, as Mr. Alaniz rounded Officer Van Dragt's patrol unit. The autopsy report indicates that the taser barbs did penetrate Mr. Alaniz.

At approximately the same time, Officer Silva dismounted his motorcycle unit and unholstered his duty firearm. As Mr. Alaniz came into Officer Silva's view from Officer Van Dragt's vehicle, Officer Silva fired 5 rounds, striking Mr. Alaniz, who fell to the ground and subsequently died from his injuries.

## Opinions:

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  I hold the opinions below a reasonable degree of professional certainty.  The basis and reasons for my opinions are premised upon my education, training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my comprehensive materials listed on Pages 2-5 of this report.  My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions.  My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

## Opinion Number 1

It is my opinion based on my review of the facts, testimony, and the totality of the circumstances in this matter, a reasonable Police Officer would have initially determined Mr. John J. Alaniz was suicidal, mentally ill, and or experiencing a mental crisis.  It is my opinion that California Highway Patrol Officer Ramon Silva, No. 019056, failed to initially determine Mr. John J. Alaniz was suicidal, mentally ill, and or experiencing a mental crisis.

Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. John J. Alaniz who are suicidal, suffering from a mental illness or experiencing a

On-Scene Consulting

mental crisis. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional resources and equipment; provide reassurance that the Police Officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions. These correct and reasonable methods are well known and proven effective for the safety and welfare of both Police Officers and the public.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.

In addition, it is my opinion, California Highway Patrol Officer Ramon Silva, failed to properly recognize that Mr. John J. Alaniz was exhibiting "Suicide by Cop," ideations when they contacted him. "Suicide by Cop" is a method in which a suicidal individual deliberately behaves in a threatening manner with the intent to provoke a lethal response from a law enforcement officer to end their own life.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Chapter 2: Force Options, Communication, 2-11: Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

In addition, it is my opinion that California High Patrol Officer Ramon Silva, failed to comply with California Highway Manual, HPM 70.6, Revised December 2020, (State of California 002816):

b. De-Escalation:

On-Scene Consulting

(2). Policing requires that at times an officer must exercise control of a violent or resisting subject to make an arrest or to protect the officer, other officers, or members of the community from risk of harm.  While not every potential violent confrontation can be de-escalated, officers do have the ability to impact the direction and the outcome of many situations they handle, based on sound decision-making and the tactics they employ.

(a). When safe and feasible under the totality of circumstances, officers are required to utilize de-escalation techniques, crisis intervention tactics, and other alternatives to force. Officers should assess the risks and consider actions that may slow a situations momentum to prevent the need to utilize a higher level of force.  This would include utilizing effective communication tools, (e.g., advisements, warnings, verbal persuasion, and other tactics), and/or employing additional resources, (e.g., additional officers or mental health specialists).

In addition, I base my opinion on the following facts and testimony:

- According to California Highway Patrol Officer Ramon Silva, he believed the subject may have been suicidal or experiencing a mental health crisis, (Deposition Transcript of Ramon Silva, Page 24).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 2**

It is my opinion based on my review of the facts, testimony and the totality of the circumstances in this matter, a reasonable Police Officer would have initially determined Mr. John J. Alaniz was a Danger to Self and met the criteria for a 5150 Hold.  It is my

On-Scene Consulting

opinion, California Highway Patrol Officer Ramon Silva <u>failed</u> to initially determine whether Mr. John J. Alaniz was a <u>Danger to Self</u> and met the criteria for a 5150 Hold.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 37-Chapter 4: Persons with Mental Illness:</u> <u>Welfare and Institutions Code Section states that:</u>

- any people who
- as a result of mental disorder
- are a <u>danger to others</u>, a <u>danger to themselves</u>, or <u>gravely disabled</u>,
- may, upon probable cause
- be taken or caused to be taken.
- by a peace officer or other designated person
- to a designated facility
- for a 72-hour treatment and evaluation.

**<u>Danger to Self:</u>**  Danger to self as a result of a mental illness typically means the presence of suicidal thoughts, statements, or behaviors.

<u>Indicators that might lead an officer to believe that a person may be in danger to self-include, but are not limited to the individual's</u>:

- Words or actions that imply an intent to commit suicide or inflict bodily harm on self.
- Exhibition of gross neglect for personal safety could lead to that person receiving or being at risk or receiving serious injury.
- Statements or action implying a specific plan to commit suicide or inflict harm on self.
- Plans and means available or within that individual's ability to carry out.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 34-Chapter 5: Medical Emergencies, 5-17:</u>

Altered mental status may be indicative of a wide range of medical conditions and traumatic emergencies.

**<u>Symptoms of Altered Mental Status</u>**

- Confusion.
- Anxiety.

Page **10** of **31**

On-Scene Consulting

- Restlessness.
- Combativeness.
- Sudden Unconsciousness.

**First Aid Measures for Altered Mental Status may include:**

- Calm and reassure the victim.
- Change environments.
- Identify possible causes.
- Provide appropriate care.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Police Officer, Detective and Sergeant, I have appropriately determined at hundreds of incidents that a subject was a <u>Danger to Self</u>, <u>Danger to Others</u>, and or <u>Gravely Disabled</u>, and took the proper course of action by taking that individual(<u>s</u>) into custody for treatment.

## <u>Opinion Number 3</u>

It is my opinion based on my review of the facts, testimony, and the totality of the circumstances in this matter, a reasonable Police Officer would have established an inner and outer perimeter around I-105 W/B, W/of Garfield Avenue, Paramount, California, to contain Mr. John J. Alaniz.  In addition, a police helicopter, (<u>Air-Ship</u>) was responding to the area and could assist with the deployment of additional California Highway Patrol Officers to shut down the freeway and contain Mr. John J. Alaniz.

It is my opinion based on my review of the facts, testimony and the totality of the circumstances in this matter, the Defendants to include California Highway Patrol Officer Ramon Silva, <u>failed</u> to contain Mr. John J. Alaniz in the area of I-105 W/B, W/of Garfield Avenue, Paramount, California to include shutting down the freeway until he was safely in custody.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, Establishing a Perimeter, (2-9)</u>: It is the responsibility of the primary officer to initiate the coordination of security and containment of the crime scene.  This can be done by establishing a perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress or to contain a suspect.  <u>Establishing a perimeter</u>:

- Contains and isolates the crime scene.

On-Scene Consulting

- Prevents the suspect from escaping the area.
- It prevents unauthorized entry into the area.
- Can aid in apprehending the suspect.

There are two types of perimeters at a crime scene: **inner perimeter** and **outer perimeter:**

**Inner Perimeter:**

- Immediate area around the incident (e.g., private residence, commercial establishment, vehicle, etc.).

**Outer Perimeter**:

- Area surrounding the inner perimeter.
- Established to further contain and isolate the crime scene.

The outer perimeter may aid in apprehension if the suspect manages to breach the inner perimeter, providing protection and cover for inner perimeter officers, providing traffic control, assisting in public safety.

Law enforcement officers are taught in their respective law enforcement academy and throughout their careers to always use available cover, especially on calls for service and tactical situations that involve or may involve a weapon.

According to POST Learning Domain 21, "Officers must approach every contact with officer safety in mind. Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 4

It is my opinion based on my review of the facts, testimony, and the totality of the circumstances in this matter, a reasonable Police Officer would have immediately tactically retreated or moved to a position of cover, if possible, to properly and safely manage this tactical incident.

In addition, it is my opinion based on my review of the facts, testimony and the totality of the circumstances in this matter, California Highway Patrol Officer Ramon Silva, should have tactically retreated or moved to a position of cover, if possible, to properly and

On-Scene Consulting

safely manage this tactical incident. Police Officers are taught or should be taught to
establish <u>Time and Distance</u>.

In addition, I base my opinion on <u>California Police Officer Standards and Training</u>
<u>(POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical</u>
<u>Considerations, Tactical Approach</u>: Peace officers should always be aware of
surrounding objects or areas that may be utilized for cover or concealment.

**<u>Cover</u>:**
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received (<u>firearm, shotgun,</u>
  <u>rifle</u>).

**<u>Examples of Cover:</u>**
- Cement block or brick walls.
- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, I base my opinion on <u>California Police Officer Standards and Training</u>
<u>(POST), Learning Domain No. 21-Officer Safety While on Patrol, Chapter 1: Basic</u>
<u>Concepts of Law Enforcement Patrol</u>:

**<u>Be aware of and use available cover:</u>**
- In every situation, identify items that would provide adequate cover if needed.
- Use or be ready to use, and/or move to cover when necessary.

**<u>Ask for backup when necessary:</u>**
- If assistance is requested, wait for that assistance to arrive before abandoning
  cover or acting.

**<u>Be aware of distance and positioning:</u>**
- Identify, plan, then move to positions of advantage.
- Avoid abandoning a safe location or rushing into a potentially dangerous situation.

In addition, I base my opinion on <u>California Police Officer Standards and Training</u>
<u>(POST), Learning Domain No. 23-Crimes in Progress, Chapter 4: Responding to Other</u>
<u>High-Risk Situations</u>: Not all suspects involved in a high-risk situation will be willing to
comply with an officer's commands. Responding officers may encounter individuals
who are mentally ill, emotionally disturbed, or even suicidal.

On-Scene Consulting

**Police Officer's Reactions:**
- Work as a team,
- Maintain communications with dispatch and other involved officers,
- Move slowly and methodically,
- Rely on known tactics and procedures while also remaining flexible enough to adapt or improvise if necessary, and
- Exercise emotional restraint and self-control.

**Safety Precautions:**
- Use available cover and concealment.
- Always maintain a position of advantage.
- Do not rush.
- Guard against being impatient (Time is usually on the officer's side).
- Wait for requested backup/assistance to arrive before acting.

**Communications Between Police Officers:**

In order to ensure officer safety and help ensure an appropriate outcome, the Contact Officer, and Cover Officer(s) must effectively communicate with one another. Appropriate communication involves:
- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.

In addition, by moving to a position of cover, it would have allowed the involved Police Officers to slow down and de-escalate the situation by utilizing effective verbal strategies and de-escalation techniques.

Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 2: Patrol Methodologies and Tactics, 2-45:

**Plan of Action:**

On-Scene Consulting

- Officers should discuss safety factors as well as possible plans for acting in situations involving fleeing subjects.
- Plans may include coordination of who will transmit radio traffic.
- Appropriate use of escalation of force.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol, 1-21</u>:

**<u>Inappropriate Attitude:</u>**
- Careless or complacent.
- Overconfident.
- Too aggressive.

**<u>Poor or No Planning:</u>**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

As set forth in <u>POST Learning Domain 22</u>, "Officers are trained to work together and function as a team.  In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves advising the primary officer of any critical occurrences or safety issues."

In addition, I base my opinion on <u>California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20-Chapter 2-Deescalation, (State of California 002677)</u>:

<u>Tactical repositioning</u> is often utilized for officer safety, and it can also be considered as a de-escalation technique.  An officer being less, or more, visible can affect the actions of others.  The vantage points from which officers observe must provide for officer safety.  Different positions may also direct someone's attention elsewhere, draw them away from threats, and/or help deescalate a situation.

In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of calls for service to assist with containment, perimeter tactics and K9 searches.

On-Scene Consulting

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 5**

It is my opinion based on my review of the facts, testimony, and the totality of the circumstances in this matter, the Defendants to include, California Highway Patrol Officer Ramon Silva <u>failed</u> to formulate a safe tactical plan. Police Officers are taught, <u>Time and Distance</u>.

Police Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack.

The tactical plan that should have outlined verbal skills (<u>defusing and de-escalation techniques</u>) and <u>Less Lethal Force options such as</u>: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the X-26 Electronic Control Device (<u>ECD</u>) Taser with an effective range of <u>7-15 feet</u> and maximum range of <u>21-25 feet</u>, Ballistic Shield, K9, Pepper Ball Launcher with a maximum effective range of 60 feet, 40MM Foam Baton Round and or Direct Impact CS Round,, ASP/ baton, or Oleoresin Capsicum "OC" spray with an effective range of <u>2-15 feet</u>.

The Direct Impact 40Mm CS Foam Round could have been safely deployed from a distance of 120 feet.

The 40MM eXact Impact Round could have been safely deployed from a distance of 131 feet.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (<u>SWAT</u>) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.  In In addition, I base my opinion as a former Long Range Impact Device Instructor, (<u>40MM/37MM/Remington</u>

On-Scene Consulting

870 Bean Bage Shotgun), during my tenure as a Los Angeles Police Department Sergeant
II+1 at Metropolitan Division K9 Platoon and as a Sergeant II+1 assigned to
Metropolitan Division Special Weapons and Tactics, (SWAT).

 The Taser is an Electronic Controlled Device (ECD) as defined by the manufacturer,
Axon.  It is a handheld, battery operated tool which uses controlled electrical current
designed to disrupt a person's sensory and motor nervous system by means of deploying
electrical energy sufficient to cause temporary uncontrolled muscle contractions, or
Neuro Muscular Incapacitation, ("NMI").  As a result, the electrical energy can override
the person's voluntary motor responses for a brief duration.  The use of Taser ECD
deployment resulting in NMI may provide a brief opportunity during which physical
restraint procedures can be initiated whenever practical.

In addition, I base my opinion on California Police Officer Standards and Training
(POST), Learning Domain No. 21-Chapter 2: Patrol Methodologies and Tactics, 2-45:
Plan of Action:
- Officers should discuss safety factors as well as possible plans for action.
- Plans may include coordination of who will transmit radio traffic.
- Appropriate use of escalation of force.

In addition, I base my opinion on California Police Officer Standards and Training
(POST), Learning Domain No. 21-Chapter 1: Basic Concepts of Law Enforcement
Patrol, 1-21:

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

As set forth in POST Learning Domain 22, "Officers are trained to work together and
function as a team.  In order to ensure officer safety and to ensure an appropriate
outcome, the primary officers and cover officers must effectively communicate with one
another.  Appropriate communication involves advising the primary officer of any critical
occurrences or safety issues."

On-Scene Consulting

In addition, I base my opinion on <u>California Commission on Peace Officers Standards
and Training, Student Materials, Learning Domain, No. 21-Chapter 1: Basic Concepts of
Law Enforcement Patrol,1-22:</u> The element of officer safety refers to the practical
application of tactically sound procedures to perform law enforcement activities in a safe
and effective manner to include the utilization of available resources.  Some of the
available resources in this situation can include calling for backup officers, waiting for
and deploying backup officers; remaining in a position of advantage, cover, and
concealment; issuing commands and verbalization from a position of cover; using less-
than-lethal and other tactics that officers are trained to use in these situations.

In addition, I base my opinion on my twenty-eight years of law enforcement experience
where I responded to thousands of calls for service and have effectively utilized defusing
techniques, de-escalation techniques, verbal strategies, and active listening skills to
reduce the potential for violence and bring the emotional level of the incident to a
manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and
specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department
Special Weapons and Tactics (<u>SWAT</u>) where I supervised hundreds of SWAT incidents
that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.

**<u>Opinion Number 6</u>**

It is my opinion that a reasonable Police Officer acting consistent with standard police
practices and outlined in the <u>California Commission on Peace Officers Standards and
Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages
3-4,</u> would have given a verbal warning to Mr. John J. Alaniz that he was going to fire his
service weapon.  The Supreme Court applied the reasonableness test set forth in the
Fourth Amendment (<u>Tennessee v. Garner</u>), "*some warning be given prior to the use of
deadly force where feasible*…"  It is my opinion based on my review of the facts,
testimony and the totality of the circumstances in this matter, California Highway Patrol
Officer Ramon Silva <u>did not</u> give a verbal warning to Mr. John J. Alaniz and give Mr.
John J. Alaniz opportunity to comply prior to firing his Smith & Wesson M&P, 40
caliber semi-automatic pistol six times killing Mr. John J. Alaniz.

On-Scene Consulting

In addition, it is my opinion that California High Patrol Officer Ramon Silva, <u>failed</u> to comply with <u>California Highway Manual, HPM 70.6, Revised December 2020</u>, (<u>State of California 002818</u>):

(<u>b</u>). Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to California Highway Patrol Officer Jonathan Van Dragt, he didn't hear anyone say, "drop it," before he deployed his Taser, (<u>Deposition Transcript of Jonathan Van Dragt, Page 39</u>).
- According to California Highway Patrol Officer Ramon Silva, he never gave a verbal warning that he would shoot, (<u>Deposition Transcript of Ramon Silva, Page 47</u>).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 7**

It is my opinion based on my review of the facts, testimony, and the totality of the circumstances in this matter, a reasonable Police Officer acting consistent with standard police practices would <u>not</u> have used lethal force in this situation.

It is my opinion based on my review of the facts, testimony and the totality of the circumstances in this matter, California Highway Patrol Officer Ramon Silva used unnecessary, unreasonable and inappropriate force when he shot and killed Mr. John J. Alaniz as he was not an imminent threat of serious/great bodily injury or death to the Officers or a citizen(<u>s</u>).

On-Scene Consulting

Imminent means: a threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)).

Fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm but is one that from appearances must be instantly confronted and addressed. (Penal Code Section 835a).

In addition, it is my opinion based on my review of the facts and videos in this matter, California Highway Patrol Officer Ramon Silva, violated with failed to comply with California Highway Manual, HPM 70.6, Revised December 2020, (State of California 002817-2818):

e. Deadly Force: An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life.  In determining whether deadly force is necessary appears to be necessary, officers shall evaluate each situation in light of a particular circumstances of each case.  If it is reasonably safe and feasible to do so, officers shall use other available resources and techniques.

(2). Apprehension

(d). Deadly force for apprehension of a person shall be used only when all other reasonable means of apprehension have been exhausted and, if under the totality of the circumstances perceived by the officer, the use of a firearm is not likely to endanger innocent persons.

(3). An officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer to another.

On-Scene Consulting

**Considerations Regarding the Use of Deadly Force**

The use of deadly force is the most serious decision a peace officer may ever have to
make.  Such a decision should be guided by ***the reverence for human life*** and used only
when other means of control are unreasonable or have been exhausted.  Reverence for
life is the foundation on which deadly force rests.  Deadly force is always the last resort
used in the direst of circumstances.  The authority to use deadly force is an awesome
responsibility given to police officers by the people who expect them to exercise that
authority judiciously.  In the law enforcement/community partnership, peace officers are
expected to be self-disciplined, accountable, and in turn, the community is expected to
support its peace officers.

Officers are trained at the POST Basic academy, and the use of force must meet an
"*Objectively Reasonable"* standard.  The following quote from POST typifies the training
(emphasis added):*"A reasonable officer* is defined as an officer with similar training,
experience, and background in a similar set of circumstances, who will react in a similar
manner."(Learning Domain #20; "Introduction to the Use of Force, " pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community
expectations regarding their powers of arrest and use of force by POST certified police
officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it
comes from the will and consent of the people who *put their trust in law enforcement to
use that power with the utmost care and restraint.*  This is why it is important to
emphasize that peace officers do with the utmost care and restraint, *not confer* "*police
powers*" *on themselves*.  These powers come to the criminal justice system from the
people they serve.  (Learning Domain #2: "Criminal Justice System," page s 1-4,
Emphasis added). Additionally, an entire chapter in POST Learning Domain #20 is
devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was
not necessary or appropriate." Also, POST specifies that there are a number of key

On-Scene Consulting

factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard. The "totality of the circumstances" means the information available to the officer at the time of the use of force, including other available alternatives if feasible and whether the officer should or did know that the person against whom the officer uses force was suffering from a physical, mental, developmental, or intellectual disability. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual perceived circumstances.* POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added). Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).
A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

In addition, I base my opinion on California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20-Chapter 2-Deescalation, (State of California 002690): The subject's actions and practical consideration involved in a situation are major factors in determining the type of force the officer may lawfully use in order to gain or maintain control of the subject or the situation.

Actively Resistant: Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody.

Possible Force Options:
- Control holds and techniques to control the subject and situation.
- Use of personal body weapons to gain advantage over the subject.

On-Scene Consulting

In addition, I base my opinion on California Commission on Peace Officers Standards
and Training, Student Materials, Learning Domain, No. 20-Chapter 4-Use of Deadly
Force, (State of California 002710): According to Penal Code Section 835a, fear alone
does not justify the use of deadly force.  An imminent harm is not merely fear of future
harm, no matter how great the fear and no matter how great the likelihood of the harm but
is one that from appearances must be instantly confronted and addressed.

The courts have held that:
- A simple statement of fear for your safety is not enough; there must be objective
  factors to justify your concern.
- It must be objectively reasonable.
- It must be based on the facts and circumstances known to the officer at the time.

In addition, I base my opinion on the following facts and testimony:
- According to California Highway Patrol Officer Jonathan Van Dragt, the object
  that Mr. John J. Dragt had in his hand didn't match a firearm, so he transitioned
  from his firearm to his Taser, (DOJ00087).
- According to California Highway Patrol Officer Jonathan Van Dragt, he didn't
  have any information that anyone had been injured or threatened or that anyone
  had a gun or knife, (Deposition Transcript of Jonathan Van Dragt, Page 11).
- According to California Highway Patrol Officer Jonathan Van Dragt, he believed
  the item that Mr. John J. Alaniz was too big to be a gun, so he transitioned to his
  Taser, (Deposition Transcript of Jonathan Van Dragt, Page 24).
- According to California Highway Patrol Officer Jonathan Van Dragt, he never
  heard Mr. John J. Alaniz say anything, (Deposition Transcript of Jonathan Van
  Dragt, Page 24).
- According to California Highway Patrol Officer Jonathan Van Dragt, he could not
  identify the item as a firearm, so he didn't fire his firearm, (Deposition Transcript
  of Jonathan Van Dragt, Page 27).
- According to California Highway Patrol Officer Jonathan Van Dragt, he described
  the item as a subway sandwich and it appeared to be like a gray sunglass case,
  (Deposition Transcript of Jonathan Van Dragt, Page 28).
- According to California Highway Patrol Officer Jonathan Van Dragt, he wouldn't
  want to shoot someone just because the person is suicidal and in a shooting
  platform, (Deposition Transcript of Jonathan Van Dragt, Page 32).
- According to California Highway Patrol Officer Jonathan Van Dragt, Mr. John J.
  Alaniz, never punched or kicked him and never made physical contact with him,
  (Deposition Transcript of Jonathan Van Dragt, Page 11).

On-Scene Consulting

- According to California Highway Patrol Officer Ramon Silva, when looking at
  <u>Exhibit 5</u>, it obviously doesn't look like a gun, (<u>Deposition Transcript of Ramon
  Silva, Pages 60-61</u>).


In addition, I base my opinion on my twenty-eight years of law enforcement experience
where I responded to thousands of calls for service and have effectively utilized defusing
techniques, de-escalation techniques, verbal strategies, and active listening skills to
reduce the potential for violence and bring the emotional level of the incident to a
manageable level.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 8**

It is my opinion based on my review of the facts, testimony and the totality of the
circumstances in this matter, California Highway Patrol Officer Ramon Silva's, use of
lethal force violated Peace Officer Standards and Training and caused the unnecessary
death of Mr. John J. Alaniz, including but not limited to for the following reasons:

- Police Officers are trained that deadly force is the highest level of force a Police
  Officer can use.
- This was not an immediate Defense of Life situation.
- Police Officers are trained that deadly force can only be used as a last resort.
- Police Officers are trained that deadly force can only be used in the direst of
  circumstances.
- Police Officers are trained that deadly force is likely to cause great bodily injury or
  death.
- Police Officers are trained that they must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Police Officers are trained that they are responsible for justifying every shot.
- Subjective Fear is insufficient to justify using deadly force.
- Police Officers are trained that an overreaction in using deadly force is excessive
  force.

I base my opinion on my twenty-eight-year law enforcement career whereas a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

## Opinion Number 9

It is my opinion based on my review of the facts, testimony, and the totality of the circumstances in this matter, California Highway Patrol Officer Ramon Silva's, tactical conduct and decisions preceding the use of deadly force in this matter was inappropriate based on the totality of the circumstances. It is my opinion that there was a departure from POST Standards.  In addition, I base my opinion on the <u>California Supreme Court opinion in Hayes v. County of San Diego, 2013 Cal LEXIS 6652</u>. In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre-shooting conduct leading up to a deadly us of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 10

It is my opinion that the California Highway Patrol should have determined through its review process that the use of lethal force by California Highway Patrol Officer Ramon Silva was unreasonable, unnecessary and inappropriate.

In addition, it is my opinion based on my review of the facts, testimony and the totality of the circumstances in this matter, there was a failure by the California Highway Patrol to properly train California Highway Patrol Officer Ramon Silva on the following <u>subject matters</u>: Proper Response and Interaction with the Mentally Ill/Suicidal Subjects, Defusing Techniques, De-Escalation Techniques, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Cover and Concealment, Tactical Plan,  Situational Awareness and the use of Less Lethal, Lethal/Deadly Force.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## <u>My Qualifications for Reviewing this Case:</u>

My opinions are based on my education, training, and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent, GS-1811.  Upon

EXHIBIT B

NATIONAL JUSTICE CONSULTANTS, INC.

1014 BROADWAY • SUITE 350 • SANTA MONICA, CA 90401 • 310.429-2940 • crchapman@earthlink.net

Mr. Lee H. Roistacher, Esq.
Dean Gazzo Roistacher LLP
440 Stevens Avenue, Suite 100
Solana Beach, California 92075

Federal Rule of Civil Procedure 26 (a)(2)(B)
REPORT OF DEFENDANTS' POLICE PRACTICES EXPERT

Re:   *Sandra Kirkman, et al., v. State of California, et al.*
      U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC

Dear Mr. Roistacher,

Per my retention agreement in this case, the following is a preliminary report based on my review and evaluation of the below-listed case materials. Upon receipt of additional information and evidence on which to opine, I reserve the right to modify my findings and conclusions accordingly.

As a police practices expert in law enforcement policies, procedures, training, and tactics in the area of the use of deadly force, the focus of this report will be to formulate opinions regarding the actions of the California Highway Patrol (*hereinafter CHP*) Officers Ramon Silva (*hereinafter Officer Silva*) and Jonathon Van Dragt (*hereinafter Officer Van Dragt*) in the shooting incident involving John Alaniz (*hereinafter Alaniz*) on May 4, 2022, in Los Angeles County California.

In my analysis of this case, I did not assign credibility to any statements or testimony of plaintiffs, Defendants, or witnesses. All of my conclusions and opinions are based on the facts and evidence presented and applied against the backdrop of contemporary police training, policies, and best practices in the area of police use of deadly force. Additionally, all the opinions expressed herein are derived from the foundation of my training, education, and over 50 years of experience as a career law enforcement officer, California POST[1] instructor and current SB2 peace officer certification consultant, California State Chief of Police, Deputy United States Marshal, and police practices consultant at the local, State, and federal levels.

---

[1] Peace Officer Standards and Training Commission

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

I. Overview of Incident:

On May 4. 2022, at approximately 11:31 a.m., the CHP received a call of a pedestrian running into moving traffic causing a hazardous condition on the freeway. Information in the call indicated that the pedestrian, later identified as Alaniz, may be suicidal. Officer Van Dragt responded to the area of the I-105 westbound freeway west of the I-710 freeway transition road where he observed Alaniz standing on the shoulder of the freeway with his hands in his sweatshirt pockets. Officer Van Dragt parked his CHP patrol vehicle on the right shoulder and ordered Alaniz to show his hands. Alaniz initially raised his hands, but then immediately shoved them back into his pockets.[2]

Meanwhile CHP Officer Silva was monitoring the call over his radio and elected to assist on the call. Upon arrival, Officer Silva observed Alaniz standing with his hands in his pocket and failing to comply with Officer Van Dragt's orders. Officer Silva suddenly sees Alaniz running at a full sprint directly toward Officer Van Dragt while holding what appeared to be a silver object in his hand with his arms extending out in a shooting posture. At this point, Officer Silva absolutely believed Alaniz was holding and aiming a handgun as he rapidly closed the distance on Officer Van Dragt. Officer Silva gave Alaniz verbal commands to show his hands[3] as Officer Van Dragt then retreated backwards around the front of his patrol vehicle where Officer Silva momentarily lost sight of him causing him to fear for the safety of Officer Van Dragt.[4] However, unbeknownst to Officer Silva at the time, Officer Van Dragt had determined that the object in Alaniz's hands was not a handgun, though he still considered Alaniz to be a potential threat. Officer Van Dragt then transitioned to his Taser device and fired one cartridge of probes at Alaniz. The Taser application had no effect in stopping Alaniz from continuing his charging attack. Simultaneously, Officer Silva believed that the sound of Officer Van Dragt's Taser activation was a gunshot fired by Alaniz and for that a split-second feared that Officer Van Dragt had been shot.    Fearing that the life of his partner was in imminent danger of being killed, Officer Silva fired 5 rounds at

---

[2] Officer Van Dragt's interview, Bates Stamp DOJ00086
[3] Officer Silva's interview statement, page 16:20-24.
[4] Officer Silva's interview, Bates Stamp STATEOFCA000056

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

Alaniz to stop his deadly attack. Alaniz was subsequently struck by Officer Silva's shots causing him to fall face down to the ground with his hands obscured underneath his body.[5]

Assisting officers arrived and provided medical care for Alaniz who was subsequently transported to a local hospital where he died of his gunshot injuries.

II.  Data or Other Information Considered in Forming Opinions:

1. Plaintiffs' Complaint for Damages
2. Plaintiffs' Rule 26 Initial Disclosures
3. Defendants' Rule 26 Initial Disclosures
4. Defendant CHP's Responses and Documents Production to Plaintiffs' Request for Production of Documents, Set One
5. Defendants CHP Supplemental Responses and Documents Production to Plaintiffs Request for Production of Documents, Set One
6. Plaintiffs Responses and Document Production
7. Defendants Request for Production of Documents, Set One
8. Plaintiffs' Responses to Defendants Special Interrogatories, Set One
9. Copy of Stipulated Protective Order
10. CHP Critical Incident Reconstruction Report
11. California Department of Justice Report on the Investigation into the Death of John Alaniz, Bates Stamp STATEOFCA003769
12. MVARS Audio Recording – Officer Jonathon Van Dragt
13. BWC Footage – Officer Ramon Silva
14. Video Evidence - MVARS Footage
15. CHP 36 – Evidence Report
16. Academy Inspection Taser Deployment
17. Description of Critical Incident
18. Crime Scene Evidence Collection
19. Criminal Investigative Agency
20. Southern Division MAIT Supplemental Report #SS-035-22
21. Recorded Administrative Interview of Enrique Ramos
22. Recorded Administrative Interview of Jonathon Van Dragt
23. Recorded Administrative Interview of Officer Ramon Silva
24. Interview Transcript of Witness Evencio Horbino
25. Interview Transcript of Witness Ariley Zamera
26. Interview Transcript of Witness Mayra Castillo

---

[5] Officer Silva deposition, page 59:9-10.

Sandra Kirkman, et al., v. State of California, et al.
Report of Police Practices Expert Clarence R. Chapman
U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC

27. Administrative Interview Transcript of Witness Officer Jonatan Van Dragt
28. Administrative Interview Transcript of Witness Officer Ramon Silva
29. CHP Risk Management Use of Force Report
30. CHP Policies
    a. 70.6 Chapter 3
    b. 70.6 Chapter 1
31. PowerPoint Presentation: Deescalation – Module 4
32. Deposition of Officer Ramon Silva
33. Deposition of Officer Jonathon Van Dragt
34. Deposition of Sandra Kirkman
35. Deposition of Carlos Lopez Alaniz, Jr.
36. Deposition of Cecil Daniel Verdugo
37. Deposition of Andrew Acosta, Volume I
38. Ramon Silva POST Profile Report
39. Use of Force Equation, Bates Stamp STATEOFCA002850
40. 579 Photos of Vehicles on Scene of Vehicles Taken By Officer Crain
41. 266 Photos of Vehicles on Scene Taken by Officer Castaneda
42. 1351 Photos of Scene Taken by MAIT Team Officer Black
43. 626 Scene Photos Taken by MAIT Team Officer Castaneda
44. Video Footage of Suspect Attempting Suicide on Roadway, May 4, 2022
45. Attorney General Findings (PENDING)
46. Coroner's Report (PENDING)
47. Training Records
48. CHP 271 Critical Incident Checklist
49. POST Learning Domain 20

III.   Exhibits to be Used in Support of Opinions:

   1. Peace Officer Standards and Training (POST) Learning Domain #20: Use of Force
   2. Peace Officer Standards and Training (POST) Learning Domain #23: Crimes in Progress
   3. Peace Officer Standards and Training (POST) Learning Domain #37: People with
      Disabilities

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

IV. <u>Statement of Opinions</u>:

1. Officers Silva and Van Dragt had probable cause to respond to a call of a situation involving Alaniz who by his dangerous behavior was creating a serious safety hazard to public safety that endangered public safety.

2. Officer Van Dragt attempted to deescalate the situation by using verbal commands in an effort to get Alaniz to comply and avoid the necessity for the use of force.

3. When attempts at verbal commands proved to be unsuccessful, Officer Van Dragt appropriately attempted to incorporate the use of a less-lethal force option Taser device to stop Alaniz's threatening attack.

4. Officer Silva's use of deadly force was based on his independent observation of a situation created by Alaniz that led him to reasonably believe to be a gun attack on the life of a fellow police officer.[6]  In response, the use of deadly force by Officer Silva was necessary, justified, and objectively reasonable under the totality of the circumstances and consistent with California POST training standards under Learning Domain #20, CHP Use of Force policies under HPM 70.6 and generally accepted practices for police use of deadly force.

5. In this case, Officer Silva had no other reasonable or viable available alternatives other than the use of deadly force to protect the life of his partner officer and ultimately his life.  Specifically, due to the suddenness of Alaniz's attack and the distance from the threat, it would not have been possible for him to attempt to use a baton, Taser device, or pepper spray.

6. The tactics and ultimate use of deadly force by Officer Silva was consistent with that of any other well-trained and competent police officer similarly situated and faced with an immediate deadly life-threatening armed attack as created by Alaniz.

---

[6] Officer Silva's deposition, page 58: Q.: *"When looking at the object in his hands, did you see any identifiable parts of a gun like a grip or a magazine or a hammer or a trigger or a trigger guard, for example?"*  A.: *"I saw the barrel of a gun, a long barrel."*

Sandra Kirkman, et al., v. State of California, et al.
Report of Police Practices Expert Clarence R. Chapman
U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC

7.  Based on the rapidly evolving threat posed by Alaniz, Officer Silva had no time or opportunity to issue a verbal warning prior to his use of deadly force to defend his partner officer's life.

V.  <u>Reasons and Basis for Opinions</u>:

My opinions in this matter are based on the summary of the incident as recited above and a comprehensive review of the materials listed. My method in forming these opinions is the result of an analysis of the case-specific facts compared with identified case law, CHP policies and practices and relevant training via California POST training guidelines and my 42 years of active law enforcement experience, knowledge, training and education. My use of terminology such as "objectively reasonable," "appropriate," "necessary," and "justified" is intended only as references relevant to the applicable generally accepted law enforcement use of force standards. The intent of this report is to assist the trier of fact with a better understanding of law enforcement processes and methods and not proffered as conclusionary or determinative as to the ultimate issues of the case. Additionally, I do not make any judgements as to the resolution of disputes of material facts or to engage in credibility determinations regarding the statements and/or testimony of any plaintiff, Defendant, or witness. The following paragraphs describe the basis in forming my opinions:

1.  CHP HPM 70.6, Chapter 1, page 1-4, entitled Deadly Force, states that officers are authorized to use deadly force to defend themselves or others from what is reasonably believed to be an imminent threat of death or serious bodily harm.

2.  When Officer Silva observed Alaniz holding what appeared to be a gun and running in the direction of Officer Van Dragt in a manner that he reasonably believed to be a gun attack[7] and heard the sound of what he interpreted as a gunshot while simultaneously

---

[7] Department of Justice AB 1506 Report, page 9, figure 10. Bates Stamp STATEOFCA003779.

Sandra Kirkman, et al., v. State of California, et al.
Report of Police Practices Expert Clarence R. Chapman
U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC

seeing Officer Van Dragt side-stepping,[8] [9] he appropriately responded with deadly force in the protection of the life of his partner officer.[10]

3. CHP HPM 70.6 Use of Force policy requires officers to issue a *Garner Warning* when feasible before using deadly force.[11]  However, it is undisputed by the video evidence in this case, that Alaniz was in a full sprint with his arms extended in a shooting position advancing on a uniformed police officer who was initially pointing a firearm at him and later a Taser device.

4. Alaniz clearly represented an intentional act of an armed attack.  Therefore, based on these circumstances that he created it would be reasonable for any well-trained police officer to believe that he understood that he would be shot with either a firearm or a device if he did not stop his attack.

5. The sudden life-threatening attack by Alaniz prevented Officer Silva from assessing any possible mental illness or accident-based disability that may have caused his threatening behavior.  Regardless of any mental disfunction that may have affected Alaniz at the time, it was his perceived life threatening actions replicating a gun attack on the life of a uniformed police officer that justified Officer Silva's use of deadly force in the immediate defense of his partner.

6. Neither Officer Van Dragt nor Officer Silva had any prior knowledge or contact with Alaniz prior to this incident.  Therefore, it was not possible for them to determine within the time span of a matter of seconds that Alaniz's behavior may be a result of a mental disfunction and altered their initial contact.  Under POST guidelines, officers are trained to attempt to use alternatives to force when dealing with individuals suffering from some form of mental disability.  However, in this case, Alaniz clearly was an immediate threat to public safety and subsequently a threat to the lives of the officers.  Additionally, this was not a

---

[8] Deposition of Officer Silva, page 48:1-5.

[9] Department of Justice Los Angeles County AB 1506 Report, page 16 of Officer Silva's interview statement.

[10] California Department of Justice Report on the Investigation into the Death of John Joseph Alaniz on May 4, 2022, page 16. Bates Stamp STATEOFCA003786

[11] A "Garner Warning" is derived from U.S. Supreme Court case entitled; Tennessee v. Garner that states a verbal warning should be given before the use of deadly force where feasible. Refer to POST LD #20, Chapter 4, p. 4-5.

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

standoff or stationary situation where the officers had sufficient time or opportunity to summon mental health professionals to attempt to diagnose and resolve any mental disfunction that Alaniz may be suffering from until he could be safely controlled and restrained.

7. Through their training and patrol experience, police officers learn to read and draw reasonable conclusions from behavioral patterns displayed by a suspect and react accordingly. Specifically, when a suspect assumes a stance with his hands and arms in a position that is universally recognized by trained police officers to simulate the pointing of a handgun, a reasonable officer would interpret that situation as an immediate deadly armed attack requiring instantaneous defensive action to safeguard his/her safety.

8. POST Learning Domain #20: Chapter 4 – Use of Deadly Force, page 4 – 7, states "***imminent danger***" *means a threat when based upon the totality of the circumstances a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed (Penal Code Section 835 a(e)(2)).* In this case, it was reasonable for Officer Silva to believe that the actions of Alaniz constituted an imminent, immediate, and instantaneous threat to the life of Officer Van Dragt if he was able to continue his deadly assault.

9. Civilian witness Evencio Horbino who was driving near the scene, witnessed Alaniz running toward Officer Van Dragt. Mr. Horbino heard Officer Van Dragt tell Alaniz to stop and then sees Alaniz run faster toward the officer and then hears gunshots.[12]

10. Contemporary police training and policy instructs officers that the type and degree of force to use in a given situation must be based upon the perception of the officer and his state of mind at the time and not through 20/20 hindsight. In this regard, a

---

[12] Interview of Witness Horbino, Bates Stamp DOJ00170 & DOJ00172

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

"reasonableness at the moment" standard applies that requires fact finders to consider the unpredictable and rapid dynamics of a potentially deadly force encounter. In this case, due to the suddenness of Alaniz's attack on Officer Van Dragt, there was no opportunity for Officer Silva to use any reasonable force alternative in order to save the life of his partner other than the use of deadly force.

11. In police use of force cases, national standards of best practices instructs that the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. Additionally, any force used by police officers must be objectively reasonable based on the facts known to the officer at the time. In my analysis all of the force used by Officer Silva was consistent with this standard of care.

12. POST LD #20, Chapter 4, p. 4-4 instruct that any use of force should have at its basis an appreciation for the sanctity of life. According to their training, the foundation of an officer's decision to use deadly force is a reverence for all human life. Officer Van Dragt attempted to use verbal commands and less-lethal force options to afford Alaniz sufficient time and opportunity to surrender. Officer Silva properly issued orders to Alaniz to show his hands prior to his use of deadly force. According to the evidence and statements of witnesses,[13] it was Alaniz who disregarded these efforts and continued his threatening actions that caused Officer Silva to fear for his life and the life of Officer Van Dragt.

13. In consideration of national standards in directing officers in the use of force, officers must be judged by the standard of "reasonableness." When determining whether to use force and evaluating whether an officer has used reasonable force, a number of factors are taken into consideration. The key elements among these factors include:

   a. Officers are to be aware of the conduct of the individual being confronted.
   b. The proximity of weapons of any kind.
   c. The suspect poses an immediate threat to the safety of officers or others.

---

[13] Department of Justice Los Angeles County AB 1506 Report, page 19 of Witness 1's interview statement.

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

---

d. The seriousness of the threat.

e. And finally, the potential for injury to citizens and/or officers.

In my review of this case, I found that Officer Silva, based on his interview statements and deposition testimony, considered all of the above delineated areas prior to making his decision to use deadly force.

14. Based on national standards and best practices in police use of deadly force, there should always be an examination of alternative defensive methods and/or options that law enforcement could have considered short of lethal force. However, according to the facts of this case, there were no viable tactical or plausible alternative less-lethal force options that could have been deployed to stop Alaniz from committing what Officer Silva believed to be an immediate life-threatening attack.

15. Among the alternative measure that could have been taken but were inappropriate were chemical agents. Chemical agents such as pepper spray are not recommended or effective when deployed in open-air environments due to unpredictable wind disbursement that could cause cross contamination and unintended exposure to officers. Additionally, kinetic energy munitions such as bean bag projectiles, even if available are not accurate or reliable against an armed and charging suspect where varying factors such as body movement, wind direction, speed, and the clothing of the suspect can cause them to be ineffective, potentially leading to the death of an officer. And police K-9s by policy are not used in situations with armed suspects. Based on the totality of the circumstances presented to the officer at the time, they are not required to stop and avail themselves of the least intrusive means when there is no time or opportunity for such measures. And finally, there was no available or sufficient cover location for Officer Silva to take before stopping the running gun assault by Alaniz that threatened the life of his partner and potentially his own safety.

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

16. Officer Silva stated that he was unaware of the truck in his shooting backdrop prior to firing his shots.[14] However, it was a correct tactical decision based on the appropriate assessment of the level of threat to Officer Van Dragt that outweighed the consequences of an unintentional bullet strike. Specifically, Officer Silva's decision was correct based on the fact that any occupants of the heavy truck would have some protection behind the metal frame of the vehicle whereas Officer Van Dragt was unprotected out in the open with no advantage of cover and in the direct line of attack from the rapidly advancing Alaniz.

17. POST LD #37: <u>People with Disabilities</u>, Chapter 4, specifically states that persons suffering from mental illness may be a danger to others based on their aggressiveness and poor impulse control. It is undisputed that Alaniz had demonstrated an intent to cause bodily harm to others by his presumed intentional attack on Officer Van Dragt. Under this Learning Domain, POST trains that there are many indicators that help determine if people who appear to be affected by mental disorders are dangerous to themselves or others. Those factors include violent acts directed at officers. All of these conditions were present and obvious to the CHP officers during their encounter with Alaniz.

18. The mere presence of danger is not sufficient in and of itself to justify the use of deadly force. According to California POST guidelines, there must be a *sufficiency of fear* in order to justify and support the use of deadly force.[15] In this case, it was the actions of Alaniz running at Officer Van Dragt with what was perceived to be a handgun that reasonably caused Officer Silva to be in fear for the life of Officer Van Dragt.

19. In my review of this case, I took into consideration the influence of human factors involved in Officer Silva's defensive reaction to the immediate life-threatening attack by Alaniz. It is sometimes posed to officers that their every shot is a separate use of force and that they are responsible for assessing the effect of every use of force. While an evaluation of each individual application of force is appropriate for force applications such as Tasers, impact weapons, pepper spray, police K-9s and kinetic energy devices, firearm use of

---

[14] Officer Silva's deposition testimony, page 57:21-24.
[15] POST LD #20: Chapter 4 - Use of Deadly Force, page 4-8.

*Sandra Kirkman, et al., v. State of California, et al.*
*Report of Police Practices Expert Clarence R. Chapman*
*U.S.D.C. Central District of California Case No.: 2:23-cv-07532-DMG-SSC*

force is categorically different based on simple physics and human perception capabilities and therefore, not subject to the same type or measure of evaluative examination. Specifically, there is a reactionary gap in the human factors formula that governs what an officer is capable of knowing in a matter of a fraction of a second. In most situations, it is humanly impossible to immediately gauge the effect of a single gunshot on a rapidly advancing assailant fired from a .40 caliber handgun traveling at the approximate subsonic speed of 1,100 feet per second (fps)[16] before the next round is fired in less than a fraction of a second. Therefore, the assessment of the effect of bullets on a suspect struck by a continuous series of shots fired within a matter of 1 – 2 seconds, is considered a single use of force and therefore, must be judged by the moment that the threat has ended, and not by an impossible assessment after every pull of the trigger.

## VI.    Qualifications:

Please see attached curriculum vitae.

## VII.    Compensation:

Please see attached fee schedule.

## VIII.    Experience:

A supplemental attachment is included listing prior trial and deposition testimony.

Executed this 2nd day of January 2025, in Los Angeles County, California.

Clarence Robert Chapman

---

[16] 6th Edition Ammo Encyclopedia, 2017, page 765.